**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Joseph ("Jay") V. Paterno | : | |
| P.O. Box 762 | : | |
| Lemont, PA 16851, | : | CIVIL ACTION |
| | : | |
| and | : | No. _____ |
| | : | |
| William Kenney | : | |
| 636 Wynding Oaks | : | |
| Kalamazoo, MI 49006, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| The Pennsylvania State University, | : | |
| 201 Old Main | : | |
| University Park, PA 16802, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiffs Joseph "Jay" V. Paterno ("Paterno") and William Kenney ("Kenney") (Paterno and Kenney, collectively, "Plaintiffs"), by and through their attorneys, Mitts Law, LLC, and The Mazurek Law Firm, LLC, file this complaint against The Pennsylvania State University ("Penn State") and allege as follows:

## PRELIMINARY STATEMENT

1.     This lawsuit arises from the tragic events and publicity surrounding the discovery of the horrific conduct of Gerald A. Sandusky ("Sandusky"), a former assistant football coach, former assistant professor of physical education and former employee of Penn State, who was charged and convicted of various criminal offenses, including aggravated criminal assault, corruption of minors, unlawful contact with minors and endangering the welfare of minors.

2.      A jury found Sandusky guilty of 45 of 48 child sexual abuse counts involving 10 victims over a period of 18 years, and the Court thereafter sentenced Sandusky to 30 to 60 years in prison.

3.      As a result of the national and international bad publicity suffered by Penn State as a result of Sandusky's reprehensible crimes (the "Sandusky Scandal"), Penn State reacted in mid-January 2012 with rashness and without basis by prematurely releasing from Penn State's employment the majority of the Penn State football coaching staff, including the employment of Paterno and Kenney, all of whom had acted as assistant coaches for the Penn State football team for many previous years (the "Termination").

4.      Prior to the Termination, Paterno and Kenney had exemplary reputations where they each had brought considerable distinction and acclaim to Penn State during their respective lengthy years of service.

5.      Although none of the terminated assistant football coaches, including Plaintiffs, had been found at that time in January 2012 to have committed or been involved in any wrongdoing in connection with the Sandusky Scandal, Penn State terminated each of them at the height of the Sandusky Scandal's dark shroud and without any attempt whatsoever by Penn State to preserve the reputations of these guiltless individuals.

6.      Penn State further re-injured and maligned anew Plaintiffs' hard earned reputations when Penn State executed the Consent Decree, titled the "*Binding Consent Decree imposed by the National Collegiate Athletic Association and Accepted by The Pennsylvania State University*," dated and issued to the public on July 23, 2012 (the "Consent Decree") (attached as **Exhibit A**).[1]

_____

[1]All Exhibits referenced in this Complaint and attached hereto are incorporated herein in their entirety.

7.      The National Collegiate Athletic Association (the "NCAA") prepared, and Penn State agreed to, the Consent Decree, resulting, *inter alia*, in over $60 million dollars in penalties against Penn State regarding the Sandusky Scandal.

8.      By executing the Consent Decree and adopting the Freeh Report (as defined herein), Penn State destroyed any realistic prospect Plaintiffs had to obtain other comparable positions for which they were qualified and would have otherwise been competitive, either at the collegiate or professional level, or with positions with national media companies, had Penn State not terminated Plaintiffs at the height of the Sandusky Scandal and/or had Penn State not executed the Consent Decree soon thereafter.

9.      In fact, upon information and belief, after the Termination and execution of the Consent Decree, a number of the terminated coaches, including each of Plaintiffs, applied for positions with other comparable professional and/or top tier Division I college football programs (including as well possible positions with national media companies), but such terminated coaches, including each of Plaintiffs, were met with both disdain and disinterest.

10.     Plaintiffs had earned, through no fault of their own, a pariah status that was attributed to them as a result of the Termination and/or Consent Decree that was wholly undeserved.

11.     Based upon Penn State's actions, notably the Termination and/or execution of the Consent Decree (and concomitant adoption of the Freeh Report), which both individually and collectively caused irreparable damage to Plaintiffs' personal and professional reputations, Plaintiffs assert a claim against Penn State as their former employer, and as a state actor, pursuant to 42 U.S.C. § 1983 and the 5th and 14th Amendments to the United States Constitution, for the deprivation of their liberty interests and reputations ***without*** due process of law and further assert additional state law claims for intentional interference with contractual relations,

civil conspiracy and violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1 *et seq.* ("WPCL").

12.     Plaintiffs seek damages in excess of One Million Dollars ($1,000,000.00), including, but not limited to, compensatory and punitive damages, and/or any other relief the Court deems appropriate, against Penn State for the harmful and injurious effects caused by the Termination and/or the execution of the Consent Decree.

## THE PARTIES

13.     Plaintiff Paterno is an adult individual with an address of P.O. Box 762, Lemont, PA 16851, who Penn State employed from 1995 until mid-January 2012.

14.     Plaintiff Kenney is an adult individual residing at 636 Wynding Oaks, Kalamazoo, MI 49006, who Penn State employed from 1988 until mid-January 2012.

15.     At all times relevant to this Complaint, Penn State employed each Plaintiff, and immediately prior to the Termination, they each held the title of an assistant football coach for Penn State's intercollegiate football team and each was a well-respected NCAA top tier Division I collegiate football coach.

16.     Defendant Penn State is organized and existing under the law of the Commonwealth of Pennsylvania (the "Commonwealth"), was incorporated for educational purposes by the Act of February 22, 1855, PL 46, and has its principal administrative office located at 201 Old Main, University Park, Centre County, Pennsylvania 16802.

17.     Penn State also has and maintains campuses for its matriculating students throughout the Commonwealth, including many within this District.

18.     At all times relevant, Penn State has been the recipient of millions of dollars annually from the Commonwealth for use in funding its operations.

## JURISDICTION AND VENUE

19.     Jurisdiction is invoked pursuant to the provisions of 42 U.S.C. § 1983.

20.     All actions complained of herein involve Penn State as a defendant that resides, in part, and conducts its business, in part, within this Court's jurisdictional limits.

21.     Venue before this Court is therefore proper pursuant to the dictates of 28 U.S.C. §§ 1391(b)(1).

## FACTUAL BACKGROUND

### I.     Brief History Of Plaintiffs' Employment With Penn State

#### A.  Jay Paterno

22.      Paterno, the son of Joe Paterno ("Joe Paterno"), the former head football coach of Penn State, was on Penn State's football coaching staff for 17 seasons, 12 of which Paterno served as Penn State's quarterbacks coach.

23.     Previously, Paterno served for five (5) years as Penn State's tight ends coach and recruiting coordinator.

24.     Prior to being on the Penn State football staff, Paterno served as a graduate assistant at the University of Virginia from 1991 to 1992, wide receivers and tight ends coach at the University of Connecticut in 1993, and as the quarterbacks coach at James Madison University in 1994.

#### B.  Bill Kenney

25.     Kenney attended Norwich University where Kenney was a three-year starter as a tight end and fullback, and was the co-captain of the football team in his senior year in 1981.

26.     Prior to being on the Penn State football staff, Kenney served as an offensive backfield coach at Norwich University in 1982, Dennis-Yarmouth Regional High from 1983 to

1984, and Lincoln High School in 1985. Kenney then moved back to the college level where, from 1986 to 1988, he served as a graduate assistant at the University of Nebraska.

27.     In 1988, Kenney moved to Penn State, where Kenney was originally a Graduate Assistant football coach and then became a full time coach with the Penn State football coaching staff in 1989.

