# **EXHIBIT A**

PSU/NCAA Consent Decree

(July 23, 2013)

## BINDING CONSENT DECREE IMPOSED BY THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION AND ACCEPTED BY THE PENNSYLVANIA STATE UNIVERSITY

## I. BASIS FOR CONSENT DECREE

On November 5, 2011, the National Collegiate Athletic Association ("NCAA" or the "Association") learned of allegations of child sexual abuse occurring in the athletic facilities of The Pennsylvania State University ("University" or "Penn State"), perpetrated by former assistant football coach Gerald A. Sandusky ("Sandusky"). The University commissioned Freeh Sporkin & Sullivan, LLP ("FSS"), led by former FBI Director Louis Freeh, to investigate the alleged failure of University personnel to respond to and report Sandusky's misconduct, and "[t]he circumstances under which such abuse could occur in University facilities or under the auspices of University programs for youth."[1] On June 22, 2012, a Criminal Jury convicted Sandusky on 45 criminal counts related to 10 victims, including a 2001 incident that occurred in the University athletic showers and was witnessed by a then-graduate assistant. On July 12, 2012, FSS released its investigative report (the "Freeh Report"). The Freeh Report's findings depict an environment shaped by the actions and inactions of members of the leadership and board of Penn State that allowed Sandusky's serial child sexual abuse.

The NCAA recognizes that the circumstances involved in the Penn State matter are, in many respects, unlike any matter encountered by the NCAA in the past; it is doubtful, hopefully, that a similar circumstance would arise on any other campus in the future. In particular, the egregiousness of the predicate conduct is unprecedented, amounting to a failure of institutional and individual integrity far exceeding a lack of institutional control or individual unethical conduct. The University has undertaken a commendable process by commissioning the independent FSS investigation. FSS has established an exhaustive factual record compiled from, *inter alia*, more than 430 interviews and analysis of more than 3.5 million pieces of electronic data and documents.[2]

In light of this record and the University's willingness, for purposes of this resolution, to accept the Freeh Report, which the University itself commissioned, traditional investigative and administrative proceedings would be duplicative and unnecessary. Rather, the existing record permits fashioning an appropriate remedy for the violations on an expedited timetable, which benefits current and future University students, faculty and staff.

---

[1]  Freeh Sporkin & Sullivan, LLP, Report of the Special Investigative Counsel Regarding the Actions of The Pennsylvania State University Related to the Child Sexual Abuse Committed by Gerald A. Sandusky, July 12, 2012, page 8, *available at* http://www.thefreehreportonpsu.com/REPORT_FINAL_071212.pdf.

[2]  *Id.* at 9.

## II.   FINDINGS AND CONCLUSIONS

In a November 17, 2011 letter from NCAA President Mark Emmert to University President Rodney Erickson, Dr. Emmert noted that the membership of the Association has made clear in its Constitution and Bylaws what is expected of member institutions, administrators and coaches. Penn State was asked to describe how the University and relevant personnel have met their obligations to the Association. Penn State has communicated to the NCAA that it accepts the findings of the Freeh Report for purposes of this resolution and acknowledges that those facts constitute violations of the Constitutional and Bylaw principles described in the letter. Penn State expressly agrees not to challenge the consent decree and waives any claim to further process, including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, and any judicial process related to the subject matter of this Consent Decree.

Therefore, without further investigation or response, the findings of the Criminal Jury and the Freeh Report establish a factual basis from which the NCAA concludes that Penn State breached the standards expected by and articulated in the NCAA Constitution and Bylaws.

1.   A failure to value and uphold institutional integrity demonstrated by inadequate, and in some instances non-existent, controls and oversight surrounding the athletics program of the University, such as those controls prescribed by Articles 2.1, 6.01.1, and 6.4 of the NCAA Constitution.

2.   A failure to maintain minimal standards of appropriate and responsible conduct. The NCAA seeks to foster an environment and culture of honesty, as exemplified by NCAA Bylaws 10.01.1 and 11.1.1, and by Bylaw 10.1 on ethical conduct. Indeed, NCAA Bylaw 10.1 enumerates a non-exhaustive list of examples of inappropriate conduct. In addition, Article 2.4 of the NCAA Constitution requires athletic programs to adhere to fundamental values of respect, fairness, civility, honesty and responsibility.

3.   A lack of adherence to fundamental notions of individual integrity. An institution's head coach should promote an atmosphere for compliance and monitor the activities of all assistant coaches and other administrators involved with the program who report directly or indirectly to the coach. Further, NCAA Bylaw 19.01.2, consistent with Article 2.4 of the NCAA Constitution, demands the employees associated with intercollegiate athletics to serve as positive moral models for students in order "for intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society."

The entirety of the factual findings in the Freeh Report supports these conclusions. A detailed recitation of the Freeh Report is not necessary, but these conclusions rely on the following key factual findings with respect to the University's oversight of its football program:

- [University] President Graham B. Spanier, Senior Vice President-Finance and Business Gary C. Shultz, Athletic Director Timothy M. Curley and Head Football Coach Joseph V. Paterno [] failed to protect against a child sexual predator harming children for over a decade. These men concealed Sandusky's activities from the Board of Trustees, the University community and authorities. . . .

- These individuals, unchecked by the Board of Trustees that did not perform its oversight duties, empowered Sandusky to attract potential victims to the campus and football events by allowing him to have continued, unrestricted and unsupervised access to the University's facilities and affiliation with the University's prominent football program. Indeed, that continued access provided Sandusky with the very currency that enabled him to attract his victims. Some coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him.

- By not promptly and fully advising the Board of Trustees about the 1998 and 2001 child sexual abuse allegations against Sandusky and the subsequent Grand Jury investigation of him, Spanier failed in his duties as President. The Board also failed in its duties to oversee the President and senior University officials in 1998 and 2001 by not inquiring about important University matters and by not creating an environment where senior University officials felt accountable.[3]

FSS recognized that Spanier, Shultz, Paterno and Curley provided various explanations for their deficient conduct, but FSS found that it was

- more reasonable to conclude that, in order to avoid the consequences of bad publicity, the most powerful leaders at the University – Spanier, Shultz, Paterno and Curley – repeatedly concealed critical facts relating to Sandusky's child abuse from the authorities, the University's Board of Trustees, the Penn State community and the public at large.[4]

Although FSS concluded that avoiding the consequences of bad publicity was the most significant cause for the University's failure to protect child victims and report to authorities, FSS further concluded it was not the only cause. FSS also noted, among other causes, that

---

[3]  *Id.* at 14-15.

[4]  *Id.* at 15-16.

- the President "discouraged discussion and dissent";

- Spanier, Schultz, Paterno, and Curley allowed Sandusky to retire as a valued member of the University's football legacy, with "ways 'to continue to work with young people through Penn State,' essentially granting him license to bring boys to campus facilities for 'grooming' as targets for his assaults";

- the football program "did not fully participate in, or opted out, of some University programs, including Clery Act compliance. . ."; and

- the University maintained a "culture of reverence for the football program that is ingrained at all levels of the campus community."[5]

## III.   SANCTIONS

The NCAA concludes that this evidence presents an unprecedented failure of institutional integrity leading to a culture in which a football program was held in higher esteem than the values of the institution, the values of the NCAA, the values of higher education, and most disturbingly the values of human decency. The sexual abuse of children on a university campus by a former university official – and even the active concealment of that abuse – while despicable, ordinarily would not be actionable by the NCAA. Yet, in this instance, it was the fear of or deference to the omnipotent football program that enabled a sexual predator to attract and abuse his victims. Indeed, the reverence for Penn State football permeated every level of the University community. That imbalance of power and its result are antithetical to the model of intercollegiate athletics embedded in higher education. Indeed, the culture exhibited at Penn State is an extraordinary affront to the values all members of the Association have pledged to uphold and calls for extraordinary action.

As a result, the NCAA has determined that the University's sanctions be designed to not only penalize the University for contravention of the NCAA Constitution and Bylaws, but also to change the culture that allowed this activity to occur and realign it in a sustainable fashion with the expected norms and values of intercollegiate athletics. Moreover, the NCAA recognizes that in this instance no student-athlete is responsible for these events and, therefore, the NCAA has fashioned its sanctions in consideration of the potential impact on all student-athletes. To wit, after serious consideration and significant discussion, the NCAA has determined not to impose the so-called "death penalty." While these circumstances certainly are severe, the suspension of competition is most warranted when the institution is a repeat violator and has failed to cooperate or take corrective action. The University has never before had NCAA major violations, accepted these penalties and corrective actions, has removed all of the individual offenders identified by FSS from their past senior leadership roles, has itself commissioned the FSS investigation and provided unprecedented access and openness, in some instances, even agreed to waive attorney-client privilege, and already has implemented many corrective actions. Acknowledging these and other factors, the NCAA does not deem the so-called "death penalty" to be appropriate.

---

[5]     *Id.* at 16-17.

In light of the foregoing, the NCAA imposes the following sanctions on the University:

## A.    Punitive Component

- **$60 million fine**. The NCAA imposes a $60 million fine, equivalent to the approximate average of one year's gross revenue from the Penn State football program, to be paid over a five-year period beginning in 2012 into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse. The minimum annual payment will be $12 million until the $60 million is paid. The proceeds of this fine may not be used to fund programs at the University. No current sponsored athletic team may be reduced or eliminated in order to fund this fine.

- **Four-year postseason ban.** The NCAA imposes a four-year ban on participation in postseason play in the sport of football, beginning with the 2012-2013 academic year and expiring at the conclusion of the 2015-2016 academic year. Therefore, the University's football team shall end its 2012 season and each season through 2015 with the playing of its last regularly scheduled, in-season contest and shall not be eligible to participate in any postseason competition, including a conference championship, any bowl game, or any post-season playoff competition.

- **Four-year reduction of grants-in-aid.** For a period of four years commencing with the 2013-2014 academic year and expiring at the conclusion of the 2016-2017 academic year, the NCAA imposes a limit of 15 initial grants-in-aid (from a maximum of twenty-five allowed) and for a period of four years commencing with the 2014-2015 academic year and expiring at the conclusion of the 2017-2018 academic year a limit of 65 total grants-in-aid (from a maximum of 85 allowed) for football during each of those specified years. In the event the number of total grants-in-aid drops below 65, the University may award grants-in-aid to non-scholarship student-athletes who have been members of the football program as allowed under Bylaw 15.5.6.3.6.

- **Five years of probation.** The NCAA imposes this period of probation, which will include the appointment of an on-campus, independent Integrity Monitor and periodic reporting as detailed in the Corrective Component of this Consent Decree. Failure to comply with the Consent Decree during this probationary period may result in additional, more severe sanctions.

- **Vacation of wins since 1998.** The NCAA vacates all wins of the Penn State football team from 1998 to 2011. The career record of Coach "Joe" Paterno will reflect the vacated records.

- **Waiver of transfer rules and grant-in-aid retention.** Any entering or returning football student-athlete will be allowed to immediately transfer and will be eligible to immediately compete at the transfer institution, provided he is otherwise eligible. Any football student-athlete who wants to remain at the University may retain his athletic grant-in-aid, as long as he meets and maintains applicable academic requirements, regardless of whether he competes on the football team.

- **Individual penalties to be determined.** The NCAA reserves the right to initiate a formal investigatory and disciplinary process and impose sanctions on individuals after the conclusion of any criminal proceedings related to any individual involved.

## B.  **Corrective Component**

- **Adoption of all recommendations presented in Chapter 10 of the Freeh Report.** The NCAA requires the University to adopt all recommendations for reform delineated in Chapter 10 of the Freeh Report. The University shall take all reasonable steps to implement the recommendations in spirit and substance by December 31, 2013.

- **Implementation of Athletics Integrity Agreement.** The Freeh Report includes a number of recommendations related to the University's Athletic Department. Specifically, in Chapter 10, Section 5.0, the Report addresses the integration of the Athletic Department into the greater University community. Within 10 days of this Consent Decree, the University will be required to enter into an "Athletics Integrity Agreement" ("AIA") with the NCAA and the Big Ten Conference, which obligates the University to adopt all of the recommendations in Section 5.0 of the Freeh Report as described in the above paragraph and, at a minimum, the following additional actions:

  o Compliance Officer for Athletics. Establish and select an individual for a position of a compliance officer or equivalent who is, at a minimum, responsible for the ethical and compliance obligations of the Athletic Department.

  o Compliance Council. Create a Compliance Council (or Council Subcommittee) composed of faculty, senior University administrators, and the compliance officer for athletics, which shall be responsible for review and oversight of matters related to ethical, legal and compliance obligations of the Athletic Department.

- o Disclosure Program. Create a reporting mechanism, including a hotline, for named or anonymous individuals to disclose, report, or request advice on any identified issues or questions regarding compliance with (i) the AIA; (ii) the Athletic Department's policies, conduct, practices, or procedures, or (iii) the NCAA Constitution, Bylaws, or the principals regarding institutional control, responsibility, ethical conduct, and integrity reflected in the Constitution and Bylaws.

- o Internal Accountability and Certifications. Appoint a named coach, manager, or administrator for each of the University's NCAA-sanctioned intercollegiate athletic teams who shall be assigned to monitor and oversee activities within his or her team and shall annually certify to the Compliance Council that his or her team is compliant with all relevant ethical, legal, compliance and University standards and obligations.

- o External Compliance Review/Certification Process. The Athletic Director shall annually certify to the Compliance Council, the Board of Trustees, and the NCAA that the Athletic Department is in compliance with all ethical, compliance, legal and University obligations. If the Department fails to earn a certification, the Board of Trustees (or subcommittee thereof) or an appropriate University administrator shall take appropriate action against the Athletic Department, including the possibility of reduction in athletic funding.

- o Athletics Code of Conduct. Create or update any code of conduct of the Athletic Department to codify the values of honesty, integrity and civility.

- o Training and Education. In addition to Chapter 10, Section 5.5 of the Freeh Report, require all student-athletes and University employees associated with the Athletic Department, including faculty and staff to complete a yearly training course that addresses issues of ethics, integrity, civility, standards of conduct and reporting of violations. Each person who is required to complete training shall certify, in writing, that he or she has received such training. All training shall be overseen by the Compliance Council. The Board of Trustees also should receive training and education on these issues, including its relationship, role and responsibilities regarding the athletics program.

- If the NCAA determines, in its sole discretion, that the University materially breached any provision of the AIA, such action shall be considered grounds for extending the term of the AIA or imposing additional sanctions, up to and including, a temporary ban on participation in certain intercollegiate athletic competition and additional fines. The NCAA shall be permitted to accept as true and take into consideration all factual findings of the Freeh Report in imposing additional sanctions related to breach of the AIA and may initiate further NCAA investigative and administrative proceedings. The NCAA will provide the University notice of the allegation of a material breach and an opportunity to

respond, but the final determination rests with the NCAA.

- **Appointment of an independent Athletics Integrity Monitor for a five-year period**. The NCAA requires that the University appoint an independent Athletics Integrity Monitor (the "Monitor") for a five-year period, at the University's expense. The Monitor will prepare a quarterly report to the University's Board of Trustees, the Big Ten Conference, and the NCAA regarding the University's execution and maintenance of the provisions of the AIA. The Monitor will make recommendations to the University to take any steps he or she reasonably believes are necessary to comply with the terms of the AIA and to enhance compliance with NCAA rules and regulations. The Monitor will operate under the following conditions:

  o He or she will be selected by the NCAA, in consultation with the University and the Big Ten Conference.

  o He or she will have access to any University facilities, personnel and non-privileged documents and records as are reasonably necessary to assist in the execution of his or her duties. The University shall preserve all such records as directed by the Monitor.

  o He or she will have the authority to employ legal counsel, consultants, investigators, experts and other personnel reasonably necessary to assist in the proper discharge of his or her duties. His or her expenses will be paid by the University, and the University shall indemnify and hold harmless the Monitor and his or her professional advisors from any claim by any third party except for conduct: a) outside the scope of the Monitor's duties; b) undertaken in bad faith; or c) constituting gross negligence or willful misconduct.

This Consent Decree may be modified or clarified by mutual written consent of the parties.

By signature of its President below, the University represents (i) that it has taken all actions necessary, to execute and perform this Consent Decree and the AIA and will take all actions necessary to perform all actions specified under this Consent Decree and the AIA in accordance with the terms hereof and thereof; (ii) its entry into this Consent Decree and the AIA is consistent with, and allowed by, the laws of Pennsylvania and any other applicable law.

IN WITNESS WHEREOF, this Consent Decree has been signed by or on behalf of each of the parties as of July 23, 2012.


_____

Rodney A. Erickson, President
The Pennsylvania State University


_____

Mark A. Emmert, President
National Collegiate Athletic Association

# **EXHIBIT B**

NCCA Emmert Letter to Penn State Erickson

(dated November 17, 2011)



November 17, 2011

**Mark A. Emmert**
*President*

P.O. Box 6222
Indianapolis, Indiana 46206
317/917-6222

President Rodney Erickson
Pennsylvania State University
201 Old Main
University Park, Pennsylvania 16802

Dear President Erickson:

As we have discussed, on November 5, 2011, the NCAA first learned about allegations of sexual abuse of young boys occurring in the athletic facilities of Pennsylvania State University, perpetrated by a former assistant head football coach. Further, at the same time the NCAA learned that these alleged acts occurred over two decades and that individuals with present or former administrative or coaching responsibilities may have been aware of this behavior. The recount of these tragic events in the Grand Jury Report is deeply troubling, and if true, individuals who were in a position to monitor and act upon learning of potential abuses appear to have been acting starkly contrary to the values of higher education, as well as the NCAA. I am writing to notify you that the NCAA will examine Penn State's exercise of institutional control over its intercollegiate athletics program, as well as the actions, and inactions, of relevant responsible personnel. I also have notified the NCAA Division I Board of Directors of the NCAA approach. We recognize that there are ongoing federal and state investigations and the NCAA does not intend to interfere with those probes. Moreover, we respect that under our criminal justice system there is a defined process to ascertain the facts, as well as determine criminal guilt or innocence. We will utilize any information gained from the criminal justice process in our review and have posed additional questions below to gather information that we believe relevant to this review.

As you undoubtedly are aware, the NCAA Constitution contains principles regarding institutional control and responsibility, as well as ethical conduct. Specifically, under Article 2.1, "it is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's president or chancellor is responsible for the administration of all aspects of the athletics program . . . ." Further, that "includes responsibility for the actions of its staff members and for the actions of any other individual or organization engaged in activities promoting the athletics interests of the institution." These principles of institutional control are further elaborated on in Articles 6.01.1 and 6.4 of the Constitution, and universities are often held accountable in our infractions process for failure to meet them. Under Article 2.4, the NCAA Constitution requires that "for intercollegiate athletics to promote the character development of participants, to

enhance the integrity of higher education and to promote civility in society, student-athletes, coaches, and all others associated with these athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty and responsibility. These values should be manifest not only in athletics participation, but also in the broad spectrum of activities affecting the athletics program." These principles are bedrock to the foundation of intercollegiate athletics; and the membership of the Association has made clear through the enactment of relevant bylaws that they are expected to be respected and followed.

