## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH ("JAY") V. PATERNO AND WILLIAM KENNEY, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | NO. 2:14-cv-04365-LS |
| PENNSYLVANIA STATE UNIVERSITY, | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant Pennsylvania State University ("Penn State") submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Complaint of Plaintiffs Joseph "Jay" V. Paterno and William Kenney in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## <u>TABLE OF CONTENTS</u>

**Page**

I.  PRELIMINARY STATEMENT ..................................................................................1

II. STATEMENT OF ALLEGED FACTS...................................................................2
    A.    Plaintiffs' Employment at Penn State.................................................. 3
    B.    Plaintiffs' Termination. ........................................................................ 3
    C.    Statements Regarding the Penn State Football Program. ...................... 4
    D.    Execution of Consent Decree................................................................ 4

III. ARGUMENT ............................................................................................................6

    A.    Count I of the First Amended Complaint (Violation of Civil Rights by
          Termination and/or Execution of the Consent Decree) Should be
          Dismissed for Failure to State a Claim. .............................................. 7
          1.    Plaintiffs fail to plead a cognizable recognized right that satisfies
                the "plus" prong of the "stigma-plus" test. .................................8
                a.    Termination of employment is not a sufficient "plus"
                        because it was not contemporaneous to statements issued at
                        the time of Consent Decree.............................................. 9
                b.    Loss of other specific employment opportunities is not
                        sufficient for the "plus" requirement. ........................... 10
          2.    None of the purportedly injurious statements is sufficient to meet
                 the "stigma" prong of the "stigma-plus" test. ...........................12
                a.    The Purported "Actionable Statement". ....................... 13
                 b.    The Press Conference Statements by Emmert. .............. 15
                 c.    PSU Press Release. ........................................................ 16
                 d.    "Various Statements" in the Consent Decree. .............. 17
          3.    Silence by defendant could not constitute a negative inference
                 creating a stigma. ..................................................................17
          4.    Plaintiffs' Section 1983 claim is waived because they failed to
                 request a timely name-clearing hearing. ....................................18
          5.    Plaintiffs' purported "Penn State Rights" and "NCAA Rights" do
                 not give rise to a claim as a matter of law..................................19

    B.    All Potential Federal Statutory Conspiracy Claims are Without Merit,
          Time Barred, and Should Be Dismissed. .............................................. 22
          1.    Plaintiffs' due process rights were not violated, so there can be no
                 conspiracy under Section 1983. ................................................22
          2.    Plaintiffs have not pleaded a plausible basis for conspiracy under
                 Section 1983 under the facts averred. .......................................23
                 a.    Plaintiffs have failed to allege that Penn State acted with
                        specific intent to cause injury to Plaintiffs..................... 24

            b.    Plaintiffs' own factual averments undermine any plausible
"meeting of the minds". ............................................................. 25

      3.    Plaintiffs' Federal Conspiracy claims are time-barred as to acts
before July 21, 2012.................................................................26

C.    The Supplemental State Law Claims Should be Dismissed. ................................ 26

D.    Count II (Intentional Interference with Prospective Contractual Relations)
Should be Dismissed as it is Time-barred and Fails to State a Claim. ................ 27
      1.    Plaintiffs' state-law claims sound in defamation, and therefore the
one-year statute of limitations for defamation should apply. ....................27
      2.    Plaintiffs' claim for intentional interference with prospective
contractual relations is insufficient as Plaintiffs have failed to
sufficiently plead that Penn State acted purposefully with the
specific intent to harm the plaintiffs. .......................................................28

E.    Count III of the Amended Complaint (Conspiracy) Should be Dismissed
as Plaintiffs' Claim is Time-barred, and Plaintiffs have Failed to State a
Claim for State-law Civil Conspiracy Associated with their Contractual
Interference Claim. .............................................................................................. 30
      1.    The "overt act" was a defamatory publication, and therefore the
one-year statute of limitations for defamation applies to the
conspiracy claim. ............................................................................................30
      2.    Plaintiffs failed to state facts sufficient to demonstrate unlawful
means or purpose, actual legal damage, or malicious intent.....................30

F.    Count IV of the Amended Complaint (Pennsylvania WPCL) Should be
Dismissed for Failure to State a Claim. ............................................................... 31
      1.    The WPCL does not cover claims for post-termination wages. ...............31
      2.    The plaintiffs were paid their full severance amount, and therefore
cannot claim severance as the basis for a WPCL claim............................32

G.    Count V of the First Amended Complaint (Breach of Contract) Should be
Dismissed for Failure to State a Claim, or, in the Alternative, the Court
should Require a More Definite Statement........................................................... 32

IV.    CONCLUSION.................................................................................................................34

# TABLE OF AUTHORITIES

**CASES**

*Allende v. Winter Fruit Distribs., Inc.*,
    709 F. Supp. 597 (E.D. Pa. 1989) ........................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................6, 22

*Barmasters Bartending Sch., Inc. v. Authentic Bartending Sch., Inc.*,
    931 F. Supp. 377 (E.D. Pa. 1996) ....................................................................29

*Barsky v. Beasley Mezzanine Holdings, L.L.C.*,
    No. 04-1303, 2004 WL 1921156 (E.D. Pa. Aug. 30, 2004) ..............................31, 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................6

*Bey v. Keen*,
    No. 1:CV-12-00732, 2012 WL 5051924 (M.D. Pa. Oct. 18, 2012) ......................23

*Bloom v. Nat'l Collegiate Athletic Ass'n*,
    93 P.3d 621 (Colo. App. 2004) ........................................................................20

*Bosold v. Warden, SCI-Somerset*,
    No. 11-4292, 2013 WL 315714 (E.D. Pa. Jan. 28, 2013) ..................................13

*Braun v. Kelsey-Hayes Co.*,
    635 F. Supp. 75 (E.D. Pa. 1986) ......................................................................33

*Britton v. Whittmanhart, Inc.*,
    No. 09-cv-1593, 2009 WL 2487410 (E.D. Pa. Aug. 13, 2009) ..........................31

*Cash v. Wetzel*,
    No. 12-cv-05268, 2014 WL 1244048 (E.D. Pa. Mar. 26, 2014) ........................22

*Chinoy v. Pa. State Univ.*,
    No. 11-cv-01263, 2012 WL 727965 (M.D. Pa. Mar. 6, 2012) ............................8

*Cindrich v. Fisher*,
    341 F. App'x 780 (3d Cir. 2009) ......................................................................26

*City of Chicago v. Int'l Coll. of Surgeons*,
    522 U.S. 156 (1997) ................................................................................26

*Corrs. U.S.A. v. McNany*,
    892 F. Supp. 2d 626 (M.D. Pa. 2012) ........................................................28, 29

iii

*Crane v. Yurick*,
   287 F. Supp. 2d 553 (D.N.J. 2003) .................................................................10

*D & D Associates, Inc. v. Bd. of Educ. of N. Plainfield*,
   No. CIV.A. 03-1026 MLC, 2012 WL 1079583 (D.N.J. Mar. 30, 2012 ..................20

*Dennis v. DeJong*,
   867 F. Supp. 2d 588 (E.D. Pa. 2011) ..........................................................23, 30

*Dist. Counsel 33, Am. Fed'n of State Cnty. & Mun. Employees, AFL-CIO v. City of Philadelphia*,
   944 F. Supp. 392 (E.D. Pa. 1995) .................................................................21

*Dobson v. Northumberland Cnty.*,
   151 F. App'x 166 (3d Cir. 2005) .....................................................................8

*Erb v. Borough of Catawissa*,
   No. 3:07-CV-1961, 2010 WL 4318886 (M.D. Pa. July 21, 2010) .........................17

*Estate of Joseph Paterno, et al., v. National Collegiate Athletic Association, ("NCAA") et al.*
   No. 2013-2082 (C.P. Centre Cnty. 2014) ....................................................15, 19

*Evans v. Philadelphia Newspapers, Inc.*,
   No. 1992, 1991 WL 1011010 (Pa. Com. Pl. Feb. 11, 1991)............................27, 30

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)............................................................................6

*Freeman v. City of Chester*,
   No. 10-2830, 2010 WL 4025918 (E.D. Pa. Oct. 14, 2010) .................................11

*Gagliardi v. Lee*,
   154 F. App'x 317 (3d Cir. 2005) ....................................................................23

*Gardella v. Prodex Int'l, Inc.*,
   No. CIVA 06-1821, 2006 WL 2261352 (E.D. Pa. Aug. 4, 2006) .........................33

*Glenn v. Point Park Coll.*,
   272 A.2d 895 (Pa. 1971)...............................................................................28

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*,
   615 F.3d 159 (3d Cir. 2010)...........................................................................24

*Greene v. Street*,
   No. 10-4529, 2011 WL 2517144 (E.D. Pa. June 22, 2011)............................18, 19

*Heimenz v. Pa. Power & Light Co.*,
    75 Pa. D. & C.2d 405 (C.P. Lycoming Cnty. 1976) ...............................................32

*Henry v. Philadelphia Adult Prob. & Parole Dep't*,
    CIV.A. 05-4809, 2007 WL 2670140 (E.D. Pa. Sept. 6, 2007) ...............................19

*Hill v. Borough of Kutztown*,
    455 F.3d 225 (3d Cir. 2006)...........................................................................7, 8, 12

*IDT Corp. v. Unlimited Recharge, Inc.*,
    No. CIVA. 11-4992 ES, 2012 WL 4050298 (D.N.J. Sept. 13, 2012).....................23

*Kafando v. Erie Ceramic Arts Co.*,
    764 A.2d 59 (Pa. Super. Ct. 2000) .......................................................................31

*Kaidanov v. Pennsylvania State Univ.*,
    No. CIV.A. 14-3191, 2014 WL 7330462 (E.D. Pa. Dec. 23, 2014) ..................12, 13

*Kelly v. Borough of Sayreville*,
    107 F.3d 1073 (3d Cir. 1997)...............................................................................11

*Knelman v. Middlebury Coll.*,
    898 F. Supp. 2d 697 (D. Vt. 2012)........................................................................20

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993)......................................................................................25

*Latessa v. N. J. Racing Comm'n*,
    113 F.3d 1313 (3d Cir. 1997)................................................................................12

*Lockett v. Pa. Dep't of Corrs.*,
    529 F. App'x 294 (3d Cir. 2013) ......................................................................12, 13

*Lokuta v. Sallemi*,
    No. 3:CV-13-0288, 2013 WL 5570227 (M.D. Pa. Oct. 9, 2013) ...........................10

*Machesky v. Hawfield*,
    No. 07-9, 2008 WL 614819 (W.D. Pa. Mar. 4, 2008) ..........................................10

*McCool v. City of Philadelphia*,
    494 F. Supp. 2d 307 (E.D. Pa. 2007) ..................................................................10

*Mun. Revenue Servs., Inc. v. McBlain*,
    No. 06-4749, 2007 WL 879004 (E.D. Pa. Mar. 19, 2007) ....................................11

*Oliver v. Nat'l Collegiate Athletic Ass'n*,
    155 Ohio Misc. 2d 8, 920 N.E. 2d 196 (2008).....................................................20

*Orelski v. Bowers,*
   303 F. App'x 93 (3d Cir. 2008) ........................................................................9

*Paul v. Davis,*
   424 U.S. 693 (1976) ...............................................................................8, 11

*Perano v. Twp. of Tilden,*
   423 F. App'x 234 (3d Cir. 2011) ..................................................................22

*Permenter v. Crown Cork & Seal Co., Inc.,*
   38 F. Supp. 2d 372 (E.D. Pa. 1999) ..............................................................8

*Phillips ex rel. Phillips v. Northwest Reg'l Commc'ns,*
   391 F. App'x 160 (3d Cir. 2010) ...................................................................7

*Phillips v. Selig,*
   959 A.2d 420 (Pa. Super. Ct. 2008) .............................................................28

*Rankin v. Smithburger,*
   No. 2:12-CV-01373, 2013 WL 3550894 (W.D. Pa. July 11, 2013) .......................26

*Reed v. Chambersburg Area Sch. Dist. Found.,*
   No. 1:13-CV-00644, 2014 WL 1028405 (M.D. Pa. Mar. 17, 2014) .......................9

*Regis Ins. Co. v. A.M. Best Co.,*
   No. 10-3171, 2013 WL 775521 (E.D. Pa. Mar. 1, 2013) .............................28, 29

*Rosembert v. Borough of E. Lansdowne,*
   No. 13-2826, 2014 WL 1395032 (E.D. Pa. Apr. 9, 2014) ............................23, 25

*Sampson v. Sch. Dist. of Lancaster,*
   No. 05–6414, 2009 WL 1675083 (E.D. Pa. June 12, 2009) ...............................9

*Snyder v. Kraus,*
   No. 08-5217, 2010 WL 3419890 (E.D. Pa. Aug. 27, 2010) ...............................22

*Spencer v. Steinman,*
   968 F. Supp. 1011 (E.D. Pa. 1997) ..............................................................25

*Strain v. Borough of Sharpsburg,*
   No. 04-1581, 2007 WL 1630363 (W.D. Pa. June 4, 2007) ................................27

*Strickland v. Univ. of Scranton,*
   700 A.2d 979 (Pa. Super. Ct. 1997) ........................................................28, 30

*Sturm v. Clark,*
   835 F.2d 1009 (3d Cir. 1987) .....................................................................11

vi

*Thomas Merton Ctr. v. Rockwell Int'l Corp.*,
  442 A.2d 213 (Pa. 1981) ...................................................................................................14

*Veggian v. Camden Board of Education*,
  600 F. Supp. 2d 615 (D.N.J. 2009) ...............................................................................10

*Young v. Kann*,
  926 F.2d 1396 (3d Cir. 1991) ..........................................................................................22

**STATUTES**

42 U.S.C. § 1983 ......................................................................................................... passim

42 U.S.C. § 1985 ..................................................................................................................25

42 U.S.C. § 1986 ..................................................................................................................25

WPCL ......................................................................................................................26, 31, 32

**OTHER AUTHORITIES**

Fourteenth Amendment ..........................................................................................................8

Federal Rule of Civil Procedure 12(b)(6) ......................................................................1, 2, 6

Restatement (Second) of Torts ..............................................................................................14

## I.    PRELIMINARY STATEMENT

After Penn State filed its Motion to Dismiss Plaintiffs' Complaint, Plaintiffs amended their Complaint in an attempt to circumvent the dismissal of their baseless claims against Penn State.[1]  While Plaintiffs have added new allegations in an attempt to defeat the legal arguments raised in the Motion to Dismiss, their efforts fall short.  The First Amended Complaint, together with its exhibits, fails to contain a single <u>factual</u> assertion to support their claim that Penn State, the NCAA, and/or the Freeh Firm specifically targeted Mr. Jay Paterno or Mr. Kenney intending to harm them in any way, shape or form.

While the First Amended Complaint raises many issues relating to the events that unfolded following the November 2011 arrest of Jerry Sandusky, Plaintiffs were terminated because the new head coach of Penn State football hired his own staff which did not include Plaintiffs.

In January 2012, Penn State hired William J. "Bill" O'Brien as Head Coach to Penn State's NCAA football program.  Like most college football coaches, Coach O'Brien was permitted to choose his own coaching staff.  As is typical in situations like this, Coach O'Brien chose to replace nearly the entire assistant football coaching staff.  As a result, several assistant coaches were released from their coaching positions, and their employment at Penn State was ultimately terminated.  (First Amended Complaint ("FAC") ¶¶ 3, 5).  Among the coaches released and terminated as a result of Coach O'Brien's coaching decisions were Plaintiffs Joseph

---

[1]    By filing the First Amended Complaint, Plaintiffs avoided a legal decision on the merits of Penn State's motion because their amended pleading rendered the Motion to Dismiss moot. *See Paterno et al. v. Pennsylvania State University,* Order that Defendant's Motion to Dismiss is Denied as Moot, Docket No. 12 (Dec. 3, 2014).

"Jay" V. Paterno and William Kenney. *Id.* Penn State honored its contractual obligations and compensated Plaintiffs with 18 months of full salary severance[2] as well as other benefits.

Plaintiffs' terminations were the typical result of a head coaching change at a Division I NCAA football program. Plaintiffs were not singled out in any way and were treated in the exact same manner as the other similarly situated assistant coaches who were terminated. Indeed, most would agree that Plaintiffs were treated extremely fairly having received the 18-month severance and other benefits.

Nevertheless and in an attempt to secure even more compensation from Penn State, Plaintiffs have concocted a facially implausible set of allegations that tell a false and preposterous tale of an alleged conspiracy directed at them between the NCAA, the Freeh Firm and Penn State completely devoid of any specific factual allegations to support such a claim. Plaintiffs allege that those entities agreed to embark on a course of conduct with the specific intent to cause harm to the reputations of Messrs. Paterno and Kenney. Ultimately, Messrs. Paterno and Kenney contend that it was the alleged conspiracy that caused them to be unable to secure comparable employment at other football programs. Each of Plaintiffs' allegations lack any factual foundation and fail to set forth a cognizable legal theory on which Plaintiffs could possibly recover. Accordingly, Plaintiffs' First Amended Complaint must be dismissed as a matter of law.

## II.     STATEMENT OF ALLEGED FACTS

Penn State disagrees with many of the facts asserted by Messrs. Paterno and Kenney and with the characterization of some of the events described in the First Amended Complaint. Nevertheless, this Court is compelled to accept Plaintiffs' well-pleaded allegations as true for

---

[2]     William Kenney obtained a coaching position at another university. Accordingly, his severance was reduced by the value of the salary earned in his new position during the 18-month severance period.

purposes of Penn State's Motion to Dismiss.  In that context, and for the purposes of this motion only, the following allegations from the First Amended Complaint should be considered by the Court.  After reviewing these allegations and the legal argument that follows, we respectfully request this Court dismiss all of Plaintiffs' claims as a matter of law.

### A.     Plaintiffs' Employment at Penn State.

Plaintiff Jay Paterno, the son of former head coach Joe Paterno, was on Penn State's football coaching staff for 17 seasons, for 12 of which he served as the quarterbacks coach. (FAC ¶ 26).  Plaintiff William Kenney began as a full time coach at Penn State in 1989 and held positions as offensive line coach, recruiting coordinator and offensive tackles/tight ends coach. (FAC ¶¶ 33, 34).   At the time of their termination, both coaches held the title of assistant football coach.  (FAC ¶ 3).

### B.     Plaintiffs' Termination.

In January 2012, Penn State hired a new head football coach, William J. "Bill" O'Brien. (FAC ¶ 62).  Coach O'Brien did not offer Kenney or Paterno a position on his coaching staff. (FAC ¶ 63).  As a result, Penn State terminated their employment at the University.  (FAC ¶ 64). Penn State agreed to pay Kenney and Paterno eighteen months of Severance Pay commencing as of the date of their termination in mid-January 2012.  (FAC ¶ 41).

Kenney is currently employed as an offensive line coach at Western Michigan University – an assistant coaching position.  (FAC ¶ 268).  Paterno alleges that he applied for a handful of head coaching positions and was not granted any interviews.   (FAC ¶¶ 277-281).  He also claims that he made inquiries with the national media and has been unable to secure employment there as well.  (FAC ¶¶ 283-290).  Significantly, Paterno does not allege that he applied for any assistant coaching positions or any other positions potentially comparable to the one he lost when Coach O'Brien decided not to retain Paterno.

### C.     Statements Regarding the Penn State Football Program.

Following the decision to hire Coach O'Brien, Penn State issued press releases, which are cited in Plaintiffs' First Amended Complaint.  None of the press releases mention either Plaintiff by name nor do the press releases imply anything negative about the assistant coaching staff at Penn State.

More specifically, on or about January 6, 2012, Penn State issued a press release (the "O'Brien Press Release") (Plaintiffs' Exhibit C) wherein Penn State "affirmed the positive legacy of Penn State football." (FAC ¶ 70).

Upon the passing of former head football coach Joe Paterno, Penn State issued another press release (the "January 23, 2012 Press Release", Plaintiffs' Exhibit D), wherein Penn State stated: "Regrettably, Coach Paterno did not finish his coaching career in the manner he or anyone else had expected, but his coaching legacy in Happy Valley and around the nation will live on forever."  (FAC ¶ 73).  Bill O'Brien then issued a press release on February 18, 2012 (Plaintiffs' Exhibit E), announcing the completion of his hiring process.  (FAC ¶¶ 75-76).

Penn State did not mention Kenney or Paterno in any of these statements, or any other statements identified during this period.  The plain language of these press releases makes clear they had nothing whatsoever to do with Jay Paterno or William Kenney.

### D.     Execution of Consent Decree

Plaintiffs allege that, in November 2011, Penn State's Board of Trustees formed a Special Investigations Task Force which engaged the law firm of Freeh Sporkin & Sullivan, LLP (the "Freeh Firm") to, among other goals, provide recommendations regarding university governance, oversight and administrative policies and procedures to help Penn State adopt policies and procedures to more effectively prevent or respond to incidents of sexual abuse of minors in the future.  (FAC ¶¶ 47-48).  Plaintiffs also allege that the NCAA announced an investigation into

the Sandusky events, citing a letter sent by NCAA president Mark A. Emmert to Rodney A.

Erickson, president of Penn State. (FAC ¶¶ 50-58, Plaintiffs' Exhibit B). On or about July 12,

2012, the Freeh Firm published its findings, opinions and conclusions of its investigation (the

"Freeh Report", Plaintiffs' Exhibit F).

