## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH ("JAY") V. PATERNO, et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| vs. | : | NO. 14-4365 |
| | : | |
| THE PENNSYLVANIA STATE UNIVERSITY, | : | |
| Defendant | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                   **February 25, 2016**

Two former assistant football coaches bring this action against the Pennsylvania State University alleging federal and state law violations in the termination of their employment.  Specifically, they claim: (1) a violation of their civil rights for the deprivation of their liberty and property interests without due process of law pursuant to 42 U.S.C. § 1983; (2) intentional interference with prospective contractual relations; (3) civil conspiracy; (4) a violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1, *et seq.*; and (5) breach of contract.  The defendant has filed a motion to dismiss to which the plaintiffs have responded.  For the following reasons, I will grant the motion to dismiss.

## I. BACKGROUND[1]

### A. The Sandusky Scandal and Penn State's Response

Jay Paterno and William Kenney contend that in mid-January 2012, they were fired by the Pennsylvania State University ("Penn State") in response to the publicity surrounding the conduct of Gerald A. Sandusky, a former assistant football coach at Penn State.  In November 2011, Sandusky was charged with various crimes, including aggravated criminal assault, corruption of minors, unlawful contact with minors, and endangering the welfare of minors.  On June 22, 2012, a jury in Centre County, Pennsylvania found Mr. Sandusky guilty of forty-five of the forty-eight criminal charges filed against him.  He was sentenced to thirty to sixty years in prison.

On November 4, 2011, the Attorney General of Pennsylvania also filed criminal charges against Penn State's Athletic Director and its Senior Vice President of Finance and Business for failing to report allegations of child abuse against Mr. Sandusky to law enforcement or child protection authorities in 2002 and for committing perjury before the grand jury in January 2011.  See Am. Compl., Exhibit F at 13.  Almost a year later, Penn State's former president was charged by a grand jury with obstructing justice, endangering the welfare of children, perjury, and conspiracy.  These three former Penn State officials have yet to go to trial.

---

[1] The facts are gleaned from the amended complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  For the purposes of this motion, they are presented in the light most favorable to the plaintiffs, as the non-moving parties, and are accepted as true with all reasonable inferences drawn in their favor.

On November 9, 2011, the Board of Trustees of Penn State voted to relieve Joe Paterno of his responsibilities as head football coach effective immediately.  See Am. Compl. ¶ 45.  The Board of Trustees stated that Joe Paterno had demonstrated a "failure of leadership" by only fulfilling his legal obligation to inform another Penn State official, Penn State's Athletic Director Tim Curley, about a 2001 incident involving Mr. Sandusky and a minor, and by not going to the police himself.  Id. ¶ 46.

On November 11, 2011, two days after terminating Head Coach Joe Paterno, Penn State's Board of Trustees formed a Special Investigations Task Force, which engaged the firm of Freeh Sporkin & Sullivan, LLP (the "Freeh Firm"), to investigate: (1) the alleged failure of Penn State personnel to respond to and report to the appropriate authorities the sexual abuse of children by Mr. Sandusky, a former football coach, see Am. Compl. ¶ 47; and (2) the circumstances under which such abuse could occur in Penn State facilities or under the auspices of Penn State programs for youth.  See Am. Compl., Exhibit F.  Further, Penn State asked the Freeh Firm to provide recommendations regarding university governance, oversight, and administrative policies and procedures to help Penn State adopt policies and procedures to more effectively prevent or respond to incidents of sexual abuse of minors in the future.  Id. ¶ 48.  The plaintiffs note that Penn State, however, had not engaged the Freeh Firm, and had not granted any authority to the Freeh Firm, to investigate or even consider whether any of the actions under its review constituted violations of the NCAA's rules.

In announcing the investigation, Trustee Kenneth C. Frazier made the following public statement:  "No one is above scrutiny.  [The Freeh Firm] has complete rein to

follow any lead, to look into every corner of the University to get to the bottom of what happened and then to make recommendations that ensure that it never happens again." See Am.Compl., Exhibit F.

On November 17, 2011, Mark A. Emmert, President of the National Collegiate Athletic Association ("NCAA"), sent a letter to Rodney A. Erickson, Penn State's Interim President, expressing concerns over the grand jury presentments that were ongoing with the criminal investigation into the Sandusky scandal.  Mr. Emmert asserted that the NCAA had jurisdiction over the matter and that the NCAA might take an enforcement action against Penn State.  Id. ¶ 50.  Mr. Emmert's letter stated that the "individuals with present or former administrative or coaching responsibilities may have been aware of this behavior;" and "if true, individuals who were in a position to monitor and act upon learning of potential abuses appear to have been acting starkly contrary to the values of higher education, as well as the NCAA."  See Am. Compl., Exhibit B.