28.     Kenney worked the next 23 years with Penn State, serving in a variety of coaching positions including offensive line coach, recruiting coordinator, and offensive tackles/tight ends coach.

**C. Fixed Term Employment Appointments**

29.     During the time that Plaintiffs each acted as an assistant football coach, Penn State's custom and practice was to treat each assistant football coach as a 12-month Fixed Term Appointee who was entitled to receive full wages and benefits from the start of the academic year in which they were coaching (*i.e.*, July 1st) through the end of the academic year (*i.e.*, June 30th of the following year) ***even if*** such assistant football coach was **released**[2] from his coaching duties by the head football coach without cause at any time during and prior to the end of the academic year.

30.     In effect, Plaintiff's wages and benefits were spread throughout a 12-month period with the majority of football coaching responsibilities were front loaded and occurring during the fall football season beginning in July and lasting through December and possibly early January, that included early mornings, long nights, weekend games and practices and significant travel time.

---

[2]Penn State's head football coach had the discretionary authority to determine his coaching staff, and so could "release" an assistant coach from his "coaching duties," but the head football coach had no authority to actually terminate or fire any assistant head coach from his employment with Penn State.

31.    In addition, it was Penn State's custom and practice, as a result of the specific wishes of Joe Paterno, that Penn State provided to each released (without cause) assistant football coach an 18-month severance package (the "Severance Pay Period") that included the continuation of the then-current level of wages and benefits for 18 months that would begin on the July 1st after their release and extend through to the end of the following year (at the conclusion of 18 months).

32.    Joe Paterno had specifically implemented this custom and practice, and Penn State had agreed to and did in fact comply over the years with this custom and practice, by providing the Severance Pay Period for the specific purpose of ensuring that any assistant football coach, released of his coaching duties and terminated as of the end of the academic year, would have his then current level of wages and benefits paid to them through at least two (2) football seasons following any release and subsequent employment termination.

33.    Consistent with this custom and practice, Erikka Runkle, Penn State's Human Resources Manager Intercollegiate Athletics, further told both Paterno and Kenney in mid-December 2011 that, if either of them were released and not retained by Penn State's yet-to-be-selected new football coach, they would each be paid their full wages and benefits, at their current level, through the end of the academic year (through to the end of June 30, 2012) and that thereafter their Severance Pay Period would commence as of July 1, 2012.

34.    As a result, in mid-January 2012, when Penn State's new football coach did not select Paterno and Kenney to be on his staff of assistant football coaches, Plaintiffs expected that they would be treated in the manner as stated by Ms. Runkle and in the same manner regarding the continuation of wages and benefits, including the commencement of their Severance Pay Period as of July 1, 2012, as all other assistant football coaches who were in years past similarly released from their coaching duties prior to the end of the academic year.

35.     However, instead of paying Plaintiffs their full wages and benefits through the end of the 2011-2012 academic year, and then commencing the Severance Pay Period as of July 1, 2012, Penn State purposefully accelerated the Severance Pay Period to commence as of mid-January 2012 that lasted through mid-July 2013.

36.     As of mid-July 2013, without ever receiving from Penn State any formal notice of their termination from their employment positions with Penn State, Penn State ceased paying all wages and benefits to Plaintiffs (except as otherwise provided by and during the Severance Pay Period).

37.     In this way, Penn State wrongfully avoided payment to Plaintiffs of those 6-months of wages and benefits from mid-January through July 2012.

**D.  The Termination, Freeh Investigation & Execution of Consent Decree**

38.     At the time of the Termination, the Sandusky Scandal was in full swing and consumed the nation and all forms of general and sports media outlets with stories of the horrible crimes Sandusky committed as well as the allegations of cover-up by Penn State officials, including allegations that Joe Paterno and other assistant football coaches participated in such alleged cover-ups.

39.     In fact, as of November 9, 2011, under this ever-darkening cloud of suspicion and innuendo, the Board of Trustees of Penn State (the "Board of Trustees") voted to relieve Joe Paterno of his head football coaching responsibilities effective immediately, only two (2) months prior to the Termination.

40.     The Board of Trustees said that Joe Paterno had demonstrated a "failure of leadership" by only fulfilling his legal obligation to inform another Penn State official, Penn State's Athletic Director Tim Curley, about a 2001 incident involving Sandusky and a minor, and by not going to the police himself.

41.     Thereafter, only two (2) days later, on November 11, 2011, the Board of Trustees formed a Special Investigations Task Force which engaged the firm of Freeh Sporkin & Sullivan, LLP (the "Freeh Firm"), to investigate the alleged failure of certain Penn State personnel, including the football coaching staff, to respond to and report certain allegations against Sandusky.

42.     Penn State also asked the Freeh Firm to provide recommendations regarding university governance, oversight and administrative policies and procedures to help Penn State adopt policies and procedures to more effectively prevent or respond to incidents of sexual abuse of minors in the future.

43.     Penn State had not engaged the Freeh Firm, and had not granted any authority to the Freeh Firm, to investigate or even consider whether any of the actions under its review constituted violations of the NCAA's rules.  Penn State did **not** retain the Freeh Firm for these purposes.

44.     On November 17, 2011, Mark A. Emmert ("Emmert"), president of the National Collegiate Athletic Association ("NCAA"), sent a letter (the "Emmert Letter") to Rodney A. Erickson ("Erickson"), Penn State's interim President, expressing concerns over the grand jury presentments that were ongoing with the criminal investigation into the Sandusky Scandal and asserting both that the NCAA had jurisdiction over the matter and that the NCAA might take an enforcement action against Penn State.  (The Emmert Letter is attached as **Exhibit B**).

45.     The Emmert Letter failed to identify any specific provision in the NCAA's Constitution or Bylaws that granted the NCAA authority to become involved in criminal matters regarding the Sandusky Scandal that resided outside of the NCAA's basic purpose and mission. *Id.*

46.     Nor did the Emmert Letter identify any NCAA rule that Penn State had allegedly violated as a result of the Sandusky Scandal. *Id.*

47.     Emmert nonetheless asserted in the Emmert Letter that the NCAA's Constitution "contains principles regarding institutional control and responsibility" and "ethical conduct," and that those provisions may justify the NCAA's involvement.  *Id.*

48.     Emmert advised Erickson that Penn State would need to "prepare for potential inquiry" by the NCAA and posed four (4) written substantive questions to which the NCAA sought responses.  *Id.*

49.     Instead of demanding that Penn State provide answers to these four (4) questions, and instead of commencing its own investigation, the NCAA waited for the Freeh Firm to complete its investigation.

50.     On or about January 6, 2012, while the Freeh Firm was conducting its investigation, Penn State announced that Penn State had selected William J. O'Brien ("O'Brien") as Penn State's new head football coach.

51.     Thereafter, O'Brien elected not to retain and otherwise released Plaintiffs as assistant football coaches with the Penn State football program.

52.     As a result, and despite Penn State's above-described custom and practice of paying the then-current wages and benefits through the end of the academic year, and without any notice, Penn State terminated Plaintiffs' employment with Penn State and accelerated Plaintiffs' Severance Pay Period to commence in mid-January 2012, instead of July 1, 2012.

53.     Throughout their entire respective tenures of employment with Penn State, each Plaintiff had an exemplary performance record and was never subjected to any disciplinary actions.

54.     The Termination occurred in temporal proximity to the events surrounding the Sandusky Scandal and, as such, the Termination, in conjunction with Penn State's subsequent execution of the Consent Decree, had the effect of branding and stigmatizing Plaintiffs as participants in the Sandusky Scandal and, by so doing, maligned Plaintiffs' heretofore stellar reputations by portraying them by implication in false light.