Indeed, NCAA Bylaw 10.1 identifies 10 types of unethical conduct, but specifically makes clear that the list of 10 *is not limited to* those delineated. Among other things, that list captures the general principle of honesty embedded in Bylaw 10.01.1, which requires individuals to "act with honesty and sportsmanship at all times so that intercollegiate athletics as a whole, their institutions and they, as individuals, shall represent the honor and dignity of fair play and the generally recognized high standards associated with wholesome competitive sports." While admittedly, the actions alleged to have occurred in this instance are not specifically listed in the bylaw, it is clear that deceitful and dishonest behavior can be found to be unethical conduct. Surely, the spirit of this bylaw also constrains behavior that endangers young people. To be clear, the requirement is so important that the language is repeated verbatim in Bylaw 11.1.1, governing the conduct of athletics personnel. Bylaw 11.1.2.1 goes on to state that "it shall be the responsibility of an institution's head coach to promote an atmosphere for compliance within the program supervised by the coach and to monitor the activities regarding compliance of all assistant coaches and other administrators involved with the program who report directly or indirectly to the coach." Under this same bylaw governing the conduct and employment of athletics personnel, it makes clear that "institutional staff members found in violation of NCAA regulations shall be subject to disciplinary or corrective action . . . . whether such violations occurred at the certifying institution or during the individual's previous employment . . ."

Lastly, it is important to bring to your attention that Bylaw 19.01.2 affirmatively states that "individuals employed by or associated with member institutions for the administration, the conduct or the coaching of intercollegiate athletics are, in the final analysis, teachers of young people. Their responsibility is an affirmative one, and they must do more than avoid improper conduct or questionable acts. Their own moral values must be so certain and positive that those younger and more pliable will be influenced by a fine example. Much more is expected of them than of the less critically placed citizen." This provision has been cited by enforcement in at least a half dozen major infractions cases in the past. Those who exhibit this behavior are meeting the ethical expectations of the NCAA membership. Those who do not, fail us all.

With this as a backdrop and to prepare for potential inquiry, the university should provide relevant information and data in response to the following questions:

1.    How has Penn State and/or its employees complied with the Articles of the Constitution and bylaws that are cited in this letter?

2.     How has Penn State exercised institutional control over the issues identified in and related to the Grand Jury Report? Were there procedures in place that were or were not followed? What are the institution's expectations and policies to address the conduct that has been alleged in this matter upon discovery by any party?

3.     Have each of the alleged persons to have been involved or have notice of the issues identified in and related to the Grand Jury Report behaved consistent with principles and requirements governing ethical conduct and honesty? If so, how? If not, how?

4.     What policies and procedures does Penn State have in place to monitor, prevent and detect the issues identified in and related to the Grand Jury Report or to take disciplinary or corrective action if such behaviors are found?

The behaviors and failures described in the allegations set forth by the grand jury try not only the integrity of the university, but that of intercollegiate athletics as a whole and the NCAA member institutions that conduct college sports. It is critical that each campus and the NCAA as an Association re-examine how we constrain or encourage behaviors that lift up young people rather than making them victims. As you and I have discussed, it is essential that Penn State respond to the questions I have posed so that any failures in the management of athletics programs – both real and perceived – can be rectified. Unless you provide reason for a different timeline, your responses should be submitted by December 16 in order for the NCAA to determine next steps.

I look forward to the complete cooperation of Penn State in our review and any future action that we may take.

Sincerely,

Mark Emmert
President

ME:dby

cc:     Division I Board of Directors
        Selected NCAA Staff Members

# EXHIBIT C

Penn State Press Release

(dated January 6, 2012)

## Penn State Selects Bill O'Brien To Lead Football Program

## New England Patriots Offensive Coordinator Named Nittany Lions' 15th Head Coach

**Jan. 6, 2012**

**Penn State Football's New Leader - The Bill O'Brien File**



Bill O'Brien

**UNIVERSITY PARK, Pa. -** The Pennsylvania State University has selected Bill O'Brien, the New England Patriots offensive coordinator, as its 15th head football coach in its storied 125-year history.

O'Brien's appointment was announced this evening by Penn State president Rodney Erickson and Dave Joyner, Acting Director of Athletics. A 14-year veteran in the collegiate coaching ranks prior to his National Football League experience, O'Brien will be introduced on the Penn State campus Saturday.

A member of the Patriots' coaching staff since 2007, including the last three mentoring the quarterbacks, O'Brien has worked with some of the game's most successful and innovative coaches and players in his 19-year coaching career. Bill Belichick, Tom Brady, Wes Welker, Randy Moss, Ralph Friedgen, George O'Leary and Chan Gailey are among the coaches and players he has teamed with throughout his career.

A graduate of Brown University, also the alma mater of Hall of Fame predecessor Joe Paterno, O'Brien joined Belichick's staff in New England as a coaching assistant in 2007 after 14 seasons on the staffs of Georgia Tech, Maryland and Duke. He served as the Patriots' wide receivers coach in 2008, was the quarterbacks coach in 2009-10 and was appointed offensive coordinator/quarterbacks coach prior to the 2011 season.

"The Penn State football program has a great legacy and has contributed enormously to our University community," said Rodney A. Erickson, president of Penn State University. "A program of this caliber requires a special kind of leader - a leader who will embrace that legacy and maintain the University's commitment to excellence on the field and in the classroom. We have that leader in Coach O'Brien, and I look forward to working with him in his new role."

"We have found the man to take Penn State football forward," said Dave Joyner, Penn State acting director of athletics. "Needless to say, we have been looking for someone with some very special qualities, beginning with a heart that beats to the values and vision of Penn State University and our Penn State football legacy and tradition. That was our starting point, and Coach O'Brien exemplifies those traits that Penn Staters hold so highly. In addition to his model characteristics as a man and a teacher, he's all about producing winners, and doing so the right way. He will embrace tradition, demand excellence and pursue Success with Honor in every phase of our program."

"I am thrilled to be the head coach of the Penn State football program," stated O'Brien. "I cannot tell you how excited I am to get started, meet the team, meet the football alumni and meet all of the people that make this University so special. As head coach of this special football program, it is my responsibility to ensure that this program represents the highest level of character, respect and integrity in everything we do. That includes my coaching staff, our players and everyone involved in the football program. There is tremendous pride in Penn State football and will never, ever take that for granted."

This season, O'Brien has been instrumental in New England earning a 13-3 record and the No. 1 seed in the AFC. The Patriots have scored 513 points (32.1 avg.), the AFC's highest mark and No. 3 in the NFL. New England is second in the NFL in total offense (428.0 ypg) and passing (317.8 ypg).

Under O'Brien's tutelage, Brady has thrown for 5,235 yards (No. 2 in NFL) and 39 touchdowns this season, as the Patriots won their final eight games. Wide receiver Welker leads the NFL with 122 receptions and his 1,569 receiving yards to rank second in the NFL. Welker and tight end Rob Gronkowski (90-1,327) rank No. 1-2 in the AFC in receiving yardage. Gronkowski leads the NFL with 17 touchdown receptions.

Under O'Brien's direction, Brady became the first unanimous Associated Press MVP in 2010 in leading the Patriots to an NFL-best 14-2 mark.

O'Brien began his coaching career at his alma mater, working with the tight ends in 1993 and the inside linebackers in 1994. He joined O'Leary's Georgia Tech staff in 1995, helping the Yellow Jackets to bowl appearances in each of his last six seasons. O'Brien was an offensive graduate assistant his initial three years in Atlanta. Working with then-offensive coordinator Friedgen, O'Brien served as the Yellow Jackets' running backs coach from 1998-2000. Georgia Tech finished no

lower than third in the Atlantic Coast Conference in rushing all three seasons. O'Brien was promoted to Georgia Tech's offensive coordinator and quarterbacks coach in 2001 and assistant head coach in 2002.

O'Brien was reunited with Friedgen in 2003, joining his Maryland staff as running backs coach. The Terrapins finished second in the ACC in rushing in his first season and defeated West Virginia, 41-7, in the Gator Bowl. Following two years in College Park, O'Brien served as offensive coordinator and quarterbacks coach at Duke in 2005 and '06 before joining the Patriots' coaching staff.

Born in Dorchester, Mass. O'Brien was raised in Andover, a Boston suburb. He played linebacker and defensive end at Brown from 1990-92, graduating in 1992 with a double concentration in political science and organizational behavior management.

O'Brien and his wife, Colleen, have two sons, Jack and Michael.

Penn State is among the nation's premier programs in success on the gridiron and in the classroom. The Nittany Lions' 827 all-time victories rank No. 5 in the nation, their 27 bowl victories are third-highest and 96 Penn Staters have earned first team All-America honors. Penn State won National Championships in 1982 and 1986 and since joining the Big Ten Conference in 1993 has won league championships in 1994, 2005 and 2008. Beaver Stadium is the nation's second-largest facility with a capacity of 106,572 and Penn State has ranked among the top four nationally in NCAA attendance every year since 1991.

Penn State is consistently among the nation's most successful program in the graduation of its football student-athletes. The 2011 NCAA Graduation Rates Report revealed that Penn State and Stanford earned a football Graduation Success Rate of 87 percent, highest among the teams ranked in the final 2011 Bowl Championship Series Top 25 rankings. Among the 70 Football Bowl Subdivision teams that played in a 2011-12 bowl game, Penn State and Stanford were tied for the fifth-highest GSR.

Penn State Football student-athletes have earned a nation's-best 15 CoSIDA Academic All-America selections (13 first-team) since 2006. The Nittany Lions' 49 Academic All-Americans all-time rank No. 3 nationally among all Football Bowl Subdivision institutions.

The Nittany Lions shared the Big Ten Leaders Division title with Wisconsin and finished with a 9-4 mark during the 2011 season. Penn State played in its fourth consecutive New Year's bowl game and 28th overall.

# **EXHIBIT D**

Penn State Press Release

(dated January 23, 2012)

# Remembering a Coaching Legend

## Iconic figure spent 46 years as head coach at Penn State

**Jan. 23, 2012**

By **Tony Mancuso**



Joe Paterno

UNIVERSITY PARK, Pa. - Joseph Vincent Paterno was assigned the responsibility of coaching the quarterbacks at Penn State by head coach Rip Engle on May 27, 1950.

More than 61 years later, the Penn State community and sports world lost a legend who made a tremendous impact on the football program, University, town and sport on Sunday morning.

Few men were more passionate about coaching college football than Joe Paterno. Coaching with class, merit and success with honor, Coach Paterno directed the Nittany Lion football program for nearly 46 years.

He embarked on a "Grand Experiment" of leading student-athletes who were able to play football, graduate, and then contribute to society.

The education pillar always came first from a man who received his degree in the IVY League at Brown. Coach Paterno wanted the student-athletes he coached to thrive on the gridiron, but more importantly in life after football by earning a degree from Penn State. His former players would be the first to tell you that when they walked onto campus as boys, Coach Paterno turned them into successful men.

Playing football for Joe Paterno was only a small facet of being a member on the roster of his teams. That's why thousands of his athletes went on to become professionals, educators, doctors, lawyers, entrepreneurs and more.

On the field, the Hall of Fame head coach erected a blueprint for success on the gridiron. For decades, the Penn State football program became a benchmark of winning the right way. Ultra-competitive, the all-time leader in Division I victories had a portfolio that included national championships in 1982 and 1986; five undefeated, untied teams; 23 finishes in the Top 10 of the national rankings; 36 bowl appearances and 24 bowl victories.

His 409 career victories and the duration of his stint in Happy Valley are things that will likely never be touched again. Spending 46 seasons as a head coach in one place is unheard of in modern college football.

Football is all Coach Paterno knew, though. He publicly said that he didn't have any other hobbies. He didn't want to play golf or go fishing.

Coach Paterno paced on the East sideline of Beaver Stadium for 46 seasons because that is the only place he wanted to be.

During his tenure on the staff, Coach Paterno missed just three games in 61-plus years. As an assistant coach, he missed the 1955 game at Army when his father, Angelo, died. As head coach in 1977, Joe and Sue Paterno's son, David, was involved in a serious trampoline accident the day before the Lions' game at Syracuse and Paterno did not attend the contest. Coach Paterno missed the Nov. 11, 2006 game with Temple, which took place five days after he had surgery on his left leg, which was injured in a sideline collision at Wisconsin on Nov. 4.

Family and football, in that order, meant everything to Coach Paterno. His office desk inside the Lasch Building did not have a computer. Instead it was filled with pictures of all 17 of his grandchildren. He and Sue have five children - Diana, Jay, Mary Kay, David and Scott.

His dedication to the football program personified his love for Penn State University. No one loved Penn State more than Joe Paterno. That's a big reason why he and wife Sue donated millions of dollars to the school, including large financial contributions to help build the Paterno Library and Pasquerilla Spiritual Center, among others.

Penn State University would not be the same place it is today without Coach Paterno.

The Paterno family has lived in the same modest house on McKee Street in State College for decades. When driving past, onlookers would have no idea that a Hall of Fame head coach resided inside. And he didn't want it any other way. He was among the most generous individuals in the community and never sought any attention from the media.

In addition to his influence on thousands of student-athletes and the University, Coach Paterno was a giant in the coaching community. The outpouring of statements released by his peers in the coaching world on Sunday speaks volumes about the respect he garnered in the coaching fraternity.

He was just as influential within the high school coaching world. On a personal level, several family members were among the thousands of high school coaches who attended clinics led by Coach Paterno. Always willing to go the extra mile to answer questions and provide guidance, he was a teacher to thousands.



Coach Paterno was the type of person who could strike up a conversation with anyone on just about anything. He could tell stories for hours because quite literally, he had seen just about everything the sports world has to offer. Some of the best Coach Paterno recollections came during Friday night impromptu off-the-record sessions with the traveling beat reporters at road games.

From nearly coming to blows on a recruiting trip with current ESPN historian Beano Cook in 1957, who at the time was a sports publicist for Pitt, to his attempt at guarding former Boston Celtics great Bob Cousy on the basketball court to Vince Lombardi, Coach Paterno had a story or joke for any topic you could imagine.

Regrettably, Coach Paterno did not finish his coaching career in the manner he or anyone else had expected, but his coaching legacy in Happy Valley and around the nation will live on forever.

His impact on the lives of the thousands of players he coached, students who attended Penn State University and millions of college football fans across the country is truly immeasurable.

Joe Paterno was one of a kind.


*A collection of famous quotes from the coaching icon.*

"Besides pride, loyalty, discipline, heart, and mind, confidence is the key to all the locks."

"When a team outgrows individual performance and learns team confidence, excellence becomes a reality."

"Success without honor is an unseasoned dish; it will satisfy your hunger, but it won't taste good."

"Losing a game is heartbreaking. Losing your sense of excellence or worth is a tragedy."

"You need to play with supreme confidence, or else you'll lose again, and then losing becomes a habit."

"The will to win is important, but the will to prepare is vital."

"Believe deep down in your heart that you're destined to do great things."

"You have to perform at a consistently higher level than others. That's the mark of a true professional."

"Publicity is like poison; it doesn't hurt unless you swallow it."

"It's the name on the front of the jersey that matters most, not the one on the back."

"They ask me what I'd like written about me when I'm gone. I hope they write I made Penn State a better place, not just that I was a good football coach."


***Follow GoPSUsports.com Media Specialist Tony Mancuso on Twitter @GoPSUTony***

# EXHIBIT E

Penn State Press Release

(dated February 18, 2012)

## Charlie Fisher Named Penn State Quarterbacks Coach

## O'Brien Selects Veteran Offensive Innovator to Complete Coaching Staff

**Feb. 18, 2012**

**VIDEO: Head Coach Bill O'Brien Addresses the Media After Winter Workout on Feb. 17**

**UNIVERSITY PARK, Pa. -** Penn State head football coach Bill O'Brien has named veteran offensive coach Charlie Fisher quarterbacks coach to complete his first Nittany Lion coaching staff.

Fisher has extensive experience as an innovative collegiate head coach, offensive coordinator, passing game coordinator, wide receivers and running backs coach. Entering his 31st season in coaching, among some of the players Fisher has coached or helped mentor are: Earl Bennett and Jay Cutler (Vanderbilt), Torry Holt and Koren Robinson (North Carolina State) and Zac Dysert and Nick Harwell (Miami Univ.).

A native of Allenwood, Pa., 70 miles east of State College, Fisher is the fifth member of O'Brien's staff who has been part of a national championship coaching staff, having helped Eastern Kentucky win an NCAA Division I-AA (now FCS) title.



Charlie Fisher

"With the hiring of Charlie Fisher as quarterbacks coach, we have completed the Penn State football coaching staff," O'Brien stated. "This is a staff made up of men who care about the mission of Penn State University and being successful on and off the field. It is also a staff of winners, with five staff members that have been a part of a national championship teams as assistant coaches. This is a staff that has won many games; some while being a part of the same staff, and is a staff comprised of former head coaches, coordinators and tremendous recruiting experience."

"I've known Charlie for a long time," Coach O'Brien said. "He is a bright guy, sharp guy who has had a lot of success. He has coached some good quarterbacks. He worked with Jay Cutler at Vanderbilt. He just led Zac Dysert last year at Miami of Ohio. We are lucky to get him."

Fisher comes to Happy Valley after serving as the pass game coordinator and quarterbacks coach at Miami (Ohio) in 2011. The prolific Dysert ranked 11th nationally in passing offense (292.7 ypg) and 14th in total offense (302.3 ypg). Wideout Harwell was No. 2 nationally in receiving yards with a 129.5 ypg average, making 97 catches for 1,525 yards and nine touchdowns for the Redhawks.

Fisher was on the Vanderbilt staff from 2002-10, serving as co-pass game coordinator his last five seasons and the wide receivers coach the final seven years. Fisher was instrumental in Bennett becoming the all-time receptions leader in Southeastern Conference history (236 catches), earning All-SEC honors three times. Bennett and Cutler play for the Chicago Bears.

A 1981 graduate of Springfield College, Fisher earned a master's degree at Eastern Kentucky, helping the Colonels win the 1982 NCAA I-AA title. He served as offensive coordinator and quarterbacks coach at Temple (2000-02) and was receivers coach at North Carolina State (1998-99), helping develop Wolfpack and NFL standouts Holt and Robinson, as well as Chris Coleman. Holt was the 1998 ACC Player of the Year and the No. 6 pick in the 1999 NFL Draft, while Robinson was the 1999 ACC Rookie of the Year and played eight years in the NFL.

Fisher was head coach at West Georgia from 1991-98, earning a 67.9 winning percentage and leading the school to its first Gulf South Conference championship in 1997. Former New York Giants wide receiver Ron Dixon was among the players he developed at West Georgia. He was the offensive coordinator and quarterbacks coach at Lenoir-Rhyne from 1985-91 and a graduate assistant coach at Ole Miss in 1983-84.