    Soon after the issuance of the Freeh Report, the NCAA imposed a Consent Decree upon

Penn State, and Penn State agreed not to challenge the Consent Decree. (Plaintiffs' Exhibit A at

2). The Consent Decree stated that for purposes of the resolution with the NCAA, Penn State

accepted the Freeh Report. (FAC ¶ 94). The Consent Decree also noted that Penn State

undertook "a commendable process by commissioning the independent [Freeh Firm]

Investigation. [The Freeh Firm] has established an exhaustive factual record. . . . [T]he existing

record permits fashioning an appropriate remedy for the violations on an expedited timetable,

which benefits current and future University students, faculty and staff." (Consent Decree at 1,

Plaintiffs' Exhibit A). Penn State issued a press release about the Consent Decree on July 23,

2012 ("PSU Press Release"). (Plaintiffs' Exhibit H) (FAC ¶¶ 211-212). That same day, NCAA

President Mark Emmert appeared at a press conference to discuss the Consent Decree ("Press

Conference Statements"). (FAC ¶¶ 181-184). At that press conference, the NCAA was asked

about its future plans with respect to "individuals" at Penn State. Regarding individual PSU

employees, the NCAA stated only that it had withheld judgment of individuals at least until the

criminal investigations were completed. (FAC ¶ 183). The Consent Decree, the Press

Conference Statements, and the July 23, 2012 Penn State Press Release made no reference

whatsoever to Plaintiffs or any assistant coaches individually, or even as a group. A reading of

the allegations in the First Amended Complaint and the exhibits thereto reveal that no mention of

either Paterno or Kenney was made at that time.

Notwithstanding the fact that Plaintiffs were released in the normal course of a head football coaching change, and that the First Amended Complaint does not allege that Penn State ever directly or indirectly said a negative word about Kenney or Paterno, Plaintiffs claim that Penn State (i) violated Plaintiffs' civil rights because it did not affirmatively clear their names; (ii) conspired with the NCAA and the Freeh Firm with the specific intent to harm Plaintiffs; (iii) tortiously interfered with their prospective contractual relations with respect to other employment opportunities; and (iv) failed to pay Plaintiffs the equivalent of two years of salary and benefits following their termination. For the reasons set forth below, all of Plaintiffs' claims fail as a matter of law.

## III.    ARGUMENT

Plaintiffs have included additional averments in the First Amended Complaint; nevertheless, like the Complaint, their arguments contain nothing more than conclusory allegations without sufficient factual support to withstand this Motion to Dismiss. Indeed, each of Plaintiffs' claims fails as a matter of law – even if the allegations in the First Amended Complaint were true (which they are largely not).

Where a plaintiff does not plead sufficient facts to support the claims he asserts in his complaint, a Court should dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a district court must accept all of the complaint's well-pleaded facts as true, a complaint must do more than allege a plaintiff's entitlement to relief – it must "show" such an entitlement with its facts. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). As illustrated below, Plaintiffs' Complaint fails to meet this standard, and therefore must be dismissed with prejudice.

6

**A.    Count I of the First Amended Complaint (Violation of Civil Rights by Termination and/or Execution of the Consent Decree) Should be Dismissed for Failure to State a Claim.**

In Count I and pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Penn State, while acting under color of state law, deprived Plaintiffs of their liberty and property interest in their respective good name, reputation, honor and integrity, and their liberty and property interest in their Penn State Rights and NCAA Rights without due process of law. (FAC ¶ 297). Plaintiffs allege further that their civil rights were violated because Penn State terminated their employment so temporally close to the Sandusky investigation and/or by then executing the Consent Decree coupled with the NCAA's Press Conference Statements and the PSU Press Release. *Id.* Essentially, Plaintiffs allege that the failure by Penn State to affirmatively clear their names caused them to be stigmatized and unable to find future employment opportunities.

In order to state a claim under Section 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "Section 1983 is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Phillips ex rel. Phillips v. Northwest Reg'l Commc'ns*, 391 F. App'x 160, 165 (3d Cir. 2010) (citation and internal quotation omitted).

In spite of the fact that Plaintiffs summarily allege that Penn State violated both their liberty and property interests, the only cognizable constitutional interest that Plaintiffs plead in an identifiable manner concerns an alleged interest in their reputation.[3] However, the United

---

[3]     To the extent Plaintiffs argue a property interest in their continued employment (FAC ¶ 50), such a claim is not supported by the facts as alleged or the law. "Pennsylvania law presumes that all employment is at-will

7

States Supreme Court has held that "reputation *alone* is not an interest protected by the Due Process Clause" of the Fourteenth Amendment. *Hill*, 455 F.3d at 236 (citing, *inter alia*, *Paul v. Davis*, 424 U.S. 693, 701-712 (1976)). The Supreme Court explained that in order to be entitled to relief under Section 1983, a Plaintiff must establish that he has suffered harm beyond a state common law claim. *Paul*, 424 U.S. at 711-12. The allegations must involve the additional deprivation of a protected interest; accordingly, the Due Process Clause only protects a liberty interest in reputation when the plaintiff can prove both a "stigma" to his reputation "*plus* deprivation of some additional right or interest." *Hill*, 455 F.3d at 236 (emphasis in original). Here, Plaintiffs have failed to satisfy both requirements on the face of the Complaint.

### 1. Plaintiffs fail to plead a cognizable recognized right that satisfies the "plus" prong of the "stigma-plus" test.

Plaintiffs have failed to sufficiently plead the "plus" element of their Section 1983 claim. To satisfy the "plus" requirement, a plaintiff must demonstrate that he or she has been deprived of "a right or status previously recognized by state law." *Hill*, 455 F.3d at 237 (quoting *Paul*, 424 U.S. at 711). Plaintiffs make reference to (i) the loss of their employment at Penn State and (ii) their inability to secure specified future employment opportunities. As described below, neither of the harms alleged by Plaintiffs in this regard rise to the level of a cognizable Section 1983 claim.

---

unless the employee is able to prove otherwise by showing with 'clarity and specificity that the parties contracted for a definite period.'" *Permenter v. Crown Cork & Seal Co., Inc.*, 38 F. Supp. 2d 372, 377 (E.D. Pa. 1999). Here, both Plaintiffs were at-will employees. *See, e.g.*, *Chinoy v. Pa. State Univ.*, No. 11-cv-01263, 2012 WL 727965, at *4 (M.D. Pa. Mar. 6, 2012) (holding that a non-tenured Penn State employee, without an employment contract allowing termination only for cause, was an at-will employee). Plaintiffs acknowledge that Coach O'Brien elected not to retain Plaintiffs as assistant football coaches. (FAC ¶ 40). An at-will employee, i.e. a party that can be fired at any time, for any reason, necessarily has no entitlement to a particular type of notice or opportunity to be heard. *See Dobson v. Northumberland Cnty.*, 151 F. App'x 166, 168-69 (3d Cir. 2005) (public employee with no protected property interest in his job has no substantive or procedural due process claims). To the extent Plaintiffs allege to have been "Fixed Term" employees, they are not alleging they could only have been released for cause. Rather, Plaintiffs are disputing what compensation they were owed for having been terminated. (FAC ¶¶ 342-351).

a.   **Termination of employment is not a sufficient "plus" because it was not contemporaneous to statements issued at the time of Consent Decree.**

Plaintiffs' termination from Penn State does not satisfy the "plus" requirement of their Section 1983 claim because Plaintiffs have not alleged a sufficient nexus between the statements given at the time of the Consent Decree and Plaintiffs' termination of employment – events which occurred 5 months apart. In order for termination of employment to satisfy the "plus" requirement, Plaintiffs must allege a sufficiently close, contemporaneous nexus for the Court to conclude that Plaintiff was stigmatized in the course of his termination. *See, e.g., Orelski v. Bowers*, 303 F. App'x 93, 94 (3d Cir. 2008) (citing *Brennan v. Hendrigan*, 888 F.2d 189, 196 (1st Cir. 1989)) (holding that delay of less than three months precluded due process claim); *see also Reed v. Chambersburg Area Sch. Dist. Found.*, No. 1:13-CV-00644, 2014 WL 1028405, at *6 (M.D. Pa. Mar. 17, 2014) (citing *Ewers v. Bd. of Cnty. Comm'rs of Curry Cnty.*, 802 F.2d 1242, 1248 (10th Cir. 1986) (holding that three-week delay between stigma and termination precluded due process claim)); *Sampson v. Sch. Dist. of Lancaster*, No. 05–6414, 2009 WL 1675083, at *9 (E.D. Pa. June 12, 2009) ("[The defamatory article] was published over a month *after* Plaintiff's termination of employment. Plaintiff's termination and the allegedly false and defamatory newspaper article are not 'roughly contemporaneous.'"). The delay of approximately five months between Plaintiffs' terminations and the execution of the Consent Decree is too long to qualify as "contemporaneous" as a matter of law. Moreover, their termination was the result of a change in the head coach position at the Penn State football program. (FAC ¶ 63). There is nothing in the First Amended Complaint which would suggest that the termination was related to the Consent Decree or the statements contained therein. As a result, Plaintiffs cannot rest their Section 1983 claim on their termination from Penn State.

**b.**    **Loss of other specific employment opportunities is not sufficient for the "plus" requirement.**

Additionally, the alleged failure of Plaintiffs to secure the specific employment opportunities identified in the First Amended Complaint does not create a sufficient "plus" for a stigma-plus claim under Section 1983.  While the "plus" prong can be satisfied where a plaintiff has been deprived of "his freedom to take advantage of other employment opportunities," *Veggian v. Camden Board of Education*, 600 F. Supp. 2d 615, 624 (D.N.J. 2009) (citations omitted), this is not true here, where Kenney admits that he secured employment as an assistant football coach and where Paterno admits he only sought head coaching positions.  Plaintiffs do not, and cannot, allege that they have been deprived of the freedom to pursue employment in the college football field.

The stigma-plus line of cases looks to protect the liberty interest to "pursue a calling or occupation, and not the right to a specific job."  *Machesky v. Hawfield*, No. 07-9, 2008 WL 614819, at *6 (W.D. Pa. Mar. 4, 2008) (quoting *Piecknick v. Commw. of Pa.*, 36 F.3d 1250, 1259 (3d Cir. 1994)).  Successful claims "all deal with a complete prohibition of the right to engage in a calling. . . . " *McCool v. City of Philadelphia*, 494 F. Supp. 2d 307, 325-26 (E.D. Pa. 2007) (citing *Conn v. Gabbert*, 526 U.S. 286, 286 (1999).

Kenney is currently employed as an assistant coach at Western Michigan.  (FAC ¶ 268).  As such, he cannot demonstrate that he was deprived of his liberty interest in a chosen occupation merely because he may not have the specific job that he would like.  *See, e.g., Lokuta v. Sallemi*, No. 3:CV-13-0288, 2013 WL 5570227, at *12 (M.D. Pa. Oct. 9, 2013) (dismissing due process claims where former judge alleged "only that she is prevented from holding judicial office, as opposed to being deprived of her ability to purse a calling in the legal field generally"); *see also Crane v. Yurick*, 287 F. Supp. 2d 553, 559 (D.N.J. 2003) ("[a]ny argument, therefore,

that Plaintiff has been foreclosed from practicing an occupation is belied by his resumption of employment approximately one year and three months from his termination . . .").  Kenney alleges that he would have liked to have been hired as an assistant coach in the NFL or at other football programs.  (FAC ¶¶ 260-266).  However, the law under Section 1983 simply does not protect Kenney's desire to obtain such specific employment opportunities.

To the extent Kenney may be alleging that he has a protected interest in earning a salary similar to that which he earned at Penn State, such a claim fails as a matter of law.  Economic harm accompanying the alleged defamation is insufficient to satisfy this "plus" requirement. *See, e.g., Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1078 (3d Cir. 1997) ("[E]ven financial injury due solely to government defamation does not constitute a claim for deprivation of a constitutional liberty interest"); *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987) ("[F]inancial harm resulting from government defamation alone is insufficient to transform a reputation interest into a liberty interest"); *Mun. Revenue Servs., Inc. v. McBlain*, No. 06-4749, 2007 WL 879004, at *4 (E.D. Pa. Mar. 19, 2007), *aff'd*, 347 F. App'x 817 (3d Cir. 2009) ("Mere economic harm accompanying the defamation is insufficient to satisfy this 'plus' requirement"); *Freeman v. City of Chester*, No. 10-2830, 2010 WL 4025918, at *4 (E.D. Pa. Oct. 14, 2010) (citing *Boyanowski v. Capital Area Intermediate Unit.*, 215 F.3d 396, 400 (3d Cir. 2000) (plaintiff's claims of lost future clients and profits, without more, do not rise to the level of "stigma-plus" contemplated by *Paul v. Davis*)).

Paterno's Section 1983 claim also fails because he does not allege that he lost the ability to pursue employment in the field of college football.  Accepting his allegations as true for the purposes of this motion, Paterno has only applied for <u>head</u> coaching jobs and careers in national sports media.  (FAC ¶ 274).  He has never held any such position.  Paterno does not allege that

11

he applied for any assistant coaching positions similar to the one he held at Penn State for many years.  Indeed, Paterno only applied for <u>four</u> head coaching jobs, and inquired about <u>one</u> other. (FAC ¶¶ 277, 279, 281).

Paterno's aspirations to become a head coach or a sports media star do not translate into a cognizable civil rights claim under Section 1983.  As one concurring Court of Appeals judge stated: "[a] plaintiff cannot assert a liberty interest where none exists merely by limiting his chosen occupation to the point where 'occupation' becomes synonymous with 'job.'" *Latessa v. N. J. Racing Comm'n*, 113 F.3d 1313, 1324 (3d Cir. 1997).  Because Paterno has failed to seek assistant football coaching positions[4], he is unable to allege that he has been excluded from the field of football coaching, and his claim fails as a matter of law.

### 2.    None of the purportedly injurious statements is sufficient to meet the "stigma" prong of the "stigma-plus" test.

In addition to failing to allege a cognizable "plus" to their Section 1983 claim, Plaintiffs have also failed to allege that Penn State made any statements in connection with the Consent Decree, or otherwise, that could possibly satisfy the three-part "stigma" requirement of the "stigma-plus" test. *Lockett v. Pa. Dep't of Corrs.*, 529 F. App'x 294, 296 (3d Cir. 2013).  In order to properly plead such a claim, Plaintiffs must allege: (1) the stigmatizing statement was made publicly; (2) the statement was substantially and materially false; and (3) the reputational harm was caused by the falsity of the statement. *Id.*[5]  Statements which could only be considered

---

[4]    In the First Amended Complaint, Paterno alleges that he "further attempted to locate an assistant coaching position through his backchannel relationships. . . ." (FAC ¶ 274).  Not only was this alleged attempt omitted from the first pleading, the vague unsupported allegation of an "attempt to locate" a position should not be enough to overcome this motion to dismiss.  Further, he fails to allege that his inability to locate such a position was in any way connected to the purported reputational harm; the only averments claiming such a connection relate to <u>head</u> coaching positions and jobs in the media.

[5]    The Third Circuit has previously articulated a two-part test of publicity and falsity; however, the causation prong was implicit in these cases. *See, e.g., Hill,* 455 F.3d at 236.  The third prong is sometimes articulated

stigmatizing through speculation cannot provide the basis of a stigma-plus claim; in a recent

Eastern District decision, Judge Pratter articulated this requirement in light of the events at Penn

State:

> The only publication [former fencing coach and plaintiff] Mr. Kaidanov points to is a statement made by the University that Mr. Kaidanov's termination was a "personnel matter." He claims that in the wake of the Sandusky scandal such a statement invited "rampant and unfounded speculation" by the public. However, **even in the post-Sandusky world of Penn State's Athletic Department, an innocuous and generalized statement such as the one alleged here could not be interpreted as materially false or infringing upon "reputation, honor, or integrity," without an enormous and unwarranted lunge into the realm of speculation.** Thus, the Court will dismiss Mr. Kaidanov's "stigma-plus" claim.

*Kaidanov v. Pa. State Univ.*, No. CIV.A. 14-3191, 2014 WL 7330462, at *7 (E.D. Pa. Dec. 23,

2014) (emphasis added). As in *Kaidanov*, and as set forth below, Plaintiffs have failed to

sufficiently plead an actionable "stigma" that could possibly be attributable to Messrs. Paterno

and Kenney specifically:[6]

### a.    The Purported "Actionable Statement".

Plaintiffs cite to a specific statement in the Consent Decree, which they label the

"Actionable Statement" in alleged support of the "stigma" element of the claim -- "[s]ome

coaches, administrators, and football staff members ignored the red flags of Sandusky's

behaviors and no one warned the public about him." (FAC ¶ 169) (Plaintiffs' Exhibit A at 3).

---

as a requirement that the statement infringe on the plaintiff's "reputation, honor, or integrity." *See Kaidanov v. Pa. State Univ.*, No. CIV.A. 14-3191, 2014 WL 7330462, at *7 (E.D. Pa. Dec. 23, 2014).

[6]    To the extent Plaintiffs may argue that other, earlier statements constitute actionable "stigma" (FAC ¶ 301), each such claim is time-barred. A cause of action accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *See, e.g., Bosold v. Warden, SCI-Somerset*, No. 11-4292, 2013 WL 315714, at *3 (E.D. Pa. Jan. 28, 2013) (citation omitted). Plaintiffs were aware of the statements made at the time of termination by February 2012. As the present lawsuit was filed over two years and five months after that time, these claims are barred. Further, Plaintiffs fail to aver that any of these statements were false, and therefore they do not meet the second prong of the "stigma" test. *See Lockett*, 529 F. App'x at 296.

For the reasons set forth below, this purported "Actionable Statement" is not actionable at all with respect to Plaintiffs and their Section 1983 claim.

First, purely as a matter of pleading, even in this second version of their Complaint Plaintiffs fail to set forth the required specific facts that would demonstrate that this statement is substantially and materially false. *See Lockett*, 529 F. App'x at 296. Furthermore, Plaintiffs have not alleged that their purported reputational harm was caused by this statement as opposed to the overwhelming publicity surrounding the crimes committed by Mr. Sandusky and the criminal investigation and trial that preceded the Consent Decree. The First Amended Complaint does not allege that, absent this purported Actionable Statement, Plaintiffs would have suffered no reputational harm from the wide-spread publicity surrounding the events that unfolded at Penn State after November 2011. For these two reasons alone, Plaintiffs' Section 1983 claims must be dismissed.

Even more fundamentally, the purported "Actionable Statement" never mentions Plaintiffs at all. It refers to "some coaches" and "football staff members." Plaintiffs' names are not mentioned anywhere in the Consent Decree or in the Freeh Report (the document on which the Consent Decree relies).

On the other hand, when put in context, both the Consent Decree and the Freeh Report specifically identify other "coaches, administrators, and football staff members" and make very specific allegations with respect to those identified individuals. By design, Plaintiffs chose to leave this information out of the face of their pleading even though they rely on both the Consent Decree and the Freeh Report in bringing their claims. A careful and fair review of the entire Consent Decree (not just a sound bite chosen by Plaintiffs) reveals that the purported "Actionable Statement" is not related in any way to Plaintiffs, and therefore, cannot form the

14

basis of the "stigma" required for their Section 1983 claim. *See, e.g.*, *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981) ("'[W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable.' Restatement (Second) of Torts, supra, s 563 Comment d. Thus, we must consider the full context of the [statement] to determine the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.") (internal quotation and citation omitted). Plaintiffs' claim that these statements refer or relate to Jay Paterno or William Kenney is not a reasonable reading of the Consent Decree, and therefore, cannot form the basis for their Section 1983 claim.[7]

### b.     The Press Conference Statements by Emmert.

Plaintiffs also dubiously argue that they were harmed by statements by NCAA President Emmert during his press conference on July 23, 2012. (FAC ¶¶ 181-184). First, Plaintiffs do not, and cannot, allege that these statements were made by Penn State – they were made by the NCAA.[8] Second, Plaintiffs cannot credibly allege that the NCAA's statements are false.

---

[7]     These same Plaintiffs asserted a similar claim in *Estate of Joseph Paterno, et al., v. National Collegiate Athletic Association ("NCAA") et al.* against the NCAA, however, that claim was one sounding in common law defamation (a claim that would be time-barred here). Opinion and Order, No. 2013-2082, (C.P. Centre Cnty. Jan. 7, 2014) (denying preliminary objections as to defamation) (attached as Defendant's Exhibit 1); Opinion and Order, No. 2013-2082, (C.P. Centre Cnty. Sept. 11, 2014) (reaffirming denial) (Defendant's Exhibit 2). In that case, Judge Leete overruled preliminary objections to the defamation claim with respect to the same purported "Actionable Statement". *Id.* Nevertheless, it appears that Judge Leete may not have considered some of the arguments raised in this motion and this motion concerns a Section 1983 claim – not a time-barred defamation claim. Moreover, Penn State was not even a party to that action at the time of Judge Leete's initial decision (and remains only a "nominal defendant"). Accordingly, Penn State respectfully requests this Court evaluate the purported "Actionable Statement" in the context of Plaintiffs' Section 1983 claim against Penn State and after considering the entire statement set forth in the Consent Decree – not only the self-selected sentence cited by Plaintiffs.