The Emmert Letter also indicated that "the NCAA will examine Penn State's exercise of institutional control over its intercollegiate athletic programs, as well as the actions, and inactions, of relevant responsible personnel."  See Am. Compl. ¶ 52.  Mr. Emmert further asserted in his letter that the NCAA's Constitution "contains principles regarding institutional control and responsibility" and "ethical conduct," and that those provisions may justify the NCAA's involvement.[2]  Id. ¶ 56.  He advised Penn State that it would need to "prepare for potential inquiry" by the NCAA.  Id. ¶ 57.

---

[2]  The plaintiffs note that Mr. Emmert's letter failed to identify any specific provision in the NCAA's Constitution or Bylaws that granted the NCAA the authority to become involved in

**B.  The Hiring of a New Head Football Coach**

On January 6, 2012, Penn State announced that it had selected William J. O'Brien as Penn State's new head football coach.  Id. ¶ 62.  The amended complaint states, "[t]hereafter, O'Brien elected not to retain and otherwise released Plaintiffs as assistant football coaches with the Penn State football program."[3]  Id. ¶ 63.  It further alleges that the plaintiffs both had exemplary reputations where they brought considerable distinction and acclaim to Penn State during their respective lengthy years of service.  Id. ¶ 4.  They even allege that there had been a widely-shared belief among professional and collegiate football organizations that, based upon the plaintiffs' reputations and successes as assistant football coaches, they would have been well-sought after and desired prospective coaches, either as head coaches or assistant coaches, had they decided to leave their positions with Penn State.  Id. ¶ 19.  The plaintiffs insist that because of the temporal proximity to the events surrounding the Sandusky scandal in conjunction with Penn State's subsequent execution of a Consent Decree, their termination had the effect of branding and stigmatizing the plaintiffs as participants in the Sandusky scandal and, by so doing, maligned the plaintiffs' stellar reputations by portraying them by implication in false light.  Id. ¶ 69.

---

criminal matters regarding the Sandusky scandal that resided outside of the NCAA's basic purpose and mission.  See Am.Compl. ¶ 55.  They also note that the letter did not identify any NCAA rule that Penn State or any of the individuals being investigated, including the plaintiffs and other coaches and administrators, had allegedly violated as a result of the Sandusky scandal.  See Am. Compl. ¶ 54.

[3]  The plaintiffs do not dispute that every head football coach has the discretionary authority to determine his coaching staff, and could release an assistant coach from his coaching duties.  See Am. Compl. ¶ 65.

In its press release on January 6, 2012 announcing Coach O'Brien's hiring, Penn State indicated that it had been looking "for someone with some very special qualities, beginning with a heart that beats to the values and vision of Penn State University and our Penn State football legacy and tradition," and that Coach O'Brien exemplified those traits.  Coach O'Brien stated,

> "I am thrilled to be the head coach of the Penn State football program.  I cannot tell you how excited I am to get started, meet the team, meet the football alumni and meet all of the people that make this University so special.  As head coach of this special football program, it is my responsibility to ensure that this program represents the highest level of character, respect and integrity in everything we do.  That includes my coaching staff, our players and everyone involved in the football program."

See Am. Compl., Exhibit C.

By mid-February 2012, Coach O'Brien completed the hiring of his assistant football coaches.  Id. ¶ 75.  On February 18, 2012, Penn State issued a press release, quoting the new head coach:

> "With the hiring of Charlie Fisher as quarterbacks coach, we have completed the Penn State football coaching staff," O'Brien stated. "This is a staff made up of men who care about the mission of Penn State University and being successful on and off the field. It is also a staff of winners, with five staff members that have been a part of national championship teams as assistant coaches. This is a staff that has won many games; some while being a part of the same staff, and is a staff comprised of former head coaches, coordinators and tremendous recruiting experience."

See Am. Compl. ¶ 76; see also Am. Compl., Exhibit E.