55.     On or about January 6, 2012, Penn State issued a press release (the "O'Brien Press Release") (attached as **Exhibit C**) upon O'Brien's hiring wherein Penn State affirmed the positive legacy of Penn State football:

> "The Penn State football program has a great legacy and has contributed enormously to our University community," said [Rodney A.] Erickson[, president of Penn State University]. "**A program of this caliber requires a special kind of leader - a leader who will embrace that legacy and maintain the University's commitment to excellence on the field and in the classroom**. We have that leader in Coach O'Brien, and I look forward to working with him in his new role."
>
> "**We have found the man to take Penn State football forward**," said Dave Joyner, Penn State acting director of athletics. "**Needless to say, we have been looking for someone with some very special qualities, beginning with a heart that beats to the values and vision of Penn State University and our Penn State football legacy and tradition. That was our starting point, and Coach O'Brien exemplifies those traits that Penn Staters hold so highly. In addition to his model characteristics as a man and a teacher**, he's all about producing winners, and doing so the right way. **He will embrace tradition, demand excellence and pursue Success with Honor in every phase of our program**."
>
> "I am thrilled to be the head coach of the Penn State football program," stated O'Brien. "I cannot tell you how excited I am to get started, meet the team, meet the football alumni and meet all of the people that make this University so special. **As head coach of this special football program, it is my responsibility to ensure that this program represents the highest level of character, respect and integrity in everything we do. That includes my coaching staff**, our players and everyone involved in the football program. There is tremendous pride in Penn State football and will never, ever take that for granted."

*Id.* (emphasis supplied).

56.     Within this backdrop of positive statements about both the legacy and character of Penn State football and about how the new assistant coaches being hired (and, by implication, not Plaintiffs who were being released) fit within and emulate that tradition, Penn State terminated Plaintiffs without even so much as (i) a public thank you for their years of service and dedication that was part of the positive legacy so identified in the O'Brien Press Release, or (ii) a statement of exoneration that Penn State had no evidence that Plaintiffs were involved in any way in the Sandusky Scandal so as to preserve Plaintiffs' good name, reputation, honor and integrity.

57.     Instead, on January 20, 2012, David Joyner, Penn State's Acting Athletics Director, made a statement to the Board of Trustees that the severance package for all of the terminated assistant football coaches, including Plaintiffs, would cost Penn State $4.5M.

58.     After the Termination, and upon the passing of Joe Paterno, Penn State issued a another press release, on or about January 23, 2012 (the "January 23, 2012 press release"), wherein Penn State stated: "**Regrettably, Coach Paterno did not finish his coaching career in the manner he or anyone else had expected**, but his coaching legacy in Happy Valley and around the nation will live on forever." (The January 23, 2012 press release is attached as **Exhibit D**) (emphasis supplied).

59.     The January 23, 2012 press release reaffirmed the innuendo and negative implications that the Sandusky Scandal foisted upon the entire Penn State football coaching staff.

60.     Subsequently, by mid-February 2012, O'Brien completed his hiring of his assistant football coaches.

61.     In a Penn State press release, dated February 18, 2012 (attached as **Exhibit E**), Penn State quoted O'Brien as follows:

"With the hiring of Charlie Fisher as quarterbacks coach, we have completed the Penn State football coaching staff," O'Brien stated. "**This is a staff made up of men who care about the mission of Penn State University and being successful on and off the field. It is also a staff of winners**, with five staff members that have been a part of national championship teams as assistant coaches. This is a staff that has won many games; some while being a part of the same staff, and is a staff comprised of former head coaches, coordinators and tremendous recruiting experience."

*Id.* (emphasis supplied).

62. At this point, Penn State had terminated Plaintiffs' employment and they were left to twist in the proverbial winds of innuendo and suspect as to whether they were involved in the Sandusky Scandal, only to be made worse by the execution of the Consent Decree.

63. At the time of or prior to the Termination, Penn State never afforded Plaintiffs an opportunity to be heard nor did Penn State issue a press release after the Termination exonerating Plaintiffs so as to preserve their good name, reputation, honor and integrity.

64. Instead, during the time after the Termination but before the issuance of the Consent Decree, the NCAA collaborated with the attorneys and investigators working for the Freeh Firm who frequently provided information and briefings to the NCAA.

65. During the course of its investigation, the Freeh Firm periodically contacted representatives of the NCAA to discuss areas of inquiry and other strategies.

66. The Freeh Firm's final report (the "Freeh Report") acknowledged that, as part of its investigative plan, the Freeh Firm cooperated with "athletic program governing bodies," *i.e.*, the NCAA.

67. Thereafter, on or about July 12, 2012, the Freeh Firm published the findings of its investigation (the "Freeh Report") (attached as **Exhibit F**).  According to the Freeh Report, Penn State officials conspired to conceal critical facts relating to Sandusky's abuse from law

enforcement authorities, the Board of Trustees, the Penn State community and the public at large.

68.     In lieu of following its own mandated enforcement procedures, as set forth below, both the NCAA and Penn State accepted the conclusions of the Freeh Report as compelling evidence sufficient to justify the execution of the Consent Decree and subsequent imposition of the Consent Decree's sanctions against Penn State.

69.     Specifically, soon after the issuance of the Freeh Report, Penn State and the NCAA agreed upon and executed the Consent Decree (**Exhibit A**) that resulted in (i) the imposition of over $60 million dollars in penalties against Penn State, (ii) a 4-year post-season play ban, (iii) loss of athletic scholarships and (iv) a vacating of football wins since 1998.

70.     The Consent Decree explicitly states that, for purposes of the resolution with the NCAA, Penn State accepted the Freeh Report.  *Id.*

*71.*     Specifically, the Consent Decree makes certain that "Penn State has communicated to the NCAA **that it accepts the findings of the Freeh Report for purposes of this resolution and acknowledges that those facts constitute violations of the Constitutional and Bylaw principles described in the [Emmert Letter]**."  *Id.* (emphasis supplied).

72.     Penn State even went further and agreed "not to challenge the consent decree and **waive[d] any claim to further process, including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, and any judicial process related to the subject matter of the Consent Decree**." *Id.* (emphasis supplied).

73.     By way of background, the NCAA is an unincorporated voluntary association of member institutions of higher education, including Penn State, which operates pursuant to a

constitution and an extensive set of rules that define both the scope of the NCAA's authority and the obligations of the NCAA's member institutions.

74.     The basic purpose of the NCAA is to maintain intercollegiate athletics as an integral part of university educational programs and the athlete as an integral part of the student body and, by doing so, to retain a clear line of demarcation between intercollegiate athletics and professional sports.

75.     The NCAA is governed by a lengthy set of rules that define both the scope of the NCAA's authority and the obligation of the NCAA's member institutions, such as Penn State.

76.     The relevant set of rules for purposes of this lawsuit is the 2011-2012 NCAA Division I Manual (the "NCAA Manual"), which is available at http://www.ncaapublications.com/p-4224-2011-2012-ncaa-division-i-manual.aspx.   (A copy of the relevant portions of the NCAA's Manual is attached to this Complaint as **Exhibit G**).

77.     Specifically, Article 1 through 6 of the NCAA Manual comprise the NCAA's Constitution which set forth information relevant to the NCAA's purposes, its structure, its membership, the legislative purpose and the more important principles governing the conduct of intercollegiate athletics.

78.     Articles 10 through 23 of the NCAA Manual are the Operating Bylaws (the "NCAA Bylaws") which consist of legislation adopted by member institutions, such as Penn State, to promote principles enunciated in the NCAA Constitution and to achieve the NCAA's stated purposes.