The Penn State assistant coaches who have won national championships are: Fisher, assistant head coach/wide receivers Stan Hixon (LSU), offensive line coach Mac McWhorter (Texas), defensive coordinator Ted Roof (Auburn) and linebackers coach Ron Vanderlinden (Colorado).

The Nittany Lions will begin spring drills March 26, with the 15 practices culminating in the Blue-White game, the highlight of the spring sports season. Blue-White Weekend is April 20-22, with the game on the Saturday, April 21 in Beaver Stadium.

"We are in the middle of our off-season conditioning program run by Craig Fitzgerald," O'Brien added. "Our players are

working extremely hard and we can't wait for the start of spring practice."

The Nittany Lions were 2011 Big Ten Leaders Division co-champions and played in their fourth consecutive New Year's bowl game and 44th bowl overall. The Nittany Lions' 827 all-time victories rank No. 5 in the nation and their 27 bowl wins are third-highest nationally.

Penn State opens its 126th season on Sept. 1. The Nittany Lions will host Ohio State, Wisconsin, Northwestern (Oct. 6-Homecoming), Indiana, Navy, Temple and Ohio University in Beaver Stadium this fall. For season ticket information, fans should call 1-800-NITTANY weekdays from 8 a.m.-5 p.m. The pricing of Penn State football game tickets and accompanying donation levels is the same as in 2011.

# **EXHIBIT F**

Freeh Report

(dated July 12, 2012)

located at

http://www.thefreehreportonpsu.com/REPORT_FINAL_071212.pdf

# EXHIBIT G

Excerpts of 2011-2012
NCCA Division I Manual



2011-12 NCAA®
# DIVISION I **MANUAL**

EFFECTIVE
AUGUST 1, 2011

CONSTITUTION
OPERATING BYLAWS
ADMINISTRATIVE BYLAWS



THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

P.O. Box 6222
Indianapolis, Indiana 46206-6222
317/917-6222
ncaa.org
July 2011
[ISSN 1093-3174]

**Text Prepared By:** NCAA Academic and Membership Affairs Staff.

**Production By:** NCAA Academic and Membership Affairs Staff.

*This publication incorporates final legislative actions taken during the 2010-11 legislative cycle. Legislation adopted after August 1, 2010, interpretations incorporated by the Legislative Review/Interpretations Committee, modifications of wording and editorial revisions are set off by a gray background and also include an adoption or revision date. Readers seeking the legislative history of a given provision (earlier dates of adoption or revision) should consult the appropriate paragraphs in the 1988-89 NCAA Manual or the NCAA academic and membership affairs staff.*

Distributed to: directors of athletics; faculty athletics representatives; senior woman administrators; presidents or chancellors; conference commissioners; senior compliance administrators; and reclassifying and affiliated members.

NCAA, NCAA logo and National Collegiate Athletic Association are registered marks of the Association, and use in any manner is prohibited unless prior approval is obtained from the Association.

©2011 by the National Collegiate Athletic Association

# Name, Purposes and Fundamental Policy

1.1 Name ........................1
1.2 Purposes ...................1
1.3 Fundamental Policy .........1

## 1.1 NAME [*]
The name of this organization shall be "The National Collegiate Athletic Association."

## 1.2 PURPOSES [*]
The purposes of this Association are:

(a) To initiate, stimulate and improve intercollegiate athletics programs for student-athletes and to promote and develop educational leadership, physical fitness, athletics excellence and athletics participation as a recreational pursuit;

(b) To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association;

(c) To encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism;

(d) To formulate, copyright and publish rules of play governing intercollegiate athletics;

(e) To preserve intercollegiate athletics records;

(f) To supervise the conduct of, and to establish eligibility standards for, regional and national athletics events under the auspices of this Association;

(g) To cooperate with other amateur athletics organizations in promoting and conducting national and international athletics events;

(h) To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics; and

(i) To study in general all phases of competitive intercollegiate athletics and establish standards whereby the colleges and universities of the United States can maintain their athletics programs on a high level.

## 1.3 FUNDAMENTAL POLICY [*]
**1.3.1 Basic Purpose. [*]** The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

**1.3.2 Obligations of Member Institutions. [*]** Legislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation.

# Principles for Conduct of Intercollegiate Athletics

| | | | | | |
|---|---|---|---|---|---|
| 2.01 | General Principle ............................................3 | | 2.9 | The Principle of Amateurism ...........................4 |
| 2.1 | The Principle of Institutional Control and Responsibility ......................................3 | | 2.10 | The Principle of Competitive Equity .............5 |
| | | | 2.11 | The Principle Governing Recruiting ..............5 |
| 2.2 | The Principle of Student-Athlete Well-Being ...............................................3 | | 2.12 | The Principle Governing Eligibility ...............5 |
| | | | 2.13 | The Principle Governing Financial Aid .........5 |
| 2.3 | The Principle of Gender Equity ......................4 | | 2.14 | The Principle Governing Playing and Practice Seasons ...................................5 |
| 2.4 | The Principle of Sportsmanship and Ethical Conduct .....................................4 | | | |
| | | | 2.15 | The Principle Governing Postseason Competition and Contests Sponsored by Noncollegiate Organizations ................5 |
| 2.5 | The Principle of Sound Academic Standards ................................4 | | | |
| 2.6 | The Principle of Nondiscrimination ...............4 | | 2.16 | The Principle Governing the Economy of Athletics Program Operation ........................5 |
| 2.7 | The Principle of Diversity within Governance Structures .........................4 | | | |
| 2.8 | The Principle of Rules Compliance ................4 | | | |

**2**

**PRINCIPLES**

## 2.01 GENERAL PRINCIPLE [*]

Legislation enacted by the Association governing the conduct of intercollegiate athletics shall be designed to advance one or more basic principles, including the following, to which the members are committed. In some instances, a delicate balance of these principles is necessary to help achieve the objectives of the Association.

## 2.1 THE PRINCIPLE OF INSTITUTIONAL CONTROL AND RESPONSIBILITY [*]

**2.1.1 Responsibility for Control. [*]** It is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. The institution's president or chancellor is responsible for the administration of all aspects of the athletics program, including approval of the budget and audit of all expenditures. *(Revised: 3/8/06)*

**2.1.2 Scope of Responsibility. [*]** The institution's responsibility for the conduct of its intercollegiate athletics program includes responsibility for the actions of its staff members and for the actions of any other individual or organization engaged in activities promoting the athletics interests of the institution.

## 2.2 THE PRINCIPLE OF STUDENT-ATHLETE WELL-BEING [*]

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. *(Revised: 11/21/05)*

**2.2.1 Overall Educational Experience. [*]** It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience. *(Adopted: 1/10/95)*

**2.2.2 Cultural Diversity and Gender Equity. [*]** It is the responsibility of each member institution to establish and maintain an environment that values cultural diversity and gender equity among its student-athletes and intercollegiate athletics department staff. *(Adopted: 1/10/95)*

**2.2.3 Health and Safety. [*]** It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95)*

**2.2.4 Student-Athlete/Coach Relationship. [*]** It is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach. *(Adopted: 1/10/95)*

**2.2.5 Fairness, Openness and Honesty. [*]** It is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes. *(Adopted: 1/10/95)*

**2.2.6 Student-Athlete Involvement. [*]** It is the responsibility of each member institution to involve student-athletes in matters that affect their lives. *(Adopted: 1/10/95)*

### 2.3 THE PRINCIPLE OF GENDER EQUITY [*]

**2.3.1 Compliance With Federal and State Legislation.** [*] It is the responsibility of each member institution to comply with federal and state laws regarding gender equity. *(Adopted: 1/11/94)*

**2.3.2 NCAA Legislation.** [*] The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws. *(Adopted: 1/11/94)*

**2.3.3 Gender Bias.** [*] The activities of the Association should be conducted in a manner free of gender bias. *(Adopted: 1/11/94)*

### 2.4 THE PRINCIPLE OF SPORTSMANSHIP AND ETHICAL CONDUCT [*]

For intercollegiate athletics to promote the character development of participants, to enhance the integrity of higher education and to promote civility in society, student-athletes, coaches, and all others associated with these athletics programs and events should adhere to such fundamental values as respect, fairness, civility, honesty and responsibility. These values should be manifest not only in athletics participation, but also in the broad spectrum of activities affecting the athletics program. It is the responsibility of each institution to: *(Revised: 1/9/96)*

(a) Establish policies for sportsmanship and ethical conduct in intercollegiate athletics consistent with the educational mission and goals of the institution; and *(Adopted: 1/9/96)*

(b) Educate, on a continuing basis, all constituencies about the policies in Constitution 2.4-(a). *(Adopted: 1/9/96)*

### 2.5 THE PRINCIPLE OF SOUND ACADEMIC STANDARDS [*]

Intercollegiate athletics programs shall be maintained as a vital component of the educational program, and student-athletes shall be an integral part of the student body. The admission, academic standing and academic progress of student-athletes shall be consistent with the policies and standards adopted by the institution for the student body in general.

### 2.6 THE PRINCIPLE OF NONDISCRIMINATION [*]

The Association shall promote an atmosphere of respect for and sensitivity to the dignity of every person. It is the policy of the Association to refrain from discrimination with respect to its governance policies, educational programs, activities and employment policies, including on the basis of age, color, disability, gender, national origin, race, religion, creed or sexual orientation. It is the responsibility of each member institution to determine independently its own policy regarding nondiscrimination. *(Adopted: 1/16/93, Revised: 1/16/00)*

### 2.7 THE PRINCIPLE OF DIVERSITY WITHIN GOVERNANCE STRUCTURES [*]

The Association shall promote diversity of representation within its various divisional governance structures and substructures. Each divisional governing body must assure gender and ethnic diversity among the membership of the bodies in the division's administrative structure. *(Adopted: 1/9/96 effective 8/1/97)*

### 2.8 THE PRINCIPLE OF RULES COMPLIANCE [*]

**2.8.1 Responsibility of Institution.** [*] Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs. It shall monitor its programs to assure compliance and to identify and report to the Association instances in which compliance has not been achieved. In any such instance, the institution shall cooperate fully with the Association and shall take appropriate corrective actions. Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance.

**2.8.2 Responsibility of Association.** [*] The Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance.

**2.8.3 Penalty for Noncompliance.** [*] An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association.

### 2.9 THE PRINCIPLE OF AMATEURISM [*]

Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from exploitation by professional and commercial enterprises.

## 2.10 THE PRINCIPLE OF COMPETITIVE EQUITY [*]

The structure and programs of the Association and the activities of its members shall promote opportunity for equity in competition to assure that individual student-athletes and institutions will not be prevented unfairly from achieving the benefits inherent in participation in intercollegiate athletics.

## 2.11 THE PRINCIPLE GOVERNING RECRUITING [*]

The recruiting process involves a balancing of the interests of prospective student-athletes, their educational institutions and the Association's member institutions. Recruiting regulations shall be designed to promote equity among member institutions in their recruiting of prospective student-athletes and to shield them from undue pressures that may interfere with the scholastic or athletics interests of the prospective student-athletes or their educational institutions.

## 2.12 THE PRINCIPLE GOVERNING ELIGIBILITY [*]

Eligibility requirements shall be designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student-athletes.

## 2.13 THE PRINCIPLE GOVERNING FINANCIAL AID [*]

A student-athlete may receive athletically related financial aid administered by the institution without violating the principle of amateurism, provided the amount does not exceed the cost of education authorized by the Association; however, such aid as defined by the Association shall not exceed the cost of attendance as published by each institution. Any other financial assistance, except that received from one upon whom the student-athlete is naturally or legally dependent, shall be prohibited unless specifically authorized by the Association.

## 2.14 THE PRINCIPLE GOVERNING PLAYING AND PRACTICE SEASONS [*]

The time required of student-athletes for participation in intercollegiate athletics shall be regulated to minimize interference with their opportunities for acquiring a quality education in a manner consistent with that afforded the general student body.

## 2.15 THE PRINCIPLE GOVERNING POSTSEASON COMPETITION AND CONTESTS SPONSORED BY NONCOLLEGIATE ORGANIZATIONS [*]

The conditions under which postseason competition occurs shall be controlled to assure that the benefits inherent in such competition flow fairly to all participants, to prevent unjustified intrusion on the time student-athletes devote to their academic programs, and to protect student-athletes from exploitation by professional and commercial enterprises.

## 2.16 THE PRINCIPLE GOVERNING THE ECONOMY OF ATHLETICS PROGRAM OPERATION [*]

Intercollegiate athletics programs shall be administered in keeping with prudent management and fiscal practices to assure the financial stability necessary for providing student-athletes with adequate opportunities for athletics competition as an integral part of a quality educational experience.

# NCAA Membership

| 3.01 | General Principles | 7 | 3.3 | Member Conference | 13 |
|------|-------------------|---|-----|-------------------|----|
| 3.02 | Definitions and Applications | 7 | 3.4 | Affiliated Membership | 14 |
| 3.1 | Eligibility for Membership | 8 | 3.7 | Dues of Members | 15 |
| 3.2 | Active Membership | 9 | | | |

## 3.01 GENERAL PRINCIPLES

**3.01.1 Classes of Membership.** Division I offers three classes of membership: active, conference and affiliated. Eligibility and method of election to membership, obligations and conditions for continuing membership, voting rights and other membership privileges for each class are defined in this article. *(Revised: 1/11/94 effective 9/2/94, 1/15/11 effective 8/1/11)*

**3.01.2 Division Membership.** Active and conference members of the NCAA may be divided into divisions for purposes of legislation and competition in NCAA championships. Criteria for membership in these divisions are defined in Bylaw 20.

**3.01.3 Obligation to Meet Division Criteria.** Division membership criteria constitute enforceable legislation. Each member institution shall comply with all applicable criteria of its division, and an institution that fails to do so shall be subject to the enforcement procedures and to possible reclassification.

**3.01.4 Termination or Suspension of Membership.** All rights and privileges of a member shall cease immediately upon termination or suspension of its membership.

## 3.02 DEFINITIONS AND APPLICATIONS

**3.02.1 Competitive Body.** A competitive body is an athletics conference that conducts competition among its member institutions and determines a conference champion in one or more sports.

**3.02.2 Legislative Body.** A legislative body is an athletics conference that develops and maintains rules and regulations governing the athletics programs and activities of its member institutions.

**3.02.3 Membership Categories.**

**3.02.3.1 Active Member.** An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association. *(Revised: 1/15/11 effective 8/1/11)*

**3.02.3.1.1 Athletics Consortium.** An athletics consortium consists of one member institution and neighboring member or nonmember institutions (but not more than one nonmember institution), recognized and approved by a two-thirds vote of the Administration Cabinet. The student-athletes of the combined institutions are permitted to compete on the NCAA member institution's athletics teams, provided they meet the eligibility requirements of the NCAA and the member institution (see Constitution 3.1.2). *(Revised: 11/1/07 effective 8/1/08)*

**3.02.3.2 Member Conference.** A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution 3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

**3.02.3.3 Affiliated Member.** An affiliated member is a coaches or sports association whose function and purpose are directly related to one or more sports in which the NCAA conducts championships or an emerging sport for women, or an association that consists of college/university administrators and has a direct connection to either the NCAA or its member institutions, duly elected to affiliated membership under the provisions of this article (see Constitution 3.4.3). An affiliated member is entitled to be represented by one nonvoting delegate at

**3.2.6 Discipline of Active Members.** Disciplinary or corrective actions other than suspension or termination of membership may be effected during the period between annual Conventions for violation of NCAA rules. (See Bylaws 19 and 32 for enforcement regulations, policies and procedures.)

**3.2.6.1 Restoration of Good Standing.** Disciplined members shall resume good standing in accordance with the terms of the disciplinary action taken, or may be restored to good standing at any time by a majority vote of the members of the Committee on Infractions present and voting. If fewer than eight members are present, any committee action requires a favorable vote of at least four committee members. Disciplined members also may be restored to good standing at the annual Convention, by vote of a majority of the members present and voting.

## 3.3 MEMBER CONFERENCE

### 3.3.1 Eligibility.

**3.3.1.1 Competitive and Legislative Body.** A member conference shall be both a competitive and a legislative body on the conference level (see Constitution 3.02.1 and 3.02.2). *(Revised: 1/15/11 effective 8/1/11)*

**3.3.1.2 Conference Competition Requirement.** Conference membership is available to duly elected athletics conferences of colleges and universities that conduct conference competition and determine a champion in one or more sports in which the Association conducts championships or for which it is responsible for providing playing rules for intercollegiate competition.

**3.3.1.3 Composition of Conference.** All of the members of the conference shall be active members of Division I or be engaged in the reclassification process pursuant to Bylaw 20.5. *(Revised: 1/11/94 effective 9/2/94, 1/15/11 effective 8/1/11)*

### 3.3.2 Privileges.

**3.3.2.1 Privileges of Member Conferences.** Member conferences shall be entitled to all of the privileges of active members except the right to compete as such in NCAA championships. A copy of NCAA Champion magazine shall be sent to each member of the NCAA.

**3.3.2.2 Voting Rights.** Only those member conferences that meet the criteria of Bylaw 20.02.5 shall be permitted to vote on issues before the Association. *(Revised: 1/15/11 effective 8/1/11)*

**3.3.2.2.1 Football Issues.** Conference championship competition shall be conducted in football in order for the conference to vote on issues pertaining only to football. *(Revised: 1/15/11 effective 8/1/11)*

**3.3.2.3 Use of Association's Registered Marks.** Member conferences may use the registered marks of the Association (the Association's name, logo or other insignia) only in accordance with guidelines established by the Executive Committee.

### 3.3.3 Election Procedures.

**3.3.3.1 Application.** An athletics conference desiring to become a member conference shall make application on a form available from the national office by June 1 for membership effective August 1 of the following academic year. A check in the appropriate amount for annual dues (see Constitution 3.7.2) shall accompany the application. Should the applicant fail election, the dues paid shall be refunded. *(Revised: 4/25/02, 1/15/11 effective 8/1/11)*

**3.3.3.2 Election.** Athletics conferences may be elected as member conferences by a majority vote of the delegates present and voting at an annual Convention or by a majority vote of the Board of Directors, effective the following August 1. *(Revised: 4/25/02, 1/11/07 effective 8/1/08, 10/28/10, 1/15/11 effective 8/1/11)*

### 3.3.4 Conditions and Obligations of Membership.

**3.3.4.1 General.** The member conferences of this Association agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association.

**3.3.4.2 Athletics Certification Program.** Member conferences shall facilitate the athletics certification program of the Association in accordance with the Association's constitution and bylaws. *(Adopted: 1/16/93 effective 1/1/94)*

**3.3.4.3 Conference Competition.** Member conferences shall conduct conference competition and determine a champion in one or more sports in which the Association conducts championships or for which it is responsible for providing playing rules for intercollegiate competition.