[8]     Plaintiffs allege that Penn State "adopted" the statements of the NCAA at the Emmert press conference, but this claim is not supported by any facts. The PSU Press Release merely states that Penn State "accepts the penalties and corrective actions announced today by the NCAA." (Plaintiffs' Exhibit H) (emphasis added). Penn State did not state that it was adopting the statements by President Emmert or the NCAA at the Press Conference. Furthermore, Plaintiffs do not allege that the PSU Press Release came after the Emmert Press

15

Instead, the statements cited in the First Amended Complaint are forward looking statements regarding the intent of the NCAA to investigate individuals or not.   For example, President Emmert stated: "we are reserving the right, after the conclusion of all of the criminal charges and proceedings that will go forward to look into any potential investigations or penalties that may need to be imposed on individuals, but for the time being, we're not doing anything with individuals." (FAC ¶ 183).  This statement, and the others identified in the First Amended Complaint, express the intent of the NCAA and <u>do not</u> make a factual statement by Penn State that can be considered false.

c.    **PSU Press Release.**

Finally, Plaintiffs claim that they were harmed by the PSU Press Release issued on July 23, 2012 (FAC ¶ 211) (Plaintiffs' Exhibit H).  A plain reading of the sections Plaintiffs themselves identify and rely on reveals that the statements contained therein are not false (FAC ¶¶ 212-213):

- "Penn State accepts the penalties and corrective actions announced today by the NCAA"
- "Today [Penn State] accept[s] the terms of the consent decree imposed by the NCAA."
- "As Penn State embarks upon change and progress, the announcement helps to further define our course.  It is with this compass that we will strive for a better tomorrow.  Penn State will move forward with a renewed sense of commitment to excellence and integrity in all aspects of our University."

Here again, Plaintiffs do not, and could not, allege that the Press Release contained any false statements.  These statements cannot possibly be characterized as statements of fact that are false in any way, and so the claim must fail under the falsity requirement of the "stigma" test.

---

Conference.  It is impossible to adopt something that came later-in-time in response to a press inquiry.  Finally, Plaintiffs now attempt to point to emails between and among Penn State and the NCAA which variously describe the approach to the press conference.  (FAC ¶¶ 194-199).  Penn State does not agree with Plaintiffs' characterization of these statements.  Nevertheless, there is no allegation that the e-mails referenced by Plaintiffs were published to the public or to any prospective employer of Plaintiffs.  Plaintiffs allegations, taken together, do not support an allegation that such prospective employers believed Penn State was adopting the NCAA's statements at the press conference or otherwise.

Moreover, the PSU Press Release cannot be reasonably read to refer to Plaintiffs at all. As such, the PSU Press Release cannot form the basis of Plaintiffs' Section 1983 Claim.

> **d.    "Various Statements" in the Consent Decree.**

Plaintiffs also allege that the Consent Decree contains "various statements" as to the "ingrained" "reverence for Penn State Football" that "permeated every level of the University." (FAC ¶ 217). Plaintiffs aver that these statements are an "indictment of the entire Penn State football coaching staff, including Plaintiffs, as well as Penn State's individual institutional leaders, Board members, those responsible for and participants in athletic programs, the faculty, and the student body." *Id.* The statements in Consent Decree, allegedly "implicating" the entire Penn State community, cannot rise to the level of stigmatizing the individual plaintiffs. As explained above, the Consent Decree and the Freeh Report specifically identify certain individuals – Jay Paterno and William Kenney are unequivocally not among those identified in either document. Plaintiffs' assertion that those documents stigmatized them is belied by the plain reading of those documents.

> **3.    Silence by defendant could not constitute a negative inference creating a stigma.**

Plaintiffs also allege that Penn State's lack of an affirmative statement "exonerating" them created a stigma surrounding their termination. (FAC ¶ 78). While some courts have held that silence upon termination may be sufficient to create a stigma, in each actionable instance, the employer failed to correct a specific false statement about the employee. *See, e.g.*, *Erb v. Borough of Catawissa*, No. 3:07-CV-1961, 2010 WL 4318886, at *6 (M.D. Pa. July 21, 2010) ("In the face of accusations by the public and reports by the media that Plaintiff resigned her position without notice, whether Defendants [sic] silence constitutes their dissemination of a false impression of her is unsettled."). Unlike those cases, Plaintiffs do not allege that Penn State

made any specific statements about them.  Consequently, no such exonerating statement is

necessary or required under the law.  Penn State's silence in response to statements that do not

mention the Plaintiffs cannot constitute stigma in this case.

> **4.     Plaintiffs' Section 1983 claim is waived because they failed to request a timely name-clearing hearing.**

Assuming, arguendo, that Plaintiffs had adequately pled the requisite "stigma-plus" to

sustain their due process claim (which they have not), Plaintiffs' claim also fails because they

have not sufficiently pled that Plaintiffs made a timely request for a name-clearing hearing which

is required by law in this context.  "[I]n a deprivation of liberty interest in reputation claim, the

cause of action 'arises not from the defamatory or stigmatization conduct *per se* but from the

denial of a name-clearing hearing. . . .  It follows that to sustain a § 1983 stigmatization claim, an

aggrieved employee must plead and prove that he <u>timely</u> requested a name-clearing hearing and

that the request was denied.'"  *Greene v. Street*, No. 10-4529, 2011 WL 2517144, at *4 (E.D. Pa.

June 22, 2011) (quoting *Schlichter v. Limerick Twp.*, No. 04-CV-4229, 2005 WL 984197, at *8

(E.D. Pa. Apr. 26, 2005) (emphasis added)).  The requirement that a plaintiff adequately plead

that he requested a name-clearing, and that his request was denied, "has long been the rule in this

district."  *Greene*, 2011 WL 2517144, at *4 & n.2 (citing application of the name-clearing

hearing rule in nine Eastern District cases).  For example, in *Greene*, the court allowed the due

process claim to proceed only after the plaintiff amended his complaint to (1) provide facts about

his counsel's offer to meet with defendants, and (2) plead that defendants ignored this

communication.  *Id.* at *5-6.

Here, Plaintiffs summarily allege that their attorneys made a request for "simple due process." (FAC ¶ 240).[9]  Plaintiffs fail to plead sufficient facts to plausibly sustain this claim because they do not aver specifically (i) what "process" was requested, (ii) the date of the requests, or (iii) that the requests were at all temporally close to the alleged stigmatizing conduct. Plaintiffs must plead this element with the requisite specificity.  Their failure to do so is a fatal flaw.

> **5.     Plaintiffs' purported "Penn State Rights" and "NCAA Rights" do not give rise to a claim as a matter of law.**

In their First Amended Complaint, Plaintiffs again refer to their purported "Penn State Rights" and "NCAA Rights."  Any claims regarding these so-called rights are entirely unavailing.

Plaintiffs describe at length certain procedures that occur when an NCAA investigation relates to "involved individuals."  (FAC ¶¶ 113-125).  However, Plaintiffs never once allege that they are in the class of persons who are entitled to these procedures; i.e., the NCAA never named them as "involved individuals", and Plaintiffs have not claimed that they should have been deemed "involved individuals" in any hypothetical NCAA investigation.[10]

---

[9]     Plaintiffs allege that this requirement was satisfied at "a November 14, 2012 meeting [sic]" with other coaches and the administration. (FAC ¶ 244-248).  It appears that Plaintiff may have intended to allege a November 14, 2011 meeting.  Nevertheless, Plaintiffs plead throughout the First Amended Complaint that it was their terminations and/or the Consent Decree which caused stigmatizing harm – neither event had taken place at the time of their November 2011 meeting with the administration.  As such, it is not clear what relief Plaintiffs could have requested at the meeting which would be relevant for their present due process claim.  Plaintiffs also note former coach Dick Anderson's purported request to "vindicate the names and reputations" of the Plaintiffs.  (FAC ¶ 256-257).  First, this was not a request for a name-clearing hearing, but merely a demand for a press release.  Second, this request cannot be at all construed as timely, as it was allegedly made over seven months after the Plaintiffs' terminations.

[10]    *Compare* the related state court action, in *Estate of Joseph Paterno, et al., v. National Collegiate Athletic Association ("NCAA") et al.* Opinion and Order, No. 2013-2082, (C.P. Centre Cnty. Sept. 11, 2014) (Defendant's Exhibit 2) at *7, in which the Estate of Joseph Paterno and former Penn State trustee Al Clemens actually claimed that they should have been "involved individuals."  The state court held that Coach Joe Paterno was not an involved individual prior to his death, and he cannot, as a matter of law, be an "involved individual" after his death, and so his estate was not an "involved individual" as a matter of law.  *Id.* at *7-*8.  The court further held that the issue of whether Al Clemens was an "involved

19

Instead, Plaintiffs base their purported "third party beneficiary" theory on one sentence in the NCAA's mission statement describing <u>uninvolved</u> individuals; "an important consideration in imposing penalties is to provide fairness to uninvolved student athletes, coaches, administrators, competitors and other institutions." (FAC ¶¶ 130-133). Such a broad statement cannot confer third-party beneficiary rights, which are interpreted narrowly under Pennsylvania contract law. *See Henry v. Philadelphia Adult Prob. & Parole Dep't*, CIV.A. 05-4809, 2007 WL 2670140, at *10 - *11, (E.D. Pa. Sept. 6, 2007) *aff'd sub nom. Henry v. Philadelphia Adult Prob. And Parole*, 297 F. App'x 90 (3d Cir. 2008) ("Generally, a promisor who contracts with a government is not subject to contractual liability to a member of the public because individual members of the public are merely incidental beneficiaries. . . . **The only possible situation in which plaintiffs could recover as third-party beneficiaries under this contract would be if the contract between the defendants provided that [the promisor] would be liable to the public.**" (emphasis added)). As a matter of law, Plaintiffs were <u>not</u> intended third party beneficiaries to the relationship between the NCAA and Penn State.[11]

---

individual" was an issue for the jury. *Id.* at *8. Plaintiffs Jay Paterno and Kenney, who are also plaintiffs in the *Estate of Paterno* case, made no such claims.

[11]  Faced with similar claims, other courts have been hesitant to find that an agreement between the NCAA and a member university creates a third-party beneficiary status, and all positive examples identified by the Defendant are confined to enforcement of NCAA's requirements enforced against <u>those specific individuals</u> asserting the claim. *See, e.g., Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623–24 (Colo. App. 2004); *Oliver v. Nat'l Collegiate Athletic Ass'n*, 155 Ohio Misc. 2d 8, 13–14, 920 N.E. 2d 196, 200 (2008); *see also Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 715 (D. Vt. 2012) *aff'd*, 13-2614-CV, 2014 WL 2808091 at *715 (2d Cir. June 23, 2014) (noting the low probability of establishing third-party beneficiary status under state law). Defendant has found <u>no</u> court which has held that all conceivably affected individuals are entitled to third-party beneficiary status as to agreements between member institutions and the NCAA.

20

Nevertheless, even if Plaintiffs did have third party beneficiary rights in this manner (which they do not), Plaintiffs fail to allege how these purported rights might give rise to a claim in this case. Plaintiffs do not allege a breach of contract with respect to these purported rights.[12]

Moreover, to the extent Plaintiffs rely on the purported Penn State and/or NCAA "rights" as the underlined foundation of their 1983 due process claim, these third-party benefits are not the type of right that could constitute a sufficient basis for due process protection. *See D & D Associates, Inc. v. Bd. of Educ. of N. Plainfield*, No. CIV.A. 03-1026 MLC, 2012 WL 1079583 at *16 (D.N.J. Mar. 30, 2012) *aff'd*, 552 F. App'x 110 (3d Cir. 2014) ("A property interest warranting due process protection has been recognized as existing with respect to two types of contract rights: where (1) the contract confers a protected status, such as in the case of receipt of welfare benefits or continued tenure in the public school employment context, or (2) the contract itself includes a provision that the state entity can terminate the contract only for cause." (citing *Linan–Faye Constr. Co., Inc. v. Hous. Auth. of City of Camden,* 49 F.3d 915, 932 (3d Cir. 1995); *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1399 (3d Cir. 1991)). The purported Penn State and NCAA "rights" do not relate to a protected status or to a termination for cause provision.

Because the purported Penn State and NCAA "rights" relate to process alone, those rights do not give rise to a 1983 due process violation as a matter of law. *See, e.g., Dist. Counsel 33, Am. Fed'n of State Cnty. & Mun. Employees, AFL-CIO v. City of Philadelphia*, 944 F. Supp. 392, 395-96 (E.D. Pa. 1995) *aff'd sub nom. Dist. Council 33, Am. Fed'n of State, Cnty. & Mun. Employees v. City of Philadelphia*, 101 F.3d 690 (3d Cir. 1996) ("[P]rocedural interests under

---

[12]    Plaintiffs do request a declaratory judgment in their Prayer for Relief; however, the basis for requesting this judgment is vague; "that the actions of Penn State violated the rights of Plaintiffs as secured to them by the applicable state and federal laws and the United States Constitution."

state law are not themselves property interests that will be enforced in the name of the Constitution."). As such, Plaintiffs fail to allege any facts to sustain a due process claim with respect to the purported Penn State and NCAA "rights".

**B.   All Potential Federal Statutory Conspiracy Claims are Without Merit, Time Barred, and Should Be Dismissed.**

While Plaintiffs again appear to have been purposefully vague as to the underlying legal basis for their conspiracy claim, it seems likely they are pleading a federal conspiracy claim pendant to their Section 1983 claims. Such a claim fails for at least three separate and independent reasons. First, there is no plausible underlying due process claim as described in detail above. Second, Plaintiffs have not pleaded a plausible basis for the claim that Penn State "conspired to" deprive them of their constitutional rights. Third, actions alleged to have occurred prior to July 21, 2012 are time-barred as to the conspiracy claim.

**1.   Plaintiffs' due process rights were not violated, so there can be no conspiracy under Section 1983.**

To sustain a conspiracy claim under Section 1983, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. *Cash v. Wetzel*, No. 12-cv-05268, 2014 WL 1244048, at *11 (E.D. Pa. Mar. 26, 2014). A Section 1983 conspiracy claim only arises when there has been an actual deprivation of a federal right. *Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011). Because Plaintiffs have not pleaded an actionable constitutional deprivation (*see* Section III.A, *supra*) they do not have a viable conspiracy claim under Section 1983. *See, e.g., Snyder v. Kraus*, No. 08-5217, 2010 WL 3419890, at *4 (E.D. Pa. Aug. 27, 2010) (dismissing claim where Plaintiffs' factual allegations in support of their conspiracy claims were the same allegations the court held did not constitute constitutional violations).

22

2.     **Plaintiffs have not pleaded a plausible basis for conspiracy under Section 1983 under the facts averred.**

Plaintiffs have failed to plead any set of actions by the so-called "Conspirators" which could possibly sustain their Section 1983 conspiracy claim.  Conspiracy claims must be based on more than mere suspicion and speculation.  *Young v. Kann*, 926 F.2d 1396, 1405 & n.16 (3d Cir. 1991).  "Where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting Fed. R. Civ. P. 8(a)(2)).

In the case at bar, Plaintiffs baldly allege that Penn State's acceptance of the Consent Decree was "improper", (*see, e.g.*, FAC ¶ 238), and that the so-called Conspirators' actions were "unlawful." (*see, e.g.*, FAC ¶ 336).  Such conclusions are insufficient to sustain a claim.  "Plaintiffs alleging a conspiracy to deprive them of their constitutional rights must include in their complaint nonconclusory allegations containing evidence of unlawful intent or face dismissal prior to the taking of discovery."  *Gagliardi v. Lee*, 154 F. App'x 317, 319 (3d Cir. 2005) (citation omitted).  None of Plaintiffs' vaguely pled allegations nor their alleged "facts" can support their claims of impropriety; rather, Plaintiffs merely show their disagreement with the actions of the NCAA and Penn State.

Courts routinely grant motions to dismiss where plaintiffs plead only cursory facts to support vague claims of conspiracy.  *See, e.g.*, *Bey v. Keen*, No. 1:CV-12-00732, 2012 WL 5051924, at \*10 (M.D. Pa. Oct. 18, 2012) ("the court finds there are no allegations in the second amended complaint to support a plan or agreement of the Defendants to conspire or engage in a corrupt plot to violate Plaintiff's civil rights.  The court therefore rejects any of Plaintiff's factual contentions as clearly baseless."); *IDT Corp. v. Unlimited Recharge, Inc.*, No. CIV.A. 11-4992 ES, 2012 WL 4050298, at \*14 (D.N.J. Sept. 13, 2012) ("the allegations in Plaintiffs' complaint

are simply too vague to survive a motion to dismiss.  While Plaintiffs do allege that these Defendants 'combined with a common purpose,' they [do] not make explicitly clear what the actual agreement consisted of, or how the agreement was made.  Plaintiffs must allege an actual agreement among Defendants for their civil conspiracy claim to survive a motion to dismiss.").  Because of their lack of foundation, Plaintiffs' conspiracy claims must fail.

>           a.    **Plaintiffs have failed to allege that Penn State acted with specific intent to cause injury to Plaintiffs.**

To state a claim for conspiracy, "[i]t is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Rosembert v. Borough of E. Lansdowne*, No. 13-2826, 2014 WL 1395032, at *9 (E.D. Pa. Apr. 9, 2014) (citation omitted).  Rather, Plaintiffs must show "actions taken in concert by defendants with the <u>specific intent</u> to violate the right protected under section 1983." *Dennis v. DeJong*, 867 F. Supp. 2d 588, 650 (E.D. Pa. 2011) (emphasis added).  Plaintiffs repeatedly aver that Penn State "knew or should have known" that Plaintiffs may be harmed.  Then, with no factual support, Plaintiffs conclude that "Penn State's conduct was motivated by an evil motive, malice and/or intent and/or showed a reckless and/or callous indifference to Plaintiffs' constitutionally protected rights."  (FAC ¶ 317).  Likewise, Plaintiffs merely conclude that "[t]he Conspirators agreed to… deprive Plaintiffs of their Penn State Rights and NCAA rights before imposing unprecedented sanctions."  (FAC ¶ 338).  A claim that the Defendant "knew or should have known", or acted "recklessly", does not create an inference of specific intent as to the violation of the Plaintiffs' rights.

Further, Plaintiffs' argument that Penn State knew that it had a choice to follow "the traditional infractions method that would have ensured due process for Plaintiffs" is entirely baseless.  (FAC ¶ 204).  Again, Plaintiffs never once claim to be within the class of individuals

that would have been "owed" process under the NCAA's own rules. They do not claim that they should have been properly identified as "involved individuals." (See Section III.A, *supra*).

Instead, Plaintiffs' own averments lend support to the conclusion that Penn State's intent with respect to the Consent Decree was not related to Plaintiffs at all. Accordingly, the Section 1983 conspiracy claim fails as a matter of law.

> **b.** **Plaintiffs' own factual averments undermine any plausible "meeting of the minds".**

Additionally, to sufficiently support a conspiracy claim, a plaintiff must allege "facts that plausibly suggest a meeting of the minds." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010). Such a meeting of the minds, moreover, must be "to violate [plaintiff's] constitutional rights." *Rosembert*, 2014 WL 1395032, at *9 (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)).

Here, Plaintiffs allege that the Consent Decree was "imposed" on Penn State. Specifically, Plaintiffs state:

- "Unknown NCAA employees communicated to and **implicitly threatened** Penn State's counsel that the "death penalty" was on the table for Penn State, despite knowing that no such "death penalty" could have lawfully been imposed on Penn State under the NCAA rules";
- "Emmert **threatened**, and Penn State accepted, that, if Penn State went to the media, the "death penalty" sanction would be certain, thus compelling and receiving silence from Erickson and Penn State"

(FAC ¶ 339) (emphasis added). These allegations must be taken as true for the purposes of this motion, and they directly contradict Plaintiffs' conclusory allegations that Penn State "conspired" with the NCAA or agreed to the Consent Decree "in order to deprive Plaintiffs of their procedural and due process rights." (FAC ¶ 334). Plaintiffs cannot have it both ways. As

"[a]greement is the *sine qua non* of a conspiracy", Plaintiffs' own averments defeat their

conspiracy claim. *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997).[13]

> ### 3.     Plaintiffs' Federal Conspiracy claims are time-barred as to acts before July 21, 2012.

In this Circuit, as a matter of federal law, the statute of limitations for a conspiracy claim

runs from "*each* overt act causing damage." *Kost v. Kozakiewicz*, 1 F.3d 176, 191 (3d Cir. 1993)

(emphasis added). The Third Circuit has expressly rejected the "last overt act rule," which

"would invite attempts to revive time-barred injuries by piggy-backing them onto actions

occurring within the relevant period." *Id.* (quoting *Wells v. Rockefeller*, 728 F.2d 209, 217 (3d

Cir. 1984)); *see also Rankin v. Smithburger*, No. 2:12-CV-01373, 2013 WL 3550894, at *5 - *6

(W.D. Pa. July 11, 2013) (holding that time-barred violations occurring before the final overt act

may not be considered as "overt acts" that make up plaintiff's conspiracy claim)).

Accordingly, to the extent Plaintiffs rely on allegations that occurred prior to July 21,

2012 (two years prior to the filing of the original Complaint) to support their federal conspiracy

claim, such a claim fails as a matter of law. *See Rankin*, 2013 WL 3550894, at *5-6 (dismissing

Section 1983 conspiracy claims as to events occurring more than two years before complaint was

filed).