6

### C.  The Freeh Report and the NCAA Sanctions

On July 12, 2012, the Freeh Firm published its report.  Id. ¶ 82.  The report was not voted on or approved by Penn State's full Board of Trustees.  Id. ¶ 84.  According to the report, in order to avoid the consequences of bad publicity, the most powerful leaders at Penn State repeatedly concealed critical facts relating to Mr. Sandusky's abuse from law enforcement authorities, the University's Board of Trustees, the Penn State community, and the public at large.  Id. ¶ 86.  Within hours of the release of the Freeh Report and before all members of the Board of Trustees even had an opportunity to read the full Report, discuss it, or vote on its contents, certain Penn State officials held a press conference and released a written statement asserting that the Board of Trustees accepted full responsibility for the purported failures outlined in the Freeh Report.

On July 22, 2012, the NCAA prepared a Consent Decree, resulting in the imposition of drastic sanctions against Penn State and its football program, including the imposition of over $60 million in penalties, a four-year post-season play ban, a loss of athletic scholarships, and a vacating of football wins since 1998.  Penn State agreed to and executed the Consent Decree, which adopted the findings of the Freeh Report.  Id. ¶¶ 89, 90.  The amended complaint asserts that

> Penn State collaborated with the NCAA and the Freeh Firm, recklessly disregarding the plaintiffs' procedural due process safeguards by imposing sanctions against Penn State and issuing the Consent Decree in a criminal matter unrelated to recruiting and athletic competition (and thus outside of the NCAA's jurisdiction), and falsely accusing Plaintiffs with malice of enabling and acting with complicity with child sexual abuse.

Id. ¶ 91.

In the Consent Decree, Penn State agreed to "waive[] any claim to further process, including, without limitation, any right to a determination of violations by the NCAA Committee on Infractions, any appeal under NCAA rules, and any judicial process related to the subject matter of the Consent Decree." See Am.Compl., Exhibit A. The plaintiffs claim that these are the NCAA rights to which they were also entitled as third party beneficiaries and involved persons.

In connection with Penn State's waiver of the NCAA Rights, Penn State agreed to and executed the Consent Decree that included the following statement to which the plaintiffs refer to as the "Actionable Statement:" "[s]ome coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him." Id. ¶ 169. The plaintiffs interpret the Actionable Statement to assert that "some coaches" were complicit in child sexual abuse by ignoring the "red flags" of child abuse, representing a factual conclusion based on the findings of the Freeh Report. Id. ¶ 170.

The plaintiffs note that the Consent Decree does not state that the Actionable Statement was an "opinion" of Penn State. Id. ¶ 171. Instead, they characterize it as a seemingly factual and truthful statement offered to the public based on language in the introductory paragraph, which states: "the findings of the Criminal Jury and the Freeh Report establish a factual basis from which the NCAA concludes that Penn State breached the standards …" Id. ¶¶ 172-73. Nevertheless, the plaintiffs insist that Penn

State knew that the Actionable Statement was based on the unreliable and unsubstantiated conclusions made in the Freeh Report, which Penn State knew was unreliable.  Id. ¶ 174.

### D.  The Effect of the Scandal, the NCAA Sanctions, and the Coaching Change on Jay Paterno's Employment

Jay Paterno was on Penn State's football coaching staff for seventeen seasons, twelve as Penn State's quarterbacks coach and five as its tight ends coach and recruiting coordinator.  Id. at ¶¶ 26-27.  Before coaching at Penn State, Mr. Paterno served as a graduate assistant at the University of Virginia from 1991 to 1992, wide receivers and tight ends coach at the University of Connecticut in 1993, and as the quarterbacks coach at James Madison University in 1994.  Id. at ¶ 26-27.

Mr. Paterno contends that before the execution of the Consent Decree, he was a top candidate for open head coaching positions at other comparable institutions.  Id. at ¶ 272.  Mr. Paterno had been approached during his time at Penn State by other universities and search firms exploring his potential interest in head coaching vacancies.  Id. at ¶ 273.

After his termination by Penn State, however, those opportunities seemed to vanish.  Being well-qualified, Mr. Paterno sought other employment either as a head football coach or a media commentator.  Id. at ¶¶ 275-76.  He further attempted to secure an assistant coaching position through his professional relationships, all to no avail.  Id. at ¶ 274.  Mr. Paterno was not granted an interview at any of the several football programs to which he applied, and the coaching positions were given to candidates with less coaching experience.  Id. at ¶¶ 277-80.

Mr. Paterno also inquired about the head coaching position at another Division I school in the mid-Atlantic region, but that university's administration allegedly considered the coaches from Penn State to be "too toxic," given the findings of the Consent Decree.  Id. at ¶ 281.  As a result, that program did not interview any candidates from Penn State.  Id.  The amended complaint also alleges that because of his qualifications and experience, Mr. Paterno would have received job offers from these programs had it not been for the disparaging accusations leveled against him in the Consent Decree.  Id. at ¶ 282.