79.     Article 31 through 33 are the Administrative Bylaws, adopted and modified by the NCAA subject to amendment by the membership through the regular legislative process (the "Administrative Bylaws").  The Administrative Bylaws implement the NCAA's general

legislative actions, setting forth policies and procedures for NCAA championships, the NCAA's business, its enforcement program and its athletics certification program.

80.     The NCAA Bylaws define and constrain the scope of the NCAA's authority, and are designed to regulate athletic competition between members in a manner that promotes fair competition and amateurism.

81.     The NCAA Bylaws further authorize the NCAA to prohibit and sanction conduct that is intended to provide any member institution with a recruiting or competitive advantage in athletics.

82.     The NCAA's rules are premised on the principle of according fairness to student athletes and staff, whether or not they may be involved in potential rules violations.

83.     The NCAA rules recognize that fair and proper procedures are important because the NCAA's action can have serious repercussions on their lives and careers.

84.     When there is an alleged violation of the NCAA's rules, the NCAA Bylaws require the NCAA to provide interested parties with certain, well-defined procedural protections, including rights of appeal, all of which are delineated in the NCAA Manual and are set forth below (collectively, the "NCAA Rights").

85.     Specifically, in accordance with Articles 19 and 32 of the NCAA Manual, if the NCAA enforcement staff conducts an investigation into allegations of misconduct and rules violations, and thereafter, as a result, deems that there is sufficient information to support a finding of a rules violation, the NCAA enforcement staff must then send "notice of allegations" to the institution that must list the NCAA rule alleged to have been violated and the details of the violation.

86.     If the allegations suggest the significant involvement of any individual staff member or student, that individual is considered an "involved individual" and must be notified and provided with an opportunity to respond to the allegations.

87.     The issuance of the "notice of allegations" initiates a formal adversarial process, which allows the institution and "involved individuals" the opportunity to respond and defend themselves.

88.     After the notice of allegations is issued, the matter is referred to the NCAA's Committee on Infractions (the "Infraction Committee").

89.     A member institution, such Penn State, has the right to pre-hearing notice of the charges and the facts upon which the charges are based, and an opportunity to be heard and to produce evidence.  The institution and all involved individuals have the right to be represented by legal counsel at all stages of the proceedings.

90.     At the conclusion of the hearing, the Infractions Committee is required to issue a formal Infractions Report detailing all of the Infraction Committee's findings and the penalties imposed.  The Infraction Committee must submit the infraction report to the institution and all involved individuals.

91.     The infractions report shall be made publicly available only after the institution and all involved individuals have had an opportunity to review the report.  Names of individuals must be deleted before the infractions report is released to the public or forwarded to the Infractions Appeals Committee.  The infractions report must also describe the opportunities for further administrative appeal.

92.     The NCAA's rules provide a member institution, such as Penn State, the right to appeal to the Infractions Appeals Committee if the institution is found to have committed major

violations.  In addition, an individual has the right to appeal if he or she is named in the Infraction Committee's report finding violations of the NCAA's rules.

93.     There is also a summary disposition process that is available to the NCAA's enforcement staff that requires, *inter alia*, consent of all of the parties, a thorough and complete investigation and a joint written report that includes the parties' proposed penalties.

94.     If the Infraction Committee accepts the findings that a violation occurred with a summary disposition joint report, but does not accept the parties' proposed penalties, the Infraction Committee must hold an expedited hearing limited to considering the possibility of imposing additional penalties.  After that expedited hearing, the Infraction Committee must issue a formal written report, and the institution and all involved individuals have the right to appeal to the Infractions Appeals Committee any additional penalties that may be imposed.

95.     These enforcement and investigative mechanisms and procedures are subject to amendment only in accordance with the legislative process set forth in Article 5 of the NCAA Manual.

96.     No other NCAA body, including the Executive Committee and the Board of Trustees of Directors, has authority to bypass or amend these procedures and impose discipline or sanctions on any member institution, such as Penn State.

97.     The Executive Committee and the Board of Trustees of Directors are authorized only to take actions that are legislative in character and are to be implemented association-wide on a prospective basis.

98.     These procedural protections are a significant and vital part of the bargain involved in each member institution's decision to participate in the NCAA.

99.    According to the mission statement of the NCAA's enforcement program, "an important consideration in imposing penalties is to provide fairness to uninvolved student-athletes, coaches, administrators, competitors and other institutions."

100.    Penn State, as a member institution of the NCAA, knew or should have known of these NCAA Rights offered by the NCAA and to which Penn State was entitled.

101.    In this way, the NCAA Bylaws are expressly intended to benefit not only the member institutions, such as Penn State, but also their staff (including the athletic coaching staffs such as Plaintiffs), students and other individuals affected by conduct subject to potential NCAA oversight and sanctions.

102.    For this reason, Plaintiffs were intended third party beneficiaries of the agreement between the NCAA and Penn State that afforded Plaintiffs their NCAA Rights and thus may enforce those NCAA Rights against Penn State where Penn State has violated and otherwise abrogated Plaintiffs' rights by Penn State's capitulation to the execution of the Consent Decree.

103.    Specifically, as noted, Erickson and Emmert executed and issued the Consent Decree to the public on July 23, 2012.

104.    Erickson signed the Consent Decree without following the procedural requirements embodied by the NCAA Rights and as further set forth in Penn State's Bylaws, Charter and Standing Orders (that governed Penn State's relationship with NCAA and with Plaintiffs) (the "Penn State Rights").

105.    Penn State's execution of the Consent Decree compounded and ignited afresh Plaintiffs' injuries caused by the Termination and only further compelled the implication and innuendo that Plaintiffs were complicit in some manner in the Sandusky Scandal, all to the detriment and stigmatization of Plaintiffs' good name, reputation, honor and integrity.

106.    Penn State knew or should have known that the Freeh Report, as the basis of the Consent Decree, was an unreliable rush to judgment without a proper investigation and the conclusions reached in the Freeh Report were not substantiated.

107.    Penn State knew or should have known that the Freeh Firm did not purport to conduct an investigation into alleged NCAA rules violations.

108.    Penn State knew or should have known that the Freeh Firm did not record or summarize witness interviews as specified by the NCAA's rules governing its relationship with Penn State.

109.    Penn State knew or should have known that the Freeh Firm failed to include in the Freeh Report any findings concerning alleged NCAA rules violations.

110.    Penn State knew or should have known that the Freeh Report's conclusions were not based on evidence that is "credible, persuasive and of a kind on which reasonably prudent persons rely in the conduct of serious affairs," as the NCAA Bylaws and other rules require.

111.    Penn State knew or should have known that the individuals named in the Freeh Report were not given any opportunity to challenge its conclusions.

112.    Penn State knew or should have known that the Freeh Report was not approved by the Board of Trustees which never took any official action based on the Freeh Report.

113.    Penn State knew or should have known that the Board of Trustees had never accepted the Consent Decree's findings or reach any conclusions about its accuracy.

114.    Penn State knew or should have known that the Freeh Report was an improper and unreliable "rush to justice" that has been thoroughly discredited.

115.    Penn State knew or should have known that the Freeh Report also failed to interview key witnesses (including Gary Schulz, Timothy Curly, Michael McQuery and Joe

Paterno), and instead of supporting its conclusions with evidence, relied heavily on speculation and innuendo.

116.    Penn State knew or should have known that the Freeh Report relied on unidentified, "confidential" sources and on questionable sources lacking any direct or personal knowledge of the facts or support for the opinions they provided.