**3.3.4.4 Officiating.** A multisport conference shall provide oversight of the officiating programs for selecting, training and assigning officials for its men's and women's basketball programs. *(Adopted: 1/15/11 effective 8/1/11)*

**3.3.4.5 Compliance Program.** A multisport conference shall have a comprehensive compliance program. *(Adopted: 1/15/11 effective 8/1/11)*

**3.3.4.6 Conference Student-Athlete Advisory Committee.** Each conference shall establish a student-athlete advisory committee for its member institutions' student-athletes. The composition and duties of the committee shall be determined by the conference. *(Adopted: 10/27/98 effective 8/1/99)*

# Organization

| | | | | |
|---|---|---|---|---|
| 4.01 | General Principles ............................17 | | 4.5 | Division I Leadership Council ............22 |
| 4.02 | Definitions and Applications ............18 | | 4.6 | Division I Legislative Council .............23 |
| 4.1 | Executive Committee ........................20 | | 4.9 | Committees/Cabinets ........................25 |
| 4.2 | Division I Board of Directors ............21 | | | |

## 4.01 GENERAL PRINCIPLES

**4.01.1 Structure. [\*]** The Association's administrative structure shall include an Executive Committee comprised of institutional presidents or chancellors that oversees Association-wide issues and shall ensure that each division operates consistent with the basic purposes, fundamental policies and general principles of the Association (see Constitution 1 and 2). In addition, the administrative structure of each division shall empower a body of institutional presidents or chancellors to set forth the policies, rules and regulations for operating the division. Further, the administrative structure of each division shall empower a body of athletics administrators and faculty athletics representatives (and in Division III, institutional presidents and chancellors) to make recommendations to the division's body of institutional presidents or chancellors and to handle responsibilities delegated to it. *(Adopted: 1/9/96 effective 8/1/97, Revised: 3/8/06)*

**4.01.2 Guarantees. [\*]** The Association's overall governance structure guarantees its members the following: *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.1 Budget Allocations. [\*]** Members are guaranteed revenue through allocations made to each division from the Association's general operating revenue. Division II shall receive at least 4.37 percent of the Association's annual general operating revenue. Division III shall receive at least 3.18 percent of the Association's annual general operating revenue. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.1.1 General Operating Revenue. [\*]** General operating revenue, as used in this section, shall include at least all sources of revenue existing at of January 9, 1996, including revenue from contracts for these existing sources and revenue from any modified, extended or successor contract for such sources. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.2 Revenue Guarantee. [♦]** All members shall receive revenue from all gross revenue sources received by the Association, unless specifically excluded, through the division's revenue distribution formulas. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.2.1 Revenue from New Subdivision Championship. [♦]** This provision shall not apply to the distribution of revenue produced directly by a new subdivisional championship in a sport that has a subdivisional championship at the time of the adoption of this legislation. Any revenue produced by such a new subdivisional championship shall be distributed as determined by that subdivision. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.2.2 Revenue Distribution Formula. [♦]** As used in this section, the components of the division's revenue distribution formulas as they existed at the time of the adoption of this legislation include the Academic Enhancement, Basketball, Conference Grant, Grant-in-Aid, Special Assistance, and Sports Sponsorship funds, and the supplemental and reserve funds intended for distribution to the membership. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.2.2.1 Proportion of Revenue. [♦]** The revenue distributed through these funds shall be allocated among the funds in the same proportion as existed in the fiscal year 2001-02. *(Adopted: 1/9/96 effective 8/1/97, Revised: 1/14/97)*

**4.01.2.2.2.2 Formula for Allocation. [♦]** The formula for allocating each such fund among the members shall be as it existed at the time of the adoption of this legislation. *(Adopted: 1/9/96 effective 8/1/97)*

**4.01.2.2.2.3 Waiver of Proportionality Requirement.** The Board of Directors may waive the proportionality requirements of the revenue guarantee to permit uniform increases to all programs in the Academic Enhancement, Conference Grant and Special Assistance funds. *(Adopted: 1/14/97 effective 8/1/97)*

**4.01.2.2.3 Joint Ventures.** All marketing joint ventures, involving sports (other than bowl subdivision football) in which the NCAA sponsored a championship as of January 15, 1997, between the Association (or the Association's representative or agent) and a member conference or member institution (or the rep-

**4.02.6.2.2 Leadership Council and Legislative Council.** The term of office for the Leadership Council and Legislative Council shall be as follows: *(Adopted: 11/1/07 effective 8/1/08)*

(a) Members shall serve a four-year term. Members are not eligible for immediate re-appointment;

(b) A conference may remove its representative during a term;

(c) The terms of office of Football Bowl Subdivision positions and Football Championship Subdivision and Division I Subdivision positions shall expire on a staggered basis to provide for continuity. Members may be appointed for less than full terms; and

(d) Members who serve more than one-half of a term shall be considered to have served a full term.

**4.02.6.3 Institution's Membership in Different Subdivision.** An institution's representative to the Board of Directors, Leadership Council and Legislative Council is eligible to serve on behalf of the multisport conference in which the institution holds membership, even if the institution's NCAA membership is in a different subdivision. *(Adopted: 11/1/07 effective 8/1/08)*

# 4.1 EXECUTIVE COMMITTEE [*]

**4.1.1 Composition. [*]** The Executive Committee shall consist of 20 members. The NCAA president and the chairs of the Division I Leadership Council and the Division II and Division III Management Councils shall be ex officio nonvoting members, except that the NCAA president is permitted to vote in the case of a tie among the voting members of the Executive Committee present and voting. The other 16 voting members of the Executive Committee shall include: *(Adopted: 1/9/96 effective 8/1/97, Revised: 3/8/06, 11/1/07 effective 8/1/08)*

(a) Eight chancellors or presidents from the Division I Board of Directors from Football Bowl Subdivision institutions; *(Revised: 3/8/06, 12/15/06)*

(b) Two chancellors or presidents from the Division I Board of Directors from Football Championship Subdivision institutions; *(Revised: 3/8/06, 12/15/06)*

(c) Two chancellors or presidents from the Division I Board of Directors from Division I Subdivision institutions; *(Revised: 3/8/06, 12/15/06)*

(d) Two Division II chancellors or presidents from the Division II Presidents Council; and *(Revised: 3/8/06)*

(e) Two Division III chancellors or presidents from the Division III Presidents Council. *(Revised: 3/8/06)*

**4.1.2 Duties and Responsibilities. [*]** The Executive Committee shall: *(Adopted: 1/9/96 effective 8/1/97)*

(a) Provide final approval and oversight of the Association's budget;

(b) Employ the NCAA president, who shall be administratively responsible to the Executive Committee and who shall be authorized to employ such other persons as may be necessary to conduct efficiently the business of the Association; *(Revised: 3/8/06)*

(c) Provide strategic planning for the Association as a whole;

(d) Identify core issues that affect the Association as a whole;

(e) Act on behalf of the Association by adopting and implementing policies to resolve core issues and other Association-wide matters; *(Revised: 1/12/08)*

(f) Initiate and settle litigation;

(g) Convene at least one combined meeting per year of the three divisional presidential governing bodies;

(h) Convene at least one same-site meeting per year of the Division I Legislative Council and the Division II and Division III Management Councils;

(i) Forward proposed amendments to Constitution 1 and 2 and other dominant legislation to the entire membership for a vote;

(j) Call for a vote of the entire membership on the action of any division that it determines to be contrary to the basic purposes, fundamental policies and general principles set forth in the Association's constitution. This action may be overridden by the Association's entire membership by a two-thirds majority vote of those institutions voting;

(k) Call for an annual or special Convention of the Association;

(l) Review and coordinate the catastrophic-injury and professional career insurance (disabling injury/illness) programs; and *(Adopted: 8/5/99)*

(m) Compile the names of those individuals associated with intercollegiate athletics who died during the year immediately preceding the annual Convention. *(Adopted: 11/1/01)*

**4.1.3 Election/Term of Office. [*]**

**4.1.3.1 Election. [*]** Division I members of the Executive Committee shall be appointed by the Division I Board of Directors. Divisions II and III members of the Executive Committee shall be appointed by the Divisions II and III Presidents Councils, respectively. *(Adopted: 1/9/96 effective 8/1/97)*

**4.1.3.2 Terms.** [*] The terms of service of members of the Executive Committee shall coincide with their service on the applicable divisional presidential governing body, unless otherwise specified by that governing body. *(Adopted: 1/9/96 effective 8/1/97)*

**4.1.3.3 Committee Chair.** [*] The Executive Committee shall elect one of its members to serve for a two-year period as chair. *(Adopted: 1/9/96 effective 8/1/97)*

## 4.2 DIVISION I BOARD OF DIRECTORS

**4.2.1 Composition.** Giving due weight to gender and ethnic diversity per Constitution 4.02.5, the Board of Directors shall include 18 members and shall be comprised of presidents or chancellors. The members of the Board shall include: *(Adopted: 1/9/96 effective 8/1/97, Revised: 1/14/97 effective 8/1/97, 8/5/99, 11/1/07 effective 8/1/08)*

(a) One institutional president or chancellor from each of the following 11 conferences: *(Revised: 8/5/99, 4/24/03)*

    (1) Atlantic Coast Conference;

    (2) Big East Conference;

    (3) Big Ten Conference;

    (4) Big 12 Conference;

    (5) Conference USA;

    (6) Mid-American Conference;

    (7) Mountain West Conference;

    (8) Pacific-12 Conference;

    (9) Southeastern Conference;

    (10) Sun Belt Conference; and

    (11) Western Athletic Conference.

(b) Seven institutional presidents or chancellors from among the following conferences: *(Revised: 1/14/97, 8/5/99, 4/24/03)*

    (1) America East Conference;

    (2) Atlantic Sun Conference;

    (3) Atlantic 10 Conference;

    (4) Big Sky Conference;

    (5) Big South Conference;

    (6) Big West Conference;

    (7) Colonial Athletic Association;

    (8) Horizon League;

    (9) Ivy Group;

    (10) Metro Atlantic Athletic Conference;

    (11) Mid-Eastern Athletic Conference;

    (12) Missouri Valley Conference;

    (13) Northeast Conference;

    (14) Ohio Valley Conference;

    (15) Patriot League;

    (16) Southern Conference;

    (17) Southland Conference;

    (18) Southwestern Athletic Conference;

    (19) The Summit League; or

    (20) West Coast Conference.

    **4.2.1.1 Conference Representation.** No conference listed in Constitution 4.2.1-(b) may have more than one conference representative serving on the Board of Directors simultaneously. *(Adopted: 1/9/96 effective 8/1/97, Revised: 8/5/99, 12/15/06)*

    **4.2.1.2 Increase or Decrease.** The number of Board members from each category set forth in Constitution 4.2.1-(a) and 4.2.1-(b) shall remain the same regardless of an increase or decrease in the number of voting member conferences. *(Adopted: 1/9/96 effective 8/1/97, Revised: 8/5/99)*

    **4.2.1.3 Rotation of Representatives.** The rotation of Board of Directors conference representatives between the conferences listed in Constitution 4.2.1-(b), shall be developed, maintained and revised by those conferences. *(Adopted: 1/14/97 effective 8/1/97, Revised: 12/15/06)*

**4.2.2 Duties and Responsibilities.** The Board of Directors shall: *(Adopted: 1/9/96 effective 8/1/97, Revised: 8/7/03)*

(a) Establish and direct general policy;

(b) Establish a strategic plan;

(c) Adopt or defeat legislative proposals independent of the Legislative Council (e.g., emergency, noncontroversial or other proposals sponsored by the Board); *(Revised: 11/1/07 effective 8/1/08)*

(d) At its discretion, ratify, amend or defeat legislation adopted by the Legislative Council (see Constitution 5.3.2); *(Revised: 11/1/07 effective 8/1/08)*

(e) Delegate to the Leadership Council or Legislative Council responsibilities for specific matters it deems appropriate; *(Revised: 11/1/07 effective 8/1/08)*

(f) Appoint members of the NCAA Division I Committee on Infractions and the Division I Infractions Appeals Committee; *(Adopted: 11/1/07 effective 8/1/08)*

(g) Review and approve policies and procedures governing the enforcement program; *(Adopted: 11/1/07 effective 8/1/08)*

(h) Ratify, amend or rescind the actions of the Leadership Council or Legislative Council; *(Revised: 11/1/07 effective 8/1/08)*

(i) Assure that there is gender and ethnic diversity among its membership and the membership of each of the other bodies in the administrative structure; *(Revised: 11/1/07 effective 8/1/08)*

(j) Require bodies in the administrative structure to alter (but not expand) their membership to achieve diversity;

(k) Approve an annual budget;

(l) Approve regulations providing for the expenditure of funds and the distribution of income consistent with the provisions of Constitution 4.01.2.2;

(m) Approve regulations providing for the administration of championships;

(n) Advise the Executive Committee concerning the employment of the NCAA president and concerning the oversight of his or her employment; *(Revised: 3/8/06)*

(o) Be responsible for the administration, compilation and disclosure of information concerning the Academic Progress Rate (APR) and Academic Performance Census (APC); and *(Adopted: 8/7/03 effective 8/1/04)*

(p) Elect institutions to active Division I membership. *(Adopted: 10/28/10)*

**4.2.3 Voting Method.** The method of voting on issues considered by the Board of Directors shall be by roll call, except for those actions taken by the unanimous consent of the Board members present and voting. Roll-call vote results shall be reported to the membership. *(Adopted: 1/9/96 effective 8/1/97)*

## 4.5 DIVISION I LEADERSHIP COUNCIL

**4.5.1 Composition.** Giving due weight to gender and ethnic diversity per Constitution 4.02.5, the Leadership Council shall include 31 members and shall be comprised of athletics administrators (e.g., athletics directors, senior woman administrators, assistant athletics directors, conference administrators), faculty athletics representatives and institutional administrators to whom athletics departments report or who have other significant duties regarding athletics. The members of the Leadership Council shall include: *(Adopted: 11/1/07 effective 8/1/08)*

(a) One administrator or representative (who shall have three votes) from each of the following seven conferences:

    (1) Atlantic Coast Conference;

    (2) Big East Conference;

    (3) Big Ten Conference;

    (4) Big 12 Conference;

    (5) Conference USA;

    (6) Pacific-12 Conference; and

    (7) Southeastern Conference.

(b) One administrator or representative (who shall have 1.5 votes) from each of the following four conferences:

    (1) Mid-American Conference;

    (2) Mountain West Conference;

    (3) Sun Belt Conference; and

    (4) Western Athletic Conference.

(c) One administrator or representative (who shall have 1.2 votes) from each of the following conferences:

    (1) America East Conference;

    (2) Atlantic Sun Conference;

    (3) Atlantic 10 Conference;

    (4) Big Sky Conference;

# Legislative Authority and Process

| | | |
|---|---|---|
| 5.01 | General Principles | 29 |
| 5.02 | Definitions and Applications | 29 |
| 5.1 | Conventions and Meetings | 29 |
| 5.2 | Elements of Legislation | 32 |

| | | |
|---|---|---|
| 5.3 | Amendment Process | 33 |
| 5.4 | Other Legislative and Amendment Procedures | 39 |

## 5.01 GENERAL PRINCIPLES [*]

**5.01.1 Basis of Legislation. [*]** All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled, or by the divisional governance structures as set forth in Constitution 4, as determined by the constitution and bylaws governing each division, and shall be consistent with the purposes and fundamental policy set forth in Constitution 1, and shall be designed to advance one or more principles such as those set forth in Constitution 2. *(Revised: 1/9/96 effective 8/1/97)*

**5.01.2 Approaches to Legislative Process. [*]** The membership of the Association recognizes that certain fundamental polices, practices and principles have applicability to all members, while others are applicable to division groupings of members, based on a common philosophy shared among the individual members of the division and on special policies and concerns that are common to the nature and purposes of the institutions in the division. *(Revised: 1/9/96 effective 8/1/97)*

## 5.02 DEFINITIONS AND APPLICATIONS

**5.02.1 Legislative (Constitution and Bylaw) Provisions.**

**5.02.1.1 Dominant. [*]** A dominant provision is a regulation that applies to all members of the Association and is of sufficient importance to the entire membership that it requires a two-thirds majority vote of all delegates present and voting in joint session at an annual or special Convention. Dominant provisions are identified by an asterisk (*).

**5.02.1.2 Division Dominant. [*]** A division dominant provision is a regulation that applies to all members of a division and is of sufficient importance to the division that it requires a two-thirds majority vote of all delegates present and voting at a division's annual or special Convention. Division dominant provisions are identified by the diamond symbol (◆). *(Revised: 1/9/96 effective 8/1/97)*

**5.02.1.3 Common. [*]** A common provision is a regulation that applies to more than one of the divisions of the Association. A common provision shall be adopted by each of the applicable divisions, acting separately pursuant to the divisional legislative process described in Constitution 5.3, and must be approved by all applicable divisions to be effective. Common provisions are identified by the pound sign (#). *(Adopted: 1/14/97 effective 8/1/97)*

**5.02.1.4 Federated. [*]** A federated provision is a regulation adopted by a majority vote of the delegates present and voting of one or more of the divisions or subdivisions of the Association, acting separately pursuant to the divisional legislative process described in Constitution 5.3. Such a provision applies only to the division(s) or subdivision(s) that adopts it. *(Revised: 1/9/96 effective 8/1/97)*

**5.02.1.5 Football Championship Subdivision Dominant. [FCSD]** A Football Championship Subdivision dominant provision is a regulation that applies only to the Football Championship Subdivision and is of sufficient importance to the subdivision that it requires a two-thirds majority vote for adoption or to be amended pursuant to the legislative process set forth in Constitution 5.3. Football Championship Subdivision dominant provisions are identified by the initialization FCSD. *(Adopted: 1/15/11)*

## 5.1 CONVENTIONS AND MEETINGS

**5.1.1 Authorization.**

**5.1.1.1 Annual Convention. [*]** There shall be an annual Convention of this Association during the second week of January or at such other time as may be prescribed by the Executive Committee.