> ### C.     The Supplemental State Law Claims Should be Dismissed.

Plaintiffs' claims for tortious interference with prospective contracts, the associated

conspiracy claim, their claim under the WPCL, and claim for breach of contract are substantive

state law claims. Because Plaintiffs' federal due process claim in Count I fails (along with its

associated conspiracy claim), the Court should dismiss the remaining state law claims, as they

---

[13]     Defendant acknowledges that federal conspiracy claims may also be brought under 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986. However, such claims were not specifically pled by Plaintiffs, and are inapposite to the well-pleaded facts of the Complaint.

involve the same set of facts and the interests of efficiency, convenience, and fairness require

dismissal of those claims on their merits.

A federal district court may exercise supplemental jurisdiction over state law claims that

are (1) related to claims over which the court does have original jurisdiction, and (2) when the

court has made a discretionary determination that the values of judicial economy, convenience,

fairness, and comity make the exercise of jurisdiction appropriate. *City of Chicago v. Int'l Coll.*

*of Surgeons*, 522 U.S. 156, 167, 172-73 (1997). When a federal court has supplemental

jurisdiction over state law claims, "it has discretion to exercise or decline to exercise this

jurisdiction." *Cindrich v. Fisher*, 341 F. App'x 780, 789 (3d Cir. 2009). The Court should

exercise discretion to assume supplemental jurisdiction over state law claims when the interests

of efficiency, judicial economy, convenience, fairness, and comity are served. *See Strain v.*

*Borough of Sharpsburg*, No. 04-1581, 2007 WL 1630363, at *10 (W.D. Pa. June 4, 2007).

Here, as the facts that the Court needs to consider to decide the due process claim(s) are

the same facts on which Plaintiffs rely for their state law claims, the interests of efficiency,

convenience, and fairness require the Court to assume supplemental jurisdiction over Plaintiffs'

state law claims and dismiss them as well.

### D.   Count II (Intentional Interference with Prospective Contractual Relations) Should be Dismissed as it is Time-barred and Fails to State a Claim.

#### 1.   Plaintiffs' state-law claims sound in defamation, and therefore the one-year statute of limitations for defamation should apply.

Where the gravamen of an action for interference with a contractual relationship is based

on the commission of a tort, the statute of limitations for that tort must govern. *Evans v.*

*Philadelphia Newspapers, Inc.*, No. 1992, 1991 WL 1011010, at *36 (Pa. Com. Pl. Feb. 11,

1991), *aff'd*, 411 Pa. Super. 244, 601 A.2d 330 (1991). In *Evans*, the court reasoned that "in

creating a cause of action for tortious interference with a contract, there is nothing to suggest that

the courts intended that a claim which was basically one of defamation should be given a two year statute of limitations." *Id.* The court further held that the plaintiff's claim for tortious interference with a contractual relationship must be dismissed where it was not filed within one year of the alleged defamatory statement that formed the basis for the claim. *Id.*

As in *Evans*, here the Plaintiffs' tortious interference claim is premised on allegedly defamatory statements, the latest of which was made on July 23, 2012 (FAC ¶ 211) (Plaintiffs' Exhibit H, "PSU Press Release"). As such, the statute of limitations ran one year from that date, and Plaintiffs' claim is now time-barred.

> **2.** **Plaintiffs' claim for intentional interference with prospective contractual relations is insufficient as Plaintiffs have failed to sufficiently plead that Penn State acted purposefully with the specific intent to harm the Plaintiffs.**

Plaintiffs have not pleaded the single most important element of an intentional interference claim: that there was "purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997). Without facts to sustain this required element, Count II and any related state-law conspiracy claims should be dismissed.

The Plaintiffs have failed to plead any facts supporting their conclusion that Penn State acted with the specific intent to prevent Plaintiffs from obtaining comparable employment at other college football programs. Indeed, such a claim would be absolutely baseless – which is likely why it was omitted from both the original and the Amended Complaint.

The Pennsylvania Supreme Court held "[i]t must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff. . . The defendant must not only have intended the interference, but must have

acted in part at least for the purpose of accomplishing it." *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971) (citations omitted); *see also Phillips v. Selig*, 959 A.2d 420, 429 (Pa. Super. Ct. 2008) ("[t]he second element requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff"); *Regis Ins. Co. v. A.M. Best Co.*, No. 10-3171, 2013 WL 775521, at *12 (E.D. Pa. Mar. 1, 2013) (granting summary judgment where nothing in the record supported plaintiff's contention that defendant specifically intended to harm his existing or prospective contractual relations); *Corrs. U.S.A. v. McNany*, 892 F. Supp. 2d 626, 644 (M.D. Pa. 2012) (same).[14]  Because the First Amended Complaint is completely devoid of any fact supporting the inference that Penn State took action with the intent to prevent Paterno and Kenney from obtaining other coaching positions, the claim must be dismissed as a matter of law.

Plaintiffs allege a litany of events that Penn State "knew or should have known" would allegedly occur and cause harm to Plaintiffs.  (FAC ¶¶ 131, 137-151, 155, 164, 166, 298, 339). However, in the context of tortious interference, knowledge of a mere possibility does not equal specific intent.  *See, e.g., Regis Ins. Co.*, 2013 WL 775521, at *12 (holding that "nothing in the record supports the argument that [defendant] downgraded [plaintiff's company] for the express purpose of causing it to lose existing or prospective business. . .  It is, of course, possible that if a rated entity is downgraded, this could cause harm to its business. But such harm is not the specific intent of the rating. It is merely an indirect effect.").  Likewise, Plaintiffs' allegations that Penn State's actions were "malicious" (FAC ¶¶ 325-326) is a conclusion wholly unsupported by facts; as such, the claim must fail.

---

[14]    An alternative formulation holds that "[a] defendant need not act with the specific intent of interfering with plaintiff's contracts. Rather, the second prong is satisfied if defendant acts improperly and with the knowledge that such interference is substantially certain to occur." *See, e.g., Barmasters Bartending Sch., Inc. v. Authentic Bartending Sch., Inc.*, 931 F. Supp. 377, 386 (E.D. Pa. 1996).  Plaintiffs fail to allege any facts to meet this "substantially certain" standard.

E.    **Count III of the Amended Complaint (Conspiracy) Should be Dismissed as Plaintiffs' Claim is Time-barred, and Plaintiffs have Failed to State a Claim for State-law Civil Conspiracy Associated with their Contractual Interference Claim.**

    1.    **The "overt act" was a defamatory publication, and therefore the one-year statute of limitations for defamation applies to the conspiracy claim.**

To the extent that Plaintiffs' vague conspiracy claim is one brought under Pennsylvania common law (as opposed to Federal law as discussed above), such a claim is time-barred pursuant to the statute of limitations applicable to defamation claims. The court in *Evans v. Philadelphia Daily News*, discussed above, also addressed a conspiracy claim similar to the Plaintiffs', which could be "characterized both as a conspiracy to defame and as a conspiracy to tortiously interfere with a contract." *Evans*, 1991 WL 1011010, at *37 (citations omitted). The court held that the "overt act in either instance was the defamatory publication [in the press]." *Id.* The statute of limitations is therefore one year, and the statute ran one year from the date of the last overt acts specifically alleged; July 23, 2012.  (FAC ¶¶ 6, 90, 211).

    2.    **Plaintiffs failed to state facts sufficient to demonstrate unlawful means or purpose, actual legal damage, or malicious intent.**

Plaintiffs' purported common law conspiracy claim also fails because Plaintiffs have not properly pleaded the elements of such a claim. In Pennsylvania, to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *Dennis*, 867 F. Supp. 2d at 657 (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003); *Strickland*, 700 A.2d at 987-88). Crucially, proof of malice or an intent to injure is essential to the proof of a conspiracy. *Strickland*, 700 A.2d at 988.

30

Plaintiffs' claim for state-law conspiracy fails for reasons similar to the failure of their federal conspiracy claim; namely, that Plaintiffs' allegations of malice or intent to injure are bald assertions that must be ignored, and that there was no unlawful act or unlawful purpose by any so-called "conspirator." (discussion at section III.B, *supra*).    As such, Plaintiffs' state-law conspiracy claim fails.

### F.    Count IV of the First Amended Complaint (Pennsylvania WPCL) Should be Dismissed for Failure to State a Claim.

Plaintiffs' penultimate claim is brought pursuant to the Pennsylvania Wage Payment and Collection Law ("WPCL"). The statute does not itself create a right to compensation; rather, a contract between the parties governs whether specific wages or commissions have been earned. *Kafando v. Erie Ceramic Arts Co.*, 764 A.2d 59, 61 (Pa. Super. Ct. 2000). Plaintiffs cannot sustain a claim under the WPCL because (1) they base their claim on post-termination wages, and (2) have already been paid their agreed-upon severance payment.

### 1.    The WPCL does not cover claims for post-termination wages.

The WPCL applies only to "back wages already earned." *Allende v. Winter Fruit Distribs., Inc.*, 709 F. Supp. 597, 599 (E.D. Pa. 1989) (granting motion to dismiss plaintiff's claim for compensation post-dating termination, except for bonus payments). In the case of a terminated employee, the WPCL applies only to wages earned prior to termination. *Cf. Britton v. Whittmanhart, Inc.*, No. 09-cv-1593, 2009 WL 2487410, at *6 (E.D. Pa. Aug. 13, 2009) (denying motion to dismiss only where employee "incentive plan" and "commission agreement" created a potential contractual right to payment in addition to salary).

Lost future earnings are more appropriately categorized as expectation damages. These lost earnings arise when the employee is prevented from performing the required services by reason of the alleged improper termination and are not covered by the statutory remedy. *Barsky*

*v. Beasley Mezzanine Holdings, L.L.C.*, No. 04-1303, 2004 WL 1921156, at *2-3 (E.D. Pa. Aug. 30, 2004) (holding that Plaintiff's claims were either for lost future wages and payments, or for separation pay that does not qualify for collection under the WPCL).

Paterno and Kenney claim that they were "entitled to receive full wages and benefits through the end of the 2012 academic year", six months past their termination date. (FAC ¶ 343). These wages are clearly "lost future earnings" not covered by the WPCL. *See Barsky*, 2004 WL 1921156, at *2. The Plaintiffs cannot state a claim for relief under this statute.

> **2.    The plaintiffs were paid their full severance amount, and therefore cannot claim severance as the basis for a WPCL claim.**

Plaintiffs also claim that they were entitled to eighteen months of severance pay, but do not claim that they are owed any severance payment. Rather, they merely claim that this 18-month severance pay period was "accelerated" to commence at the time of their termination. (FAC ¶ 345). Since the entire severance amount was paid to Plaintiffs, Plaintiffs cannot sustain a claim under the WPCL on the basis of this alleged obligation. *Cf. Heimenz v. Pa. Power & Light Co.*, 75 Pa. D. & C.2d 405, 406 (C.P. Lycoming Cnty. 1976) (denying preliminary objections to WPCL claim where severance was <u>not paid</u> to plaintiff).

> **G.    Count V of the First Amended Complaint (Breach of Contract) Should be Dismissed for Failure to State a Claim, or, in the Alternative, the Court should Require a More Definite Statement**

For the first time in their First Amended Complaint, Plaintiffs claim that Penn State has breached its contract by ceasing to make wage and benefit payments to Plaintiffs in mid-July, 2013 – eighteen months after Plaintiffs were terminated. Plaintiffs' argument regarding a breach of contract is undermined by their own averments, and therefore fails to state a claim upon which relief may be granted.

Plaintiffs claim that they were promised "their full salary through the end of the academic year." (FAC ¶ 353). However, Plaintiffs (perhaps tacitly acknowledging that they were at-will employees) do not claim that they were promised continued <u>employment</u> by virtue of their agreement with Penn State employee Erikka Runkle. Per Plaintiffs' own averments, Runkle did not promise (and could not have promised) that they would not be terminated. (FAC ¶ 353). Plaintiffs' view regarding the proposed employment arrangement is altogether unclear; if they believe that they were to be retained as employees, they have not so stated in their Amended Complaint.

Even if the Plaintiffs did argue that Runkle's statement constituted an offer of employment through the end of the academic year, such an argument would fail. First, the statement cannot overcome Pennsylvania's strong presumption of at-will employment. *See, e.g.*, *Braun v. Kelsey-Hayes Co.*, 635 F. Supp. 75, 77 (E.D. Pa. 1986) ("the plaintiff has the burden of overcoming the presumption under Pennsylvania law that employers may terminate employees at will for any reason, at any time, absent a contract or statute which provides otherwise."). Second, Plaintiffs have not pled, with specificity, an essential part of the alleged employment contract: "the details of the agreement including the duration of the employment position." *Gardella v. Prodex Int'l, Inc.*, No. CIVA 06-1821, 2006 WL 2261352, at *1 (E.D. Pa. Aug. 4, 2006) (noting requirements for pleading at Motion to Dismiss stage).

Rather, Plaintiffs' sole claim is that they were promised "their full salary through the end of the academic year." (FAC ¶ 353). Plaintiffs, in fact, <u>received an equivalent of three times this amount</u>; the equivalent of 18 months of salary and benefits from Penn State (reduced only in Kenney's case when he secured other employment). By Plaintiffs' own averments, Penn State <u>exceeded</u> the allegedly promised salary and benefits by its severance payment.

33

Under the facts as viewed in the most favorable light to the Plaintiff, there was no contract to retain Plaintiffs as employees, and their claim must fail. Defendant therefore respectfully requests that the Court dismiss this count, or, in the alternative, requests that Plaintiffs provide a more definite statement regarding the alleged contract.

## IV.   CONCLUSION

Because of the deficiencies in Plaintiffs' First Amended Complaint, Penn State respectfully requests that the Court grant its Motion to Dismiss and dismiss with prejudice Plaintiffs' First Amended Complaint in its entirety for failure to state a claim upon which relief may be granted.

Dated: January 7, 2015                            Respectfully submitted,

                                                  /s/ Joseph F. O'Dea, Jr.
                                                  Joseph F. O'Dea, Jr., Esq.
                                                  PA Attorney ID No. 48370
                                                  Nicholas J. Nastasi, Esq.
                                                  PA Attorney ID No. 82102
                                                  Centre Square West
                                                  1500 Market Street, 38th Floor
                                                  Philadelphia, PA, 19102-2186
                                                  T: (215) 972-7109

                                                  *Attorneys for Defendant*
                                                  *Pennsylvania State University*

34

# EXHIBIT 1



# IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA

| | |
|---|---|
| **GEORGE SCOTT PATERNO,** <br> **As duly appointed representative of the** <br> **ESTATE and FAMILY of JOSEPH PATERNO;** | : <br> : <br> : <br> : |
| **RYAN McCOMBIE, ANTHONY LUBRANO,** <br> **AL CLEMENS, and ADAM TALIAFERRO, members of the** <br> **Board of Trustees of Pennsylvania State University;** | : **Civil Division** <br> : **No. 2013-2082** <br> : <br> : |
| **PETER BORDI, TERRY ENGELDER,** <br> **SPENCER NILES, and JOHN O'DONNELL,** <br> **members of the faculty of Pennsylvania State University;** | : <br> : <br> : |
| **WILLIAM KENNEY and JOSEPH V. ("JAY") PATERNO,** <br> **former football coaches at Pennsylvania State University; and** | : <br> : |
| **ANTHONY ADAMS, GERALD CADOGAN,** <br> **SHAMAR FINNEY, JUSTIN KURPEIKIS,** <br> **RICHARD GARDNER, JOSH GAINES, PATRICK MAUTI,** <br> **ANWAR PHILLIPS, and MICHAEL ROBINSON,** <br> **former football players of Pennsylvania State University,** | : <br> : <br> : <br> : <br> : |
| **Plaintiffs,** | : <br> : |
| **v.** | : <br> : |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION** <br> **("NCAA"),** | : <br> : <br> : |
| **MARK EMMERT, individually** <br> **and as President of the NCAA, and** | : <br> : <br> : |
| **EDWARD RAY, individually and as former** <br> **Chairman of the Executive Committee of the NCAA,** | : <br> : <br> : |
| **Defendants.** | : <br> : |

## OPINION & ORDER

**LEETE, Senior J.**

Before the Court are Preliminary Objections filed by Defendants National Collegiate

Athletic Association ("NCAA"), Mark Emmert, and Edward Ray to the Complaint of Plaintiffs

■ O ☐ RD ☐ S

George Scott Paterno, as duly appointed representative of the Estate and Family of Joseph Paterno ("Paterno's Estate"); Ryan McCombie, Anthony Lubrano, Al Clemens, and Adam Taliaferro, members of the Board of Trustees of Pennsylvania State University ("Trustees"); Peter Bordi, Terry Engelder, Spencer Niles, and John O'Donnell, members of the faculty of Pennsylvania State University ("Faculty"); William Kenney and Joseph V. ("Jay") Paterno, former football coaches at Pennsylvania State University ("Former Coaches"); and Anthony Adams, Gerald Cadogan, Shamar Finney, Justin Kurpeikis, Richard Gardner, Josh Gaines, Patrick Mauti, Anwar Phillips, and Michael Robinson, former football players at Pennsylvania State University ("Former Players").

For the reasons discussed below, Defendants' Preliminary Objections are SUSTAINED in part and OVERRULED in part.

## BACKGROUND

This case arises from sanctions the NCAA imposed on the Pennsylvania State University ("Penn State") following the conviction of former Assistant Football Coach Jerry Sandusky related to child sex abuse. The sanctions were premised on Sandusky's use of Penn State facilities and his affiliation with Penn State's football program during the period when the abuse occurred. The pertinent facts alleged in the Complaint, highly summarized, are as follows.

The NCAA is a voluntary association of higher education institutions whose purpose is to promote academic and athletic excellence. Compl. ¶¶ 2, 19. The NCAA operates pursuant to a Constitution and Bylaws, which are incorporated into its contracts with member institutions and are designed promote the goals of fair competition and amateurism. Id. at ¶¶ 2, 20, 22. Articles 19 and 32 of the Bylaws contain detailed policies and provisions governing enforcement of NCAA rules, including imposition of sanctions on member institutions for rules violations. Id. at

2

¶¶ 2, 28. These provisions grant numerous procedural protections to member institutions and other parties interested in investigations of NCAA rules violations, including provisions for notice and an opportunity to respond to allegations. Compl. ¶¶ 3, 24, 28-46. The Constitution also requires that institutions and their staff and student-athletes be provided fair procedures in enforcement matters. Id. at ¶¶ 24, 47.

On November 17, 2011, the NCAA notified Penn State that it was concerned about criminal charges filed against Jerry Sandusky for allegedly sexually abusing young boys at Penn State and through his connections to Penn State's football program. Id. at ¶ 53. The NCAA indicated that Penn State should prepare for a possible NCAA inquiry and involvement. Id. At that point, the Penn State Board of Trustees had already taken action in response to the scandal, including removing Penn State's President Graham Spanier from his position and replacing him with Rodney Erickson and removing head football coach Joe Paterno from his position. Compl. ¶ 49. Penn State's Board of Trustees had also commissioned the firm of Freeh, Sporkin & Sullivan, LLP to investigate any failures by Penn State officials and employees in regard to Sandusky's actions and to make recommendations regarding Penn State's policies, procedures and governance. Id. at ¶ 50. Instead of commencing its own investigation, as mandated by its own rules and procedures, the NCAA collaborated with the Freeh firm and waited for the results of the firm's investigation. Id. at ¶ 54.

On July 12, 2012, the Freeh firm released its report (the "Freeh Report") concluding, among other things, that certain Penn State officials and personnel including Joe Paterno had been aware of Sandusky's actions but failed to take action and concealed evidence from investigators. Id. at ¶ 56. Within hours after the Freeh Report was released, certain Penn State officials announced in a press release that the Board of Trustees had accepted full responsibility

3

for the failures outlined in the Report. Compl. ¶ 57, 58. However, the Board of Trustees never approved or took any official action with respect to the Freeh Report. Id. at ¶ 59.

In lieu of following its own mandated enforcement procedures, the NCAA accepted the conclusions of the Freeh Report as compelling evidence sufficient to justify imposition of sanctions against Penn State. Id. at ¶ 58, 60. The NCAA did so despite serious flaws in the investigation and despite knowing that all the relevant facts were not even available. Id. at ¶¶ 60-88. About ten days after the Freeh report was released, and under threat of the "death penalty" (a complete ban from participation in college football for a period of time), the Consent Decree was executed by the NCAA and President Erickson. Compl. ¶¶ 83-86. The Consent Decree accepts the findings of Freeh Report and the jury findings in Sandusky's criminal trial as bases for sanctions, which included a $60 million fine, a 4-year post-season play ban, loss of athletic scholarships, and vacation of wins since 1998. Id. at ¶ 96. President Erickson signed the Decree without following the procedural requirements set forth in Penn State's Bylaws, Charter, and Standing Orders. Id. at ¶¶ 87, 88.

Some of the Plaintiffs filed appeals from the Consent Decree with the NCAA Infractions Appeals Committee, but the NCAA refused to accept the appeals on the ground that it was not proceeding pursuant to its traditional enforcement process. Id. at ¶¶ 98, 99.