Mr. Paterno also allegedly engaged in discussions with various media companies, including ESPN, CBS Sports, and Fox Sports, about serving as a college football commentator.  Id. at ¶ 283.  Mr. Paterno had prior dealings with officials at each network, and they were aware of his experience as a columnist for StateCollege.com for nearly three years.  Id. at ¶ 284.  Before the execution of the Consent Decree, ESPN advised Mr. Paterno that it was interested in his services and suggested that it wanted to have him involved in a Spring 2012 telecast and a couple of in-studio college football shows.  Id. at ¶ 285.  These discussions were later discontinued.  Id. at ¶ 286.

The amended complaint alleges that officials at ESPN were uneasy about the Sandusky scandal and the Consent Decree's unsupported finding that Mr. Paterno and other coaches had ignored "the red flags of Sandusky's behaviors" and failed to report Sandusky's crimes.  Id. at ¶ 287.  Further discussions with ESPN about the possibility of Mr. Paterno being a commentator during lower profile college football games for the 2013 season were fruitless.  Id. at ¶¶ 288-89.

During the Spring of 2013, Mr. Paterno had discussions with representatives of CBS Sports and Fox Sports which were also fruitless.  Id. at ¶ 290.  Mr. Paterno's hiring was allegedly considered too controversial, because the networks would have had no choice but to have Mr. Paterno publicly address past events at Penn State and developments arising from the Sandusky Scandal.  Id. at ¶ 291.  Mr. Paterno is not currently employed other than as a freelance sports columnist, consultant, and author.  Id. at ¶ 292.

### E.  The Effect of the Scandal, the NCAA Sanctions, and the Coaching Change on William Kenney's Employment

William Kenney had served as a Division I collegiate football coach for twenty-seven years.  He was well-respected within the profession and was responsible for training and developing many college football players who later played in the National Football League ("NFL").  See Am. Compl. ¶ 259.  Prior to coaching for Penn State, Mr. Kenney served as an offensive backfield coach at Norwich University in 1982, at Dennis-Yarmouth Regional High School from 1983 to 1984, and at Lincoln High School in 1985. He then returned to the college level where, from 1986 to 1988, he served as a graduate assistant at the University of Nebraska.  Mr. Kenney left each of his coaching positions in good standing and with a strong reputation as a successful football coach.  In 1988, Mr. Kenney moved to Penn State, where he was first a graduate assistant football coach and then a year later became a full-time coach.  Mr. Kenney worked the next twenty-three years with Penn State, serving in a variety of coaching positions including offensive line coach, recruiting coordinator, and offensive tackles/tight ends coach.

After his termination by Penn State, Mr. Kenney made a determined effort to secure other employment as a football coach. Id. at ¶ 260. He applied for open coaching positions with several Division I college football programs and in the NFL. Id. at ¶¶ 261-262. Mr. Kenney contends he was exceptionally well-qualified for these positions and would have possibly received job offers from these programs had it not been for the Sandusky scandal. Id. at ¶ 267. Mr. Kenney received a few interviews, but was allegedly questioned about the NCAA's unsupported finding that he and other coaches had ignored "the red flags of Sandusky's behaviors" at Penn State, rather than on his credentials as a football coach. Id. at ¶ 263. Despite interviews or discussions with these potential employers, Mr. Kenney was not offered a position. Mr. Kenney alleges that in most instances, the positions he applied for were given to less experienced and less qualified candidates. Id. at ¶ 264.

During the course of his pursuit for new employment, Mr. Kenney allegedly learned that other college teams and NFL programs did not want to deal with the potential recruiting issues and the adverse public reaction that would likely follow any decision to hire him. Id. at ¶ 265. In fact, some head coaches were allegedly instructed by their colleges to forgo interviewing or hiring any former Penn State coaches. Id. at ¶ 266.

After over a year, Mr. Kenney secured employment as an offensive line coach at Western Michigan University. Id. ¶ 268. He earns significantly less in salary than he did at Penn State and less than he would have earned had he been hired by one of the top Division I programs or NFL teams. Id. ¶ 269. The amended complaint alleges that Mr.

Kenney's professional career suffered an extraordinary set-back and his future opportunities and earning potential have been harmed by Penn State's conduct.  Id. ¶ 270.