117.    Penn State knew or should have known that many of the Freeh Report's primary conclusions are either unsupported by evidence or supported only by anonymous, hearsay information of the type specifically prohibited by the NCAA rules.

118.    Penn State knew or should have known that, contrary to suggestions made in the Freeh Report, as adopted by Penn State upon execution of the Consent Decree, there is no evidence that Joe Paterno, or any other Penn State assistant football coach, covered up known incidents of child molestation by Sandusky to protect Penn State football, to avoid bad publicity or for any other reason.

119.    Penn State knew or should have known that there was no evidence that Joe Paterno or any other members of the football athletic staff, including Plaintiffs, conspired with Penn State officials to suppress information because of publicity concerns or a desire to protect the football program.

120.    In short, Penn State knew or should have known that the Freeh Report provided no evidence of a cover-up by Joe Paterno or any other Penn State assistant football coach and no evidence that Penn State's football program caused or contributed to the underlying facts of the Sandusky Scandal.

121.    Penn State also knew or should have known that, by accepting the Freeh Report upon execution of the Consent Decree, the Freeh Report would dramatically increase the publicity given to its unreliable conclusions, effectively terminate the search for the truth and

enable the NCAA, in violation of Plaintiffs' Penn State Rights and NCAA Rights, to force Penn State to accept the imposition of unprecedented sanctions.

122.   Penn State knew or should have known that the conduct described in the Freeh Report, as adopted by Penn State by execution of the Consent Decree, was not a violation of the NCAA's rules and could not substitute for the procedures required under the NCAA's rules, including without limitation Plaintiffs' NCAA Rights.

123.   Among other things, Penn State knew or should have known that the NCAA staff had not completed a thorough investigation, as required under the NCAA's rules, and had not identified any major or secondary violations committed by Penn State in connection with the criminal matters involving the Sandusky Scandal.

124.   No general legislation adopted by the NCAA's member institutions authorized the actions taken by Penn State regarding the execution of the Consent Decree.

125.   Penn State knew or should have known that neither Penn State nor any involved individual authorized the NCAA to use a summary disposition process and, in any event, that the NCAA did not comply with any such summary disposition process.

126.   Finally, at no time did Penn State self-report any rules violations to the NCAA.

127.   Before executing the NCAA-imposed Consent Decree, as noted, Erickson did not comply with the governing requirements required by Penn States governing rules, including the Penn State Rights.

128.   Erickson failed to present the NCAA-imposed Consent Decree to the Board of Trustees for its approval, even though the Board of Trustees is the final repository of all legal responsibility and authority that governs Penn State.

129.   Nor did Erickson call for a meeting of the Board of Trustees or the NCAA's Executive Committee (the "Executive Committee").

130.    Although Erickson was subject to the threats and coercive tactics of Emmert and the NCAA, Erickson failed to inform the Board of Trustees about these issues in advance of executing the Consent Decree.

131.    Erickson did not have the legal or delegated authority to bind the Board of Trustees to the Consent Decree imposed by the NCAA.

132.    Penn State knew or should have known that the Consent Decree did not identify any conduct that, under the NCAA's rules, would qualify as either a secondary or a major violation of the NCAA rules.

133.    A timely appeal of the Consent Decree was made with the NCAA Infractions Appeals Committee but the NCAA refused to accept those appeals.

134.    As a result, Penn State knew or should have known that individuals who were involved and directly harmed by the Consent Decree were given no opportunity to challenge the NCAA's abuse of discretion.

135.    Nonetheless, the NCAA stipulated that Penn State had violated the principles of "institutional control" and "ethical conduct" contained in the NCAA's Constitution, and that Penn State's employees had not conducted themselves as the "positive moral models" expected by Article 19 of the NCAA Bylaws.

136.    The Consent Decree's purported "factual findings" related to the alleged conduct of Joe Paterno and members of the Board of Trustees in 1998 and 2001, as well as other former Penn State staff and administrators.

137.    Specifically, as regards Plaintiffs' liberty interests, the Consent Decree found that "**[s]ome coaches, administrators and football program staff members** ignored the red flags of Sandusky's behaviors and no one warned the public about him."  *See* **Exhibit A**, at 3 (emphasis supplied) (the "Actionable Statement").

138.    Penn State knew or should have known that the Actionable Statement was erroneous and based on unreliable and unsubstantiated conclusions made in the Freeh Report.

139.    Emmert magnified the negative impact of the Actionable Statement during a press conference on July 23, 2012, wherein Emmert confirmed that the investigation into possible additional sanctions against individual assistant coaches was continuing.

140.    Specifically, Rosemary Connors, with NBC 10 in Philadelphia, questioned Emmert during Emmert's press conference announcing the Consent Decree: "**Are you considering the possibility of any future sanctions, for coaches who were at Penn State during the years that this abuse occurred and may be looking to coach again**?" *See* NCAA Announces PSU Sanctions, http://www.youtube.com/watch?v=7La97HPn7X0, at 4:20 (emphasis supplied).

141.    In response to Ms. Connors' question, Emmert replied: "As I said in my opening statement, **we are reserving the right, after the conclusion of all of the criminal charges and proceedings that will go forward to look into any potential investigations or penalties that may need to be imposed on individuals, but for the time being, we're not doing anything with individuals**." *Id.* (emphasis supplied).

142.    Emmert in his opening statement had earlier confirmed that the investigations were continuing and other "individuals" might be disciplined for their alleged participation in the cover-up of the Sandusky Scandal: "And finally, **the NCAA is reserving the right to initiate a formal investigation and disciplinary processes, to impose sanctions as needed on individuals involved in this case**, after the conclusion of any criminal proceedings. Beyond these sanctions, the NCAA is imposing other corrective actions to ensure that the intended cultural changes actually occur. The NCAA is requiring the university to adopt the formal reforms delineated in Chapter 10 of the Freeh Report, specifically 5.0." *See* NCAA Announces

PSU Sanctions: The Opening Statement, https://www.youtube.com/watch?v=VxlzH65ywtg, at 3:37 (emphasis supplied).

143.    Even though Plaintiffs were <u>not</u> implicated in any wrongdoing regarding the Sandusky Scandal, and even though Plaintiffs were not involved in or implicated by any of the ongoing criminal proceedings, Emmert refused to clear the good name and reputation of Plaintiffs and the other assistant football coaches.

144.    Instead, to the contrary, at the conclusion of his press conference, Emmert further reiterated the NCAA's position, thus Penn State's position as well (given that Penn State had abdicated its and Plaintiffs' rights to due process as it regarded the NCAA's potential future sanctions against individuals, including Plaintiffs), that there existed continuing investigations into the possible involvement of other individuals, including Plaintiffs as assistant football coaches, in the cover-up of some aspect of the Sandusky Scandal.

145.    Specifically, Emmert stated at the end of his press conference:  "Well again, **we expressly have, in these sanctions and findings, withheld judgment on individuals, and will continue to do so until all of the criminal investigations have concluded, and until then we won't have any comment on individuals**." *See* NCAA Announces PSU Sanctions, http://www.youtube.com/watch?v=7La97HPn7X0, at 27:36 (emphasis supplied). (Collectively, Emmert's statements at the July 23, 2012 press conference are referred to hereafter as the "Press Conference Statements").

146.    Penn State issued its own press release on July 23, 2012 (the "PSU Press Release") (attached as **Exhibit H**), which adopted not only the Consent Decree but also, by implication, Emmert's Press Conference Statements.

147.   Specifically, the PSU Press Release stated that "Penn State accepts the penalties and corrective actions **announced today by the NCAA**" and that "[t]oday [Penn State] accept[s] the terms of the consent decree imposed by the NCAA." *Id.* (emphasis supplied).