## 5.4 OTHER LEGISLATIVE AND AMENDMENT PROCEDURES

### 5.4.1 Interpretations of Constitution and Bylaws.

**5.4.1.1 Authorization.** The Board of Directors and the Legislative Council, and the Legislative Review/Interpretations Committee in the interim between meetings of the Board of Directors and Legislative Council, are empowered to make interpretations of the constitution and bylaws (see Constitution 5.2.5). *(Revised: 1/9/96 effective 8/1/97, 11/1/07 effective 8/1/08)*

**5.4.1.1.1 Modification of Wording.** In addition to its general authority to make binding interpretations of NCAA legislation, the Legislative Council, by a two-thirds majority of its members present and voting, may interpret legislation consistent with the intent of the membership in adopting the legislation if sufficient documentation and testimony are available to establish clearly that the wording of the legislation is inconsistent with that intent. The Legislative Council shall initiate the legislative process to confirm any such interpretations. *(Revised: 1/9/96 effective 8/1/97, 11/1/07 effective 8/1/08)*

**5.4.1.2 Interpretation Process.**

**5.4.1.2.1 Staff Interpretation (Determination).** The academic and membership affairs staff shall respond to a request from a member institution for an interpretation of NCAA rules. *(Revised: 1/14/97 effective 8/1/97, 8/5/04, 4/24/08)*

**5.4.1.2.1.1 Appeal of Staff Interpretation.** An institution may appeal a staff interpretation to the Legislative Review/Interpretations Committee. Such a request must be submitted in writing by the institution's conference or by one of the five individuals who are authorized to request interpretations on behalf of the institution (president or chancellor, faculty athletics representative, athletics director, senior woman administrator, senior compliance administrator, or a designated substitute for the president or chancellor and/or athletics director, as specified in writing to the national office). *(Revised: 1/10/91, 1/11/94, 1/14/97 effective 8/1/97, 8/5/04, 3/8/06, 4/24/08)*

**5.4.1.2.1.1.1 Institutional Participation.** An institution may participate by teleconference in the appeal of an interpretation if the activity at issue already has occurred and the interpretative decision could result in an individual or institutional violation. The Legislative Review/Interpretations Committee shall establish policies and procedures relating to an institution's participation. *(Adopted: 4/25/02, Revised: 8/5/04, 4/24/08)*

**5.4.1.2.1.2 Review of Staff Interpretations.** The Legislative Review/Interpretations Committee shall review all staff interpretations. *(Adopted: 4/24/08)*

**5.4.1.2.1.3 Publication and Notification.** A staff interpretation shall be binding on the requesting institution on notification of the response to its interpretation request, unless the interpretation is modified or reversed on appeal or review by the Legislative Review/Interpretations Committee. A staff interpretation that has been reviewed and approved by the Legislative Review/Interpretations Committee shall be binding on all other institutions on publication to the membership (e.g., announced on the NCAA website or Legislative Services Database for the Internet). *(Adopted: 4/24/08)*

**5.4.1.2.2 Review of Legislative Review/Interpretations Committee's Decision.** The Legislative Council shall review all interpretations issued by the Legislative Review/Interpretations Committee and may approve, reverse or modify such interpretations. A member institution may appeal a decision of the Legislative Review/Interpretations Committee to the Legislative Council. The appeal must be submitted in writing by the institution's president or chancellor, faculty athletics representative or director of athletics. The Legislative Council shall establish the procedures for such an appeal. A decision of the Legislative Council is final and no additional appeal opportunity shall exist for a member institution. *(Adopted: 1/11/94, Revised: 1/9/96 effective 8/1/97, 1/14/97 effective 8/1/97, 8/5/04, 3/8/06, 11/1/07 effective 8/1/08, 10/28/10)*

**5.4.1.2.3 Publication and Notification.** Interpretations issued by the Legislative Review/Interpretations Committee shall be binding on notification to affected institutions and on all member institutions after publication and notification to the membership. *(Revised: 1/9/96 effective 8/1/97, 1/14/97 effective 8/1/97, 8/5/04)*

**5.4.1.2.4 Revision.** Interpretations approved by the Legislative Council may not be revised by the Legislative Review/Interpretations Committee. The Legislative Review/Interpretations Committee may only recommend to the Legislative Council revisions of such interpretations. *(Revised: 1/9/96 effective 8/1/97, 1/14/97 effective 8/1/97, 8/5/04, 11/1/07 effective 8/1/08)*

**5.4.1.3 Subcommittee for Legislative Relief of the Legislative Council.** An institution may appeal a decision of the NCAA staff regarding the application of NCAA legislation to a particular situation to the subcommittee when no other entity has the authority to act. In reaching its decision, the subcommittee shall review the complete record in order to determine whether there is sufficient basis to grant relief from the application of the legislation. The Legislative Council shall establish the process for such a review, shall monitor the actions taken under this authorization, and shall report annually to the membership the actions taken, in summary, aggregate form. *(Adopted: 1/16/93, Revised: 1/9/96 effective 8/1/97, 11/1/00, 11/1/07 effective 8/1/08)*

# Institutional Control

| | | | | | |
|---|---|---|---|---|---|
| 6.01 | General Principle ...........43 | | 6.3 | Self-Study and Evaluation ...........44 | |
| 6.1 | Institutional Governance ...........43 | | 6.4 | Responsibility for Actions of | |
| 6.2 | Budgetary Control ...........44 | | | Outside Entities ...........44 | |

## 6.01 GENERAL PRINCIPLE

**6.01.1 Institutional Control.** The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and by the conference(s), if any, of which it is a member. Administrative control or faculty control, or a combination of the two, shall constitute institutional control.

## 6.1 INSTITUTIONAL GOVERNANCE

**6.1.1 President or Chancellor.** A member institution's president or chancellor has ultimate responsibility and final authority for the conduct of the intercollegiate athletics program and the actions of any board in control of that program. *(Revised: 3/8/06)*

**6.1.2 Athletics Board.** A board in control of athletics or an athletics advisory board, which has responsibility for advising or establishing athletics policies and making policy decisions, is not required. However, if such a board exists, it must conform to the following provisions.

    **6.1.2.1 Composition.** Administration and/or faculty staff members shall constitute at least a majority of the board in control of athletics or an athletics advisory board, irrespective of the president or chancellor's responsibility and authority or whether the athletics department is financed in whole or in part by student fees. If the board has a parliamentary requirement necessitating more than a simple majority in order to transact some or all of its business, then the administrative and faculty members shall be of sufficient number to constitute at least that majority. *(Revised: 3/8/06)*

        **6.1.2.1.1 Administrator Defined.** An administrator (for purposes of this legislation) is an individual employed by the institution as a full-time administrative staff member who holds an academic appointment, is directly responsible to the institution's president or chancellor or serves as a chief administrative official (e.g., admissions director, finance officer, department head, or athletics department head). Other nonacademic staff members and individuals who are members of an institution's board of trustees or similar governing body would not be considered to be administrators for purposes of this regulation. *(Revised: 3/8/06)*

        **6.1.2.1.2 Board Subcommittee.** If a board subcommittee is appointed, it is not necessary for the subcommittee to have majority control by administration and/or faculty members (see Constitution 6.1.2.1), provided all actions of the subcommittee are approved by the entire board before becoming effective. However, if the subcommittee's actions are effective permanently or become effective immediately and remain in effect until reviewed by the entire board at a later date, the subcommittee's membership must satisfy the majority-control requirement.

        **6.1.2.1.3 Attendance.** A parliamentary majority of administrators and faculty members of a board in control of athletics is not required to be present at any single meeting in order to conduct business.

    **6.1.2.2 Chair or Voting Delegate.** Only an administrator or faculty member (as opposed to a student, alumnus or governing board member) may serve as chair of a member institution's board in control of intercollegiate athletics or represent the board as the institution's voting delegate at Conventions. Institutional representatives in these positions have responsibility for advising or establishing athletics policies and making policy decisions that require administrative and/or faculty control.

**6.1.3 Faculty Athletics Representative.** A member institution shall designate an individual to serve as faculty athletics representative. An individual so designated after January 12, 1989, shall be a member of the institution's faculty or an administrator who holds faculty rank and shall not hold an administrative or coaching position in the athletics department. Duties of the faculty athletics representative shall be determined by the member institution. *(Adopted: 1/11/89)*

**6.1.4 Student-Athlete Advisory Committee.** Each institution shall establish a student-athlete advisory committee for its student-athletes. The composition and duties of the committee shall be determined by the institution. *(Adopted: 1/10/95 effective 8/1/95)*

## 6.2 BUDGETARY CONTROL

**6.2.1 Normal Budgeting Procedures.** The institution's annual budget for its intercollegiate athletics programs shall be controlled by the institution and subject to its normal budgeting procedures.

**6.2.2 President or Chancellor Approval.** The institution's president or chancellor or an institutional administrator designated by the president or chancellor from outside the athletics department shall approve the annual budget in the event that the institution's normal budgeting procedures do not require such action. *(Revised: 3/8/06)*

## 6.3 SELF-STUDY AND EVALUATION

**6.3.1 Self-Study Report.** Member institutions shall conduct a comprehensive self-study and evaluation of their intercollegiate athletics programs at least once every 10 years pursuant to the athletics certification process (see Bylaws 22 and 33). (Note: Between April 28, 2011, and August 1, 2013, no active Division I institution shall begin the athletics certification process.) *(Revised: 1/14/97 effective 8/1/97, 5/30/07, 4/28/11)*

**6.3.2 Exit Interviews.** The institution's director of athletics, senior woman administrator or designated representatives (excluding coaching staff members) shall conduct exit interviews in each sport with a sample of student-athletes (as determined by the institution) whose eligibility has expired. Interviews shall include questions regarding the value of the students' athletics experiences, the extent of the athletics time demands encountered by the student-athletes, proposed changes in intercollegiate athletics and concerns related to the administration of the student-athletes' specific sports. *(Adopted: 1/10/91 effective 8/1/91)*

## 6.4 RESPONSIBILITY FOR ACTIONS OF OUTSIDE ENTITIES

**6.4.1 Independent Agencies or Organizations.** An institution's "responsibility" for the conduct of its intercollegiate athletics program shall include responsibility for the acts of an independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization when a member of the institution's executive or athletics administration, or an athletics department staff member, has knowledge that such agency, corporate entity or other organization is promoting the institution's intercollegiate athletics program. *(Revised: 2/16/00)*

**6.4.2 Representatives of Athletics Interests.** An institution's "responsibility" for the conduct of its intercollegiate athletics program shall include responsibility for the acts of individuals, a corporate entity (e.g., apparel or equipment manufacturer) or other organization when a member of the institution's executive or athletics administration or an athletics department staff member has knowledge or should have knowledge that such an individual, corporate entity or other organization: *(Revised: 2/16/00)*

(a) Has participated in or is a member of an agency or organization as described in Constitution 6.4.1;

(b) Has made financial contributions to the athletics department or to an athletics booster organization of that institution;

(c) Has been requested by the athletics department staff to assist in the recruitment of prospective student-athletes or is assisting in the recruitment of prospective student-athletes;

(d) Has assisted or is assisting in providing benefits to enrolled student-athletes; or

(e) Is otherwise involved in promoting the institution's athletics program.

**6.4.2.1 Agreement to Provide Benefit or Privilege.** Any agreement between an institution (or any organization that promotes, assists or augments in any way the athletics interests of the member institution, including those identified per Constitution 6.4.1) and an individual who, for any consideration, is or may be entitled under the terms of the agreement to any benefit or privilege relating to the institution's athletics program, shall contain a specific clause providing that any such benefit or privilege may be withheld if the individual has engaged in conduct that is determined to be a violation of NCAA legislation. The clause shall provide for the withholding of the benefit or privilege from a party to the agreement and any other person who may be entitled to a benefit or privilege under the terms of the agreement. *(Adopted: 1/10/95)*

**6.4.2.2 Retention of Identity as "Representative."** Any individual participating in the activities set forth in Constitution 6.4.2 shall be considered a "representative of the institution's athletics interests," and once so identified as a representative, it is presumed the person retains that identity.

# Ethical Conduct

| | | | | |
|---|---|---|---|---|
| 10.01 | General Principle .................................... 45 | | 10.2 | Knowledge of Use of Banned Drugs ......46 |
| 10.02 | Definitions and Applications ................ 45 | | 10.3 | Sports Wagering Activities ..................... 46 |
| 10.1 | Unethical Conduct ................................ 45 | | 10.4 | Disciplinary Action ................................. 46 |

## 10.01 GENERAL PRINCIPLE

**10.01.1 Honesty and Sportsmanship.** Individuals employed by (or associated with) a member institution to administer, conduct or coach intercollegiate athletics and all participating student-athletes shall act with honesty and sportsmanship at all times so that intercollegiate athletics as a whole, their institutions and they, as individuals, shall represent the honor and dignity of fair play and the generally recognized high standards associated with wholesome competitive sports.

## 10.02 DEFINITIONS AND APPLICATIONS

**10.02.1 Sports Wagering. [#]** Sports wagering includes placing, accepting or soliciting a wager (on a staff member's or student-athlete's own behalf or on the behalf of others) of any type with any individual or organization on any intercollegiate, amateur or professional team or contest. Examples of sports wagering include, but are not limited to, the use of a bookmaker or parlay card; Internet sports wagering; auctions in which bids are placed on teams, individuals or contests; and pools or fantasy leagues in which an entry fee is required and there is an opportunity to win a prize. *(Adopted: 4/26/07 effective 8/1/07)*

**10.02.2 Wager. [#]** A wager is any agreement in which an individual or entity agrees to give up an item of value (e.g., cash, shirt, dinner) in exchange for the possibility of gaining another item of value. *(Adopted: 4/26/07 effective 8/1/07)*

## 10.1 UNETHICAL CONDUCT

Unethical conduct by a prospective or enrolled student-athlete or a current or former institutional staff member, which includes any individual who performs work for the institution or the athletics department even if he or she does not receive compensation for such work, may include, but is not limited to, the following: *(Revised: 1/10/90, 1/9/96, 2/22/01, 10/5/10)*

(a) Refusal to furnish information relevant to an investigation of a possible violation of an NCAA regulation when requested to do so by the NCAA or the individual's institution;

(b) Knowing involvement in arranging for fraudulent academic credit or false transcripts for a prospective or an enrolled student-athlete;

(c) Knowing involvement in offering or providing a prospective or an enrolled student-athlete an improper inducement or extra benefit or improper financial aid; *(Revised: 1/9/96)*

(d) Knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation; *(Revised: 1/16/10)*

(e) Receipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or a representative of an agent or advisor (e.g., "runner"); *(Adopted: 1/9/96, Revised: 8/4/05)*

(f) Knowing involvement in providing a banned substance or impermissible supplement to student-athletes, or knowingly providing medications to student-athletes contrary to medical licensure, commonly accepted standards of care in sports medicine practice, or state and federal law. This provision shall not apply to banned substances for which the student-athlete has received a medical exception per Bylaw 31.2.3.5; however, the substance must be provided in accordance with medical licensure, commonly accepted standards of care and state or federal law; *(Adopted: 8/4/05, Revised: 5/6/08)*

(g) Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or an institution's admissions office regarding an individual's academic record (e.g., schools attended, completion of coursework, grades and test scores); *(Adopted: 4/27/06, Revised: 10/23/07)*

(h) Fraudulence or misconduct in connection with entrance or placement examinations; *(Adopted: 4/27/06)*

(i)   Engaging in any athletics competition under an assumed name or with intent to otherwise deceive; or *(Adopted: 4/27/06)*

(j)   Failure to provide complete and accurate information to the NCAA, the NCAA Eligibility Center or the institution's athletics department regarding an individual's amateur status. *(Adopted: 1/8/07, Revised: 5/9/07)*

## 10.2 KNOWLEDGE OF USE OF BANNED DRUGS

A member institution's athletics department staff members or others employed by the intercollegiate athletics program who have knowledge of a student-athlete's use at any time of a substance on the list of banned drugs, as set forth in Bylaw 31.2.3.4, shall follow institutional procedures dealing with drug abuse or shall be subject to disciplinary or corrective action as set forth in Bylaw 19.5.2.2.

## 10.3 SPORTS WAGERING ACTIVITIES [#]

The following individuals shall not knowingly participate in sports wagering activities or provide information to individuals involved in or associated with any type of sports wagering activities concerning intercollegiate, amateur or professional athletics competition: *(Adopted: 4/26/07 effective 8/1/07)*

(a)   Staff members of an institution's athletics department;

(b)   Nonathletics department staff members who have responsibilities within or over the athletics department (e.g., chancellor or president, faculty athletics representative, individual to whom athletics reports);

(c)   Staff members of a conference office; and

(d)   Student-athletes.

**10.3.1 Scope of Application. [#]**   The prohibition against sports wagering applies to any institutional practice or any competition (intercollegiate, amateur or professional) in a sport in which the Association conducts championship competition, in bowl subdivision football and in emerging sports for women. *(Adopted: 4/26/07 effective 8/1/07)*

> **10.3.1.1 Exception. [#]**   The provisions of Bylaw 10.3 are not applicable to traditional wagers between institutions (e.g., traditional rivalry) or in conjunction with particular contests (e.g., bowl games). Items wagered must be representative of the involved institutions or the states in which they are located. *(Adopted: 4/26/07 effective 8/1/07)*

**10.3.2 Sanctions. [#]**   The following sanctions for violations of Bylaw 10.3 shall apply: *(Adopted: 4/27/00 effective 8/1/00, Revised: 4/26/07 effective 8/1/07)*

(a)   A student-athlete who engages in activities designed to influence the outcome of an intercollegiate contest or in an effort to affect win-loss margins ("point shaving") or who participates in any sports wagering activity involving the student-athlete's institution shall permanently lose all remaining regular-season and postseason eligibility in all sports. *(Revised: 4/26/07 effective 8/1/07)*

(b)   A student-athlete who participates in any sports wagering activity through the Internet, a bookmaker or a parlay card shall be ineligible for all regular-season and postseason competition for a minimum period of one year from the date of the institution's determination that a violation occurred and shall be charged with the loss of a minimum of one season of eligibility. If the student-athlete is determined to have been involved in a later violation of any portion of Bylaw 10.3, the student-athlete shall permanently lose all remaining regular-season and postseason eligibility in all sports. *(Revised: 4/26/07 effective 8/1/07)*

## 10.4 DISCIPLINARY ACTION [#]

Prospective or enrolled student-athletes found in violation of the provisions of this regulation shall be ineligible for further intercollegiate competition, subject to appeal to the Committee on Student-Athlete Reinstatement for restoration of eligibility. (See Bylaw 10.3.2 for sanctions of student-athletes involved in violations of Bylaw 10.3.) Institutional staff members found in violation of the provisions of this regulation shall be subject to disciplinary or corrective action as set forth in Bylaw 19.5.2.2 of the NCAA enforcement procedures, whether such violations occurred at the certifying institution or during the individual's previous employment at another member institution. *(Revised: 1/10/90, 4/27/00 effective 8/1/00, 4/26/07 effective 8/1/07)*

# Conduct and Employment of Athletics Personnel

| | | | | | |
|---|---|---|---|---|---|
| 11.01 | Definitions and Applications | 47 | 11.5 | Certification to Recruit Off Campus | 51 |
| 11.1 | Conduct of Athletics Personnel | 49 | 11.6 | Limitations on Scouting of Opponents | 51 |
| 11.2 | Contractual Agreements | 49 | 11.7 | Limitations on the Number and | |
| 11.3 | Compensation and Remuneration | 50 | | Duties of Coaches | 52 |
| 11.4 | Employment of High School, Preparatory School or Two-Year College Coaches, or Other Individuals Associated with Prospective Student-Athletes | 50 | | | |

## 11.01 DEFINITIONS AND APPLICATIONS

**11.01.1 Bonus.** A bonus is a direct cash payment over and above an athletics department staff member's institutional salary in recognition of a specific and extraordinary achievement (see Bylaw 11.3.2.3).