Based on these allegations, Plaintiffs filed the Complaint on May 30, 2013. Count I of the Complaint alleges breach of Penn State's membership contract with the NCAA on behalf of Paterno and Trustee Clemens as third party beneficiaries. Count II asserts breach of the membership contract on behalf of the remaining Trustees and the Former Coaches and Former Players as third party beneficiaries. Count III asserts a claim for intentional interference with contractual relations on behalf of the Former Coaches. Count IV asserts a claim for injurious

Printed from Centre County Online Access - 7/28/2014 1:07:22 PM

falsehood/commercial disparagement by Paterno's Estate on behalf of Paterno. Count V asserts a claim for defamation on behalf of the Plaintiffs other than Paterno's Estate.  Count VI asserts a claim for civil conspiracy by all Plaintiffs. Plaintiffs seek declaratory and injunctive relief and recovery of compensatory and punitive damages and costs of the action.

Defendants filed the instant Preliminary Objections on July 23, 2013, asserting several challenges to the Complaint under Pa. R. Civ. P. 1028, including: (1) Lack of Jurisdiction Due to Failure to Join Indispensable Party; (2) Incapacity to Bring Contract Counts; (3) Impertinent Material; (4) Demurrers to Counts III through VI; and (5) Lack of Personal Jurisdiction. Pursuant to an agreement of the parties, the personal jurisdiction issues are reserved until the other preliminary objections are resolved. The remaining objections were fully briefed, and oral argument was held on October 29, 2013.

## DISCUSSION

For purposes of deciding the preliminary objections, the Court must assume the well-pleaded factual allegations in the Complaint are true and must draw all inferences reasonably deducible from those allegations in favor of Plaintiffs. Foflygen v. R. Zemel, M.D. (P.C.), 420 Pa. Super. 18, 32, 615 A.2d 1345, 1352 (1992).

### Failure to Join Indispensable Party (Rule 1028(a)(1))

#### Parties' Arguments

Defendants argue that Penn State is an indispensable party to this action because no judgment can be rendered on Plaintiffs' claims without dramatically affecting Penn State's rights. Specifically, Plaintiffs seek to materially impair Penn State's rights by voiding its contract with the NCAA, and they directly challenge the authority of Penn State and its senior leadership to execute the Consent Decree.

5

Plaintiffs respond that Penn State is not indispensable because they do not seek any redress from Penn State. Moreover, Penn State signed a waiver in the Consent Decree which prohibits it from participating in any litigation related to the Consent Decree. Based on that waiver, the Pennsylvania Commonwealth Court recently held that Penn State was not an indispensable party in another suit involving different issues in the Consent Decree, Corman v. National Collegiate Athletic Ass'n, 74 A.3d 1149 (Pa. Cmmw. Ct. 2013).

### Legal Standards

A party is indispensable to a suit when its rights are so connected with the claims asserted that no decree can be made without impairing those rights. Polydyne, Inc. v. City of Phila., 795 A.2d 495, 496-97 (Pa. Commw. Ct. 2002). If an indispensable party is not joined, the court lacks subject matter jurisdiction and may not address the merits of the case. See id.; see also Erie Ins. Group v. Cavalier, 380 Pa. Super. 601, 606, 552 A.2d 705, 707 (1989) (applying Pennsylvania's Declaratory Judgments Act).

In determining whether a party is indispensable, courts consider the following factors:

(1) Do absent parties have a right or interest related to the claim?

(2) If so, what is the nature of that right or interest?

(3) Is that right or interest essential to the merits of the issue?

(4) Can justice be afforded without violating the due process rights of absent parties?

See, e.g., Polydyne, 795 A.2d at 496; E-Z Parks, Inc. v. Philadelphia Parking Auth., 103 Pa. Commw. 627, 632, 521 A.2d 71, 73 (1987).

Applying these standards, Pennsylvania courts consistently have found that in breach of contract actions, all parties to the contract are indispensable. See, e.g., Polydyne, 795 A.2d at 496

6

(in suit to enjoin contract between city and competing bidder, competing bidder was indispensable); Borough of Wilkinsburg v. Horner, 88 Pa. Commw. 594, 597-98, 490 A.2d 964, 965 (1985) (in taxpayers' suit to enjoin performance of refuse contract between borough and sanitation company, sanitation company was indispensable party); Gavigan v. Bookbinders, Mach. Operators and Auxiliary Workers Local Union No. 97, 394 Pa. 400, 401, 147 A.2d 147, 147 (1959) (in suit by union members seeking interpretation of contract between employer and union, employer was indispensable party and failure to join it was "fatal to the action").

Plaintiffs have not cited any persuasive authority to the contrary. Several of the cases they rely on do not involve contract-based claims or are otherwise distinguishable. Campanaro v. Pennsylvania Elec. Co., 440 Pa. Super. 519, 656 A.2d 491 (1995) (employment discrimination); Sprague v. Casey, 520 Pa. 38, 550 A.2d 184 (1988) (election challenge); County of Berks v. Allied Waste Indus. Inc., 66 Pa. D. &. C.4th 429 (2004) (nuisance and other property claims); see also Comerford v. Factoryville Borough Council, 16 Pa. Commw. 261, 328 A.2d 221 (1974) (state agency not indispensable in action to enjoin contract between borough and engineering firm); Americus Ctr., Inc. v. City of Allentown, 112 Pa. Commw. 308, 535 A.2d 1200 (1988)(potential lessee not indispensable where contract had not yet been executed). French v. Shoemaker, 81 U.S. 314 (1871) involved a contract claim but because it is from 1871 and originated in Virginia, it is not compelling authority in this case.

## Analysis

## Indispensable Party Test

In this case, all of the factors in the indispensable party test apply with respect to Plaintiffs' contract claims. The contract at issue is the membership contract between Penn State and the NCAA in the form of the NCAA's Bylaws and Constitution. Compl. ¶¶ 105-121.

7

Plaintiffs allege that Defendants breached the enforcement provision in the Bylaws as well as the covenant of good faith and fair dealing implied in the membership contract. Penn State has an interest and stake in the resolution of these issues as a party to the contract. See Bloom v. National Collegiate Athletic Ass'n, 93 P.3d 621, 622 (Colo. App. 2004) (noting, in another case involving claims under a NCAA membership contract, that the trial court had ordered the member institution joined as an indispensable party). In addition, Penn State has an interest in resolution of Plaintiffs claims that its senior leadership acted ultra vires in accepting the Freeh Report and entering the Consent Decree without ratification by Penn State's Board of Trustees. Likewise, Penn State has an interest in litigating Plaintiffs' claims that it lacked authority to waive the enforcement provisions set forth in the Bylaws.

Penn State's participation is also essential to resolving the threshold issue of standing. Plaintiffs contend that they have standing as third party beneficiaries to the membership contract because the Bylaws bestow various procedural rights upon "involved individuals," defined as student athletes and staff who have received notice of "significant involvement in alleged violations." See Compl. Exh. A, R. 32.1.5. They contend that Paterno and Clemens meet this definition because they were accused of wrongdoing and Paterno was sanctioned by the vacation of his record of wins. The absence of formal notice to Paterno and Clemens does not remove them from the definition of "involved individuals," they argue, because Defendants concede they were not utilizing any of the traditional enforcement procedures. Plaintiffs allege the other Plaintiffs have standing by virtue of the NCAA rule stating that providing fairness to uninvolved individuals is essential to a viable and effective enforcement program. See id. R. 19.01.1. Defendants argue that the NCAA has never interpreted its rules broadly enough to include persons who were not personally sanctioned or under threat of an official finding that they

8

violated a rule. They argue that Paterno and Clemens did not receive notice of involvement in alleged violations and were not personally sanctioned. According to Defendants, the fairness provisions are too vague to support a third party beneficiary contract claim.

Whether a person has third party beneficiary status depends on the intent of the primary contract parties. Scarpitti v. Weborg, 530 Pa. 366 (1992). Where contract language is clear and unambiguous, it is conclusive as to the parties' intent. See, e.g., Keystone Dedicated Logistics, LLC v. JGB Enters. Inc., 77 A.3d 1, 6-7 (Pa. Super. Ct. 2013). However, when the contract language is susceptible of different reasonable interpretations extrinsic evidence may be needed to resolve the ambiguity. Id.

Here, the contract language is ambiguous. Based on the contract language and the context of this case, Defendants' argument that "involved individuals" means persons who are sanctioned or under threat of an official finding of rules violations is reasonable. Plaintiffs' argument that the phrase may cover a person who is named in the sanctioning document or whose conduct underlies sanctions is also reasonable. Many fact questions remain concerning the meaning and application of the phrase "involved individuals" in this case, including whether Paterno was personally sanctioned. Regarding the fairness provisions, it is not clear whether they were intended to create contract rights in third parties, and neither party has cited a controlling case on point in hundreds of pages of briefing. Cf. Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 713 (D. Vt. 2012) (applying Vermont law, even if college athlete had standing based on NCAA fairness provisions, he could not establish a concrete and specific promise to support a contract claim); Bloom, 93 P. 3d at 623-24 (in disciplinary matter, college athlete had standing to challenge NCAA eligibility rules); see also Oliver v. National Collegiate Athletic Ass'n, 155 Ohio Misc. 2d 8, 13-14 (2008). Given that Penn State's intentions as a primary contract party are

9

directly at issue, it would be inappropriate to resolve these ambiguities and determine standing in Penn State's absence.

Penn State is also indispensable because the relief Plaintiffs seek would deprive Penn State of its rights under the Consent Decree. If the Consent Decree is declared void, as Plaintiffs request, Penn State would lose the benefits it bargained for, including avoiding harsher sanctions and limiting further loss that could result from a prolonged investigation. Even at oral argument, the NCAA indicated that the "death penalty" could conceivably result if the Consent Decree was invalidated. Where similar relief voiding a contract has been sought, Pennsylvania courts have held the parties to the contract must be joined. See, e.g., E-Z Parks, Inc. v. Philadelphia Parking Auth., 103 Pa. Commw. 627, 631-33, 521 A.2d 71, 73 (1987)(DOT indispensable party in parking lot operator's suit to void contract between DOT and parking authority as unauthorized); Frushon v. Pittston Twp. Sch. Dist., 8 Pa. D. & C. 2d 165, 167, 1957 WL 6299 at p.* 2 (1956) (in suit to cancel contract between school district and tax collector, tax collector was indispensable).

Nor can declaratory relief be granted without Penn State's presence as a party to this suit. Section 7540 of the Pennsylvania Declaratory Judgments Act, 42 Pa. C.S.A. §§ 7531-7541, provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." See also Erie Ins. Group v. Cavalier, 380 Pa. Super. 601, 606, 552 A.2d 705, 707 (Pa. Super. Ct. 1989) (in insurer's suit for declaration of coverage limits, insureds were indispensable parties); ESP Enters., LLC v. Garagozzo, 2005 WL 1580049 at p* 2 (Pa. Com. Pl. 2005) (parties to agreement of sale indispensable in suit to declare agreement void).

10

Thus, Penn State has interests in the action arising from its contract rights, and those interests are essential to the merits of the claims. Penn State's interests are distinct from those of Plaintiffs and Defendants, and their interests are not adequately protected by the other parties. See, e.g., Polydyne, 795 A.2d at 496 (in suit to enjoin city's contract with competing bidder, competing bidder's rights were not adequately protected by city's interest in upholding contract). "Inquiry into whether a party is indispensable is viewed from the perspective of protecting rights of absent parties, not from perspective of whether joinder of a party to an action would make matters more difficult to litigate." E-Z Parks, 103 Pa. Cmmw. at 635, 521 A.2d at 72. In this case, it would be unjust to rule upon the meaning of the terms of Penn State's contract and whether its conduct was voluntary and authorized in its absence.

### Waiver Issue

The waiver provision relied on in Corman v. National Collegiate Athletic Ass'n, does not compel a different conclusion. First, Corman is factually distinguishable. The issue in Corman was whether the fine money received by the NCAA under the Consent Decree was subject to the Institution of Higher Education Monetary Penalty Endowment Act. As "[n]othing in the Consent Decree permits [Penn State] to affect the disposition of the fine being paid," its rights were not essential to the merits of the case. Corman, 74 A.3d at 1163. In Corman, none of the relief requested impacted Penn State. Id. at 1165-66. By contrast, in this case Penn State's contract rights would be determined by the declaratory and other relief sought. Penn State has a direct and material interest in how its own contract is interpreted and enforced and whether its actions are determined to be authorized, voluntary, or appropriate.

11

Moreover the waiver provision relied on in <u>Corman</u> court does not appear to apply here, based on its plain language. The waiver provides as follows:

> Penn State expressly agrees not to challenge the consent decree and waives any claim to further process, including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, and any judicial process related to the subject matter of this Consent Decree.

Compl. Exh. B at p. 2.

Thus, the waiver applies to Penn State's "challenge to the consent decree." This suit is based on the membership contract, and the only challenge to the consent decree is asserted by Plaintiffs. It is not reasonable to construe the waiver to cover a suit for breach of a different contract based on a non-party's request for voidance of the Consent Decree.

It is also significant that in this case, unlike in <u>Corman</u>, Plaintiffs have alleged the Consent Decree was coerced and is void *ab initio*. In <u>Corman</u>, the court noted that the Consent Decree was a contract and had to be enforced absent fraud or other invalidating grounds, which were not alleged in that case <u>Id.</u> at 1165. Here, Plaintiffs themselves allege the Consent Decree is invalid because President Erickson was "forced to agree not to challenge the decree and to waive any right to a 'determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rule, and any judicial process related to the subject matter of the Consent Decree." Compl. ¶ 97. In deciding preliminary objections the Court must accept Plaintiffs' allegations as true. If the Consent Decree is void as alleged, the waiver also is void and has no effect.

### Conclusion

The preliminary objection based on failure to join an indispensable party is therefore SUSTAINED. For the same reasons, the preliminary objection seeking to have the request for voidance of the Consent Decree stricken as impertinent is also SUSTAINED. In light of this

12

disposition, the Court lacks jurisdiction over the contract claims. See Erie Ins. Group v. Cavalier, 380 Pa. Super. 601, 606, 552 A.2d 705, 707 (1989) (declining to address merits of appeal where jurisdiction lacking due to failure to join indispensable parties). Accordingly, the Court does not reach the objection to Plaintiffs' standing to assert the contract claims. See, e.g., Hollinger v. Dep't of Pub. Welfare, 469 Pa. 358, 364, 365 A.2d 1245, 1248 (1976) (declining to reach remaining preliminary objections where objection to jurisdiction was sustained); Barr v. Commonwealth, 110 Pa. Commw. 530, 533, 532 A.2d 1236, 1237 (1987) (same). However, the Court notes for purposes of judicial economy that it appears from the current record that the operative Bylaws language is ambiguous.

Although the court lacks jurisdiction over the contract claims, Penn State's absence does not require dismissal of the entire Complaint. Plaintiffs' tort claims stand on a different footing than the contract claims because they do not require rulings affecting Penn State's rights in any significant way.  The Court next addresses Defendants' demurrers pursuant to Rule 1028(a)(4) to each of the four tort claims: Count V (defamation), Count IV (commercial disparagement), Count III (tortious interference with contract), and Count VI (civil conspiracy).

## Demurrers (Rule 1028)(a)(4))

A complaint must allege enough facts to apprise the defendant of the nature of the claims and allow the defendant to prepare an answer and defense. Sevin v. Kelshaw, 417 Pa. Super. 1, 7, 611 A.2d 1232, 1235 (1992).  A claim should only be dismissed on preliminary objections when it is clear and free from doubt that the pleader will not be able to prove facts legally sufficient to establish a right to relief. Bower v. Bower, 531 Pa. 54, 57, 611 A.2d 181, 182 (1992). When reviewing preliminary objections in the form of a demurrer, all well-pleaded material facts in the complaint, as well as inferences fairly deducible therefrom, are admitted as true. Strickland v.

13

University of Scranton, 700 A.2d 979, 983 (Pa. Super. Ct. 1979). A demurrer should be sustained

only where, on the facts averred, the law says with certainty that no recovery is possible. Id.


**Demurrer to Defamation Claim**

Defendants argue that the defamation claim, which is asserted by all of the Plaintiffs

except Paterno's Estate, fails because the allegedly defamatory statements are directed to the

Penn State community at large or to general groups at Penn State and do not reasonably identify

any of the individual Plaintiffs. In addition, the alleged statements are expressions of opinion

based on publicly disclosed facts and most Plaintiffs are public figures but have failed to allege

malice.

Plaintiffs argue that the defamatory statements were directed at the individual Plaintiffs,

and the size of the group defamed does not determine the viability of the claim. They further

argue that the statements were factual conclusions and that malice is sufficiently alleged.

To state a claim for defamation, a plaintiff must allege (1) that the communication was

defamatory; (2) that the defendant published the communication; (3) that it applied to the

plaintiff; (4) that the recipient understood the defamatory meaning; (5) that the recipient

understood that it was intended to be applied to the plaintiff; (6) that the plaintiff suffered special

harm as a result of the publication; and (7) abuse of any conditional privilege. Alston v. PW-

Philadelphia Weekly, 980 A.2d 215, 220 (Pa. Commw. Ct. 2009).

To constitute a defamatory statement, the plaintiff need not be named but may be

referenced as part of a group. Klauder v. Philadelphia Newspapers, Inc., 66 Pa. D. & C.2d 271,

276 (1973). However, the plaintiff still must show a reasonable person would identify him as a

target of the defamatory statement. Id. In making this determination, group size is an important

14

factor. Id. at 276-78. As a general guideline, a group consisting of 25 or more members is too large to support a defamation claim. See id. at 280 (police force of 8,200 too large), Schonek v. WJAC, Inc., 436 Pa. 78, 84, 258 A.2d 504, 507 (1969) (committee of several hundred too large); Viola v. A & E Television Networks, 433 F. Supp. 2d 613, 617 (W.D. Pa. 2006) (applying Pennsylvania law)(Roman Catholic Church too large); cf. Farrell v. Triangle Publ'ns, Inc., 399 Pa. 102, 109, 159 A.2d 734, 738-39 (1960)(board of commissioners with 13 members not too large); Mzamane v. Winfrey, 693 F. Supp. 2d 442, 495 (E.D. Pa. 2010) (defamatory statements about school's "leadership" construed as concerning plaintiff); O'Neill v. Motor Transp. Labor Relations, Inc., 41 Pa. D & C.2d 242, 246 (1966) (group of 124 company employees not too large, but each was listed by name).

With these standards in mind, the Court will address the five allegedly defamatory statements alleged in the Complaint:

Statement 1: The Consent Decree stated that "the Board of Trustees … did not perform its oversight duties," and it "failed in its duties to oversee the President and senior University officials in 1998 and 2001 by not inquiring about important University matters and by not creating an environment where senior University officials felt accountable." See Compl. ¶¶ 90(b), 140.

Statement 2: The Consent Decree found that "[s]ome coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him." Compl. ¶ 90(c).

Statement 3: "[T]he NCAA asserted that … 'it was the fear of or deference to the omnipotent football program that enabled a sexual predator to attract and abuse his victims.' According to the NCAA, 'the reverence for Penn State football permeated every level of the University community,'" and was "'an extraordinary affront to the values all members of the Association have pledged to uphold.'" Compl. ¶ 92.

Statements 4: "[E]very level of the Penn State community created and maintained a culture of reverence for, fear of, and deference to the football program, in disregard of the

15

value of human decency and the safety and well-being of vulnerable children." Compl. ¶ 94, see also Compl. ¶ 140.

Statement 5: The NCAA and its officials stated that the issues addressed "in the Consent Decree were 'about the whole institution'" and that "the Freeh Report ... revealed [matters] that suggest really inappropriate behavior at every level of the university.'" Compl. ¶ 141.

Accepting Plaintiffs' allegations as true for purposes of the demurrer, Plaintiffs have adequately pled a defamation claim on behalf of Clemens based on Statement 1 and on behalf of the Former Coaches based on Statements 2. The first two elements of defamation, that the statements are defamatory and are published, are easily met based on Plaintiffs' allegations. Statement 1 asserts that the Trustees serving in 1998 and 2001 failed in their oversight duties, and Statement 2 asserts that some coaches were basically complicit in child sexual abuse. Both Statements were published in the Consent Decree as conclusions based on fact findings contained in the Freeh Report. See Compl. Exh. B at pp. 2-3.

A closer question is whether the Statements reasonably identify those Plaintiffs. Both Statements refer to groups that are limited in size and consist of people who are well-known in the community or whose identity could easily be discovered upon inquiry. Statement 1 concerns the Board of Trustees serving in 1998 and 2001. Trustees meeting that description are a finite group and include Clemens, but not the other Trustee Plaintiffs. Id. at ¶ 9.  Statement 2 is directed as "some coaches," a limited group of individuals including Former Coaches Paterno and Kinney.  These groups are certainly smaller than the 8,200-member police force in Klauder and closer to 13-member board of commissioners in Farrell and the school "leadership" in Mzamane. In addition, the Pennsylvania Supreme Court has recognized that when defamatory statements are made in the course of a public scandal, recipients may be more likely to make

16

inquiry to determine the specific group members. Farrell, 399 Pa. at 109, 159 A.2d at 738-39. Thus, Plaintiffs have sufficiently alleged that Clemens and the Former Coaches reasonably could be viewed as targets of Statements 1 and 2, respectively.