## II.  LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Following the Supreme Court decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleadings standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss under Fed. R. Civ. P.12(b)(6).  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009); see also Phillips v. County of Allegheny, 515 F. 3d 224, 230 (3d Cir. 2008).

Therefore, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis.  First, the factual and legal elements of a claim should be separated.  The court must accept all of the complaint's well-pleaded facts as true but may disregard legal conclusions.  Iqbal, 556 U.S. at 679.  Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  Id.  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  Id.; see also Phillips, 515 F.3d at 234-235.  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  Id. at 557.

## III.  DISCUSSION

### A.  Plaintiffs' Section 1983 Civil Rights Claim

Mr. Paterno and Mr. Kenney claim that Penn State's actions caused irreparable damage to their personal and professional reputations.  They assert a civil rights claim against Penn State under 42 U.S.C. § 1983, for violations of the 5th and 14th Amendments to the United States Constitution, as they contend they were deprived of their liberty interests and reputations without due process of law.  They further claim that Penn State injured and maligned them when it executed the Consent Decree in violation of their procedural due process rights.

The timeline of events is very important.  In the fall of 2011, Mr. Sandusky's criminal conduct was discovered, leading to the filing of criminal charges against him

and three Penn State officials.  A Special Investigations Task Force was formed by the Board of Trustees to investigate how this criminal conduct had been able to continue at Penn State and how it was possible that personnel had failed to report it to the authorities. Shortly thereafter, the Board voted to relieve Head Coach Joe Paterno of his coaching responsibilities.  In January 2012, Penn State announced the hiring of William J. O'Brien to replace Mr. Paterno as Head Coach.  Thereafter, Coach O'Brien released the majority of the assistant football coaches, including the plaintiffs.  By February 2012, the newly formed football coaching staff was complete.

A review of these events establishes that the plaintiffs were terminated as part of a new regime for Penn State football.  The plaintiffs themselves understand that this process is typical with the hiring of a new head football coach: "[t]o be certain, Plaintiffs do not complain that O'Brien released them from their coaching responsibilities and do not deny that O'Brien had the right to release them from such responsibilities."  See Am. Compl. ¶ 65.  Thus, the termination of the plaintiffs was a foreseeable result of the hiring of a new head coach.

The plaintiffs were no longer employees of Penn State at the time the Freeh Report and the Consent Decree with its Actionable Statement were published.  Rather, the Freeh Report was completed and the Consent Decree signed long after Paterno and Kenney were fired.  Although their terminations occurred in the midst of a scandal, they were not a byproduct of the Freeh Report or the Consent Decree.  Rather, Mr. Paterno and Mr. Kenney were let go as part of a series of coaching staff decisions by new Head Coach William O'Brien.  These coaching staff personnel changes are normal, typical, and

accepted in the profession whenever a new head coach assumes control of a team.  These reasonable and expected personnel decisions did not rise to the level of the deprivation of the plaintiffs' constitutional rights without due process of law by a state actor.

Plaintiffs' allegation that they had a "property interest" in their continued employment is not supported by the facts or by the law.  Pennsylvania law presumes that all employment is at-will unless the employee is able to prove otherwise by showing with *clarity* and *specificity* that the parties contracted for a definite period.  Permenter v. Crown Cork & Seal Co., Inc., 38 F.Supp.2d 372, 377 (E.D. Pa. 1999) (emphasis added). Here, there are no allegations that the employment of the plaintiffs was anything other than at-will.  There was no special contract requiring that they could only be terminated for cause.  In fact, the plaintiffs do not dispute that every head football coach has the discretionary authority to determine his coaching staff, and could release an assistant coach from his coaching duties for no reason.  See Am.Compl. ¶ 65.  I find that both of the plaintiffs were at-will employees.  An at-will employee has no entitlement to a particular type of notice or opportunity to be heard.  See Dobson v. Northumberland Cnty., 151 F.App'x 166, 168-69 (3d Cir. 2005) (public employee with no protected property interest in his job has no substantive or procedural due process claims). Accordingly, I will grant the defendant's motion to dismiss as to Count I.