148.   The PSU Press Release continued that "[a]s Penn State embarks upon change and progress, the announcement helps to further define our course. **It is with this compass that we will strive for a better tomorrow. Penn State will move forward with a renewed sense of commitment to excellence and integrity in all aspects of our University**." *Id.* (emphasis supplied).

149.   It is apparent that the PSU Press Release is announcing the acceptance of not only the terms of the Consent Decree, but as well the NCAA's position, as stated by Emmert in the Press Conference Statements, that the "future" "compass" for Penn State, and its "renewed sense of commitment to excellence and integrity," will necessarily entail additional "**potential investigations or penalties that may need to be imposed on**" individuals, including potentially assistant football coaches who include Plaintiffs, for their role in the Sandusky Scandal.

150.   The imposed Consent Decree, and its various statements as to the "ingrained" "reverence for Penn State football" that "permeated every level of the University community," as well as the Press Conference Statements and PSU Press Release, are an indictment of the entire Penn State football coaching staff, including Plaintiffs, as well as Penn State's individual institutional leaders, Board members, those responsible for and participants in athletic programs, the faculty and the student body.

151.   The Consent Decree charges that every level of the Penn State community, and specifically the Athletic Staff (that includes Plaintiffs), created and maintained a culture of reverence for, fear of and deference to the Penn State football program, in disregard of the values of human decency and the safety and well-being of vulnerable children.

152.    The unwarranted and unprecedented sanctions on Penn State, as agreed to and as allowed by Penn State, breached the contract between the NCAA and Penn State, which included those substantive and procedural safeguards and rights owed to Plaintiffs, including without limitation Plaintiffs' rights to notice and an opportunity to be heard before the imposition of such sanctions and execution of the Consent Decree, as embodied by the Penn State Rights, the NCAA Rights, and all other applicable Penn State and NCAA rules.

153.    Penn State and the NCAA breached Plaintiffs' Penn State Rights, NCAA Rights and the obligations that both Penn State and the NCAA owed to uninvolved student-athletes, coaches, administrators and competitors, including the duty to ensure that those individuals, including Plaintiffs, are treated fairly by both Penn State and the NCAA in any NCAA enforcement action.

154.    As a result of and due to the negativity created by implication and false innuendo as a result of the Termination and/or the execution of the Consent Decree, including the Actionable Statement, the Press Conference Statements and PSU Press Release, at the height of the Sandusky Scandal, Plaintiffs were deprived on their liberty and property interest in their good name, reputation, honor and integrity, as well as their liberty and property interest Penn State Rights and NCAA Rights.

155.    The execution of the Consent Decree, the Press Conference Statements and the PSU Press Release, standing alone and coupled with the Termination, created a false and fabricated implication about each Plaintiff and their likely involvement in the Sandusky Scandal, despite that Penn State knew or should have known that it had **no** evidence, and it had not been suggested by any source, that Plaintiffs were involved in any way whatsoever in the Sandusky Scandal.

156.     This false and fabricated impression, caused as a result of Penn State's abrogation of Plaintiffs' Penn State Rights and NCAA Rights, diminished Plaintiffs' future employment income and opportunities.

157.     Accordingly, Penn State's execution of the Consent Decree and the issuance of the Press Conference Statements along with the PSU Press Release, that were predicated upon the abrogation of Plaintiffs' Penn State Rights and NCAA Rights, and coupled with the Termination that occurred in close temporal proximity, caused irreparable damage to Plaintiffs' liberty and property interest in their good name, reputation, honor and integrity, as well as an abrogation of Plaintiffs' liberty and property interest in their Penn State Rights and NCAA Rights.

158.     Plaintiffs, through their attorneys, have made several requests both in writing and orally that they be afforded simple due process in order to clear and otherwise preserve their respective good name, reputation, honor and integrity, by securing and reaffirming Plaintiffs' Penn State Rights and NCAA Rights.

159.     Penn State has denied Plaintiffs' requests for a vindication of their due process right as embodied by Plaintiffs' Penn State Rights and NCAA Rights, as well as other Penn State and NCAA rules, procedures and regulations governing Penn State's and the NCAA's relationship to Plaintiffs.

### E.  Lost Employment Opportunities

160.     As a result of the Termination and upon execution of the Consent Decree and issuance of the Press Conference Statements and PSU Press Release, by and through Penn State's employees and officers, Penn State has not only deprived Plaintiffs of their Penn State Rights and NCAA Rights, but Penn State has further damaged Plaintiffs' professional livelihoods where Plaintiffs have been denied lucrative employment opportunities based upon

the false light and association by innuendo and negative implication that the Termination and Consent Decree (along with the Press Conference Statements and PSU Press Release) have suggested to the world.

161.    Upon information and belief, but for Penn State's conduct set forth herein, Plaintiffs would have been hired to a comparable position with a comparable professional and/or top tier Division I football program (including as well possible positions with national media companies), including without limitation, to anyone of those positions that Kenney and Paterno applied to, interviewed for and/or for which they were respectively considered.

### a.  Coach Bill Kenney

162.    As of the date of the Consent Decree imposed by the NCAA, Kenney had served as a Division I collegiate football coach for 27 years.

163.    Kenney was well respected within the profession and was responsible for training and developing dozens of college football players who went on to play in the National Football League ("NFL"), including several first-round draft choices.

164.    After Penn State terminated Kenney, Kenney made a determined effort to secure other employment as a football coach.

165.    Kenney applied for open positions with various Division I college football programs, including Illinois, Wisconsin, Purdue, Virginia Tech, Florida State, Massachusetts, North Carolina State, Boston College, Arizona, Delaware, Syracuse and several others.

166.    Kenney also applied for open coaching positions in the NFL, with franchises such as the New York Giants, Indianapolis Colts, and Cleveland Browns. Kenney was experienced and well-qualified for these positions.

167.    Kenney received a few interviews with college and professional teams. His interviewers asked him questions focused on the NCAA's unsupported finding that he and other

coaches had ignored "the red flags of Sandusky's behaviors" at Penn State, rather than on Kenney's credentials and approach as a football coach.

168.     Despite interviews or discussions with schools such as the University of Massachusetts and NFL teams such as the New York Giants and Indianapolis Colts, Kenney was not offered a position. In most instances, the positions he applied for went to less experienced and less qualified candidates.

169.     During the course of his pursuit for new employment, Kenney learned that other college teams and NFL programs did not want to deal with the potential recruiting issues and the adverse public reaction that would likely follow any decision to hire him.

170.     Kenney made inquiries at or applied to at least one Division I school that instructed its Head Coach not to interview or consider hiring any former coaches from Penn State.

171.     Kenney was exceptionally well-qualified for the positions for which he applied and was interviewed, and, upon information and belief, Kenney would have received job offers from these programs had it not been for the disparaging accusations leveled against Kenney by Penn State.

172.     After over a year of frustration and disappointment, Kenney eventually secured employment as an offensive line coach at Western Michigan University ("Western Michigan").

173.     While Kenney enjoys his new role at Western Michigan and greatly appreciates the opportunity, Kenney earns significantly less in salary than he once earned at Penn State, or would have earned had he been hired by one of the larger Division I programs or NFL teams.

174.     Kenney's professional career has suffered an extraordinary set-back and his future opportunities and earning potential have been harmed by Penn State's conduct.

### b. **Coach Jay Paterno**

175.    As of the date of the Consent Decree, Paterno had served as a Division I collegiate football coach for 21 years.

176.    Before the execution of the Consent Decree, Paterno was a top candidate for open head coaching positions at other comparable institutions.