**11.01.2 Coach, Head or Assistant.** A head or assistant coach is any coach who is designated by the institution's athletics department to perform coaching duties and who serves in that capacity on a volunteer or paid basis. *(Revised: 1/10/91 effective 8/1/92)*

**11.01.3 Coach, Graduate Assistant—Bowl Subdivision Football and Women's Rowing. [FBS]** In bowl subdivision football, a graduate assistant coach is any coach who has received a baccalaureate degree and has either received his or her first baccalaureate degree or has exhausted athletics eligibility (whichever occurs later) within the previous seven years and qualifies for appointment as a graduate assistant under the policies of the institution. In women's rowing, a graduate assistant coach is any coach who has received a baccalaureate degree and qualifies for appointment as a graduate assistant under the policies of the institution. In bowl subdivision football and women's rowing, the individual is not required to be enrolled in a specific graduate degree program unless required by institutional policy. The following provisions shall apply: *(Revised: 1/10/91, 1/10/92, 1/9/06 effective 8/1/06, 12/15/06, 1/8/07 effective 8/1/07, 4/29/10 for new appointments)*

(a) The individual shall be enrolled in at least 50 percent of the institution's minimum regular graduate program of studies, except that during his or her final semester or quarter of the degree program, he or she may be enrolled in less than 50 percent of the institution's minimum regular program, provided he or she is carrying (for credit) the courses necessary to complete the degree requirements. If the individual fails to complete all degree requirements during the term in which he or she is enrolled in less than 50 percent of the institution's minimum regular program, the result shall be an institutional violation per Constitution 2.8.1. An institution may appoint a midyear replacement graduate assistant coach who is enrolled in less than 50 percent of the institution's minimum regular graduate program of studies (or is not yet enrolled), provided the graduate assistant coach has been accepted for enrollment in a graduate program beginning with the next regular academic term; *(Adopted: 1/8/07 effective 8/1/07, Revised: 1/16/10 effective 8/1/10)*

(b) The individual may not receive compensation or remuneration in excess of the value of a full grant-in-aid for a full-time student, based on the resident status of that individual, and the receipt of four complimentary tickets to the institution's intercollegiate football and basketball games;

(c) Graduate and postgraduate financial assistance administered outside the institution (e.g., NCAA postgraduate scholarship) shall be excluded from the individual's limit on remuneration, provided such assistance is awarded through an established and continuing program to aid graduate students and the donor of the assistance does not restrict the recipient's choice of institutions; *(Adopted: 1/11/89)*

(d) The individual may not serve as a graduate assistant coach for a period of more than two years except that if the individual successfully completes 24-semester or 36-quarter hours during the initial two-year period, the individual may serve as a graduate assistant coach for a third year. The Legislative Council Subcommittee for Legislative Relief may approve a waiver of these limitations based on the fact that the student's service as a coach and enrollment as a graduate student were interrupted for reasons that are unrelated to athletics, or to personal or family finances, and that are beyond the control of the institution or the coach. Such a waiver may not be granted solely to permit the completion of a graduate program; *(Revised: 1/16/93, 11/1/07 effective 8/1/08)*

than a full-time program of studies, provided he or she is carrying (for credit) the courses necessary to complete the degree requirements;

(b) The individual may participate in limited on-court or on-field activities during practice (e.g., assist with drills, throw batting practice) or competition (e.g., assist with warm-up activities) involving student-athletes on a regular basis;

(c) The individual shall not provide instruction to student-athletes;

(d) The individual shall not participate in countable athletically related activities (e.g., practice player) except as permitted in Bylaw 11.01.6-(b); and

(e) In baseball, the individual shall forfeit any remaining eligibility in the sport at the institution at which the individual serves as a manager. *(Adopted: 4/29/10 effective 8/1/10)*

**11.01.7 Supplemental Pay.** Supplemental pay is the payment of cash over and above an athletics department staff member's institutional salary by an outside source for the purpose of increasing that staff member's annual earnings (see Bylaw 11.3.2.2).

# 11.1 CONDUCT OF ATHLETICS PERSONNEL

**11.1.1 Honesty and Sportsmanship.** Individuals employed by or associated with a member institution to administer, conduct or coach intercollegiate athletics shall act with honesty and sportsmanship at all times so that intercollegiate athletics as a whole, their institutions and they, as individuals, represent the honor and dignity of fair play and the generally recognized high standards associated with wholesome competitive sports. (See Bylaw 10 for more specific ethical-conduct standards.)

**11.1.2 Responsibility for Violations of NCAA Regulations.** Institutional staff members found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures, whether such violations occurred at the certifying institution or during the individual's previous employment at another member institution.

**11.1.2.1 Responsibility of Head Coach.** It shall be the responsibility of an institution's head coach to promote an atmosphere for compliance within the program supervised by the coach and to monitor the activities regarding compliance of all assistant coaches and other administrators involved with the program who report directly or indirectly to the coach. *(Adopted: 4/28/05)*

**11.1.3 Use of Association Name or Affiliation.** Staff members of member institutions and others serving on the Association's committees or acting as consultants shall not use, directly or by implication, the Association's name or their affiliation with the Association in the endorsement of products or services.

**11.1.4 Representing Individuals in Marketing Athletics Ability/Reputation.** Staff members of the athletics department of a member institution shall not represent, directly or indirectly, any individual in the marketing of athletics ability or reputation to an agent, a professional sports team or a professional sports organization, including receiving compensation for arranging commercial endorsements or personal appearances for former student-athletes, except as specified in Bylaw 11.1.4.1, and shall not receive compensation or gratuities of any kind, directly or indirectly, for such services. *(Revised: 1/10/92, 1/11/94)*

**11.1.4.1 Exception—Professional Sports Counseling Panel and Head Coach.** An institution's professional sports counseling panel or a head coach in a sport may contact agents, professional sports teams or professional sports organizations on behalf of a student-athlete, provided no compensation is received for such services. The head coach shall consult with and report his or her activities on behalf of the student-athlete to the institution's professional sports counseling panel. If the institution has no such panel, the head coach shall consult with and report his or her activities to the president or chancellor [or an individual or group (e.g., athletics advisory board) designated by the president or chancellor]. *(Revised: 11/1/01 effective 8/1/02, 3/8/06)*

**11.1.5 Use of Tobacco Products.** The use of tobacco products is prohibited by all game personnel (e.g., coaches, trainers, managers and game officials) in all sports during practice and competition. Uniform penalties (as determined by the applicable rules-making committees and sports committees with rules-making responsibilities) shall be established for such use. *(Adopted: 1/11/94 effective 8/1/94, Revised: 1/10/95, 1/14/97 effective 8/1/97)*

# 11.2 CONTRACTUAL AGREEMENTS

**11.2.1 Stipulation That NCAA Enforcement Provisions Apply.** Contractual agreements or appointments between a coach and an institution shall include the stipulation that a coach who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures, including suspension without pay or termination of employment for significant or repetitive violations. *(Revised: 3/10/04)*

**11.2.2 Athletically Related Income.** Contractual agreements, including letters of appointment, between a full-time or part-time athletics department staff member (excluding secretarial or clerical personnel) and an institution shall include the stipulation that the staff member is required to provide a written detailed account annually to the president or chancellor for all athletically related income and benefits from sources outside the institution. In addition, the approval of all athletically related income and benefits shall be consistent with the institution's

policy related to outside income and benefits applicable to all full-time or part-time employees. Sources of such income shall include, but are not limited to, the following: *(Revised: 1/10/92, 1/11/94, 1/10/95, 4/26/01 effective 8/1/01, 3/8/06)*

(a) Income from annuities;

(b) Sports camps;

(c) Housing benefits (including preferential housing arrangements);

(d) Country club memberships;

(e) Complimentary ticket sales;

(f) Television and radio programs; and

(g) Endorsement or consultation contracts with athletics shoe, apparel or equipment manufacturers.

## 11.3 COMPENSATION AND REMUNERATION

**11.3.1 Control of Employment and Salaries.** The institution, as opposed to any outside source, shall remain in control of determining who is to be its employee and the amount of salary the employee is to receive within the restrictions specified by NCAA legislation.

**11.3.2 Income in Addition to Institutional Salary.**

**11.3.2.1 Bona Fide Outside Employment.** A staff member may earn income in addition to the institutional salary by performing services for outside groups. *(Revised: 1/10/92, 4/26/01 effective 8/1/01)*

**11.3.2.2 Supplemental Pay.** An outside source is prohibited from paying or regularly supplementing an athletics department staff member's annual salary and from arranging to supplement that salary for an unspecified achievement. This includes the donation of cash from outside sources to the institution earmarked for the staff member's salary or supplemental income. It would be permissible for an outside source to donate funds to the institution to be used as determined by the institution, and it would be permissible for the institution, at its sole discretion, to use such funds to pay or supplement a staff member's salary.

**11.3.2.3 Bonuses for Specific and Extraordinary Achievement.** An institution may permit an outside individual, group or agency to supplement an athletics department staff member's salary with a direct cash payment in recognition of a specific and extraordinary achievement (e.g., contribution during career to the athletics department of the institution, winning a conference or national championship, number of games or meets won during career/season), provided such a cash supplement is in recognition of a specific achievement and is in conformance with institutional policy.

**11.3.2.4 Noninstitutional Publications That Report on Athletics Program.** Athletics department staff members shall not endorse (either orally or in writing) any noninstitutional publication dedicated primarily to reporting on an institution's athletics activities, except as provided in this section, and shall not write for such publications. *(Adopted: 1/16/93, Revised: 1/11/94, 4/26/01 effective 8/1/01)*

**11.3.2.4.1 Educational Articles.** Athletics department staff members may write educational articles related to NCAA rules and crowd control for noninstitutional publications dedicated primarily to reporting on an institution's athletics activities. *(Adopted: 1/11/94)*

**11.3.2.5 Recruiting Service Consultants.** Institutional athletics department staff members may not endorse, serve as consultants or participate on advisory panels for any recruiting or scouting service involving prospective student-athletes. *(Adopted: 1/16/93)*

**11.3.2.6 Quotations and Pictures Used to Promote a Camp.** An institution's coaching staff member may not promote a noninstitutional camp or clinic by permitting the use of his or her quotations and/or pictures in the camp or clinic brochure, unless that coaching staff member is employed by the camp. *(Adopted: 1/14/97 effective 8/1/97)*

**11.3.2.7 Consultant for or Endorsement of Noninstitutional Athletics Events Involving Prospective Student-Athletes.** An athletics department staff member may not serve as a consultant for a noninstitutional athletics event that primarily involves prospective student-athletes and may not endorse or promote such an event. *(Adopted: 1/15/11)*

**11.3.2.8 Promotion or Endorsement of a Prospective Student-Athlete's Team, Coach or Athletics Facility.** An athletics department staff member shall not promote or endorse a prospective student-athlete's team or coach, or an athletics facility that is primarily used by prospective student-athletes. *(Adopted: 1/15/11)*

## 11.4 EMPLOYMENT OF HIGH SCHOOL, PREPARATORY SCHOOL OR TWO-YEAR COLLEGE COACHES, OR OTHER INDIVIDUALS ASSOCIATED WITH PROSPECTIVE STUDENT-ATHLETES

**11.4.1 High School, Preparatory School or Two-Year College Coach.** An institution may not employ a high school, preparatory school or two-year college coach who remains a coach in the same sport at the high school, preparatory school or two-year college. This provision does not preclude employment of a high school,

# Amateurism

| 12.01 | General Principles | 61 |
| 12.02 | Definitions and Applications | 61 |
| 12.1 | General Regulations | 62 |
| 12.2 | Involvement with Professional Teams | 67 |
| 12.3 | Use of Agents | 70 |
| 12.4 | Employment | 71 |
| 12.5 | Promotional Activities | 72 |
| 12.6 | Financial Donations from Outside Organizations | 76 |

## 12.01 GENERAL PRINCIPLES

**12.01.1 Eligibility for Intercollegiate Athletics.** Only an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport.

**12.01.2 Clear Line of Demarcation.** Member institutions' athletics programs are designed to be an integral part of the educational program. The student-athlete is considered an integral part of the student body, thus maintaining a clear line of demarcation between college athletics and professional sports.

**12.01.3 "Individual" vs. "Student-Athlete."** NCAA amateur status may be lost as a result of activities prior to enrollment in college. If NCAA rules specify that an "individual" may or may not participate in certain activities, this term refers to a person prior to and after enrollment in a member institution. If NCAA rules specify a "student-athlete," the legislation applies only to that person's activities after enrollment.

**12.01.4 Permissible Grant-in-Aid.** A grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership.

## 12.02 DEFINITIONS AND APPLICATIONS

**12.02.1 Individual.** An individual, for purposes of this bylaw, is any person of any age without reference to enrollment in an educational institution or status as a student-athlete.

**12.02.2 Pay.** Pay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics.

**12.02.3 Professional Athlete.** A professional athlete is one who receives any kind of payment, directly or indirectly, for athletics participation except as permitted by the governing legislation of the Association.

**12.02.4 Professional Athletics Team.** A professional team is any organized team that:

(a) Provides any of its players more than actual and necessary expenses for participation on the team, except as otherwise permitted by NCAA legislation. Actual and necessary expenses are limited to the following, provided the value of these items is commensurate with the fair market value in the locality of the player(s) and is not excessive in nature: *(Revised: 4/25/02 effective 8/1/02)*

   (1) Meals directly tied to competition and practice held in preparation for such competition;

   (2) Lodging directly tied to competition and practice held in preparation for such competition;

   (3) Apparel, equipment and supplies;

   (4) Coaching and instruction;

   (5) Health/medical insurance;

   (6) Transportation (expenses to and from practice competition, cost of transportation from home to training/practice site at the beginning of the season and from training/practice site to home at the end of season);

   (7) Medical treatment and physical therapy;

   (8) Facility usage; *(Revised: 4/24/03)*

   (9) Entry fees; and *(Revised: 4/24/03)*

   (10) Other reasonable expenses; or *(Adopted: 4/24/03, Revised: 10/28/04)*

(b) Declares itself to be professional (see Bylaw 12.2.3.2.4). *(Revised: 8/8/02)*

# Enforcement

| | | |
|---|---|---|
| 19.01 | General Principles ........................................ 319 | |
| 19.02 | Definitions and Applications ..................... 319 | |
| 19.1 | Committee on Infractions ........................... 320 | |
| 19.2 | Appeals Committees ..................................... 321 | |
| 19.3 | Establishment and Revision of | |
| | Enforcement Policies | |
| | and Procedures ............................................. 321 | |

| | | |
|---|---|---|
| 19.4 | Notice of Charges and Opportunity | |
| | to Appear ........................................................ 322 | |
| 19.5 | Penalties ......................................................... 322 | |
| 19.6 | Rights of Member to Appeal ...................... 325 | |
| 19.7 | Restitution ..................................................... 326 | |

## 19.01 GENERAL PRINCIPLES

**19.01.1 Mission of NCAA Enforcement Program.** It shall be the mission of the NCAA enforcement program to eliminate violations of NCAA rules and impose appropriate penalties should violations occur. The program is committed to fairness of procedures and the timely and equitable resolution of infractions cases. The achievement of these objectives is essential to the conduct of a viable and effective enforcement program. Further, an important consideration in imposing penalties is to provide fairness to uninvolved student-athletes, coaches, administrators, competitors and other institutions. *(Adopted: 1/11/94)*

**19.01.2 Exemplary Conduct.** Individuals employed by or associated with member institutions for the administration, the conduct or the coaching of intercollegiate athletics are, in the final analysis, teachers of young people. Their responsibility is an affirmative one, and they must do more than avoid improper conduct or questionable acts. Their own moral values must be so certain and positive that those younger and more pliable will be influenced by a fine example. Much more is expected of them than of the less critically placed citizen.

**19.01.3 Responsibility to Cooperate.** All representatives of member institutions shall cooperate fully with the NCAA enforcement staff, Committee on Infractions, Infractions Appeals Committee and Board of Directors to further the objectives of the Association and its enforcement program. The enforcement policies and procedures are an essential part of the intercollegiate athletics program of each member institution and require full and complete disclosure by all institutional representatives of any relevant information requested by the NCAA enforcement staff, Committee on Infractions or Infractions Appeals Committee during the course of an inquiry. *(Revised: 11/1/07 effective 8/1/08)*

**19.01.4 Violations by Institutional Staff Members.** Institutional staff members found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures, whether such violations occurred at the certifying institution or during the individual's previous employment at another member institution.

**19.01.5 Nature of Penalty Structure.** As a guiding principle, a penalty imposed under NCAA enforcement policies and procedures should be broad and severe if the violation or violations reflect a general disregard for the governing rules; in those instances in which the violation or violations are isolated and of relative insignificance, then the NCAA penalty shall be specific and limited. Previous violations of NCAA legislation shall be a contributing factor in determining the degree of penalty.

## 19.02 DEFINITIONS AND APPLICATIONS

**19.02.1 Show-Cause Order.** A show-cause order is one that requires a member institution to demonstrate to the satisfaction of the Committee on Infractions (or the Infractions Appeals Committee per Bylaw 19.2) why it should not be subject to a penalty (or additional penalty) for not taking appropriate disciplinary or corrective action against an institutional staff member or representative of the institution's athletics interests identified by the committee as having been involved in a violation of NCAA regulations that has been found by the committee. *(Revised: 1/10/95, 4/24/03)*

**19.02.2 Types of Violations.**

**19.02.2.1 Violation, Secondary.** A secondary violation is a violation that is isolated or inadvertent in nature, provides or is intended to provide only a minimal recruiting, competitive or other advantage and does not include any significant impermissible benefit (including, but not limited to, an extra benefit, recruiting inducement, preferential treatment or financial aid). Multiple secondary violations by a member institution may collectively be considered as a major violation. *(Revised: 1/11/94, 10/28/10)*

319

**19.02.2.2 Violation, Major.** All violations other than secondary violations are major violations, specifically including those that provide an extensive recruiting or competitive advantage. *(Revised: 1/11/94)*

**19.02.3 New Evidence.** New evidence is evidence that could not reasonably be ascertained prior to the Committee on Infractions hearing. *(Adopted: 1/6/96)*

# 19.1 COMMITTEE ON INFRACTIONS

The Board of Directors shall appoint a Committee on Infractions, which shall be responsible for administration of the NCAA enforcement program. *(Revised: 11/1/07 effective 8/1/08)*

**19.1.1 Composition of Committee.** The committee shall be composed of 10 members, seven of whom shall be at present or previously on the staff of an active member institution or member conference of the Association, not more than three and no less than two of whom shall be from the general public and shall not be associated with a collegiate institution, conference, or professional or similar sports organization, or represent coaches or athletes in any capacity. One of the members shall serve as chair and one member shall serve as vice chair. Two members shall be elected as coordinators of appeals, one of whom may be a public member. Two positions shall be allocated for men, two allocated for women and six unallocated. There shall be no subdivision restrictions except that all nonpublic members may not be from the same subdivision; however, the coordinators of appeals shall not be considered in determining whether such a requirement is satisfied. *(Revised: 1/16/93, 10/27/98, 10/28/99, 1/11/00, 11/1/01, 11/31/02)*

**19.1.1.1 Quorum.** Four members present and voting shall constitute a quorum for conduct of committee business, it being understood that the chair shall make a special effort to have full committee attendance when major infractions cases involving violations are to be considered.