Plaintiffs have also sufficiently alleged the element of malice. By virtue of their positions with Penn State and involvement in a public scandal, Clemens and the Former Coaches are at least limited purpose public figures, and thus Plaintiffs must plead malice to establish their defamation claim. See Barry v. Time, Inc., 584 F. Supp. 1110 (N.D. Cal. 1984)(discussing cases finding college players and coaches to be public figures); Mzamane v. Winfrey, 693 F. Supp. 2d 442, 498-99 (E.D. Pa. 2010) (headmistress of school was limited purpose public figure). Malice is shown when a defendant publishes statements with obvious reasons to doubt their veracity, such as when the defendant is aware of internal inconsistencies or apparently reliable contradictory information. Mzamane, 693 F. Supp. 2d at 505-06.

In this case, the Complaint alleges that Defendants accepted the Freeh Report even though they knew it was unreliable and seriously flawed. Compl. ¶¶ 5, 6, 60-88. It also alleges that Defendants intentionally rushed to judgment without a proper investigation, violating the procedural rights of affected individuals, and aware that innocent parties would suffer substantial harm. Id. These allegations are sufficient to support the element of malice with respect to Statements 1 and 2.

However, Statements 3 through 5 are not actionable because nothing in those statements identifies any of the Plaintiffs as targets. Those statements refer to the "Penn State community," and Plaintiffs specifically allege that the statements were directed at all members of the Penn State Community between 1998 and 2011. Id. at ¶ 144. Because that group would consist of hundreds of thousands of people, it is far too large to support a finding that the statements

17

targeted any of the Plaintiffs personally. See Klauder, 66 Pa. D. & C.2d at 280. The Former

Players and Faculty and the Trustees who did not serve in 1998 and 2001 are not otherwise

named, directly or indirectly, as individuals or as part of groups. Cf. O'Neill, 41 Pa. D & C.2d at

246 (124 group members were specifically named in defamatory statements). Thus recovery for

defamation is not possible based on Statements 3 through 5.

     The Demurrer to Count V is OVERRULED as to claims by Clemens and the Former

Coaches based on Statements 1 and 2 and is otherwise SUSTAINED.

### Demurrer to Commercial Disparagement Claim

     Defendants argue that the commercial disparagement claim fails because Plaintiffs have

not alleged any actionable commercial interest, pecuniary loss, or that the NCAA acted with

knowing and reckless disregard for the truth. Plaintiffs respond that they have alleged a property

interest in Paterno's name and reputation and need not allege specific pecuniary loss because the

disparaging statements were widely disseminated and constituted libel per se.

     To state a claim for commercial disparagement, a plaintiff must allege that publication of

a disparaging statement about another's business where: (1) the statement is false, (2) the

publisher intends that the statement will cause pecuniary loss or reasonably should recognize that

it will cause pecuniary loss; (3) pecuniary loss in fact; and (3) the publisher knows the statement

is false or acts in reckless disregard of its truth or falsity. Pro Golf. Mfg., Inc. v. Tribune Review

Newspaper Co., 809 A.2d 243, 246, 570 Pa. 242, 246 (2002). Commercial disparagement is like

defamation but protects commercial as opposed to reputational interests. Id. at 247, 570 Pa. at

246.

     The Pennsylvania Supreme Court made clear in Menefee v. Columbia Broad. Sys., Inc.,

458 Pa. 46, 54, 329 A.2d 216, 220 (1974), that the commercial interest need not be a product or

18

service. The plaintiff in that case was a radio broadcaster and asserted a commercial disparagement claim based on statements indicating that he was unable to draw an audience and obtain good ratings. The Supreme Court recognized that he had "an intangible property interest in his broadcasting personality and that a statement that his program could no longer attract satisfactory ratings would tend to disparage that property interest." Id.

In this case the Complaint alleges that Joe Paterno or his estate "possessed a property interest in his name and reputation, and there was a readily available, valuable commercial market concerning Joe Paterno's commercial property." Compl. ¶ 131. It further alleges that the Consent Decree published various statements maligning Joe Paterno's moral character, including (1) "Head Football Coach Joseph V. Paterno failed to protect against a child sexual predator harming children for over a decade," (2) Paterno "concealed Sandusky's activities from the Board of Trustees, the University community and authorities," and (3) Paterno "allow[ed] [Sandusky] to have continued, unrestricted and unsupervised access to the University's facilities and affiliation with the University's prominent football program." Id. at ¶ ¶ 90(a), 130.  The Complaint alleges that Plaintiffs knew or should have known the statements were false and that the statements were published across the country, causing the Estate's "commercial interests and value" to "substantially and materially declined as a direct result of Defendant's conduct." Id. at ¶¶ 136, 137, see also id. at ¶ 103(a).

The Complaint sets forth sufficient factual allegations to support a plausible claim for commercial disparagement. Based on Menefee, Plaintiffs have at least a possibility of recovery based on a commercialized interest in Paterno's personality or reputation as a football coach. Plaintiffs identified disparaging statements accusing Joe Paterno of enabling and concealing child sexual abuse and knowledge or reckless disregard with respect to their falsity. Although

19

Plaintiffs did not specifically plead pecuniary loss, as a plaintiff generally must in a commercial disparagement case (see Swift Bros. v. Swift & Sons, Inc., 921 F. Supp. 267, 276 (E.D. Pa. 1995)), such specificity is not required where the disparaging statements constitute libel per se. See Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 378, 415 (E.D. Pa. 2009) (applying Pennsylvania law); Testing Sys., Inc. v. Magnaflux Corp., 251 F. Supp. 286, 291 (D.C. Pa. 1966) (applying libel per se exception in context of trade libel/disparagement of property case but finding test was not met). The statements about Joe Paterno's response to child sexual abuse at Penn State impugn his moral character and conduct in his profession, constituting libel per se. See Testing Sys., Inc., 251 F. Supp. at 291. Alternatively, the pleading standards are relaxed where statements were widely disseminated due to the difficulty of proving particular customers were lost when the disparagement affects an entire market. Menefee, 458 Pa. at 54-55, 329 A.2d at 221 (citing Restatement of Torts § 633). Accordingly, Plaintiffs have stated a claim for commercial disparagement.

The Demurrer to Count IV is OVERRULED.

**Demurrer to Intentional Interference with Prospective Contract Claim**

Defendants argue that Plaintiffs have not stated a claim for tortious interference with prospective contractual relations because they failed to identify any contract or opportunity that had a reasonable likelihood of coming to fruition. They further argue that Plaintiffs have failed to allege any acts of intentional interference by Defendants. Finally, Defendants argue that Plaintiffs cannot allege lack of privilege because Defendants' actions were taken in course of official investigation of potential rules violations. Plaintiffs contend that their allegations are more than sufficient to apprise Defendants of the nature of their claim.

The elements of tortious interference with prospective contractual relations are: (1) the

20

existence of a prospective contractual relationship between the plaintiff and a third party, (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship, (3) the absence of a privilege or justification for such interference, and (4) actual damages resulting from the defendant's conduct.  Foster v. UPMC South Side Hosp., 2 A.3d 655, 665 (Pa. Super. 2010).

While Pennsylvania law does not require a plaintiff to identify a specific contract that was lost, a mere hope for employment is not enough. Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc., 1992 WL 97826 at p. *11 (E.D. Pa. 1992) ("The area of prospective relationships is necessarily a murky one."); Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir. 1994) (A prospective contract "is something less than a contractual right, something more than a mere hope"); Brunson Comme'ns, Inc. v. Arbitron Inc., 239 F. Supp. 2d 550, 578 (E.D. Pa. 2002) (same).  There must be a reasonable probability, based on the parties' current dealings, that a contract will arise. Brunson, 239 F. Supp. 2d at 578 (allegations deficient where plaintiffs failed to identify a single prospective customer or plead facts suggesting that any customer was lost).

The Complaint alleges that the coaches had "prospective and existing employment, business, and economic opportunities with many prestigious college and professional football programs, including at Penn State." Compl. ¶ 123. The Complaint further alleges that Defendants knew or should have known of these opportunities and intentionally interfered with them without justification or privilege, causing harm. Id. at ¶ 124. Plaintiffs allegedly suffered damage to their reputations and standing as football coaches and have been unable to secure comparable employment despite qualifications and existence of employers who otherwise would hire them. Id. at ¶¶ 103(b), 128.

Plaintiffs do not allege that any specific prospective contracts would have been consummated but for Defendants' conduct. They do not allege that they were applying for jobs, interviewing, or even job searching. They merely allege that based on their reputations they expected open doors with college and professional football programs. Such a general expectation is not equivalent to a specific contract being contemplated but is more akin to a "mere hope." The allegations here are general and speculative like those held deficient in Advanced Power Systems, Inc., where the plaintiff averred that because the defendant had plaintiff's trade secrets it would have the ability to undercut plaintiff's sales. There, as here, Plaintiffs have not pled facts supporting an inference that actual contracts were probably forthcoming.

The allegations as to the remaining elements of the claim, although sparse on facts, are sufficient. Intent to cause a result may be inferred from circumstances indicating the result is substantially certain to occur. See BTZ, Inc. v. Grove, 803 F. Supp. 1019, 1023-24 (M.D. Pa. 1992). Accepting as true that the Former Coaches were accused of ignoring child sexual abuse, they were substantially certain to be less attractive job candidates, were an employer to contemplate hiring them. Absence of privilege is also sufficiently pled by the allegations that the NCAA violated its own rules for an improper purpose.

The Demurrer to Count III is SUSTAINED without prejudice. Plaintiffs may file an Amended Complaint that provides factual allegations supporting their claims of lost opportunities or contracts.

## Demurrer to Civil Conspiracy Claim

Defendants argue that the conspiracy claim fails because Plaintiffs do not allege that the NCAA and the Freeh firm "combined for an unlawful purpose." Specifically, Defendants argue that Plaintiffs do not plead facts, beyond generic allegations of coordination and communication,

22

showing that the NCAA and the Freeh firm acted in concert. Defendants further argue that the only unlawful purpose Plaintiffs allege is breach of contract, which cannot form the basis for a civil conspiracy claim. Plaintiffs respond that their allegations that Defendants and the Freeh firm acted in concert and beyond their lawful authority to substantially harm others for their own benefit are sufficient to state a claim for conspiracy.

The elements of civil conspiracy are: (1) a combination of persons with purpose to do an unlawful act or a lawful act by unlawful means; (2) an overt act in furtherance of the purpose; and (3) actual legal damage. Strickland v. University of Scranton, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997). Although typically based on tort, civil conspiracy cases have been recognized in Pennsylvania based on breach of contract. See, e.g., Fife v. Great Atl. & Pac. Tea. Co., 356 Pa. 265, 266, 52 A.2d 24, 32 (1947); Commonwealth v. Musser Forests, Inc., 394 Pa. 205, 207, 146 A.2d 714, 715 (1958).

The Complaint alleges that the NCAA collaborated with the Freeh firm to breach contractual obligations owed to Plaintiffs. Compl. ¶¶ 54, 148. Specifically, over the course of the Freeh firm's investigation, the firm provided frequent briefings to the NCAA, contacted NCAA representatives to discuss areas of inquiry and strategies, and cooperated with the NCAA. Id. at ¶ 150. The Complaint alleges that Defendant took these actions to purposefully injure Plaintiffs to deprive them of their procedural rights, or at least acted in reckless disregard of substantially certain injury to Plaintiffs, with no legitimate purpose. Numerous overt acts are alleged in the Complaint, including working together to prepare a false report and threatening to impose the "death penalty" when the remedy was not authorized in order to extort silence from President Erickson. Id. at ¶ 151(a) through (f).

23

Accepting the allegations of the Complaint as true, Plaintiffs have alleged that Defendants and the Freeh Firm acted together to commit overt acts in furtherance of their improper purpose to harm Plaintiffs, causing damage. Plaintiffs' general allegations of meetings between the alleged co-conspirators are sufficient, as Pennsylvania law does not require a plaintiff to plead dates, locations, or other specific details in order to state a civil conspiracy claim. Pappert v. TAP Pharmaceutical Prods., Inc., 885 A.2d 1127, 1141 (Pa. Commw. Ct. 2005). Plaintiffs' allegations that Defendants and the Freeh firm recklessly disregarded Plaintiffs' procedural rights in imposing sanctions in a criminal matter unrelated to recruiting and athletic competition, accepted the flawed Freeh report knowing it was not the result of a reliable investigation, and falsely accused Plaintiffs of enabling and causing child sex abuse are sufficient to allege malice. Reading Radio, Inc. v. Fink, 833 A.2d 199, 213 (Pa. Super. Ct. 2003) (malice can be shown by reckless disregard of plaintiff's rights). Thus, the Court cannot say that no recovery is possible on Plaintiffs' civil conspiracy claim.

The Demurrer to Count V is OVERRULED.

## ORDER

AND NOW, this 6 day of ~~December~~ January 2013, 2014, upon consideration of Defendant's Preliminary Objections, the Objections are SUSTAINED in part and OVERRULED in part, as follows:

(1) The Preliminary Objections based on failure to join an indispensable party and impertinent material are SUSTAINED with respect to Counts I and II for Breach of Contract. Plaintiffs are granted leave to file an Amended Complaint that cures the

24

jurisdictional defect by joining the Pennsylvania State University as a party to this action.

(2) No decision is made on the Preliminary Objection based on standing.

(3) The Demurrer to Count III for Intentional Interference with Prospective Contractual Relations is SUSTAINED without prejudice.

(4) The Demurrer to Count V for Defamation is SUSTAINED, except as to the defamation claims asserted by Trustee Clemens and the Former Coaches, as to which it is OVERRULED.

(5) The Demurrers to Count IV for Commercial Disparagement and Count VI for Civil Conspiracy are OVERRULED.

Plaintiffs shall have 30 days from the date of this Opinion and Order to file an Amended Complaint.


BY THE COURT:

John B. Leete, Senior Judge

25

# EXHIBIT 2

## IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA

GEORGE SCOTT PATERNO, as duly appointed representative of the ESTATE and FAMILY of JOSEPH PATERNO;

RYAN McCOMBIE, ANTHONY LUBRANO, AL CLEMENS, and ADAM TALIAFERRO, members of the Board of Trustees of Pennsylvania State University;

PETER BORDI, TERRY ENGELDER, SPENCER NILES, and JOHN O'DONNELL, members of the faculty of Pennsylvania State University;

WILLIAM KENNY and JOSEPH V. ("JAY") PATERNO, former football coaches at Pennsylvania State University; and

ANTHONY ADAMS, GERALD CADOGAN, SHAMAR FINNEY, JUSTIN KURPEIKIS, RICHARD GARDNER, JOSH GAINES, PATRICK MAUTI, ANWAR PHILLIPS, and MICHAEL ROBINSON, former football players of Pennsylvania State University,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("NCAA");

MARK EMMERT, individually and as President of the NCAA; and

EDWARD RAY, individually and as former Chairman of the Executive Committee of the NCAA,

Defendants,

and

THE PENNSYLVANIA STATE UNIVERSITY,

Nominal Defendants.

CIVIL DIVISION

Docket No. 2013-2082

2014 SEP 11 PM 2: 12

DEBRA C. IMMEL
PROTHONOTARY
CENTRE COUNTY PA

# OPINION AND ORDER

Presently before the Court are Preliminary Objections filed by Defendants National Collegiate Athletic Association (hereinafter "NCAA") and Nominal Defendants The Pennsylvania State University (hereinafter "Penn State") to Plaintiff's First Amended Complaint.  Also before the Court are Discovery Objections filed by Penn State, including a disputed provision of an otherwise stipulated Joint Motion for a protective Order.  A hearing on all relevant issues was conducted and all parties have submitted briefs. In response, the Court issues the following Opinion and Order.

## Background

A detailed background of this case was discussed in this Court's Opinion & Order of January 6, 2014 (docketed on January 7, 2014, hereinafter "January 7 Order"). To briefly summarize, the genesis of this case was sanctions imposed on Penn State by the NCAA and the language of the publically released Consent Decree entered into between NCAA and Penn State that accompanied said sanctions.

Plaintiff's original Complaint, filed May 30, 2013, did not include Penn State as a Defendant, which was joined as a nominal Defendant subsequent to the January 7 Order. After joining Penn State as nominal a Defendant, Plaintiffs filed their Amended Complaint on February 5, 2014.  Count I of the Amended Complaint alleged Breach of Contract for Plaintiffs The Estate and Family of Joe Paterno on Behalf of Joe Paterno and Al Clemens, based on their status as third part beneficiaries between the Membership Agreement between Penn State and NCAA.

2

Count II alleges Intentional Interference With Contractual Relations for Plaintiffs William Kenny and Jay Paterno. Count III asserts a claim for Injurious Falsehood/ Commercial Disparagement for Plaintiffs The Estate and Family of Joe Paterno on behalf of Joe Paterno. Count IV alleges Defamation for Plaintiffs William Kenney, Jay Paterno, and Al Clemens. Finally, Count V asserts a claim for Civil Conspiracy for All Plaintiffs.

On March 17, 2014, NCAA filed the instant Preliminary Objections to the Amended Complaint, pursuant to Pa.R.Civ.P. 1028, asserting: (1) Incapacity to Bring Count I; (2) Impertinent Material and Demurrer to Count I; (3) Incapacity to Bring Count I and Demurrer to Count I; (4) Demurrer to Count II; (5) Demurrer to Count V; (6) Demurrer to Count IV; (7) Demurrer to Count III; (8) Failure of a Pleading to Confirm to Law or Rule of Court; and (9) Lack of Personal Jurisdiction Over Dr. Emmert and Dr. Ray.

On March 17, 2014, Penn State also filed its Preliminary Objections to the Amended Complaint, pursuant to Pa.R.Civ.P. 1028, asserting: (1) Insufficient Specificity With Respect To Counts, Plaintiffs, Relief Sought for All Counts and All Plaintiffs; (2) Demurrer For Lack of Standing to Count I for Plaintiff Al Clemens; (3) Lack of Capacity to Sue for Count I for Plaintiff George Scott Paterno As Representative Of "The Family Of Joseph Paterno"; (4) Demurrer – Alleged Intended Third-Party Beneficiary Status for Count I for Plaintiffs Al Clemens, George Scott Paterno As The Representative of the Estate of Joe Paterno, and George Scott Paterno as the Representative of the "Family of Joe Paterno"; (5) Demurrer For Failure to Allege A Breach Of Contract to Count I for Plaintiffs The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens; (6) Insufficient Specificity

3

Alleged Intended Third-Party Beneficiary Status for Count I for Plaintiffs The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens; (7) Demurrer For Failure To Allege Elements of Civil Conspiracy Against Penn State for Count V for All Plaintiffs; (8) Failure To Comply With Law Or Rule Of Court – No Verification to All Counts for All Plaintiffs; and (9) Failure To Comply With Law Or Rule Of Court – No Notice To Defend Or Plead to All Counts for All Plaintiffs.

The Discovery requests at issue originate from Plaintiff's Notice of Intent to Serve a Subpoena to Pepper Hamilton LLP To Produce Documents Pursuant to Rule 4009.21, filed on February 25, 2014. On March 14, 2014, Penn State filed Objections to the Discovery Request claiming: (1) Attorney-Client/Work Product/Self-Examination Privileges and Limited Waiver; (2) Relevance; (3) FERPA & CHRIA Protections; (4) Criminal Investigation; (5) Speculation as to an Opinion; (6) Vague, Overbroad, and Unduly Burdensome; (7) Costly, Time Consuming, and Excessively Burdensome; (8) Documents already in the Public Domain; (9) Invasive of Confidentiality Duties; Irrelevant in Time; (10) Overbroad and Irrelevant; (11) Standing with respect to "The Paterno Family"; (12) Entry of a Protective Order; and (13) A Missing Letter referenced in Request No. 3.

## Preliminary Objections Discussion

For purposes of deciding the Preliminary Objections, "[a]ll material facts set forth in the pleadings as well as all inferences reasonably deducible therefrom are admitted as true". *Foflygen v. R. Zemel, M.D. (PC)*, 420 Pa. Super. 18, 32, 615 A.2d 1345, 1352 (1992).

4

<u>NCAA: Incapacity to Bring Count I</u>

NCAA alleges that neither the Estate of Joseph Paterno nor Al Clemens are parties to the Consent Decree, nor are they intended third-party beneficiaries, and as a result they do not have standing to seek to void the Consent Decree. It is true that neither of these Plaintiffs were parties to the Consent Decree, nor were they intended third party beneficiaries, and Plaintiffs state in their brief that they never claimed to be. Instead, Plaintiffs aver that the Consent Decree was imposed through an unlawful and unauthorized exercise of the NCAA's enforcement authority, therefore the Consent Decree is void, not simply voidable. Contracts that "are absolutely void, because they have no legal sanction,...establish no legitimate bond or relation between the parties, and even a stranger may raise the objection." *Pearsoll v. Chapin*, 44 Pa. 9, 15 (1862).

Under *Foflygen, supra*, the Court must accept that the Plaintiffs averment that the Consent Decree was imposed through an illegal and unauthorized exercise of the NCAA's authority is true for the instant Motion, making the Consent Decree void. As a result, under *Pearsoll*, Plaintiffs have standing to challenge the Consent Decree.

It is also worth noting that this case is unique. What distinguishes it from a typical third-party contract challenge is the basis of the alleged harm. The alleged harm does not come from an action, duty, or relationship resulting from the Consent Decree, but instead is derived from the language in the document itself.