In the alternative, even if it could be said that the plaintiffs' constitutional rights were involved, their Section 1983 claim would still fail.  Under 42 U.S.C. § 1983, a private party may recover in an action against any person acting under the color of state

law who deprives the party of his constitutional rights.  Section 1983 provides in

pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia subjects, or causes to be
> subjected, any citizen of the United States or other person
> . . . to the deprivation of any rights, privileges or
> immunities secured by the Constitution and law, shall be
> liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Section 1983 does not by itself confer substantive rights, but instead provides a

remedy for redress when a constitutionally protected right has been violated.  Oklahoma

City v. Tuttle, 471 U.S. 808, 816 (1985).  Therefore, in order to succeed on a claim under

42 U.S.C. § 1983, a plaintiff must demonstrate: (1) the violation of a right secured by the

Constitution, and (2) that the constitutional deprivation was committed by a person acting

under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

Here, there is no dispute that Penn State is a state actor.  The defendant does

dispute, however, whether a constitutional right was involved or violated during the

plaintiffs' termination.  I agree with the defendant that the only cognizable constitutional

interest that the plaintiffs pleaded properly is an alleged interest in their reputation.  An

individual has a protectable interest in reputation.  Wisconsin v. Constantineau, 400 U.S.

433 (1971).  "Where a person's good name, reputation, honor, or integrity is at stake

because of what the government is doing to him, notice and an opportunity to be heard

are essential."  Id. at 437.  Courts have clarified, however, that "reputation alone is not an

interest protected by the Due Process Clause." <u>Versarge v. Township of Clinton, New Jersey</u>, 984 F.2d 1359, 1371 (3d Cir. 1993) (citing <u>Paul v. Davis</u>, 424 U.S. 693, 701-712 (1976)). The Court announced that defamation is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution. <u>Paul</u>, 424 U.S. at 701-12.

Accordingly, to prevail on a claim for deprivation of a liberty interest in one's reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest. <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 236 (3d Cir. 2006). "In the public employment context, the stigma-plus test has been applied to mean that when an employer creates and disseminates a false and defamatory impression about the employee *in connection with* his termination, it deprives the employee of a protected liberty interest." <u>Id.</u> (citing <u>Codd v. Velger</u>, 429 U.S. 624, 628 (1977)) (emphasis added). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" <u>Hill</u>, 455 F.3d. at 236. In order to satisfy the stigma prong of the test, the plaintiff must allege that the stigmatizing statements "(1) were made publicly, and (2) were false." <u>Id.</u>

I am not convinced that there is any evidence that Penn State made stigmatizing statements specifically about the plaintiffs or any other statements about them that were sufficient to satisfy the stigma prong of the "stigma-plus" test. The "Actionable Statement" of the Consent Decree states, "*[s]ome* coaches, administrators and football program staff members ignored the red flags of Sandusky's behavior and no one warned the public about him." <u>See</u> Am.Compl., Exhibit A at 3 (emphasis added). The plaintiffs

18

base much of this action on the Consent Decree's use of the term "some coaches." They argue that because of the limited number of football coaches involved in the program at the time, it would be easily determined that the plaintiffs were members of that group and thus, be tainted as complicit in the child sexual abuse scandal. In fact, the amended complaint makes the following huge leap from actual language of the Actionable Statement to the plaintiffs' own interpretation:

> The effect of the Actionable Statement was that, following the lengthy investigation by the Freeh Firm, both Penn State and the NCAA (as well as the Freeh Firm) had come to the conclusion that ***Plaintiffs, as coaches with the Penn State football program, were involved in child sexual abuse conduct*** and therefore, it is this Actionable Statement that has caused Plaintiffs their injury.

See Am.Compl. ¶ 176 (emphasis added). Thus, the plaintiffs insist, because of this statement, they were substantially certain to be less attractive job candidates. Id. ¶ 180. I disagree.

The difference between what the Actionable Statement actually says and the interpretation the plaintiffs urge the court to accept is more than unreasonable. The force of the term "some coaches" here is lessened because the Consent Decree specifically names other individuals at Penn State who were accused in the Freeh Report of wrongdoing. For example, the Consent Decree states,

> "University President Graham B. ***Spanier***, Senior Vice President – Finance and Business Gary C. ***Shultz***, Athletic Director Timothy M. ***Curley***, and Head Football Coach Joseph V. ***Paterno*** failed to protect against a child sexual predator harming children for over a decade. These men concealed Sandusky's activities from the Board of Trustees, the University community and authorities…"

Id. at 4 (emphasis added).  The Consent Decree also states,

> "By not promptly and fully advising the Board of Trustees about the 1998 and 2001 child sexual abuse allegations against Sandusky and the subsequent Grand Jury investigation of him, *Spanier* failed in his duties as President."