177.    Paterno had received awards and accolades for his coaching efforts at Penn State, and Paterno had been approached during his time there by other universities and search firms exploring his potential interest in head coaching vacancies.

178.    After Penn State terminated Paterno, Paterno sought other employment either as a head football coach or a media commentator.

179.    Transitioning from his position to a head coaching role was a logical and customary progression for someone with Paterno's experience and reputation.

180.    Paterno was well-qualified to receive such an offer.

181.    Accordingly, Paterno applied for the open head coaching positions at the University of Connecticut and James Madison University, where he had worked earlier in his career.

182.    Based on his qualifications and experience, Paterno was a strong candidate for each position; however, Paterno was not even interviewed by either school, and the open positions went to candidates with less coaching experience.

183.    Paterno also applied for head coaching vacancies at the University of Colorado and Boston College.

184.    Paterno was not granted an interview at either school.

185.    Paterno also inquired about the head coaching position at another Division I school in the mid-Atlantic region, but the university administration considered the coaches from

Penn State "too toxic," given the findings of the Consent Decree.  As a result, the program in question did not grant interviews to any candidates from Penn State.

186.    Paterno was extremely well-qualified for the positions he sought and would have received job offers from these programs had it not been for the disparaging accusations leveled against him in the Consent Decree.

187.    Paterno also engaged in discussions with various media companies, including ESPN, CBS Sports and Fox Sports, about serving as a college football commentator.

188.    Paterno had had prior dealings with officials at each company, and they were aware of his experience as a columnist for StateCollege.com for nearly three (3) years.

189.    Before the execution of the Consent Decree, ESPN advised Paterno that they were interested in his services and suggested that they wanted to have him involved in a spring 2012 telecast and at least a couple of in-studio college football shows.

190.    The ESPN plan was to have Paterno start working as a commentator during the 2012 football season. These discussions were later discontinued.

191.    Upon information and belief, officials at the ESPN network were nervous about the Sandusky Scandal and the NCAA's unsupported finding that Paterno and other coaches had ignored "the red flags of Sandusky's behaviors" at Penn State.

192.    Paterno had further discussions with ESPN during the off-season before the 2013 season about the possibility of having him work as a commentator during lower profile college football games.

193.    Despite these discussions, that position with ESPN never came to fruition and no offer was forthcoming.

194.    During the spring 2013, Paterno had similar discussions with representatives of CBS Sports and Fox Sports, who had earlier expressed some interest in Paterno's services. Again, nothing materialized.

195.    Paterno's hiring was considered too controversial, because if they placed Paterno in an "on-the-air" position, the networks would have no choice but to have Paterno publicly address past events at Penn State and developments arising from the Sandusky Scandal, given the baseless findings as set forth in the Consent Decree and Freeh Report.

196.    Paterno is not currently employed other than as a freelance sports columnist, consultant and a soon-to-be author.

## COUNT I

### VIOLATION OF CIVIL RIGHTS BY
### TERMINATION AND/OR EXECUTION OF CONSENT DECREE

### 42 U.S.C. § 1983

### (Deprivation of Constitutional Liberty
### And Property Interest Without Due Process)

197.    Plaintiffs incorporate the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

198.    Penn State acted under color of state law with respect to all acts referenced herein as regarding the execution of the Consent Decree and/or the Termination.

199.    As provided in the Constitution of the United States, Plaintiffs have a liberty and property interest in their good name, reputation, honor and integrity, as well as a liberty and property interest in their NCAA Rights and Penn State Rights.

200.    The aforementioned conduct of Penn State in terminating the employment of Plaintiffs so close in temporality to the Sandusky Scandal and/or then by executing the Consent Decree, coupled with the Press Conference Statements and the PSU Press Release, predicated

upon and adopting the Freeh Report without affording either of Plaintiffs an offer of explanation or exoneration deprived Plaintiffs of their liberty and property interest in their respective good name, reputation, honor and integrity, and their liberty and property interest in their Penn State Rights and NCAA Rights without due process of law.

201.    In short, Penn State intentionally rushed to judgment without a proper investigation, violated Plaintiffs' procedural rights that afforded Plaintiff due process protections and knew or should have known that innocent parties, such Plaintiffs, would suffer substantial harm and be branded as an alleged participant in the Sandusky Scandal.

202.    Penn State's actions and treatment of Plaintiffs under the circumstances of the Sandusky Scandal, as demonstrated by the Termination and/or the execution of the Consent Decree, coupled with the Press Conference Statements and PSU Press Release, stigmatized each of Plaintiffs and called into question their good names, reputations, honor and integrity, and further denigrated their competence as professional and/or top tier Division I collegiate football coaches.

203.    The conduct of Penn State in effectuating the Termination and/or then by executing the Consent Decree, coupled with the Press Conference Statements and PSU Press Release, impugned Plaintiffs' professional good name, reputation, honor and integrity, and further abrogated Plaintiffs' Penn State Rights and NCAA Rights without due process.

204.    Penn State, as a state actor, is liable for these violations of Plaintiffs' federal constitutional rights pursuant to 42 U.S.C. § 1983.

205.    As a result of Penn State's conduct regarding the Termination and/or the Consent Decree, coupled with the Press Conference Statements and PSU Press Release, whereupon Plaintiffs were denied their Penn State Rights and NCAA Rights, without due process, Plaintiffs have suffered harm to their good name, reputation, honor and integrity, and further suffered

additional humiliation and severe emotional distress and financial harm in the nature of lost wages and future lost employment opportunities with comparable professional and/or top tier Division I football programs (including as well possible positions with national media companies).

206.    Penn State's conduct was motivated by an evil motive, malice and/or intent and/or showed a reckless and/or callous indifference to Plaintiffs' constitutionally protected rights.

<u>COUNT II</u>

**INTENTIONAL INTERFERENCE
WITH PROSPECTIVE CONTRACTUAL RELATIONS**

207.    Plaintiffs incorporate the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

208.    As set forth above in detail, each Plaintiff had prospective and existing employment, business and economic opportunities with many prestigious comparable professional and/or top tier Division I university football programs, including at Penn State (including as well positions with national media companies), as a result of the favorable reputations that each of them had earned during their service as assistant coaches of the Penn State football program which was or should have been known to Penn State.

209.    With knowledge of Plaintiffs' future prospective employment, business and economic opportunities, Penn State took the purposeful actions described above regarding the Termination and/or execution of the Consent Decree, coupled with the Press Conference Statements and PSU Press Release, in order to negligently, recklessly, intentionally and maliciously harm Plaintiffs and interfere with their prospective contractual relations.

210.    Where Penn State effectively accused Plaintiffs of ignoring child sexual abuse and participating by implication in the cover-up of the Sandusky Scandal, Plaintiffs were

substantially certain to be less attractive job candidates to any prospective comparable employer that were considering employing them.

211.    Penn State lacked justification for their intentional interference with Plaintiffs' prospective contractual relationships, or alternatively, Penn State abused any privilege it had to take the actions outlined above where Penn State violated Plaintiff's Penn State Rights and NCAA Rights, as well as Penn State's other rules and contractual obligations for an improper purpose.

212.    As a direct and proximate result of the wrongful, arbitrary, capricious, malicious and unreasonable actions of Penn State, as described above, Plaintiffs have been unable to secure comparable employment opportunities with comparable professional and/or top tier Division I university football programs (including as well positions with national media companies).

213.    Penn State's conduct in tortiously interfering with Plaintiffs' prospective contractual relations was malicious and outrageous and demonstrated a reckless disregard for Plaintiffs' rights to a good name, reputation, honor and integrity, as well as, without limitation, Plaintiffs' NCAA Rights and Penn State Rights.