**19.1.1.2 Temporary Substitutes.** If it appears that one or more members of the committee will be unable to participate in the hearing of a case, the chair may request the Administration Cabinet to designate a former member or members of the committee to rejoin the committee for purposes of the consideration and disposition of that case. *(Revised: 11/1/07 effective 8/1/08)*

**19.1.1.3 Term of Office.** A member shall serve a three-year term, which shall commence on the first day of September following the member's election. A member may be reappointed but shall not serve more than nine years on the committee, with the exception of the position of coordinator of appeals, which may be filled by a former member of the committee who had previously served nine years. In such instances, a minimum period of three years must have elapsed between the date the committee member previously relinquished duties with the committee and reappointment to the committee as the coordinator of appeals. As with a regular member of the committee, the coordinator of appeals shall serve a three-year term, which commences on the first day of September following the coordinator of appeals' selection. The coordinator of appeals may be reappointed but shall not serve more than nine years on the committee in that capacity. *(Adopted: 1/11/00)*

**19.1.1.4 Duties of the Coordinators of Appeals.** The coordinators of appeals shall: *(Adopted: 10/28/99, Revised: 10/31/02, 4/28/11)*

(a) Be responsible for processing appeals to infractions cases on behalf of the committee;

(b) Be present during institutional hearings before the committee, but will not be active participants;

(c) Be present and actively participate during committee deliberations; and

(d) Represent the committee in proceedings before the Infractions Appeals Committee.

**19.1.2 Authority of Committee.** Disciplinary or corrective actions other than suspension or termination of membership may be effected by members of the Committee on Infractions present and voting at any duly called meeting thereof, provided the call of such a meeting shall have contained notice of the situation presenting the disciplinary problem. Actions of the committee in cases involving major violations, however, shall be subject to review by the Infractions Appeals Committee per Bylaw 19.2, on appeal. *(Revised: 1/16/93, 1/10/95, 4/24/03)*

**19.1.2.1 Authority of Vice President for Enforcement Services.** Upon review of information developed by the enforcement staff or self-reported by the member institution, the vice president for enforcement services shall identify the charges as involving alleged major or secondary violations, or multiple secondary violations that should be viewed as a major violation. Disciplinary or corrective actions in the case of secondary violations may be effected by the vice president for enforcement services. Said actions shall be taken in accordance with the provisions of the enforcement policies and procedures and shall be subject to review by the committee upon appeal. *(Revised: 4/24/03)*

**19.1.2.2 Authority of Committee Chair.** In the interim between meetings of the committee, the chair shall be empowered to act on behalf of the committee, subject to committee approval at its next meeting. If at any time, at a meeting or between meetings, the chair is unavailable to act as such, the vice chair is empowered to exercise the functions of the chair. *(Revised: 11/1/01)*

**19.1.2.3 Authority of Infractions Appeals Committee.** The Infractions Appeals Committee per Bylaw 19.2, shall hear and act upon an institution's or an involved individual's appeal of the findings of major violations and/or the imposition of associated penalties by the Committee on Infractions. *(Revised: 1/16/93, 1/10/95, 4/24/03)*

**19.1.3 Duties of Committee.** The duties of the Committee on Infractions shall be as follows: *(Revised: 4/24/03)*

(a) Consider complaints that may be filed with the Association charging the failure of any member to maintain the academic or athletics standards required for membership or the failure of any member to meet the conditions and obligations of membership in the Association;

(b) Formulate and revise, in accordance with the requirements of Bylaw 19.3, a statement of its established operating policies and procedures, including investigative guidelines (see Bylaw 32);

(c) Determine facts related to alleged violations and find violations of NCAA rules and requirements;

(d) Impose an appropriate penalty or show-cause requirement on a member found to be involved in a major violation (or, upon appeal, on a member found to be involved in a secondary violation), or recommend to the Board of Directors suspension or termination of membership; and

(e) Carry out any other duties directly related to the administration of the Association's enforcement program.

## 19.2 APPEALS COMMITTEES

**19.2.1 Infractions Appeals Committee.** The Board of Directors shall appoint an Infractions Appeals Committee, which shall hear and act upon appeals of the findings of major violations by the Committee on Infractions involving member institutions. *(Adopted: 1/16/93, Revised: 1/10/95, 11/1/07 effective 8/1/08)*

> **19.2.1.1 Composition of Committee.** The committee shall be composed of five members. At least one member shall be from the general public and shall not be connected with a collegiate institution, conference, or professional or similar sports organization, or represent coaches or athletes in any capacity. The remaining members shall presently or previously be on the staff of an active member institution or member conference, but shall not serve presently on the Board of Directors. There shall be no subdivision restrictions except that all nonpublic members may not be from the same subdivision. *(Adopted: 1/16/93, Revised: 10/27/98)*

> > **19.2.1.1.1 Temporary Substitutes.** If it appears that one or more of the committee members will be unable to participate in the disposition of a case, the chair may request the Administration Cabinet to designate a former member or members of the committee to rejoin the committee for purposes of consideration and disposition of that case. *(Adopted: 4/22/98, Revised: 11/1/07 effective 8/1/08, 4/28/11)*

> **19.2.1.2 Term of Office.** A member shall serve a three-year term, which shall commence on the first day of September following the member's election. A member may be reappointed but shall not serve more than nine years on the committee. *(Adopted: 1/9/96)*

> **19.2.1.3 Authority and Duties of Committee.** The committee shall hear and act on appeals of the findings of major violations by the Committee on Infractions involving member institutions (see Bylaws 32.10 and 32.11). The committee may establish or amend enforcement policies and procedures set forth in Bylaws 32.10 and 32.11 that relate directly to the infractions appeals process, subject to review and approval by the Board of Directors. *(Adopted: 1/16/93, Revised: 1/10/95, 1/14/97, 11/1/07 effective 8/1/08)*

> > **19.2.1.3.1 Notification to Membership.** To the extent that the infractions appeals policies and procedures are revised, any member institution involved in the processing of an infractions appeals case shall be notified immediately of the change and the general membership shall be advised through the NCAA website. *(Adopted: 1/14/97)*

> > **19.2.1.3.2 Review by Convention.** Policies and procedures established by the Infractions Appeals Committee, per Bylaw 19.2.1.3, are subject to review and approval by the Board of Directors (see Constitution 5.2.3.3). *(Adopted: 1/14/97, Revised: 4/24/03, 11/1/07 effective 8/1/08)*

## 19.3 ESTABLISHMENT AND REVISION OF ENFORCEMENT POLICIES AND PROCEDURES

**19.3.1 Amendment by Committee and Approval by Board of Directors.** The Committee on Infractions may establish or amend the policies and procedures in regard to issues other than those concerning institutional penalties, restitution, and committee duties and structure. A member institution shall be provided notice of alleged NCAA rules violations for which it is charged before any penalty is imposed, as well as the opportunity to appear before the committee and the opportunity to appeal the committee's findings of major violations or penalties (see Bylaws 19.4 and 19.5). The policies and procedures governing the administration of the Association's enforcement program, as set forth in Bylaw 32, are subject to review and approval by the Board of Directors at its next regularly scheduled meeting. *(Revised: 11/1/07 effective 8/1/08)*

> **19.3.1.1 Notification to Membership.** To the extent that the enforcement policies and procedures are revised, any member institution involved in the processing of an infractions case shall be notified immediately of the change.

**19.3.2 Amendment to Enforcement Procedures.** The enforcement policies and procedures set forth in Bylaw 32 may be amended in accordance with the legislative process. *(Revised: 4/24/03)*

## 19.4  NOTICE OF CHARGES AND OPPORTUNITY TO APPEAR

**19.4.1  For Major Violations.**  A member under investigation for major violations shall be given the following:

(a)  Notice of any specific charges against it and the facts upon which such charges are based; and

(b)  An opportunity to appear before the Committee on Infractions (or the Infractions Appeals Committee per Bylaw 19.2) to answer such charges by the production of evidence (see Bylaw 19.6.2). *(Revised: 1/16/93, 1/10/95, 4/24/03)*

**19.4.2  For Secondary Violations.**  A member under investigation for secondary violations shall be given the following:

(a)  Notice of any specific charges against it and the facts upon which such charges are based; and

(b)  An opportunity to provide a written response to the vice president for enforcement services (or to appear before the Committee on Infractions upon appeal) to answer such charges by the production of evidence (see Bylaw 19.6.1).

**19.4.3  New Findings.**  When an institution and involved individual appear before the committee to discuss a response to the notice of allegations, the hearing shall be directed toward the general scope of the notice of allegations but shall not preclude the committee from finding any violation resulting from information developed or discussed during the hearing. *(Revised: 4/24/03)*

## 19.5  PENALTIES

**19.5.1  Penalties for Secondary Violations.**  The vice president for enforcement services, upon approval by the chair or another member of the Committee on Infractions designated by the chair, or the committee may determine that no penalty is warranted in a secondary case, that an institutional- or conference-determined penalty is satisfactory or, if appropriate, impose a penalty. Among the disciplinary measures are: *(Revised: 1/11/94)*

(a)  Termination of the recruitment of a prospective student-athlete by the institution or, if the prospective student-athlete enrolls (or has enrolled) in the institution, permanent ineligibility to represent the institution in intercollegiate competition (unless eligibility is restored by the Committee on Student-Athlete Reinstatement upon appeal);

(b)  Forfeit/vacate contests in which an ineligible student-athlete participated;

(c)  Prohibition of the head coach or other staff members in the involved sport from participating in any off-campus recruiting activities for up to one year; *(Revised: 1/11/94)*

(d)  An institutional fine for each violation, with the monetary penalty ranging in total from $500 to $5,000, except when an ineligible student-athlete participates in an NCAA championship or other postseason competition, in which case the $5,000 limit shall not apply; *(Revised: 4/26/01 effective 8/1/01)*

(e)  A limited reduction in the number of financial aid awards that may be awarded during a specified period in the sport involved to the maximum extent of 20 percent of the maximum number of awards normally permissible in that sport;

(f)  Institutional recertification that its current athletics policies and practices conform to all requirements of NCAA regulations;

(g)  Suspension of the head coach or other staff members for one or more competitions; *(Adopted: 1/11/94)*

(h)  Public reprimand (to be invoked only in situations in which the Committee on Infractions or the vice president for enforcement services, upon approval by the committee, determines that a penalty, in addition to any institutional- or conference-determined penalty, is warranted); and *(Adopted: 1/11/94)*

(i)  Requirement that a member institution that has been found in violation, or that has an athletics department staff member who has been found in violation of the provisions of NCAA legislation while representing another institution, show cause why a penalty or an additional penalty should not be imposed if it does not take appropriate disciplinary or corrective action against the athletics department personnel involved, any other institutional employee if the circumstances warrant or representatives of the institution's athletics interests. *(Adopted: 1/11/94)*

**19.5.2  Penalties for Major Violations.**  Penalties for a major violation shall be significantly more severe than those for a secondary violation and shall be consistent with the penalty structure and guidelines used by other regulatory committees (e.g., Division I Committee on Academic Performance). The Committee on Infractions may impose one or more of the following penalties: *(Revised: 4/28/11 for any institution that receives a notice of inquiry after 4/28/11.)*

(a)  Public reprimand and censure.

(b)  Probationary period for up to five years (including a periodic in-person monitoring system, written institutional reports, and institutional affirmation that current athletics policies and procedures conform to all requirements of NCAA regulations).

(c) Suspension of institutional staff members from their duties for a specified period if such staff members are determined by the Committee on Infractions to have engaged in or condoned a major violation.

(d) Reduction in the number of financial aid awards (as defined in Bylaw 15.02.4.1) that may be awarded during a specified period.

(e) Reduction in the number of expense-paid recruiting visits to the institution in the involved sport.

(f) Prohibition against, or limits on, recruiting activities by some or all coaching staff members in an involved sport.

(g) Prohibition against specified competition in the sport (including, but not limited to, postseason competition, invitational tournaments and exempt contests or dates of competition, such as foreign tours or contests in Alaska or Hawaii), particularly in cases in which:

   (1) An involved individual remains employed at the institution;

   (2) A significant competitive advantage resulted from the violation;

   (3) The violation reflects a lack of institutional control, failure to monitor a program, or a violation of the cooperative principle set forth in Bylaw 32.1.4;

   (4) The violation includes findings of academic fraud; or

   (5) The institution is a repeat violator (as defined in Bylaw 19.5.2.1).

(h) Vacation of records in a cases which a student-athlete has competed while ineligible, particularly in cases involving academic fraud, serious intentional violations, direct involvement of a coach or a high-ranking school administrator, a large number of violations, competition while academically ineligible, a finding of failure to monitor or lack of institutional control, a repeat violator, or a case in which vacation or a similar penalty would be imposed if the underlying violations were secondary. The penalties may include one or more of the following:

   (1) Vacation of individual records and performances;

   (2) Vacation of team records and performances, including wins from the career record of the head coach in the involved sport, or, in applicable cases, reconfiguration of team point totals; or

   (3) Return of individual or team awards to the Association.

(i) Financial penalty.

(j) Prohibition against television appearances of the institution in the sport in which the violation occurred.

(k) Requirement that an institution that has been found in violation, or that has an athletics department staff member who has been found in violation of the provisions of NCAA legislation while representing another institution, show cause why a penalty or additional penalty should not be imposed, if, in the opinion of the Committee on Infractions, the institution has not taken appropriate disciplinary or corrective action against athletics department personnel involved in the infractions case or any other institutional employee, if the circumstances warrant, or a representative of the institution's athletics interests.

   (1) The penalty imposed under this provision may include a recommendation to the membership that the institution's membership in the Association be suspended or terminated.

   (2) "Appropriate disciplinary or corrective action" may include severance of relations with any representative of the institution's athletics interests who may be involved; the debarment of the head coach or any assistant coach involved in the infraction from coaching, recruiting, or participation in speaking engagements; and the prohibition of all recruiting in a specified sport for a specified period. The nature and extent of such action shall be determined by the institution, but the determination of whether the action is appropriate in the fulfillment of NCAA policies and principles, and its resulting effect on any institutional penalty, shall be solely that of the Committee on Infractions (or the Infractions Appeals Committee per Bylaw 19.2).

   (3) In the event the Committee on Infractions imposes additional penalties upon an institution, the institution shall be provided the opportunity to appear before the committee; further, the institution shall be provided the opportunity to appeal (per Bylaw 19.6.2) any additional penalty imposed by the Committee on Infractions.

(l) Other penalties as appropriate.

### 19.5.2.1 Repeat Violators.

**19.5.2.1.1 Time Period.** An institution shall be considered a "repeat" violator if the Committee on Infractions finds that a major violation has occurred within five years of the starting date of a major penalty. For this provision to apply, at least one major violation must have occurred within five years after the starting date of the penalties in the previous case. It shall not be necessary that the Committee on Infractions' hearing be conducted or its report issued within the five-year period. *(Revised: 1/14/97 effective 8/1/97)*

**19.5.2.1.2 Repeat-Violator Penalties.** A repeat violator shall be subject to enhanced major violation penalties and any or all of the following additional penalties: *(Revised: 1/11/94, 4/28/11; for any institution that receives notice of inquiry after 4/28/11)*

(a) The prohibition of some or all outside competition in the sport involved in the latest major violation for a prescribed period as deemed appropriate by the Committee on Infractions and the prohibition of all coaching staff members in that sport from involvement directly or indirectly in any coaching activities at the institution during that period; *(Revised: 4/28/11)*

(b) The elimination of all initial grants-in-aid and all recruiting activities in the sport involved in the latest major violation in question for a prescribed period; *(Revised: 4/28/11)*

(c) The requirement that all institutional staff members serving on the Board of Directors, Leadership Council, Legislative Council or other cabinets or committees of the Association resign those positions, it being understood that all institutional representatives shall be ineligible to serve on any NCAA committee for a prescribed period; and *(Revised: 11/1/07 effective 8/1/08, 4/28/11)*

(d) The requirement that the institution relinquish its voting privilege in the Association for a prescribed period. *(Revised: 4/28/11)*

### 19.5.2.2 Probationary Periods.

**19.5.2.2.1 Conditions of Probation.** The committee (or the Infractions Appeals Committee per Bylaw 19.2) may identify possible conditions that an institution must satisfy during a probationary period. Such conditions shall be designed on a case-by-case basis to focus on the institution's administrative weaknesses detected in the case and shall include, but not be limited to, written reports from the institution pertaining to areas of concern to the committee (or the Infractions Appeals Committee per Bylaw 19.2), in-person reviews of the institution's athletics policies and practices by the NCAA administrator for the Committee on Infractions, implementation of educational or deterrent programs, and audits for specific programs or teams. If the institution fails to satisfy such conditions, the committee (or the Infractions Appeals Committee per Bylaw 19.2) may reconsider the penalties in the case and may extend the probationary period and/or impose additional sanctions. *(Revised: 1/10/95, 4/24/03)*

**19.5.2.2.2 Review Prior to Restoration of Membership Rights and Privileges.** In the event the committee imposes a penalty involving a probationary period, the institution shall be notified that after the penalty becomes effective, the NCAA administrator for the Committee on Infractions will review the athletics policies and practices of the institution prior to action by the committee to restore the institution to full rights and privileges of membership in the Association. *(Revised: 1/10/95)*

### 19.5.2.3 Television Appearance Limitations.
In some instances, an institution is rendered ineligible to appear on television programs. When an institution is banned from such television programs, the penalty shall specify that the institution may not enter into any contracts or agreements for such appearances until the institution's probationary status has been terminated and it has been restored to full rights and privileges of membership. *(Revised: 1/10/92)*

**19.5.2.3.1 Closed-Circuit Telecast Exception.** The Board of Directors is authorized to permit a closed-circuit telecast, limited to the campus of the opponent of the ineligible institution, it being understood that no rights fee is to be paid to the ineligible institution. *(Revised: 11/1/07 effective 8/1/08)*

### 19.5.2.4 Disassociation of Representatives of Athletics Interests.
The disassociation of relations with a representative of an institution's athletics interests may be imposed on a permanent basis, for the duration of the applicable probationary period or for another specified period of time. When an institution is required to show cause why a representative of the institution's athletics interests should not be disassociated from its athletics program, such disassociation shall require that the institution:

(a) Refrain from accepting any assistance from the individual that would aid in the recruitment of prospective student-athletes or the support of enrolled student-athletes;

(b) Not accept financial assistance for the institution's athletics program from the individual;

(c) Ensure that no athletics benefit or privilege be provided to the individual that is not generally available to the public at large; and

(d) Take such other actions against the individual that the institution determines to be within its authority to eliminate the involvement of the individual in the institution's athletics program.