5

The Court finds this distinguishing characteristic alone also warrants Plaintiffs'
standing to challenge the Consent Decree.

### Impertinent Material and Demurrer to Count I

NCAA correctly states that under Pennsylvania law, voiding a contract[1] is
traditionally limited to instances "such as fraud, mistake, or illegality," *In re Frey's
Estate*, 223 Pa. 61, 65, 72 A. 317, 318 (1909), or in cases in which a party enters
into a contract under extreme duress. *See Sheppard v Frank & Seder Inc.,* 307 Pa.
372, 161 A. 304 (1932).

Plaintiffs allege that Penn State entered the Consent Decree under extreme
duress, and as a result, the Consent Decree can be void *ab initio*. NCAA counter-
argues, stating that although Penn State may have been under some form of
duress, the degree of duress did not rise to the benchmark level of "'extreme' and
of a 'forcible or terrorizing character'" required under *Sheppard* to support voiding
the Consent Decree.

Whether or not Penn State was under ordinary duress, extreme duress, or
any duress at all, is not a question for this Court; instead it falls to the factfinder.

> Whether [a] situation and all the attending circumstances
> were sufficient to establish duress to such extent as to induce
> [a person] to sign [a document] is a question which should be
> submitted to a jury.

*Sheppard, supra* at 376, citing *Fountain v. Bigham*, 235 Pa. 35, 48, 84 A. 131, Ann.
Cas. 1913D, 1185; *Hogarth v. Grundy & Co.*, 256 Pa. 451, 461, 100 A. 1001.

---

[1] or in this case, a Consent Decree.

6

### NCAA: Incapacity to Bring Count I and Demurrer to Count I

NCAA alleges that neither the Estate of Joseph Paterno nor Al Clemens are parties to the NCAA Constitution or Bylaws, nor are they third-party beneficiaries of said documents; therefore, they are not parties to any alleged breach of contract based on them. The Estate of Joseph Paterno and Al Clemens claim they are third-party beneficiaries based on their status as "involved individuals" under NCAA Bylaws article 32.1.5, and as a result, they were entitled to certain procedural mechanisms in connection with the NCAA's and Penn State's entrance into the Consent Decree.

NCAA argues that Plaintiffs' claim is flawed for two reasons. First, any status Plaintiffs may have had under the Constitution and Bylaws is moot, as the purpose behind the Consent Decree, *inter alia*, was to permit Penn State to resolve the Sandusky matter without enduring a full NCAA investigation and enforcement process. Second, NCAA Bylaws define the term "involved individual" to mean,

> ...former or current student-athletes and former or current institutional staff members who have received notice of significant involvement in alleged violations through the notice of allegations or summary disposition process...

and Plaintiffs concede that they never received such notice from the NCAA.

To claim that Plaintiffs do not have standing to bring suit against NCAA for not following their own rules *because* NCAA did not follow their own rules is circuitous logic, which the Court finds to be contrary to the interest of justice.

7

Estate of Joseph Paterno

NCAA argues that Coach Joe Paterno was not an "involved individual" prior to or at the time of his death in January 2012, and the procedural rights extended to "involved individuals"—such as notice, the opportunity to attend hearings, and the chance to submit written information to assist the NCAA in its investigation—unambiguously and self-evidently contemplate only living individuals. It was therefore impossible for NCAA to deny these rights to Coach Paterno.

Plaintiffs recognize this fact by stating, "[t]o be sure, the rules may have been fashioned with a living, participating individual in mind; but that is not a requirement." Defendants argue that because that is how the rules were fashioned, that was everyone's understanding, and Plaintiff's shouldn't be allowed to argue otherwise now.  The Court agrees.

As Coach Joe Paterno was not an involved individual prior to his death, and he cannot, as a matter of law, be an "involved individual" after his death, he had no rights as an "involved individual" at any time, and as a result, his estate has no rights as an "involved individual" now.


Al Clemens

NCAA goes on to claim that Clemens cannot be an "involved individual" as his basis for asserting said status is based on his being a member of the Penn State Board of Trustees.  NCAA alleges that Clemens is claiming "involved individual" status by suggesting that the NCAA improperly repeated a conclusion in the Freeh Report that "the Board of Trustees ... did not perform its oversight duties."  NCAA argues that NCAA Rules refers only to an individual who is significantly involved in

8

violations of NCAA rules, not a corporate body like the Board of Trustees, and the Consent Decree makes no claim that Clemens—or any particular individual from the Board of Trustees—was significantly involved in NCAA violations.  NCAA further argues that even if a corporate body could assert rights as an "involved individual" on the basis of the Consent Decree, it could only be the Board of Trustees—the entity named in the Consent Decree—not Clemens, and the Board of Trustees, as a body, has not sought to challenge the conclusions in the Freeh report.

Plaintiffs counter-argue stating NCAA Defendants recognize that the definition of an "involved individual" is related to whether the Consent Decree sufficiently identifies plaintiffs. Therefore, whether or not Clemens is an "involved individual" hinges on whether or not he is identifiable by the NCAA statements. This issue has been addressed in the January 7 Order with respect to Count IV (Defamation).  Specifically, this Court Overruled Objections that alleged NCAA statements could not be interpreted as referring to Clemens, and that it would be for a jury to decide that question.


### NCAA: Demurrer to Count II

NCAA alleges that Plaintiffs Jay Paterno and William Kenney's tortious interference claim must be dismissed because it is entirely derivative of their defamation claim based on statements in the Consent Decree, and as a result, Plaintiffs are seeking double-recovery for the same allegedly tortious conduct, which the law does not permit.

9

NCAA also argues that Plaintiffs failed to cure the pleading deficiencies that led the Court to dismiss the tortious interference claim in its January 7 Order. Specifically, NCAA claims that Plaintiffs pleaded no facts which would support a finding that there existed a reasonable probability that a contract would arise with which Defendants interfered.

With respect to NCAA's argument that Plaintiffs are barred from "seeking double-recovery", Plaintiffs correctly counter-argue that Pennsylvania courts have recognized that defamatory statements can provide the basis for a tortious interference claim. *See Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 935-36 (Pa. Super. Ct. 2013); *see also*, e.g., *Kiely v. Univ. of Pittsburgh Med. Ctr.*, No. 98-1536, 2000 WL 262580, at *3-5, *11 (W.D. Pa. Jan. 20, 2000) ("unfounded and unsubstantiated" accusations made by the defendants formed the basis for both defamation and tortious interference claims); *Geyer v. Steinbronn*, 351 Pa. Super. 536, 550-54, 506 A.2d 901, 908-10 (1986) (defamatory statements made to prospective employer gave rise to both defamation and tortious interference claims).

Regarding the curing of deficiencies from their original Complaint, in their First Amended Complaint, Plaintiffs now allege: Kenney interviewed with such teams as the University of Massachusetts, the New York Giants, and the Indianapolis Colts, and those teams hired "less experienced and less qualified candidates." Jay Paterno alleged to have applied with University of Connecticut and James Madison where the position went to candidates with less coaching experience, and he also applied at University of Colorado and Boston College where he was not granted an interview. Jay Paterno also mentioned negotiations and

10

tentative arrangements with media companies, such as ESPN, CBS, and FOX Sports, serving as a football commentator. The Court finds that Plaintiffs have cured the Deficiencies of the original Complaint by pleading sufficient facts to proceed with this claim.

### NCAA: Demurrer to Count V

In Pennsylvania, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Goldstein v. Phillip Morris, Inc.*, 2004 PA Super 260, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (citing *McKeeman v. Corestates Bank, N.A.*, 2000 PA Super 117, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)).  Under *Goldstein*, civil conspiracy without an underlying cause of action is a legal impossibility.

In Plaintiffs' Amended Complaint, only the Estate of Joseph Paterno, Jay Paterno, Al Clemens, and William Kenney have alleged a cause of action in addition to Civil Conspiracy. Because the remaining plaintiffs have not alleged any cause of action (other than the civil conspiracy), there is no act upon which they could have conspired to commit. Therefore, these plaintiffs' Civil Conspiracy claim fails, as a matter of law. Further, since the remaining plaintiffs claim for Civil Conspiracy cannot succeed, and these plaintiffs have alleged no other claims, they have no standing in this case and shall be dismissed from this action.

### NCAA: Demurrer to Count IV

NCAA alleges three reasons why this Count should be dismissed:

11

1. The alleged statements made by NCAA in the Consent Decree do not mention plaintiffs by name, nor could they be reasonably be interpreted as referring to them;

2. Plaintiffs have not pleaded that Defendant acted with malice or reckless disregard for the truth; and

3. the Statements about which Plaintiffs complain are pure opinions, premised upon disclosed facts.  As such they are protected expressions, under *Alston v. PW-Philadelphia Weekly*, 980 A.2d 215, 220 (Pa. Commw. Ct. 2009), and cannot be defamatory as a matter of law.

This Objection was already ruled upon in the January 7th Opinion and Order, and NCAA has offered no new argument to justify the Court revisiting its decision with respect to reasons 1 and 2.

With respect to reason 3, the Pennsylvania Commonwealth Court has explained that "'when the maker of a comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiffs conduct,' that statement is 'protected as a pure expression of opinion.'" *Alston, supra* at 220-21. NCAA argues that the statements at issue are opinions based on published fact, and are thus protected. They bolster their argument with a statement made by Plaintiff Jay Paterno, to wit, he states in a media interview that the Freeh Report's conclusions were "basically an opinion."

12

The Court recognizes that Jay Paterno's statement was an attempt to mitigate a perceived damage to his reputation and that of his family name.[2] Consequently, any statements he may have made to the media have no legal effect in determining whether or not the statements were actually opinions.

Further, Plaintiffs argue that this Court, in its January 7 Order, characterized the statements as conclusions, not opinions; therefore *Alston* does not apply. The Court reasserts its characterization of the Consent Decree statements as conclusions, which by definition is "a judgment or decision reached by reasoning." http://www.oxforddictionaries.com/us/definition/american_english/conclusion. In making this determination, the Court looked at the language of the Consent Decree.

In their Amended Complaint, Plaintiffs allege the following statements form the basis of their Defamation Claim:

> [The Board of Trustees] did not perform its oversight duties...[and]...failed in its duties to oversee the President and senior University officials in 1998 and 2001 by not inquiring about important University matters and my not creating an environment where senior University officials felt accountable;

and

> [s]ome coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him.

These statements are contained in the Consent Decree under the Findings And Conclusions sections of the document. At no point does the Consent Decree state that these statements are opinions of NCAA or Penn State. On the contrary, key

---

[2] The Court makes no determination as to whether or not any damage actually occurred, as such a determination is for a jury to decide.

language of the Findings And Conclusions introductory paragraph state, "Penn State has communicated to the NCAA that it accepts the findings of the Freeh Report...", and more definitively "...the findings of the Criminal Jury and the Freeh Report establish a factual basis from which the NCAA concludes that Penn State breached the standards..."

Because the statements at issue are conclusions, as opposed to opinions, *Alston* does not apply; therefore, they are not protected.

### NCAA: Demurrer to Count III

NCAA alleges two reasons why this Count should be dismissed:

1. the claim for disparagement is not actionable because all of the underlying facts upon which the opinions are premised were disclosed to the public through the Freeh Report; and

2. an estate cannot bring a survival action for tort liability that accrues after the decedent's death.

This Objection was already ruled upon in the January 7th Opinion and Order, and NCAA has offered no new argument to justify the Court revisiting its decision.

### NCAA: Failure of a Pleading to Confirm to Law or Rule of Court

NCAA alleges that Plaintiffs' Amended Complaint has not been verified. This procedural defect has been cured, rendering this Objection moot.

14

<u>NCAA Lack of Personal Jurisdiction Over Dr. Emmert and Dr. Ray.</u>

As per the Court's, August 16, 2013 Order, this issue has been set aside from the remaining issues, and the Court will set a separate schedule for the objections relating to personal jurisdiction as necessary.

<u>Penn State: Insufficient Specificity With Respect To Counts, Plaintiffs, Relief Sought<br>for All Counts and All Plaintiffs</u>

Penn State correctly alleges that Plaintiffs have not sought relief for each Count listed in the Amended Complaint, instead, Plaintiffs are seeking relief for the Complaint in its entirety. Penn State claims that it is unable to determine which counts of the First Amended Complaint are being directed against it, what actions (or inactions) Penn State is alleged to have committed to support each count, and what relief is being sought in connection with those counts. As a result, Penn State is unable to prepare for its defense. Plaintiffs respond that the Amended Complaint is clear that "no relief is sought against the University, and Penn State has no standing to press objections on the NCAA defendants' behalf."

Plaintiffs' claim that no relief is being sought against Penn State is incorrect. The Amended Complaint contains two paragraphs that describe the relief they are seeking. Paragraph 168 purports to seek relief solely from NCAA, and paragraph 169 seeks relief from NCAA *and* Penn State. Further, ¶ 168 requests the issuance of an injunction to prevent NCAA from further enforcing the Consent Decree to which Penn State is a party—a course of action which presumably Penn State does not wish to pursue.

"The purpose of the pleadings is to place a defendant on notice of the claims upon which he will have to defend." *City of New Castle v. Uzamere*, 829 A.2d 763,

15

767 (Pa. Commw. Ct. 2003). The Court finds that the pleadings are insufficient to put Penn State on notice of the claims upon which they will have to defend. Plaintiffs will need to file a Second Amended Complaint alleging the actions of each defendant giving rise to each count along with the corresponding relief requested.

### Penn State: Demurrer For Lack of Standing to Count I for Plaintiff Al Clemens

This Objection is identical to NCAA's objection *Incapacity to Bring Count I and Demurrer to Count I, supra*.

### Penn State: Lack of Capacity to Sue for Count I for Plaintiff George Scott Paterno As Representative Of "The Family Of Joseph Paterno"

This Objection was stipulated to at the hearing. It was agreed that "The Family of Joseph Paterno" does not have any legal standing in Pennsylvania. The phrase "George Scott Paterno, as duly appointed representative of the Estate and Family of Joseph Paterno" will be replaced with "The Estate of Joseph Paterno" in the caption of this case.

### Penn State: Demurrer – Alleged Intended Third-Party Beneficiary Status for Count I for Plaintiffs Al Clemens, George Scott Paterno As The Representative of the Estate of Joe Paterno, and George Scott Paterno as the Representative of the "Family of Joe Paterno"

This Objection is identical to NCAA's objection *Incapacity to Bring Count I and Demurrer to Count I, supra*.

### Penn State: Demurrer For Failure to Allege A Breach Of Contract to Count I for Plaintiffs The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens

PSU argues that the Amended Complaint is devoid of allegations that Penn State breached the NCAA's Constitution, the NCAA's Operating Bylaws, or the

16

NCAA's Administrative Bylaws.  This objections can properly be categorized as a "subset" of the overall objection to lack of specificity for all counts. Plaintiffs will have the opportunity to cure this defect by submitting a Second Amended Complaint.

### Penn State: Insufficient Specificity Alleged Intended Third-Party Beneficiary Status for Count I for Plaintiffs The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens

PSU alleges that although Plaintiff's claim they have the right to "enforce the provisions of" the NCAA's Constitution and Bylaws, they do not identify:

1. what particular rights any of these plaintiffs purportedly acquired under this alleged contract;

2. how Penn State allegedly violated those claimed contractual rights; or

3. how any of the plaintiffs claim to have been injured by Penn State's alleged breach(es) of said contract.

This objection can properly be categorized as a "subset" of the overall objection to lack of specificity for all counts. Plaintiffs will have the opportunity to cure this defect by submitting a Second Amended Complaint.

### Penn State: Demurrer For Failure To Allege Elements of Civil Conspiracy Against Penn State for Count V for All Plaintiffs

PSU claims Plaintiffs do not allege that Penn State combined with any other defendant acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose.  Nor do they allege either that Penn State took any overt act in pursuit of any alleged common purpose or that any of

17

the Plaintiffs suffered actual legal damage as the result of any conspiratorial conduct by Penn State.

This objection can properly be categorized as a "subset" of the overall objection to lack of specificity for all counts. Plaintiffs will have the opportunity to cure this defect by submitting a Second Amended Complaint.

### Penn State: Failure To Comply With Law Or Rule Of Court – No Verification to All Counts for All Plaintiffs

This Objection is identical to NCAA's objection *NCAA: Failure of a Pleading to Confirm to Law or Rule of Court, supra.*

### Penn State: Failure To Comply With Law Or Rule Of Court – No Notice To Defend Or Plead to All Counts for All Plaintiffs.

Penn State alleges that Plaintiffs' Amended Complaint failed to contain a notice to defend or a notice to plead, as required by rule 1018.1(a) or Rule 1026(a). Because Penn State has responded to Plaintiffs' Amended Complaint, this Objection is moot.

## Discovery Discussion

The Court notes that originally Plaintiffs filed a Notice of Intent to Serve a Subpoena to Pepper Hamilton, LLP., as the keeper of the source documents[3];

---

[3] Source documents are the documents that the Freeh firm gathered from University servers and University custodians such as emails and other documents not created

18

however, during testimony, it was revealed that Pepper Hamilton no longer possess

the database on which the source documents are stored, but rather, it is

Defendants Penn State which now possesses the database at issue.

### Attorney-Client / Work Product / Self-Examination Privileges and Limited Waiver

Penn State alleges that,

> [a]lthough Penn State directed that the Freeh Report be made
> public, beyond the public disclosure of that Report, Penn State
> did not waive, and hereby asserts, the attorney-client
> privilege, the work product doctrine, the self-examination
> privilege and all other privileges or immunities from discovery,
> relating to the Investigation and the Freeh Report.

In essence, Penn State is alleging "limited waiver" objection to the documents

sought, claiming that only the publicly released findings contained in the publically

released Freeh Report have been waived.

Plaintiffs counter argue that Penn State waived Attorney-Client in its entirety;

Penn State cannot assert work-product on Pepper Hamilton's behalf and work-

product does not apply, as the documents at issue were not prepared in

anticipation of litigation; and Pennsylvania does not recognize a self-examination

privilege.

### Attorney-Client

> The generally recited requirements for assertion of the
> attorney-client privilege are: 1) The asserted holder of the
> privilege is or sought to become a client. 2) The person to
> whom the communication was made is a member of the bar of
> a court, or his subordinate. 3) The communication relates to a

---

specifically for the Investigation.  Non-source documents are communications, interview
notes, internal memoranda, etc. created for and during the course of the investigation.

fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort. 4) The privilege has been claimed and is not waived by the client.

*Com. v. Mrozek*, 441 Pa. Super. 425, 428, 657 A.2d 997, 998 (1995).

Under *Mrozek*, an essential element of an attorney-client privileged document is that the document must relate to "securing either an opinion of law, legal services or assistance in a legal matter." The Engagement Letter between Penn State and the Freeh Firm states that the <u>Scope of Engagement</u> is as follows:

FSS has been engaged to serve as independent, external legal counsel to the Task Force to perform an independent, full and complete investigation of the recently publicized allegations of sexual abuse at the facilities and the alleged failure of The Pennsylvania State University ("PSU") personnel to report such sexual abuse to appropriate police and government authorities. The results of FSS's investigation will be provided in a written report to the Task Force and other parties as so directed by the Task Force. The report will contain FSS's findings concerning: i) failures that occurred in the reporting process; ii) the cause for those failures; iii) who had knowledge of the allegations of sexual abuse; and iv) how those allegations were handled by the Trustees, PSU administrators, coaches and other staff. FSS's report also will provide recommendations to the Task Force and Trustees for actions to be taken to attempt to ensure that those and similar failures do not occur again.

At no point does the scope mention a purpose of securing either an opinion of law, legal services, or assistance in a legal matter. Further, section 5 (<u>Retention of Third Parties</u>), paragraph 2 of the engagement letter states,

For the purpose of providing legal services to the Task Force, FSS will retain Freeh Group International Solutions, LLC ("FGIS") to assist in this engagement. It should be noted that Louis J. Freeh is a partner and member in FSS and FGIS, respectively, and has a controlling interest in both. FSS is a

20

law firm and FGIS is a separate investigative and consulting group.

It therefore becomes clear that communications between Penn State and the Freeh Firm were not sought pursuant to seeking legal services; as such they are not subject to the attorney client privilege.  As a result, any source documents Penn State turned over to the Freeh Firm for the purpose of conducting the investigation are not privileged. Likewise, any non-source documents created by either Penn State or the Freeh Firm is non privileged.

However, since Freeh Group International was providing legal services to Penn State, communications between Penn State and the Freeh Group International may be subject to attorney-client privilege.  As such, any non-source documents created by the Freeh Group International may be privileged, and any non-source documents created by Penn State communicated to the Freeh Group International may also privileged, but that privilege may have been waived.

A client disclosing protected communications to a third party has long been considered inconsistent with an assertion of the privilege. *See Serrano v. Chesapeake Appalachia*, LLC, 298 F.R.D. 271 (W.D. Pa. 2014). Plaintiffs note that the Freeh Firm was communicating with third parties during the investigation—specifically, The Big Ten Athletic Conference and the NCAA.  It is unquestioned that under *Serrano*, with respect to all documents—source and non-source—that were shared with the Big Ten or NCAA, the attorney-client privilege (if it ever existed) was waived.