Id. (emphasis added).  Later, the Consent Decree states,

> "[The Freeh Report] found that it was more reasonable to conclude that, in order to avoid the consequences of bad publicity, the most powerful leaders at the University – *Spanier, Schultz, Paterno, and Curley* – repeatedly concealed critical facts relating to Sandusky's child abuse from the authorities, the University's Board of Trustees, the Penn State Community, and the public at large."

Id. (emphasis added).  Finally, the Consent Decree states,

> "*Spanier, Schultz, Paterno, and Curley* allowed Sandusky to retire as a valued member of the University's football legacy, with 'ways to continue to work with young people through Penn State,' essentially granting him license to bring boys to campus facilities for 'grooming' as targets for his assaults.'"

Id. (emphasis added).  The Freeh Report and subsequent Consent Decree went to great lengths to specifically name four individuals who were accused of wrongdoing.  It would be reasonable, then, to expect that the Consent Decree would also specifically name the plaintiffs if Penn State, as a state actor, determined that they were also involved in this scandal.

Nevertheless, even if I were convinced that Penn State had publically made false and stigmatizing statements against the plaintiffs sufficient to satisfy the stigma prong of the stigma-plus test, their claim would still fail because they also cannot satisfy the plus

prong.  Over the years, the Supreme Court has discussed, without specifically deciding, what was required to satisfy the plus prong of the stigma-plus test.  In Paul v. Davis, the Court stated that the "plus" had to be an alteration or extinguishment of "a right or status previously recognized by state law."  424 U.S. at 711.  In Board of Regents v. Roth,[4] the Court suggested that under this standard, a person's loss of employment to which he did not hold a state law-created property interest is a sufficient "plus."  408 U.S. 564, 573 (1972).  In Owen v. Independence, the Eighth Circuit had held that the police chief petitioner "possessed no property interest in continued employment," but that allegedly false accusations that the city made incident to his discharge "had blackened petitioner's name and reputation, thus depriving him of liberty without due process of law."  445 U.S. 622, 631 (1980).  Citing Roth and Paul, the Supreme Court held that it had "no doubt that the Court of Appeals" was correct in this conclusion.  Id. at 633 n.13.  Similarly, in Codd v. Velger, the Court stated that "where a non-tenured employee has been stigmatized in the course of a decision to terminate his employment," he is entitled to a name-clearing hearing.  429 U.S. at 627.

The Third Circuit Court of Appeals has also discussed the requirements necessary to establish the plus prong of the stigma-plus test.  See McKnight v. SEPTA, 583 F.2d 1229, 1235-1242 (3d Cir. 1978) (holding that a complaint stated a "stigma-plus" due

---

[4] In Roth, a non-tenured professor who had not been reappointed after his initial one-year term ended claimed that he had been deprived of a right to continued employment without due process.  The Court denied his claim, finding that the professor, because he was not tenured, did not have a property right to continued employment.  It noted, however, that had the University defamed the professor in the course of declining to rehire him, it would have deprived the professor of a liberty interest.  Id. at 573.

process claim where the plaintiff was defamed in the course of being discharged, though

it was not clear under state law whether he had a property interest in continued

employment).  In Hill, however, the court definitively decided,

> We therefore conclude today that a public employee who
> is defamed in the course of being terminated or
> constructively discharged satisfies the "stigma-plus"
> test even if, as a matter of state law, he lacks a property
> interest in the job he lost.

Hill, 455 F.3d at 238.

Here, whether or not the plaintiffs held a property interest in continued

employment under state law, there was no deprivation following or connected to the

purported stigmatizing statements of the defendant.  Because the plaintiffs had already

been terminated months before those statements, there can be no connection between the

statements and the termination.  In all of the cases discussing the stigma-plus test, a basic

fact pattern exists.  An employer creates and/or disseminates a false and defamatory

impression about the plaintiff in connection with the plaintiff's termination.  The

employers' actions have come first and the employees' terminations have followed either

immediately or shortly thereafter.  Here, the plaintiffs were terminated during a change in

the regime of a university's football program, and not in connection with or subsequent to

any alleged stigmatizing statements by the defendant.  The plaintiffs' reputations may

have been negatively impacted by statements made by the defendant months after their

terminations.  Reputation alone, however, apart from some more tangible interests such

as employment, does not implicate any "liberty" or "property" interests sufficient to

invoke the procedural protection of the Due Process Clause.  Paul, 424 U.S. at 701.

Thus, I find that the plaintiffs have failed to state a claim for the deprivation of their liberty interest in their reputations without the process due under the U.S. Constitution.