214.    As a direct and proximate result of these actions by Penn State, Plaintiffs have suffered economic loss, opportunity loss, reputational damage, emotional distress and other damage.

## COUNT III

## CIVIL CONSPIRACY

215.    Plaintiffs incorporate the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

216.    As set forth above, Penn State, Emmert, the NCAA, other unknown NCAA employees, along with the Freeh Firm (collectively, the "Conspirators"), conspired to work

together and did work together, and held briefings and meetings with and for each other, contacted each other to discuss areas of inquiry and strategies and otherwise worked and cooperated with each other, all in order to create a false report in the nature of the Freeh Report and, as a result, for the NCAA to threaten to impose the "death penalty" upon Penn State and thereby,[3] by extortion, compel Penn State to accept, and NCAA to impose, unwarranted and unprecedented sanctions on Penn State, thereby causing and compelling Penn State (i) to breach the contract between the NCAA and Penn State and (ii) to deprive Plaintiffs' of their Penn State Rights and NCAA Rights, to which they were entitled as an intended third party beneficiaries.

217.    The Conspirators' concerted actions were unlawful or taken for an unlawful purpose in order to deprive Plaintiffs of their procedural and due process rights, and, by false accusation that Plaintiffs enabled and caused child sex abuse to occur and remain unreported, were malicious and intended to injure, or were at least in reckless disregard of substantially certain injury to Plaintiffs' property interest in their good name, reputation, honor and integrity, as well as Plaintiffs' Penn State Rights and NCAA Rights.

218.    The Conspirators had no valid justification for their actions.

219.    Among other things, the Conspirators agreed to:

a.    bypass the NCAA's rules and procedural requirements in conducting the Penn State investigation;

b.    deprive Plaintiffs of their Penn State Rights and NCAA Rights before imposing unprecedented sanctions; and

---

[3]The "death penalty" sanction refers to the sanction of cessation of an institution's participation in a sport, such as football, for a set period of time which can have enormous consequences for a program's future ability to recruit players, retain staff and attract/maintain fans and boosters.  It is well known that imposing the "death penalty" on an institution can ruin the livelihood of those associated with an institution's athletic program and harm involved individuals well beyond the death penalty's immediate economic impact.

   c. impose sanctions on Penn State based on an investigation that was improper, lacked investigation and failed to consider whether Penn State had violated any of the NCAA's rules.

  220. The Conspirators performed a series of overt acts in furtherance of this conspiracy, including, without limitation, the following:

   a. The Executive Committee and Dr. Edward Ray, the former Chairman of the Executive Committee ("Dr. Ray"), purported to grant Emmert authority to investigate Penn State and impose sanctions, despite knowing they did not have the power to do so and further knowing that such imposition of such sanctions violated Plaintiffs' Penn State Rights and NCAA Rights;

   b. Emmert, Dr. Ray and other NCAA employees worked closely and coordinated with the Freeh Firm to help the NCAA prepare a false and unsubstantiated report that the Conspirators knew or should have known included false conclusions that had not been reached by means of an adequate investigation;

   c. Emmert advised Erickson, and Penn State accepted, that the NCAA would use the Freeh Report as a substitute for its own investigation, in reckless disregard of the known falsity and inadequacy of the Freeh Report, and the various NCAA procedural rules violations committed thereby;

   d. Unknown NCAA employees communicated to and implicitly threatened Penn State's counsel that the "death penalty" was on the table for Penn State, despite knowing that no such "death penalty" could have lawfully been imposed on Penn State under the NCAA rules;

e.      Emmert threatened, and Penn State accepted, that, if Penn State went to the media, the "death penalty" sanction would be certain, thus extorting silence from Erickson and Penn State; and

f.      Emmert imposed the Consent Decree on Penn State, and Penn State accepted the Consent Decree, based on the allegations in the Freeh Report, although doing so was impermissible under the NCAA's own rules, its contract with Penn State and would further violate Plaintiffs' Penn State Rights and NCAA Rights.

221.    Penn State's conduct in engaging in this civil conspiracy with the other Conspirators was malicious and outrageous and showed a reckless disregard for Plaintiffs' rights to a good name, reputation, honor and integrity, as well as Plaintiffs' Penn State Rights and NCAA Rights.

222.    As a result of this conspiracy, Plaintiffs suffered economic loss, opportunity loss, reputational damage, emotional distress and other damage.

## COUNT IV

## PENNSYLVANIA WPCL

223.    Plaintiffs incorporate the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

224.    Both Paterno and Kenney, based upon Penn State's custom and practice, where each was an assistant football coach who was terminated before the end of the academic year, as a fixed term appointee, were entitled (i) to receive full wages and benefits through the end of the 2012 academic year (*i.e.*, through the end of June 2012) and (ii) further entitled to have the Severance Pay Period, to which each were similarly promised, commence as of July 1, 2012.

225.    Penn State failed to pay each Plaintiff the amounts that were due to them between the date of their Termination and through the end of June 2012.

226.    Instead, Penn State accelerated the Severance Pay Period to commence as of mid-January 2012, and ceased making wage and benefits payments to Plaintiffs sometime in mid-July 2013 (*i.e.*, 18 months after Plaintiffs' termination).

227.    For this reason, Penn State wrongfully terminated Plaintiffs and denied Plaintiffs their due wages and benefits as of mid-January 2012 through June 30, 2012.

228.    Penn State's failure to pay Plaintiffs all owed wages and benefits through the end of June 2012 violated the WPCL.

229.    As a result of Penn State' unlawful conduct, Plaintiffs suffered damages in the form of unpaid wages and benefits from January 12, 2012 through June 30, 2012, as set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)    Enter a declaratory judgment that the actions of Penn State violated the rights of Plaintiffs as secured to them by the applicable state and federal laws and the United States Constitution;

(b)    Compel Penn State to issue a public statement confirming that neither of Plaintiffs committed any wrongdoing or impropriety of any kind in connection with the crimes and misconduct of Sandusky, and/or Penn State's handling of Sandusky's crimes and misconduct in any way, shape or form;

(c)    Award Plaintiffs past and future damages for loss of income, employment opportunities and all other wages and benefits denied to them due to the improper and unlawful actions of Penn State regarding the Termination and/or execution of the Consent Decree (coupled with the Press Conference Statements and PSU Press Release);

(d)     Award Plaintiffs damages in compensation for their emotional distress, humiliation, loss of reputation and status in the community of their respective peers, and the loss of their ability to provide for themselves with the rewards of their years of excellence in their chosen profession;

(e)     Award Plaintiffs punitive damages;

(f)     Grant Plaintiffs costs, disbursements and reasonable attorneys' fees; and

(g)     Grant Plaintiffs such additional relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

**MITTS LAW, LLC**

By:     _____
        Maurice R. Mitts, Esquire
        Gerard M. McCabe, Esquire
        1822 Spruce Street
        Philadelphia, PA 19103
        (215) 866-0110 (office)
        mmitts@mittslaw.com
        gmccabe@mittslaw.com

**THE MAZUREK LAW FIRM, LLC**

By:     _____/s/ Edward R. Mazurek_____
        Edward R. Mazurek, Esquire
        717 South Columbus Boulevard
        Philadelphia, PA 19147
        (215) 988-9090
        emazurek@mazureklawfirm.com

**ATTORNEYS FOR PLAINTIFFS JOSEPH
"JAY" V. PATERNO AND WILLIAM KENNEY**

Dated:   July 21, 2014