### 19.5.2.5 Notification to Regional Accrediting Agency.
When an institution has been found to be in violation of NCAA requirements, and the report reflects academic violations or questionable academic procedures, the president shall be authorized to forward a copy of the report to the appropriate regional accrediting agency.

### 19.5.2.6 Review of Penalty.

**19.5.2.6.1 Newly Discovered Evidence or Prejudicial Error.** When a penalty has been imposed and publicly announced and the appeal opportunity has been exhausted, there shall be no review of the penalty except upon a showing of newly discovered evidence (per Bylaw 19.02.3) that is directly related to the findings in the case or that there was prejudicial error in the procedure that was followed in the processing of the case by the committee. *(Revised: 1/9/96)*

**19.5.2.6.1.1 Review Process.** Any institution that initiates such a review shall be required to submit a brief of its appeal to the committee and to furnish sufficient copies of the brief for distribution to all members of the committee. The committee shall review the brief and decide by majority vote whether it shall grant a hearing of the appeal.

**19.5.2.6.1.2 Institution or Conference Discipline as New Evidence.** Disciplinary measures imposed by the institution or its conference following the NCAA's action may be considered to be "newly discovered evidence" for the purposes of this section.

**19.5.2.6.1.3 No Imposition of New Penalty.** If a hearing of the appeal is granted, the committee may reduce or eliminate any penalty but may not impose any new penalty. The committee's decision with respect to the penalty shall be final and conclusive for all purposes.

**19.5.2.6.2 Reconsideration of Penalty.** The institution shall be notified that should any portion of the penalty in the case be set aside for any reason other than by appropriate action of the Association, the penalty shall be reconsidered by the NCAA. In such cases, any extension or adjustment of a penalty shall be proposed by the Committee on Infractions after notice to the institution and hearing. Any such action by the committee shall be subject to appeal.

**19.5.3 Discipline of Affiliated Member.**

**19.5.3.1 Termination or Suspension.** The membership of any affiliated member failing to meet the conditions and obligations of membership or failing to support and adhere to the purposes and policies set forth in Constitution 1 may be terminated or suspended or the member otherwise may be disciplined through the following procedure: *(Revised: 1/15/11 effective 8/1/11)*

(a) The Executive Committee by a two-thirds majority of its members present and voting, may take such action on its own initiative; or *(Adopted: 1/11/89 Revised: 1/15/11 effective 8/1/11)*

(b) The Committee on Infractions, by majority vote, may recommend such action to the Executive Committee, which may adopt the recommendation by a two-thirds vote of its members present and voting; and

(c) The affiliated member shall be advised of the proposed action at least 30 days prior to any Committee on Infractions or Executive Committee meeting in which such action is considered and shall be provided the opportunity to appear at any such meeting. *(Revised: 1/15/11 effective 8/1/11)*

**19.5.4 Recommendation to Committee on Athletics Certification.** The Committee on Infractions may recommend to the Committee on Athletics Certification that an institution's certification status be reviewed as a result of the institution's completed infractions case. *(Adopted: 1/16/93 effective 1/1/94)*

# 19.6 RIGHTS OF MEMBER TO APPEAL

**19.6.1 Appeal of Secondary Violations.** A member shall have the right to appeal actions taken by the vice president of enforcement services in reference to secondary violations. To appeal, the member must submit written notice of appeal to the Committee on Infractions. The Committee on Infractions must receive the written notice of appeal and any supporting information within 30 days of the date the institution receives the enforcement staff's decision. *(Adopted: 1/16/93 effective 1/1/94)*

**19.6.2 Appeal of Major Violations.** A member shall have the right to give written notice of appeal of the committee's findings of major violations (subject to Bylaw 32.10.2), the penalty, or both to the Infractions Appeals Committee per Bylaw 19.2. *(Revised: 1/16/93, 1/10/95, 4/24/03)*

**19.6.3 Appeal by an Institutional Staff Member.** If any current or former institutional staff member participates in a hearing (either in person or through written presentation) before the Committee on Infractions and is involved in a finding of a violation against that individual, the individual shall be given the opportunity to appeal any of the findings in question (subject to the conditions of Bylaw 32.10.2) or the committee's decision to issue a show-cause order to the Infractions Appeals Committee. Under such circumstances, the individual and personal legal counsel may appear before the appeals committee at the time it considers the pertinent findings. *(Revised: 1/16/93, 1/10/95, 1/6/96, 4/24/03)*

**19.6.4 Student-Athlete Appeal.** If an institution concludes that continued application of the rule(s) would work an injustice on any student-athlete, an appeal shall be submitted to the Committee on Student-Athlete Reinstatement and promptly reviewed.

**19.6.4.1 Obligation of Institution to Take Appropriate Action.** When the committee (or the Infractions Appeals Committee per Bylaw 19.2) finds that there has been a violation of the constitution or bylaws affecting the eligibility of an individual student-athlete or student-athletes, the institution involved and its conference(s), if any, shall be notified of the violation and the name(s) of the student-athlete(s) involved, it being understood that if the institution fails to take appropriate action, the involved institution shall be cited to show cause under the Association's regular enforcement procedures why it should not be disciplined for a failure to abide by the conditions and obligations of membership (declaration of ineligibility) if it permits the student-athlete(s) to compete. *(Revised: 1/10/95, 4/24/03)*

## 19.7 RESTITUTION

If a student-athlete who is ineligible under the terms of the constitution, bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions: *(Revised: 11/1/07 effective 8/1/08)*

(a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in the contest(s) selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and *(Revised: 11/1/07 effective 8/1/08)*

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions. *(Revised: 4/26/01 effective 8/1/01)*

# Enforcement Policies and Procedures

| | | |
|---|---|---|
| 32.1 | Committee on Infractions—Special Operating Rules | 395 |
| 32.2 | Preliminary Review of Information | 395 |
| 32.3 | Investigative Procedures | 396 |
| 32.4 | Processing Information for Secondary Violations | 398 |
| 32.5 | Notice of Inquiry | 399 |
| 32.6 | Notice of Allegations | 399 |
| 32.7 | Summary Disposition and Expedited Hearing | 401 |
| 32.8 | Committee on Infractions Hearings | 402 |
| 32.9 | Notification of Committee on Infractions Action | 404 |
| 32.10 | Appeal Procedure | 404 |
| 32.11 | Oral Arguments | 406 |

## 32.1 COMMITTEE ON INFRACTIONS—SPECIAL OPERATING RULES

**32.1.1 Confidentiality.** The Committee on Infractions, the Infractions Appeals Committee and the enforcement staff shall treat all cases before them as confidential until they have been announced in accordance with the prescribed procedures. In addition, an institution and any individual subject to NCAA rules involved in a case shall treat that case under inquiry by the enforcement staff, under consideration by the Committee on Infractions and, if appealed, under consideration by the Infractions Appeals Committee, as confidential until the decisions in such a case have been announced in accordance with prescribed procedures. *(Revised: 1/11/94, 4/24/03, 1/13/08, 4/28/11)*

**32.1.2 Public Announcements.** The enforcement staff shall not confirm or deny the existence of an infractions case before complete resolution of the case through normal NCAA enforcement and hearing procedures. However, if the involved institution or any person involved in the case (e.g., involved individual, representative of the institution's athletics interests, interviewee) makes information concerning a case public, the involved institution, enforcement staff and the involved person may confirm, correct or deny the information made public. *(Revised: 4/24/03, 1/13/08)*

**32.1.3 Conflict of Interest.** Any member of the Committee on Infractions or the Infractions Appeals Committee shall neither appear at the hearing or oral argument nor participate on the committee when the member is directly connected with an institution under investigation or has a personal, professional or institutional affiliation that reasonably would result in the appearance of prejudice. It is the responsibility of the committee member or members of the Infractions Appeals Committee per Bylaw 19.2 to remove himself or herself if a conflict exists. Objections to the participation of a committee member or the Infractions Appeals Committee member per Bylaw 19.2 should be raised as soon as recognized, but will not be considered unless raised at least one week in advance of the affected hearing or oral argument. *(Revised: 1/16/93, 1/11/94, 4/24/03, 4/28/11)*

**32.1.4 Cooperative Principle.** The cooperative principle imposes an affirmative obligation on each institution to assist the enforcement staff in developing full information to determine whether a possible violation of NCAA legislation has occurred and the details thereof. An important element of the cooperative principle requires that all individuals who are subject to NCAA rules protect the integrity of an investigation. A failure to do so may be a violation of the principles of ethical conduct. The enforcement staff will usually share information with the institution during an investigation; however, it is understood that the staff, to protect the integrity of the investigation, may not in all instances be able to share information with the institution. *(Adopted: 1/12/99)*

**32.1.5 Definition of Involved Individual.** Involved individuals are former or current student-athletes and former or current institutional staff members who have received notice of significant involvement in alleged violations through the notice of allegations or summary disposition process. *(Adopted: 4/24/03, Revised: 4/17/07)*

## 32.2 PRELIMINARY REVIEW OF INFORMATION

**32.2.1 Enforcement Staff to Receive Complaints and Conduct Investigations.** It is the responsibility of the enforcement staff to conduct investigations relative to an institution's failure to comply with NCAA legislation or to meet the conditions and obligations of membership. Information that an institution failed to meet these obligations shall be provided to the enforcement staff and, if received by the Committee on Infractions or NCAA president, will be channeled to the enforcement staff. *(Revised: 4/24/03)*

32

ENFORCEMENT PROCEDURES

**32.2.1.1 Staff Initiation of Investigation.** The enforcement staff may initiate an investigation on its own motion when it receives information that an institution is, has been, or may have been in violation of NCAA legislation. *(Revised: 4/24/03, 4/10/06)*

**32.2.1.2 Self-Disclosure by an Institution.** Self-disclosure shall be considered in establishing penalties, and, if an institution uncovers a violation prior to its being reported to the NCAA and/or its conference, such disclosure shall be considered as a mitigating factor in determining the penalty. *(Revised: 10/12/94)*

**32.2.2 Investigative Guidelines.** The Committee on Infractions shall provide general guidance to the enforcement staff through approved and established investigative and procedural guidelines.

**32.2.2.1 Initial Enforcement Staff Responsibilities.** The enforcement staff is responsible for evaluating information reported to the NCAA staff to determine whether the possible violation should be handled by correspondence with the involved institution or its conference, or whether the enforcement staff should conduct its own in-person inquiries.

**32.2.2.1.1 Basic Information Gathering.** The enforcement staff has a responsibility to gather basic information regarding possible violations and, in doing so, may contact individuals to solicit information. If information indicating a potential NCAA violation believed to be reliable is developed, the procedures provided in Bylaw 32.5 (Notice of Inquiry) are undertaken. *(Revised: 4/24/03)*

**32.2.2.1.2 Identification of Major/Secondary Violation.** The enforcement staff shall identify information developed by it or self-reported by the institution as alleged major or secondary violations (as defined in Bylaw 19.02.2). The staff shall have the discretion to submit information to the Committee on Infractions, or a designated member of the Committee on Infractions, for an initial determination of how that information should be processed. *(Adopted: 4/24/03, Revised: 4/10/06)*

**32.2.2.1.3 Matters Handled by Correspondence.** Matters that clearly are secondary in nature should be handled promptly by correspondence with the involved institution. *(Revised: 4/24/03)*

## 32.3 INVESTIGATIVE PROCEDURES

**32.3.1 Conformance with Procedures.** Investigations by the enforcement staff shall be conducted in accordance with the operating policies, procedures and investigative guidelines established by the Committee on Infractions, the Board of Directors and membership in accordance with Bylaw 19. *(Revised: 11/1/07 effective 8/1/08)*

**32.3.1.1 Consultation with Committee on Infractions.** If questions arise concerning investigative procedures during the course of an investigation, the chair (or the full Committee on Infractions, if necessary) may be consulted by the enforcement staff. *(Adopted: 4/24/03)*

**32.3.2 Timely Process.** The enforcement staff shall make reasonable efforts to process infractions matters in a timely manner. *(Revised: 4/24/03)*

**32.3.3 Conflict of Interest.** Any enforcement staff member who has or had a personal relationship or institutional affiliation that reasonably would result in the appearance of prejudice should refrain from participating in any manner in the processing of the involved institution's or individual's infractions case. *(Adopted: 1/16/93)*

**32.3.4 Interviews with Member Institution.** The athletics director or other appropriate official of an institution shall be contacted by the enforcement staff in order to schedule interviews on the institution's campus with enrolled student-athletes, coaching staff members or other institutional staff members with athletically related responsibilities or oversight who are involved in possible violations at the institution. *(Revised: 4/24/03)*

**32.3.4.1 Presence of Institutional Representative During Interview.** If an interview with an enrolled student-athlete or athletics department staff member is conducted on the campus of an institution, an institutional representative(s) (as designated by the institution) will be permitted to be present during the interview, provided the subject matter to be discussed in the interview relates directly to the individual's institution or could affect the individual's eligibility or employment at the institution. If the investigator wishes to discuss information with a student-athlete or staff member that is related solely to institutions other than the one in which the student-athlete is enrolled or staff member is employed and would not reasonably affect the student's eligibility or the staff member's employment, the institutional representative shall not be present during that portion of the interview. In such a situation (after the institutional representative has departed), any information inadvertently reported by the student-athlete or the staff member that is related to his or her own institution shall not be used against the student-athlete, staff member or that institution. *(Revised: 4/24/03)*

**32.3.4.2 Conflict with Academic Schedule.** If possible, interviews should be conducted without disrupting the normally scheduled academic activities of the student-athlete. *(Revised: 4/24/03)*

**32.3.5 Proper Identification of NCAA Staff Member.** In no case shall an enforcement staff member misrepresent the staff member's identity or title.

**32.3.6 Representation by Legal Counsel.** When an enforcement staff member conducts an interview that may develop information detrimental to the interests of the individual being questioned, that individual may be represented by personal legal counsel throughout the interview.

### 32.3.7 Notice Requirements.

**32.3.7.1 Disclosure of Purpose of Interview.** When an enforcement representative requests information that could be detrimental to the interests of the student-athlete or institutional employee being interviewed, that individual shall be advised that the purpose of the interview is to determine whether the individual has knowledge of or has been involved directly or indirectly in any violation of NCAA legislation. *(Revised: 4/24/03, 4/10/06)*

**32.3.7.2 Responsibility to Cooperate.** At the beginning of an interview arranged or initiated by the enforcement staff, a current or former student-athlete or institutional employee shall be advised that refusing to furnish information or providing false or misleading information to the NCAA, conference or institution may result in an allegation that the individual has violated NCAA ethical conduct legislation (see Bylaw 10.1).

### 32.3.8 Limited Immunity.

**32.3.8.1 Athletics Personnel.** At the request of the enforcement staff, the Committee on Infractions may grant limited immunity to an institutional employee with responsibilities related to athletics based on information that the employee reports when such an employee otherwise would be subject to disciplinary action as described in Bylaws 19.5.1-(i) and 19.5.2-(k). Such immunity shall not apply to the employee's involvement in violations of NCAA legislation not reported or to future involvement in violations of NCAA legislation by the employee or to any action taken by an institution. In any case, such immunity shall not be granted unless the employee provides information not otherwise available to the enforcement staff. *(Revised: 10/12/94, 4/24/03, 4/28/11)*

**32.3.8.2 Student-Athlete or Prospective Student-Athlete.** At the request of the enforcement staff, the Committee on Infractions may grant limited immunity to a student-athlete or prospective student-athlete when such an individual otherwise might be declared ineligible for intercollegiate competition based on information reported to the enforcement staff by the individual or a third party associated with the individual. Such immunity shall not apply to the individual's involvement in violations of NCAA legislation not reported or to future involvement in violations of NCAA legislation by the individual or to any action taken by an institution. In any case, such immunity shall not be granted unless the relevant information would not otherwise be available to the enforcement staff. *(Adopted: 4/28/11)*

### 32.3.9 Interview Record.

**32.3.9.1 Recordings.** It is preferable that an interview conducted by the enforcement staff be recorded through the use of a mechanical device. If an interviewee objects to being recorded however, or the enforcement staff believes the use of a recording device would have an inhibiting effect on the interviewee, a summary of the information reported shall be prepared by Bylaw 32.3.9.2. *(Revised: 4/10/06, 6/11/07)*

**32.3.9.1.1 Access to Recordings and Transcripts.** Both the enforcement staff and the interviewee may record the interview or the interviewee may receive a copy of the recording and if prepared by the enforcement staff, the interview transcript, subject to the confidentiality provisions of Bylaws 32.3.9.1.4 and 32.3.9.2.1. Copies of recorded interview summaries and any report prepared by the enforcement staff are confidential and shall only be provided to interviewees (and their institutions) as set forth in Bylaws 32.3.9.2 and 32.6.4. *(Revised: 4/24/03, 4/10/06, 6/11/07, 8/7/08)*

**32.3.9.1.2 Institutional Recording of an Interview—Access to Recordings and Transcripts.** Interviews conducted in accordance with Bylaw 32.3.4.1 or jointly with the enforcement staff at any location, may be recorded by the institution under inquiry. If the institution is unable or chooses not to record such an interview, the institution may receive a copy of the enforcement staff's recording of the interview and/or a copy of the interview transcript, if prepared by the enforcement staff. Institutional recordings of NCAA interviews under any other circumstances must be approved by the Committee on Infractions. *(Adopted: 10/12/94)*

**32.3.9.1.2.1 Access to Recordings and Transcripts by Conference.** For interviews conducted in accordance with Bylaw 32.3.4.1 or jointly by the institution and enforcement staff, and on consent of the institution, a conference may receive a copy of the interview recording and/or transcript, if prepared by the enforcement staff or institution. *(Adopted: 6/11/07)*

**32.3.9.1.3 Use of Court Reporters.** Institutional representatives or individuals being interviewed may use a court reporter to transcribe and interview subject to the following conditions. The institution or individual shall:

(a) Pay the court reporter's fees;

(b) Provide a copy of the transcript to the enforcement staff at no charge; and

(c) Agree that the confidentiality standards of Bylaw 32.3.9.1.4 apply. An institutional representative or individual who chooses to use a court reporter shall submit a written notice of agreement with the required conditions to the enforcement staff prior to the interview. If the enforcement staff chooses to use a court reporter, the NCAA will pay all costs of the reporter. A copy of the transcript prepared by the court reporter for the enforcement staff shall be made available to the institution and the involved individuals. *(Adopted: 4/24/03, Revised: 5/22/09)*