Further, the scope of an attorney-client privilege waiver applies to the subject matter of the privileged documents disclosed.  Therefore, voluntary

21

disclosure waives the privilege as to remaining documents of that same subject matter. *See Murray v. Gemplus Int'l, S.A.*, 217 F.R.D. 362, 367 (E.D. Pa. 2003) *citing Edwards v. Whitaker*, 868 F. Supp. 226, 229 (M.D. Tenn. 1994); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990). It then falls to the Court to decide how broadly subject matter classifications should be defined.  The Court holds the divisions outlined in the Scope of Engagement are appropriate for categorizing subject matters:

    i)      failures that occurred in the reporting process;

    ii)     the cause for those failures;

    iii)    who had knowledge of the allegations of sexual abuse; and

    iv)    how those allegations were handled by the Trustees, PSU administrators, coaches and other staff

As such, any documents shared with the Big Ten or NCAA regarding any of the aforementioned categories would constitute a subject-matter waiver.


Work Product

       Unlike the attorney-client privilege, which belongs to the client to assert, the work product doctrine is asserted by the attorney. *Rhone-Poulenc Rorer, Inc. v. Home Inc/em. Co.*, 32 F.3d 851, 866 (3d Cir. 1994). Further, the purpose of work product is to allow an attorney to develop his/her mental impressions, conclusions, and opinions in preparation for trial. However, in Pennsylvania, the work product protection is not available unless the requests are made in connection with the litigation for which the material was prepared. *See Graziani v. OneBeacon Ins. Inc.*, 2 Pa. D. & C.5th 242, 249 (C.C.P. 2007).

Since Penn State does not have standing to object based on the privilege of work product, and the Scope of Engagement did not contemplate legal advice or legal services in conjunction with the case at bar, the Work Product doctrine does not apply.

Self-Examination

Pennsylvania Law does not recognize a Self-Examination Privilege. Penn State cites *Van Hine v. Dep't of State of Com.*, 856 A.2d 204, 212 (Pa. Commw. Ct. 2004) for the proposition that Pennsylvania may allow for such a Privilege, based on the Commonwealth Court's hypothetical existence of such a privilege in that opinion; however, this is misplaced. *Van Hine*'s use of the hypothetical existence of the privilege is for illustrative purposes only, and the Court goes on to emphasize that no such privilege actually exists.

Relevance

Penn State claims that the Freeh Firm collected over 3.5 million source documents, and only a small percentage of those documents would have any relevance. Further, it is not feasible for Penn State to review the vast number of documents to comply with the subpoena requests and or check for any privileges.

At the hearing, it was determined that search terms could be provided to narrow the 3.5 million documents down to a reasonable number. The question remained whether it would fall to Plaintiffs to provide the search terms to Penn State to perform the search, or whether Penn State should turn over the database to Plaintiffs to allow Plaintiffs to run their own search. The Court holds the former

23

is the correct procedure.  This would allow Penn State to screen for and produce a privilege log prior to exposing privileged documents to plaintiffs.

<u>FERPA & CHRIA Protections</u>

Penn State claims that Freeh Firm may have gained access to documents and records protected from disclosure and dissemination pursuant to the Family Educational Rights and Privacy Act ("FERPA") and the Criminal History Record Information Act. ("CHRIA").

<u>FERPA</u>

There is no evidentiary privilege created by FERPA. *T.M. v. Elwyn, Inc.* 950 A.2d 1050, 1061 (Pa. Super. 2008).

<u>CHRIA</u>

Investigative and treatment information shall not be disseminated to any department, agency or individual unless the department, agency or individual requesting the information is a criminal justice agency which requests the information in connection with its duties, and the request is based upon a name, fingerprints, modus operandi, genetic typing, voice print or other identifying characteristic."

18 Pa.C.S.A. § 9106(c)(4) (part of CHRIA)

CHRIA shall apply to "persons within this Commonwealth and to any agency of the Commonwealth or its political subdivisions which collects, maintains, disseminates or receives criminal history record information."

18 Pa.C.S.A. § 9103

'Criminal history record information.' Information collected by criminal justice agencies concerning individuals, and arising from the initiation of a criminal proceeding, consisting of

24

identifiable descriptions, dates and notations of arrests, indictments, informations or other formal criminal charges and any dispositions arising therefrom. The term does not include intelligence information, investigative information or treatment information...

18 Pa.C.S.A. § 9102

Penn State claims that it may have in its possession criminal history information on individuals, and it is prohibited from disseminating that information to persons other than criminal justice agencies under 18 Pa.C.S.A. § 9106(c)(4).

Penn State's reliance on § 9106 is misplaced.  Under § 9103, any privilege that would be created under CHRIA does not apply to any source or non-source documents obtained or created by the Freeh Firm, as the Freeh Firm is not an agency of the Commonwealth or its political subdivision. Further, any source documents turned over to the Freeh Firm from Penn State likewise is not applicable, as Penn State does not collect, maintain, disseminate, or receive criminal history record information—with one possible exception: the Penn State University Police Department.

Of note, the only information that could conceivably be privileged, under § 9102, would be dates and notations of arrests, indictments, informations or other formal criminal charges and any dispositions arising therefrom that were collected by the Penn State University Police Department.  All other investigative information including notes and other documents and confiscated evidence in pursuit of potential future criminal prosecution is expressly not subject to CHRIA.

Therefore, this privilege applies solely to notations of arrests, indictments, informations, or other formal criminal charges and any dispositions arising therefrom that were collected from Penn State University Police.

25

Criminal Investigation

Penn State claims some of the requested documents may relate to ongoing criminal investigations; therefore they object to the production of any such documents without prior notice to and approval from appropriate law enforcement officials.

The engagement letter instructed the Freeh Firm

to communicate regarding its independent investigation performed hereunder with media, police agencies, governmental authorities and agencies, and any other parties, as directed by the Task Force.

According to the plain language of the engagement letter, any information the Freeh Firm shared with police agencies or governmental authorities is to be shared with the media and/or any other parties.  Therefore, these documents are discoverable.

Speculate as to an Opinion

Penn State claims the subpoena requests documents that may "support" or "relate to" an opinion or conclusion expressed by the Freeh Firm, and Penn State is unable to speculate as to the basis of opinions held by others.

Although not expressly stated in their objection, it can be inferred that Penn State is referring to Plaintiff's requests for documents that support or relate to the Freeh Firm's following statements and/or conclusions:

- Joe Paterno failed to protect against a child sexual predator harming children for over a decade.
- The Board of Trustees did not perform oversight duties

26

- The Board of Trustees failed in its duties to oversee the President and senior University officials in 1998 ans 2001 by not inquiring about important University matters and by not creating an environment where senior officials felt accountable
- Joe Paterno, among others, concealed Jerry Sandusky's activities from the Penn State Board of Trustees
- Joe Paterno concealed critical facts regarding Jerry Sandusky from the authorities, the Penn State Board of Trustees, the Penn State community, and the public at large
- at the time of Jerry Sandusky's resignation from the coaching staff at Penn State, Joe Paterno suspected or believed that Sandusky was a sexual predator
- Some coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him
- Descriptions of Timothy Curley as "Joe Paterno's errand boy"
- Joe Paterno, among others, was kept informed of an investigation by Penn State Police and/or the Department of Public Welfare into a possible sexual assault by Jerry Sandusky in the Lasch Building in May 1998
- Joe Paterno knew everything that was going on at the Penn State football facilities, including but not limited to copies of interviews referenced at note 167 of the Freeh Report

The plain language of these requests warrants overruling this objection, as any reasonable person would be able to extrapolate the subject matter from a document and easily determine if it applies to one or several of the aforementioned statements.

However, Penn State's objection has merit with respect to one request. Plaintiffs have also requested "all documents that support any conclusions or recommendations for action reached by the NCAA, Emmert, or Ray as a result of the Freeh investigation, including all notes or records of telephone calls, memos, emails, letters, or other forms of communication." While any reasonable person could easily extrapolate the subject matter from a document relating to any "recommendations for action", asking Penn State to determine which documents "support any conclusions reached by the NCAA, Emmert, or Ray" is too speculative; therefore, this Objection shall be Sustained in Part and Overruled in part.

## Vague, Overbroad, and Unduly Burdensome

Penn State claims that the language in the subpoena "evidence, reflect, or relate to" various subjects is vague, overbroad and unduly burdensome.

Because Penn State objects to turning over the 3.5 million document database over to Plaintiffs to allow them to run their own search terms, they should not be able to object to the burden they will endure by reviewing the documents in responding to the specific requests from the subpoena. In short, Penn State can't have it both ways. As previously discussed, Plaintiffs shall submit their search terms to Penn State to narrow the 3.5 million documents to a feasible number of documents, rendering this Objection moot.

28

### Costly, Time Consuming, and Excessively Burdensome

Penn State claims that the broad nature of the language "evidence, reflect, or relate to", the various topics requested, and the efforts required to separate privileged and otherwise protected documents from non-protected documents would require substantial amounts of time and incur very substantial and unwarranted expenses in order to protect the privileges. The analysis and result of this Objection is identical to the Objection immediately preceding it.

### Public Domain

Penn State claims many documents sought are already in the public domain. The Court holds that the effort required to produce said documents is de minimus.

### Invasive of Confidentiality Duties

Penn State also objects as the requests may be invasive of confidentiality duties that Penn State may owe other third parties, such as employees. However, there is no privilege based on an individual's status as an employee in Pennsylvania.

### Irrelevant in Time

Penn State objects to any documents created after July 23, 2012, as that was the creation of the Consent Decree, which is the subject of the litigation; any documents created after this date would be irrelevant.

Plaintiffs argue that an Amended Consent Decree was adopted after that date; therefore, defendants continued to document and evaluate the matters in the Consent Decree well after the July 23, 2012 date.  Plaintiffs further argue, if the

29

work of the Freeh Firm stopped on July 23, 2012, there will not be responsive documents after that date; if there are responsive documents, they were the result of ongoing work and should be produced. The Court Agrees.

<u>Overbroad and Irrelevant</u>

Penn State claims many of the requests are so broad that they seek documents and information that are neither relevant to the subject matter, nor reasonably calculated to lead to the discovery of admissible evidence.

The only specific Overbroad and Irrelevant objection Penn State made was in response to request number 24—all invoices for services submitted to Penn State pursuant to the Engagement Letter.

The Court holds the invoices may be relevant. Under Attorney-Client Privilege, *supra*, the Court discussed the distinction between the Freeh Firm, responsible for the Investigation, and Freeh Group International Solutions, responsible for legal services—both of which would be invoiced pursuant to the engagement letter. Because documents produced and/or collected by the Freeh Firm are not subject to attorney-client privilege, and documents produced and/or collected by Freeh Group International Solutions may be privileged, albeit possibly waived, the invoices could reasonably be calculated to lead to the discovery of admissible evidence, specifically, the invoices could be used as evidence to distinguish between documents protected by attorney-client privilege and documents which are not privileged.

30

## The Paterno Family

Penn State Objects to the issuance of the subpoena that purports to be on behalf of "the family of Joseph Paterno," as the "family" is not a recognized legal entity with standing to sue.

This issue was dealt with in the Preliminary Objections. All references to "The Family of Joe Paterno" are being replaced with "The Estate of Joeseph Paterno" by stipulation at the hearing.

## Protective Order

Penn State objects to the production of any documents prior to the entry of an appropriate confidentiality stipulation and protective order in this case.

Recently[4], the parties have come close to reaching an agreement on the language of a Protective Order; there is only one provision remaining on which they cannot agree. The provision at issue is as follows:

> **General Protections.** All pre-trial discovery materials in this litigation (including materials that are not designated as constituting Confidential Information or Highly Confidential – Attorneys' Eyes Only Information) shall be used solely for the purpose of preparing and prosecuting the Parties' respective cases, and shall not be used or disclosed for any other purpose. Nothing in this Order, however limits: (i) the Parties' use of materials not designated as Confidential Information or Highly Confidential – Attorney's Eyes Only – Information that the Parties, in good faith, have made part of the judicial record in this case; or (ii) the use of information a Party legitimately obtained through public sources.

Plaintiffs object to this provision claiming that there is a high public interest in this case and the public has a right to any non-confidential information. Plaintiffs

---

[4] As of July 3, 2014

also claim that this provision creates a blanket protective order, and blanket protective orders are disfavored in Pennsylvania.

While it is unquestionable that there is a high public interest in the instant case, Plaintiffs have cited no statutory or case law which stands for the proposition that such an interest creates an increased interest for a party to disseminate pre-trial discovery.

The fact that there is a high public interest in this case more strongly justifies the inclusion of the provision, as the dissemination of pre-trial discovery, which may ultimately not be admissible at trial, is more likely to taint a potential jury pool in a situation where public interest is higher than average, such as the case at bar.

> [T]he public may be "excluded, temporarily or permanently, from court proceedings or the records of court proceedings to protect private as well as public interests...**and to minimize the danger of an unfair trial by adverse publicity**"

*Katz v. Katz*, 356 Pa. Super. 461, 468, 514 A.2d 1374, 1377 (1986)(**emphasis added**)

Further, Private documents collected during discovery are not "judicial records" to which public has presumptive right of access. *See Stenger v. Lehigh Valley Hosp. Ctr.*, 382 Pa. Super. 75, 89, 554 A.2d 954, 960 (1989). And,

> [P]retrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice. Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related, to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.

32

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33, 104 S. Ct. 2199, 2207-08, 81 L. Ed. 2d 17 (1984)(citations omitted).

Both Penn State and NCAA have cited *Seattle Times,* to support their claim that the public does not have a right to pre-trial discovery, and both parties are alleging that Plaintiffs' objection to the provision is Plaintiffs' desire to release said documents for public relations purposes. In their Statement in support of including the above provision, the NCAA has proffered evidence in support of this claim. The Court finds NCAA's argument convincing and holds that Plaintiffs using discovery for this purpose would be an abuse of the discovery process.

Because there is no right for the public to have access to pre-trial documents, the risk to contaminate the potential jury pool is high, and the dissemination of pre-trial documents would be an abuse of the discovery process, the provision at issue shall be included in the protective order.

### Missing Letter in Request No. 3

Discovery Request number three states "Please produce all documents maintained as part of the Client File created by the Freeh Firm pursuant to the engagement letter attached hereto as Exhibit 1." Penn State objects that no "Exhibit 1" was attached to the Subpoena.

This is a procedural defect which was cured in subsequent filings; therefore this objection is moot.

## Order

AND NOW, this ___10___ day of September, 2014, upon consideration of Defendants' Preliminary Objections and Defendant Penn State University's Objections to discovery requests, briefs submitted by all parties involved, and a hearing on the matters, the Objections are SUSTAINED in part and OVERRULED in part, as follows:

1. NCAA's Preliminary Objection based on an Incapacity to Bring Count I of the Amended Complaint is OVERRULED.

2. NCAA's Preliminary Objection based on Impertinent Material and Demurrer to Count I is OVERRULED.

3. NCAA's Preliminary Objection based on Incapacity to Bring Count I and Demurrer to Count I is SUSTAINED with respect to the incapacity of the Estate of Joseph Paterno to bring suit; it is OVERRULED in all other respects.

4. NCAA's Preliminary Objection based on Demurrer to Count II is OVERRULED.

5. NCAA's Preliminary Objection based on Demurrer to Count V is OVERRULED for the Estate of Joseph Paterno, Jay Paterno, Al Clemens, and William Kenney; it is SUSTAINED for all remaining Plaintiffs.

Ryan McCombie, Anthony Lubrano, Adam Taliaferro, Peter Bordi, Terry Engelder, Spencer Niles, John O'Donnell, Anthony Adams, Gerald Cadogan, Shamar

34

Finney, Justin Kurpeikis, Richard Gardner, Josh Gaines, Patrick Mauti, Anwar

Phillips, and Michael Robinson are dismissed from this action.

6. NCAA's Preliminary Objection based on Demurrer to Count IV is OVERRULED.

7. NCAA's Preliminary Objection based on Demurrer to Count III is OVERRULED.

8. NCAA's Preliminary Objection based on Failure of a Pleading to Confirm to Law

   or Rule of Court is OVERRULED on mootness.

9. No decision is made on the NCAA's Preliminary Objection based on Lack of

   Personal Jurisdiction Over Dr. Emmert and Dr. Ray.

10. Penn State's Preliminary Objection based on Insufficient Specificity With Repsect

    To Counts, Plaintiffs, Relief Sought for All Counts and Plaintiffs is SUSTAINED.

    Plaintiffs shall have 30 days from the date of this Opinion and Order to file a

    Second Amended Complaint to cure this deficiency.

11. Penn State's Preliminary Objection based on Lack of Capacity to Sue for Count I

    for Plaintiff George Scott Paterno As Representative Of "The Family Of Joseph

    Paterno" is SUSTAINED.  Plaintiff "George Scott Paterno, As duly appointed

    representative of the Estate and Family of Joseph Paterno; shall be replaced

    with "The Estate of Joseph Paterno".

All filings from this point forward shall be as follows:

ESTATE of JOSEPH PATERNO;

AL CLEMENS, member of the Board of Trustees of Pennsylvania State University; and

WILLIAM KENNEY and JOSEPH V. ("JAY") PATERNO, former football coaches at Pennsylvania State University,

      Plaintiffs,

    v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ("NCAA");

MARK EMMERT, individually and as President of the NCAA; and

EDWARD RAY, individually and as former Chairman of the Executive Committee of the NCAA,

      Defendants,

    and

THE PENNSYLVANIA STATE UNIVERSITY,

      Nominal Defendant.

12. Penn State's Preliminary Objection based on Demurrer – Alleged Intended Third-Party Beneficiary Status for Count I for Plaintiffs Al Clemens, George Scott Paterno As The Representative of the Estate of Joe Paterno, and George Scott Paterno as the Representative of the "Family of Joe Paterno" is SUSTAINED in part and OVERRULED in part.

13. Penn State's Preliminary Objection based on Demurrer For Failure to Allege A Breach of Contract to Count I for plaintiffs The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens is SUSTAINED.

14. Penn State's Preliminary Objection based on Insufficient Specificity Intended Third-Party Beneficiary Status for Count I for Plaintiff The Estate of Joe Paterno, The Family of Joe Paterno, and Al Clemens is SUSTAINED.

15. Penn State's Preliminary Objection based on Demurrer for Failure to Allege Elements of Civil Conspiracy Against Penn State for Count V for All Plaintiffs is SUSTAINED.

16. Penn State's Preliminary Objection based on Failure to Comply With Law or Rule of Court – No Verification to All Counts for All Plaintiffs is OVERRULED for mootness.

17. Penn State's Preliminary Objection based on Failure to Comply With Law or Rule of Court – No Notice To Defend or Plead to All Counts for All Plaintiffs is OVERRULED for mootness.

18. Penn State's Discovery Objection based on Attorney-Client / Work Product / Self-Examination Privileges and Limited Waiver is SUSTAINED for non-source documents between Penn State and Freeh Group International that are not of the same subject matter Penn State disclosed to third parties. The Objection is OVERRULED for all other documents.

19. Penn State's Discovery Objection based on Relevance is SUSTAINED in part and OVERRULED in part. Plaintiffs shall provide a search terms to Penn State to narrow the database of 3.5 million documents to a reasonable number.

20. Penn State's Discovery Objection based on FERPA and CHRIA Protections is SUSTAINED for dates and notations of arrests, indictments, informations or other formal criminal charges and any dispositions arising therefrom that were

37

collected by the Penn State University Police Department. The Objection is OVERRULED for all other documents.

21. Penn State's Discovery Objection based on a current Criminal Investigation is OVERRULED.

22. Penn State's Discovery Objection based on Speculation as to an Opinion is SUSTAINED for Plaintiff's request to provide "all documents that support any conclusion or recommendation for action reached by the NCAA, Emmert, or Ray as a result of the Freeh investigation, including all notes or record of telephone calls, memos, emails, letters, or other forms of communication." The Objection is OVERRULED for all other requests.

23. Penn State's Discovery Objection based on Vague, Overbroad, and Unduly Burdensome is OVERRULED. *See* ¶19.

24. Penn State's Discovery Objection based on Costly, Time Consuming, and Excessively Burdensome is OVERRULED. *See* ¶19.

25. Penn State's Discovery Objection based on Information already in the Public Domain is OVERRULED.

26. Penn State's Discovery Objection based on Invasiveness of Confidentiality Duties is OVERRULED.

27. Penn State's Discovery Objection based on Irrelevant in Time is OVERRULED.

28. Penn State's Discovery Objection based on Overbroad and Irrelevant is OVERRULED.

29. Penn State's Discovery Objection based on The Paterno Family's standing is SUSTAINED. *See* ¶ 11.

30. Penn State's Discovery Objection based on the need for a Protective Order is
SUSTAINED. The Protective Order shall be made with the provision at issue
included.

31. Penn State's Discovery Objection based on a Missing Letter in Request Number 3
is OVERRULED for mootness.

J.

39

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing *Motion to Dismiss Plaintiffs' First Amended Complaint* to be served upon the following:

### ***Via ECF***
Maurice R. Mitts, Esq.
Gerard M. McCabe, Esq.
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0110

### ***Via Electronic Mail***
Edward R. Mazurek, Esq.
717 South Columbus Boulevard
Philadelphia, PA 19147
(215) 998-9090

*/s/ Joseph F. O'Dea, Jr.*_____
Joseph F. O'Dea, Jr.

Dated: January 7, 2015