### B.  Civil Conspiracy

The amended complaint alleges that Penn State, along with other alleged conspirators, acted intentionally to abrogate and deny the plaintiffs their liberty interests and did so with knowledge, intent, and malice toward the plaintiffs by executing the Consent Decree and issuing the Actionable Statement.  See Am. Compl. ¶¶ 175, 177.  It further contends that Mr. Emmert, an alleged co-conspirator but not a state actor, magnified the negative impact of the Actionable Statement during his press conference on July 23, 2012, when he indicated that the NCAA may yet "impose sanctions as needed on individuals involved in this case."  Id. ¶ 181.  Mr. Emmert stated,

> Well again, we expressly have, in these sanctions and findings, withheld judgment on individuals, and will continue to do so until all of the criminal investigations have concluded, and until then we won't have any comment on individuals.

Id. ¶ 210.  The plaintiffs characterize Mr. Emmert's statement as the result of a collaboratively designed effort by Penn State and the NCAA to have a unified public message.  Id. ¶ 191.  As further proof, the plaintiffs cite the following statement of Donald Remy, the NCAA's Chief Legal Officer, made to Gene Marsh, Penn State's negotiator with the NCAA:

> the statements made by President Emmert were designed to assist Penn State with the story it was publicly communicating at the time.

Id. ¶ 194.

In Count III, the amended complaint alleges that "there was an understanding and/or agreement between Penn State and the NCAA that Penn State would bypass the due process procedures which Plaintiffs were entitled to."  See Am.Compl. ¶ 333.  It also contends that,

> the Conspirators'[5] concerted actions were unlawful or taken for an unlawful purpose in order to deprive Plaintiffs of their procedural and due process rights, and, by false accusation that Plaintiffs enabled and caused child sexual abuse to occur and remain unreported, were malicious and intended to injure, or were at least in reckless disregard of substantially certain injury to Plaintiffs' property interest in their good name, reputation, honor and integrity, as well as Plaintiffs' NCAA Rights and Penn State Rights.

Id. at ¶ 336.  Because the plaintiffs claim that the purpose of the alleged conspiracy was to deprive them of their procedural and due process rights, I will construe Count III as a claim for conspiracy under Section 1983, rather than a state law claim for civil conspiracy.[6]

---

[5] The plaintiffs refer to "Penn State, Emmert, the NCAA, other unknown NCAA employees, along with the Freeh Firm, and others" as the "Conspirators."  See Am. Compl. ¶ 334.

[6] I note that "[t]he standard for civil conspiracy under Pennsylvania law" sets "a higher bar than under Section 1983" because in addition to proving the existence of an agreement, a plaintiff must also prove malice.  Banks v. Gallagher, 686 F. Supp. 2d 499, 528 (M.D. Pa. 2009) (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)).  The elements of a state law claim for civil conspiracy in Pennsylvania are: (1) an agreement between two or more persons; (2) to do an illegal act or to do a legal act by unlawful means; and (3) malice. Skipworth by Williams v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997).  In order to proceed with a civil conspiracy action, however, the plaintiffs also must have a valid cause of action for a particular act which the defendants conspired to commit.  See McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660 (Pa. Super. 2000).  Because that is not the case here, the plaintiffs' claim for civil conspiracy also would fail if it were construed as a state law claim.

"In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federal protected right." Ashton v. City of Uniontown, 459 F.App'x 185, 190 (3d Cir. 2012) (quoting Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999)); see also Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)) (In order to demonstrate a Section 1983 conspiracy, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of state law).

Here, because I have concluded that the object of the conspiracy claim must be dismissed, the alleged conspiracy claim itself must be dismissed. The amended complaint does not establish a claim for the deprivation of a liberty interest in reputation. Thus, one element of a conspiracy cause of action has not been satisfied, i.e., the deprivation of a federal protected right. See Ashton, 459 F.App'x at 190-191. I will grant the motion to dismiss Count III.

### C. Remaining State Law Claims

The plaintiffs also have brought several state law claims against Penn State, including intentional interference with prospective contractual relations, a violation of Pennsylvania's Wage Payment and Collection Law, and breach of contract. Having dismissed the plaintiffs' federal claims, I decline to exercise supplemental jurisdiction over these remaining state law claims. See 28 U.S.C. § 1367(c)(3) (stating that a federal district court may decline to exercise supplemental jurisdiction over state law claims

25

when the district court has dismissed all claims over which it has original jurisdiction).

Accordingly, I will dismiss those claims without prejudice.

An appropriate Order follows.